No. 25-1428

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————————

WOONASQUATUCKET RIVER WATERSHED COUNCIL; EASTERN
RHODE ISLAND CONSERVATION DISTRICT; GREEN INFRASTRUCTURE
CENTER; NATIONAL COUNCIL OF NONPROFITS; CHILDHOOD LEAD
ACTION PROJECT; CODMAN SQUARE NEIGHBORHOOD
DEVELOPMENT CORPORATION,
                                        Plaintiffs-Appellees,

*(caption continued on inside cover)*

————————

On Appeal from the United States District Court
for the District of Rhode Island

————————

## BRIEF FOR APPELLANTS

————————

BRETT A. SHUMATE
  *Assistant Attorney General*

SARA MIRON BLOOM
  *Acting United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*

v.

U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in their official capacity as Secretary of Agriculture; U.S. DEPARTMENT OF ENERGY; CHRIS WRIGHT, in their official capacity as Secretary of Energy; U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in their official capacity as Secretary of the Interior; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in their official capacity as Administrator of the Environmental Protection Agency; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in their official capacity as Director of the Office of Management and Budget; KEVIN HASSETT, in their official capacity as Director of the National Economic Council; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in their official capacity as Secretary of Housing and Urban Development, Defendants-Appellants.

_____

# TABLE OF CONTENTS

**Page**

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION ...............................................................3

STATEMENT OF THE ISSUE......................................................................3

STATEMENT OF THE CASE.........................................................................4

      A.    Legal and Factual Background........................................................4

      B.    Related Litigation and Prior Proceedings......................................6

SUMMARY OF ARGUMENT.....................................................................11

STANDARD OF REVIEW ...........................................................................15

ARGUMENT .................................................................................................15

I.     Plaintiffs Are Unlikely to Succeed on the Merits of Their Challenges to the OMB Memorandum.........................................................................15

      A.    The District Court Misconstrued the OMB Memorandum.....................15

      B.    Plaintiffs' Challenges to the OMB Memorandum Fail on the Merits .................................................................................................18

II.    The Preliminary Injunction Must Be Vacated Because It Covers a Vast Array of Agency Decisions that Are Not Properly Enjoined..............................23

      A.    The Broad Injunction Was Procedurally Improper ...................................23

            1.    The District Court's Broad-Brush Approach Was Fundamentally Flawed.........................................................23

            2.    Plaintiffs Improperly Split Their Claims into Two Different Lawsuits .........................................................28

     B.     The Broad Injunction Is Substantively Flawed ...........................................31

          1.     Numerous Covered Grant Programs Allow Funding Pauses .......32

          2.     Funding Decisions Are Frequently Committed to Agency Discretion by Law ...............................................................................36

          3.     The District Court Lacks the Power to Order Direct Monetary Payments ...........................................................................40

III.    The Remaining Preliminary Injunction Factors Counsel Against Relief ........... 44

IV.    At a Minimum, Relief Must Be Limited to the Identified Parties ....................... 47

CONCLUSION ................................................................................................................ 53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) ............................................................ 41

*American Freedom Def. Initiative v. Massachusetts Bay Transp. Auth.*,
781 F.3d 571 (1st Cir. 2015) ............................................................ 15

*American Sci. & Eng'g, Inc. v. Califano*,
571 F.2d 58 (1st Cir. 1978) .............................................................. 41

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*,
794 F.3d 168 (1st Cir. 2015) ............................................................ 26

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ............................................................. 52

*Bennett v. New Jersey*,
470 U.S. 632 (1985) ........................................................................ 42

*Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021) .................................................. 41, 44

*Bondi v. VanDerStok*,
145 S. Ct. 857 (2025) ................................................................ 26, 27

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .................................................................. 43, 44

*Building & Constr. Trades Dep't v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ..................................................... 20, 21

*California v. U.S. Dep't of Educ.*,
132 F.4th 92 (1st Cir. 2025) ............................................................. 42

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021) ........................................................ 43

*Community Action of Laramie Cnty., Inc. v. Bowen*,
866 F.2d 347 (10th Cir. 1989) .......................................................... 38

*Curtis v. Citibank, N.A.*,
226 F.3d 133 (2d Cir. 2000) ............................................................. 30

*Dennis Melancon, Inc. v. City of New Orleans,*
    703 F.3d 262 (5th Cir. 2012) ........................... 47

*Department of Educ. v. California,*
    145 S. Ct. 966 (2025) (per curiam) ........................... 40, 42, 44, 46

*Diaz v. Johnson,*
    No. 19-1501, 2020 WL 9437887 (1st Cir. Nov. 12, 2020) ........................... 41

*Doe v. Trustees of Bos. Coll.,*
    942 F.3d 527 (1st Cir. 2019) ........................... 15, 44

*Federal Commc'ns Comm'n v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ........................... 22

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ........................... 20

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
    129 F.3d 826 (5th Cir. 1997) ........................... 51

*Kale v. Combined Ins. Co. of Am.,*
    924 F.2d 1161 (1st Cir. 1991) ........................... 28, 30

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ........................... 32, 33, 37, 38, 40

*Lujan v. National Wildlife Fed'n,*
    497 U.S. 871 (1990) ........................... 24, 25

*Massachusetts Sch. of L. at Andover, Inc. v. American Bar Ass'n,*
    142 F.3d 26 (1st Cir. 1998) ........................... 30

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ........................... 41

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) ........................... 41

*Milk Train, Inc. v. Veneman,*
    310 F.3d 747 (D.C. Cir. 2002) ........................... 37

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1867) ........................... 45

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ..................................................................... 27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ...................................................................... 35

*National Council of Nonprofits v. OMB*,
775 F. Supp. 3d 100 (D.D.C. 2025) .................................. 6, 28, 29

*New York v. Trump*,
769 F. Supp. 3d 119 (D.R.I. 2025) ......................................... 7, 29

*Nken v. Holder*,
556 U.S. 418 (2009) ..................................................................... 45

*Norton v. Southern Utah Wilderness All.*,
542 U.S. 55 (2004) ...................................................................... 24

*OfficeMax, Inc. v. Levesque*,
658 F.3d 94 (1st Cir. 2011) ................................................... 15, 44

*Policy & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
313 F. Supp. 3d 62 (D.D.C. 2018) .............................................. 38

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ..................................................................... 18

*Sierra Club v. Costle*,
657 F.2d 298 (D.C. Cir. 1981) ..................................................... 19

*Sprague Elec. Co. v. Tax Court*,
340 F.2d 947 (1st Cir. 1965) ........................................................41

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) (per curiam) ................................... 49

*Trump v. American Fed'n of Gov't Emps.*,
No. 24A1174, 2025 WL 1873449 (U.S. July 8, 2025) ................. 21

*Trump v. CASA, Inc.*,
145 S. Ct. 2540 (2025) ................................................... 48, 49, 52

*Union of Concerned Scientists v. Wheeler*,
954 F.3d 11 (1st Cir. 2020) .......................................................... 36

*United States v. Salerno,*
    481 U.S. 739 (1987) ................................................................ 26

*Village of Bald Head Island v. U.S. Army Corps of Eng'rs,*
    714 F.3d 186 (4th Cir. 2013) .......................................... 24, 25

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .................................................................. 15

*Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n,*
    758 F.2d 669 (D.C. Cir. 1985) (per curiam) ...................... 47

**Statutes:**

Administrative Procedure Act (APA):
    5 U.S.C. § 701(a)(2) ............................................................ 36
    5 U.S.C. § 702 ........................................................ 41, 43, 44
    5 U.S.C. § 702(1) .................................................................. 50
    5 U.S.C. § 704 ...................................................................... 43
    5 U.S.C. § 705 ...................................................................... 50
    5 U.S.C. § 706(2) .................................................................. 49

Pub. L. No. 117-58, 135 Stat. 429 (2021) ...............................39

Pub. L. No. 117-169, 136 Stat. 1818 (2022) ...........................33

16 U.S.C. § 2105(c) ................................................................ 33

28 U.S.C. § 1292(a)(1) .............................................................. 3

28 U.S.C. § 1331 ....................................................................... 3

28 U.S.C. § 1491(a)(1) ............................................................ 41

31 U.S.C. § 501 ...................................................................... 19

31 U.S.C. § 503(a)(2) .............................................................. 19

42 U.S.C. § 6866 .................................................................... 39

42 U.S.C. § 7434(a)(1) ............................................................ 38

42 U.S.C. § 7437(a)(1) ........................................................ 5, 38

42 U.S.C. § 7437(a)(2) ............................................................. 5, 38

42 U.S.C. § 7437(c)(1) ............................................................. 5, 38

42 U.S.C. § 7437(c)(3) ............................................................. 5, 39

**Regulatory Materials:**

2 C.F.R. § 200.340(a)(4) ................................................... 19, 34, 36

10 C.F.R. § 440.23(e) ........................................................... 39

Exec. Order No. 14,154,
   90 Fed. Reg. 8353 (Jan. 29, 2025) ........................... 4, 5, 16, 20, 31

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ....................................................... 3

Fed. R. Civ. P. 23 ................................................................. 52

Fed. R. Civ. P. 65(c) ............................................................. 46

Fed. R. Civ. P. 65(d)(1)(C) ..................................................... 46

**Legislative Materials:**

An Act to Provide for Reconciliation,
   H.R. 1, 119th Cong. tit. VI (2025) (enacted).......................... 6, 47

H.R. Rep. No. 79-1980 (1946).................................................50

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The district court entered a preliminary injunction that interferes with multiple agency defendants' ability to ensure that federal funding is properly aligned with the President's policy priorities. The government respectfully requests that the Court hold oral argument. Argument will aid the Court in resolving the important issues presented by this appeal.

**INTRODUCTION**

This case stems from an Executive Order that articulated the President's energy policy and directed agencies to temporarily pause the disbursement of certain federal funds—where legally permitted—to give the Executive Branch time to assess whether those funds are being spent in ways that accord with the President's policy priorities. Plaintiffs allege that an Office of Management and Budget (OMB) Memorandum clarifying the limited scope of that direction, as well as various agencies' asserted follow-on "categorical" funding freezes, are unlawful. In advancing those broad-brush arguments, plaintiffs do not contend that every possible implementation of the Executive Order or pause in funding would be unlawful. To the contrary, plaintiffs have effectively conceded that, in many circumstances, agencies have broad authority to temporarily pause the obligation and disbursement of federal funds. Nor have plaintiffs made any meaningful attempt to isolate the specific funding decisions with which they disagree or to analyze whether the relevant statutes, regulations, and grant terms allow or forbid those decisions.

Nonetheless, the district court granted a preliminary injunction that mirrored the breadth of plaintiffs' claims, broadly prohibiting agencies from implementing the OMB Memorandum or any non-individualized pauses in funding appropriated under certain statutes. In determining that plaintiffs were entitled to that relief, the district court primarily relied on its belief that the Memorandum amounted to a command to agencies to execute a categorical funding freeze.

That decision was erroneous on all levels. At the outset, the district court fundamentally misunderstood the OMB Memorandum, which did not itself direct any pause in funding. Instead, the Memorandum did nothing more than clarify the limited scope of the President's Executive Order. With that proper understanding, plaintiffs cannot succeed on their claims against the Memorandum. Both the Memorandum and the underlying Executive Order were routine and permissible exercises of the President's and OMB's power to instruct the President's subordinates in the Executive Branch on how to carry out discretionary authorities.

The district court compounded the problem by enjoining not just the OMB Memorandum but also a vast range of funding decisions across multiple agencies. That injunction was procedurally improper. The court did not even attempt to justify its sweeping injunction with the necessary analysis of the relevant statutes, regulations, and grant terms, instead waving away those governing legal regimes as irrelevant. And the court acted at the behest of plaintiffs who already brought a separate challenge to the government's asserted funding freezes and—after obtaining more limited relief in that suit—attempted to get a second bite at the apple in a different court.

The injunction was also substantively unjustified. There are indisputably many circumstances where agencies may lawfully pause federal funding—and, indeed, agencies' decisions regarding such funding are often committed to agency discretion by law. But the district court failed to grapple with the authorities permitting such

2

pauses in specific contexts. As a result, its categorical injunction prohibits a broad swath of lawful conduct.

That intrusion on the President's Article II authority to direct his subordinates and to ensure that federal funding programs are aligned, where legally permitted, with his policy priorities is bad enough. But the intrusion is made worse in this case by the injunction's vague and sweeping terms, which chill legitimate agency activity. And those errors are compounded by the district court's improper entry of universal relief, even though such relief is not necessary to remedy plaintiffs' asserted harms.

## STATEMENT OF JURISDICTION

In this action brought under the Administrative Procedure Act (APA), plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. A72. The district court granted plaintiffs' motion for a preliminary injunction on April 15, 2025. A1-63. The government filed a timely notice of appeal on April 30, 2025. A195; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

The issue presented is whether the district court erred in entering a universal preliminary injunction broadly prohibiting the agency defendants from pausing certain federal funding in accordance with an Executive Order.

# STATEMENT OF THE CASE

## A.    Legal and Factual Background

In the days after his inauguration, the President issued several Executive Orders setting forth Administration priorities and instructing agencies to pause funding where legally permissible to allow time to review whether that funding aligns with those priorities. Most relevant here, Executive Order No. 14,154, titled *Unleashing American Energy*, declares that "the policy of the United States" is to encourage certain "energy exploration and production," guarantee the accessibility of "an abundant supply of reliable energy," and ensure that no federal funding is "employed in a manner contrary to the principles outlined in this section, unless required by law." Exec. Order No. 14,154, § 2(a), (c), (i), 90 Fed. Reg. 8353, 8353-54 (Jan. 29, 2025).

The American Energy Executive Order implicates funding under two federal statutes—the Inflation Reduction Act (IRA) and the Infrastructure Investment and Jobs Act (IIJA). Those statutes appropriate large "sums of money for an array of initiatives" and programs "administered by various agencies." A6-7 (quotation omitted). Although the specific statutory frameworks vary, many provisions set forth high-level program goals with an associated appropriation and leave the agency to determine how to allocate the appropriated funds among potential recipients to best carry out the program's goals. For example, one statutory provision appropriated a lump sum of $5 billion for the Environmental Protection Agency (EPA) to "competitively award grants to eligible entities to implement plans" to reduce

greenhouse-gas air pollution. 42 U.S.C. § 7437(a)(1)-(2), (c)(1). Funds would be made available to grantees "in such amounts, upon such a schedule, and subject to such conditions" as the EPA determines. *Id.* § 7437(c)(3).

The American Energy Executive Order instructs agencies to "immediately pause the disbursement of funds" under the IRA and IIJA to assess "consistency with the law and the policy outlined in" the Executive Order. Exec. Order No. 14,154, § 7(a), 90 Fed. Reg. at 8357. Agencies would conduct a review of "their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds" and, within 90 days, prepare a report "including recommendations to enhance their alignment with the policy set forth in" the Executive Order. *Id.* The Executive Order directs that implementation must be done "in a manner consistent with applicable law." *Id.* § 10(b), 90 Fed. Reg. at 8359.

OMB, together with the Director of the National Economic Council, issued a memorandum regarding the American Energy Executive Order. That Memorandum indicated that the pause "only applies to funds supporting programs, projects, or activities that may be implicated by the policy established" in the Executive Order. A101; *see also id.* (explaining that the only funds subject to the pause are the "appropriations for objectives that contravene the policies established in" the Executive Order). The Memorandum also stated that "[a]gency heads may disburse funds as they deem necessary after consulting with [OMB]." *Id.*

Congress has recently rescinded all unobligated funds previously made available for several of the grant programs under the IRA and IIJA. *See* An Act to Provide for Reconciliation, H.R. 1, 119th Cong. tit. VI (2025) (enacted). For example, with respect to the greenhouse-gas grant program described above, Congress provided that "[t]he unobligated balances of amounts made available to carry out [the relevant statutory provision] are rescinded." *Id.* § 60013.

**B.    Related Litigation and Prior Proceedings**

1.  This case is related to two other cases challenging the Executive's funding decisions. The first case was brought in the District of Columbia by multiple organizations—including one of the plaintiffs in this case, the National Council of Nonprofits—on behalf of themselves and their members. *See National Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 108, 112 (D.D.C. 2025). The plaintiffs sought a preliminary injunction against another OMB memorandum that instructed agencies to temporarily pause disbursement of federal funds that implicated the President's Executive Orders, including the American Energy Executive Order. *See id.* at 108-09. Although that memorandum was rescinded, the district court enjoined the government defendants from "implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in [the OMB memorandum] with respect to the disbursement of Federal funds under all open awards." *Id.* at 130. The government's appeal of that preliminary injunction is

pending in the D.C. Circuit. *See National Council of Nonprofits v. OMB*, No. 25-5148 (D.C. Cir.) (opening brief due September 5, 2025).

The second case was brought in the District of Rhode Island by several States, the District of Columbia, and the Governor of Kentucky, and involves similar allegations. *See New York v. Trump*, 769 F. Supp. 3d 119, 130 (D.R.I. 2025). The plaintiffs challenge what they characterize as "a pause on federal funding" effectuated by the same now-rescinded OMB memorandum and several Executive Orders, including the American Energy Executive Order. *Id.* at 134. Like the district court in *National Council of Nonprofits*, the district court in *New York* granted a preliminary injunction barring the government defendants from "reissuing, adopting, implementing, giving effect to, or reinstating under a different name the directives in [the OMB memorandum]" with respect to the plaintiffs. *Id.* at 146. The preliminary injunction also went further to prohibit "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds" to the plaintiffs "based on" the OMB memorandum or the President's Executive Orders. *Id.* at 146-47. This Court denied a stay pending appeal, the government's appeal of that preliminary injunction and a later order enforcing the preliminary injunction were consolidated, and briefing is underway. *See New York v. Trump*, Nos. 25-1236, 25-1413 (1st Cir.) (reply brief due August 22, 2025).

2. Plaintiffs in this case are six organizations that overlap substantially with the plaintiffs in *National Council of Nonprofits*. The National Council of Nonprofits is a

plaintiff here and also the lead plaintiff in *National Council of Nonprofits*. At least two other plaintiffs here—Woonasquatucket River Watershed Council and Green Infrastructure Center, Inc.—are members of the National Council of Nonprofits. *See* A127; A133.

In this APA action filed in the District of Rhode Island, plaintiffs allege that they receive, or that their members receive, federal funds appropriated under the IRA and IIJA. *See* A87-92. They claim that, in light of OMB's guidance, the other five agency defendants "have broadly frozen funding appropriated under the IRA and IIJA." A78.

The district court granted plaintiffs' request for a preliminary injunction, relying on the district courts' reasoning in *National Council of Nonprofits* and *New York* as well as this Court's decision denying a stay pending appeal in *New York*. *See, e.g.*, A24-25; A27-28; A35; A37; A42; A51-52. The court acknowledged that this case "implicate[s] a breadth of statutory schemes and regulations," A16, because plaintiffs seek to "challeng[e] many different actions by numerous different agencies all at once," A25 (quotation omitted). The court nonetheless characterized this lawsuit not as an "improper programmatic attack," but rather as a challenge to various agency decisions "to withhold already-awarded funds appropriated by Congress under two laws, the IIJA and the IRA, based on compliance with a directive from OMB." A25-26.

The district court also rejected other threshold problems with plaintiffs' lawsuit and their request for preliminary injunctive relief. The court deemed it appropriate

for the National Council of Nonprofits and some of its members to bring this case simultaneously with the *National Council of Nonprofits* case in the District of Columbia, even though the cases involve overlapping legal issues about decisions related to federal grant funding. *See* A19-22. And the court disclaimed that it was enforcing a contractual obligation to pay money when it ordered the government to resume payments and disburse funds pursuant to the grants. *See* A28-35.

On the merits, the district court declared that the "funding freezes" allegedly carried out by the agency defendants were unlawful. A41. The court stated that the funding freezes were arbitrary and capricious because the agencies had "failed to provide a rational reason that the need to safeguard valuable taxpayer resources justifies a sweeping pause of all already-awarded IIJA and IRA funds with such short notice." A42 (quotation omitted). The court recognized that "there is nothing inherently arbitrary and capricious about an agency conducting a review of its spending under the IIJA and the IRA." *Id.* (quotation omitted). However, the court concluded that the agencies had not sufficiently "considered the consequences" or adequately articulated "a rational connection between the facts, the agency's rationale, and the ultimate decision." A44 (quotation omitted).

The district court further held that OMB likely lacked statutory authority to issue guidance regarding the pause contemplated by the American Energy Executive Order. The court explained that the applicable statutes grant OMB authority to "provid[e] overall direction and establish[] financial management policies." A48. In

the court's view, by issuing a memorandum that clarified the scope of the President's Executive Order, OMB had strayed beyond its "mainly supervisory" role to a role that is too "directly active." A49.

The district court also determined that there was "no clear statutory hook" for the agencies' decisions to pause funding, A48, though the court did not dispute that "the greater power to administer the funds includes some lesser power to pause individual grants," A46. The court observed that "the exact statutory analysis is difficult to pin down" because plaintiffs' case "implicate[s] a breadth of statutory schemes and regulations." A16. The court did not undertake any analysis of the statutes or regulations governing any grant program. The court concluded that it could address the challenged funding freezes "in the abstract" without any need to "evaluate the specifics of each withholding to determine its lawfulness." A48 (quotation omitted).

As to the equities, the district court concluded that the suspension of certain funding streams would "make it more difficult for [plaintiffs] to accomplish their primary missions" and would harm their "standing in the communities that they serve." A52-53 (alteration and quotation omitted). The court also asserted that "[t]he pause placed critical climate, housing, and infrastructure projects in serious jeopardy." A55. On the other side of the balance, the court believed that Executive Branch agencies and officials would not be "harmed" by an order "requir[ing] them to disburse funds that Congress has appropriated and that [the] [a]gencies have already

awarded" because an "agency is not harmed by an order prohibiting it from violating the law." A56.

The district court entered a preliminary injunction. The injunction prohibits defendants from "implementing, giving effect to, or reinstating under a different name the directive in [the OMB Memorandum] to unilaterally freeze awarded funding appropriated under the [IRA] or the [IIJA]." A62. Under the injunction, defendants must not "freez[e], halt[], or paus[e] on a non-individualized basis the processing and payment of [already-awarded IRA and IIJA] funding" and must "take immediate steps to resume the processing, disbursement, and payment of [such] funding . . . and to release awarded funds previously withheld or rendered inaccessible." A61. The court concluded that a universal injunction was appropriate in this APA action to protect "[n]onparties in exactly the same circumstances" as plaintiffs. A59.

The government appealed and sought to hold this appeal in abeyance pending this Court's resolution of the related appeals in *New York*. Plaintiffs opposed, and this Court denied the government's motion. This Court's order indicated that "[t]o the extent necessary and appropriate, the ultimate merits panel(s) will coordinate resolution of relevant appeals." *See* Order (June 16, 2025).

## SUMMARY OF ARGUMENT

I. Plaintiffs are unlikely to succeed on their challenges to the OMB Memorandum, and the district court's contrary conclusion rested on a fundamental misunderstanding of the Memorandum.

11

In the district court's view, the OMB Memorandum "mandat[ed]" that agencies pause funding, A25, and "unilaterally pull[ed] the plug on nearly all federal monetary flows under the IIJA and the IRA," A49. But that characterization is impossible to square with the text of the Memorandum, which does not direct any pause. Instead, it is the President's Executive Order—which the district court correctly recognized that plaintiffs may not challenge—that directs a pause of funding, where legally permissible, pending a review of that funding to assess consistency with the President's priorities. The Memorandum simply clarifies the limited scope of that direction, making clear that it applies only to IRA and IIJA funds that may be inconsistent with the President's priorities and that agencies may continue to disburse funds where necessary after consulting with OMB.

That proper understanding of the OMB Memorandum undermines plaintiffs' challenges to the Memorandum. The Memorandum and underlying Executive Order reflected a proper exercise of the President's and OMB's authority to issue guidance to the Executive Branch directing agency officials. The plain language of the Executive Order restricted that guidance to circumstances where pausing funding would comport with applicable law. And the Memorandum reasonably clarified the limits of the Executive Order's direction.

II. Making matters worse, the district court not only enjoined implementation of the OMB Memorandum but also enjoined a host of other agency funding decisions. That was improper.

The district court's broad injunction was procedurally improper. The court should have rejected plaintiffs' attempt to levy a programmatic attack on federal spending decisions across an assortment of agencies. Instead, the court exacerbated the problem by discussing the legal issues in the abstract and by expressly declining to analyze the lawfulness of any individual funding decision in the context of the governing legal framework. The district court's endorsement of plaintiffs' broad-brush approach is especially objectionable because it disregards that plaintiffs are simultaneously pursuing another challenge involving the same subject matter in another court where they secured more limited relief.

Moreover, by extending across the breadth of agency decisions related to awarded IRA and IIJA funding, the district court's injunction improperly prohibits substantial lawful conduct and exceeds the court's power. In many circumstances, federal agencies have broad discretion to pause IRA and IIJA funding—and many of the Executive Branch's decisions in this area are committed to agency discretion by law. Examples of such discretionary funding programs abound among the grants received by plaintiffs. In enjoining the agency defendants from pausing funding across these programs, the district court failed to consider, much less grapple with, the statutes providing this discretionary authority.

In addition, the district court specifically ordered the government to resume payments and disburse funds pursuant to the grants. As the Supreme Court has recently made clear, district courts lack jurisdiction under the APA to enforce

contractual obligations for the government to pay money.  Instead, plaintiffs must pursue those claims and that relief in the Court of Federal Claims.

III.  The equities also counsel against the district court's preliminary injunction. The injunction substantially harms the government's and the public's interests by interfering with the President's Article II authority to direct his subordinates.  And the injunction impermissibly contains vague instructions that threaten to chill agencies from taking legally permissible actions to ensure that funding is aligned with the President's policy priorities.  By contrast, plaintiffs' asserted harms are relatively minimal.  Not only do plaintiffs have no cognizable interest in receiving funds to which they are not entitled, but plaintiffs may also pursue in an appropriate forum any claim to recover specific funds that they believe have been unlawfully withheld.

IV.  At the least, the district court's universal injunction must be vacated as overbroad.  The Supreme Court has recently made clear that the equitable powers of the federal courts are limited to providing relief to the parties in a particular case. Here, that limitation requires confining any injunction to the specific funding streams in which plaintiffs or their identified members have an interest.  In nonetheless entering a much more sweeping injunction, the district court reasoned that it would be unfair to allow nonparties to remain subject to the government's assertedly unlawful actions.  That reasoning has been directly repudiated by the Supreme Court and provides no basis for sustaining the injunction here.

**STANDARD OF REVIEW**

This Court reviews the district court's decision to grant a preliminary injunction for abuse of discretion. *OfficeMax, Inc. v. Levesque*, 658 F.3d 94, 97 (1st Cir. 2011). Where the district court's analysis is premised on an error of law, the court "has abused its discretion and [this Court is] required to vacate the injunction." *Doe v. Trustees of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019).

**ARGUMENT**

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Here, plaintiffs have not established "a strong likelihood that they will ultimately prevail on the merits." *American Freedom Def. Initiative v. Massachusetts Bay Transp. Auth.*, 781 F.3d 571, 578 (1st Cir. 2015) (quotation omitted). Nor have they shown irreparable injury to justify an injunction that inflicts outsized harm on the government and the public. *See Winter*, 555 U.S. at 24. The district court erred in concluding that plaintiffs satisfied the requirements for interim injunctive relief and in granting relief that extends beyond the parties.

**I.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Challenges to the OMB Memorandum**

**A.    The District Court Misconstrued the OMB Memorandum**

Much of the district court's analysis on both threshold and merits questions stems from a fundamental misunderstanding of the OMB Memorandum. The court

also conflated a review of the Memorandum itself with a generalized assessment of the actions of a set of federal agencies.

1. The OMB Memorandum was simply internal guidance to agencies regarding the scope and import of the President's direction to temporarily pause certain federal funding—if agencies could lawfully do so—while the Executive Branch reviewed that funding for consistency with the President's priorities. Shortly after taking office, President Trump issued an Executive Order that declared the country's energy policy and directed agencies to "immediately pause the disbursement of funds" under two statutes—the IRA and IIJA—to assess "consistency with the law and the policy" declared in the Executive Order. Exec. Order No. 14,154, § 7(a), 90 Fed. Reg. at 8357. The American Energy Executive Order also made clear that all implementation of the pause and the Order's other directives should be done "in a manner consistent with applicable law." *Id.* § 10(b), 90 Fed. Reg. at 8359.

OMB then issued its memorandum to clarify the funding-related directions in the Executive Order. The OMB Memorandum made clear that the pause directed by the Executive Order did not apply to all funds appropriated under the IRA and IIJA but instead applied only "to funds supporting programs, projects, or activities that may be implicated by the policy established" in the Executive Order. A101. To underscore the point, the Memorandum reiterated that the Executive Order's pause reached only funds for "objectives that contravene the policies established in" the Executive Order. *Id.* In addition to emphasizing the limited scope of the Executive

Order, the Memorandum also made clear that agencies were free to "disburse funds as they deem necessary after consulting with [OMB]." *Id.*

In short, the OMB Memorandum does not itself direct any agency to pause any funding. Instead, the Memorandum provides guidance to agencies about how to interpret and implement the Executive Order, making clear its relatively limited scope and reminding agencies that they may disburse funds where necessary. By its terms, the Memorandum did not instruct agencies to take any actions that were not already compelled by the Executive Order, and in fact its primary effect was to provide a narrow construction of the Executive Order.

2. The crux of the district court's analysis was to interpret the OMB Memorandum in a matter irreconcilable with its plain text. In the court's view, the Memorandum "mandat[ed] a pause," A25, reflected an exercise of "affirmative control" over funding, and "unilaterally pull[ed] the plug on nearly all federal monetary flows under the IIJA and the IRA," A49.

That fundamentally erroneous understanding permeated the district court's analysis. In allowing the suit to proceed, the court characterized it not as an "improper programmatic attack" on innumerable individual funding decisions but instead as a challenge to decisions to withhold funds "based on compliance with a directive from OMB." A25-26. On the merits, the court disclaimed any need to "evaluate the specifics" of each agency funding decision on the ground that defendants had directed a pause of funding "in the abstract." A48 (quotation

omitted).  Moreover, the court held that OMB lacked statutory authority to issue the Memorandum because dictating a pause was too "directly active" a role for OMB to take.  A49.  And the court stated that the agencies' actions were arbitrary and capricious because they did not adequately justify such "a sweeping pause."  A42.  The court did not even attempt to reconcile these characterizations with the OMB Memorandum's text.  As discussed below, these misunderstandings caused the court to issue an erroneous injunction for several mutually reinforcing reasons.

## B.    Plaintiffs' Challenges to the OMB Memorandum Fail on the Merits

Plaintiffs' challenges to the OMB Memorandum are unavailing because the Memorandum is plainly lawful.  Properly understood, the Memorandum constituted the routine exercise of OMB's authority to provide guidance to agencies on implementing the President's fiscal policy directives.

There should be no dispute that the President may issue policy guidance to federal agencies, including in the form of Executive Orders and memoranda that direct agency officials.  *See generally Seila Law LLC v. CFPB*, 591 U.S. 197, 203-04 (2020) (discussing how the President exercises his executive power by relying on subordinate officers subject to his direction).  The President may properly exercise this authority by instructing agencies generally to pause or terminate federal funding that does not accord with the President's policy priorities, to the extent agencies have authority to do so under governing law.  Federal agencies often have broad discretion

to determine how to implement funding programs, including to terminate funding based on policy preferences. *See, e.g.*, 2 C.F.R. § 200.340(a)(4) (authorizing terminations "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities"); *see also infra* pp. 32-40. Because agencies often can terminate funding awards for policy-based reasons, so too may the President "control and supervise" agencies' decisions in this area. *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981).

There should also be no dispute that OMB—an office within the Executive Office of the President, 31 U.S.C. § 501—is entitled to issue guidance regarding implementation of the President's funding directives. As the district court correctly recognized, *see* A48, OMB is statutorily authorized to provide "overall direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements," 31 U.S.C. § 503(a)(2). Thus, to the extent that statutory authority is required to issue internal-facing guidance, OMB is clearly authorized to issue guidance regarding the management of budgetary matters.

Here, the President issued an Executive Order that directed federal agencies to pause federal funding programs that may not accord with the President's energy policy, as articulated in the Executive Order, where such action is consistent with applicable law. And the OMB Memorandum provided clarification to agencies that were required to implement the Executive Order's directive regarding the scope and limitations of that directive. Both the Executive Order's direction and the

Memorandum's guidance are plainly lawful, and the district court identified no meaningful defect. Rather, the court emphasized its view that the Memorandum reflected an instruction to "halt all funding arising from the IIJA and IRA, full-stop, on a moment's notice." A48-50. For the reasons already explained, that view wholly misunderstands the Memorandum, which contained no instruction to halt any—much less all—IRA and IIJA funding and instead clarified the limited scope of the Executive Order's directions.

Nor could any claim on similar grounds against the Executive Order—the actual source of the direction to pause certain funding—succeed. As plaintiffs and the district court seem to understand, *see* A26, the Executive Order is not itself challengeable under the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) (explaining that the President is not an "agency" whose actions are subject to APA review). And even if it were, the Executive Order explicitly accounted for the possibility that the relevant statutes might require disbursement of some funds by making clear that agencies had to implement the directed pause "in a manner consistent with applicable law." Exec. Order No. 14,154, § 10(b), 90 Fed. Reg. at 8359. Thus, if an "agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

Any argument that a particular agency acted inconsistent with governing law could be raised as a separate claim against that agency, but it cannot be shoehorned

into a challenge to an Executive Order that directs agencies to conform to governing law—let alone a challenge to the OMB Memorandum, which directs no pause at all. The "possibility that some agency might make a legally suspect decision" with regard to funding "does not justify an injunction against enforcement of a policy" that may be properly implemented in many circumstances. *Allbaugh*, 295 F.3d at 33.

Indeed, in relevantly similar circumstances, the Supreme Court recently granted a stay of a preliminary injunction entered against implementation of an Executive Order and a joint OMB and Office of Personnel Management memorandum directing agencies to develop certain reorganization plans. Although the Supreme Court "express[ed] no view on the legality of" any specific reorganization plans, which were "not before th[e] Court," the Court concluded that "the Executive Order and Memorandum" were likely "lawful." *Trump v. American Fed'n of Gov't Emps.*, No. 24A1174, 2025 WL 1873449, at *1 (U.S. July 8, 2025). In her concurrence, Justice Sotomayor further explained that "the relevant Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law'" and that the memorandum "reiterates as much." *Id.* (Sotomayor, J., concurring in the grant of stay). Given those constraints incorporated into the Executive Order and the memorandum, the claims against those actions failed. The same result holds here.

The district court was also incorrect to the extent that it intended to suggest that the OMB Memorandum was arbitrary and capricious as either unreasonably explained or as failing to take account of reliance interests. *See* A43-44. The

arbitrary-and-capricious "standard requires that agency action be reasonable and reasonably explained." *Federal Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.*

The OMB Memorandum itself did not direct any pause in funding; instead, in the context of the pause directed by the Executive Order, the Memorandum reasonably clarified the Order's instructions and reiterated that agencies could continue to disburse funding as necessary after consulting with OMB. That Memorandum thus advanced, rather than impaired, any reliance interests that plaintiffs may have had by making clear the limited scope of the Order's directions.

Nor were the agencies' high-level decisions to implement the Executive Order's directions arbitrary and capricious, to the extent that plaintiffs' programmatic challenges to those decisions are cognizable, *but see infra* pp. 23-27. The rationale for the Executive Order's directions was plain: the Executive Order articulated the new Administration's energy policy; substantial funds were being disbursed every day; and the contemplated pause was necessary to minimize the expenditure of funds inconsistent with the Administration's policy priorities while the Administration reviewed funding. At the same time, the Executive Order—and the OMB Memorandum—took steps to ameliorate any negative effects, including for funding recipients who had reasonable reliance interests in continued disbursement (as, for example, where such disbursement was required by law). Thus, the Executive Order

and the Memorandum made clear that the directive was limited to funds that were

potentially being spent in ways contrary to Administration priorities and allowed

agencies to continue to disburse funds as required by law. That calibrated approach—

particularly in the context of a temporary pause designed to ensure that funding is

consistent with the President's priorities—readily satisfied the APA's standard.

## II. The Preliminary Injunction Must Be Vacated Because It Covers a Vast Array of Agency Decisions that Are Not Properly Enjoined

The district court thus had no basis for enjoining the OMB Memorandum. To

make matters worse, the district court's order provides universal relief and extends to

a wide swath of agency decisions that go well beyond the Memorandum without

performing any analysis of applicable statutes, regulations, or contractual terms that

govern the litany of grant programs and funding agreements encompassed by the

injunction. Those parts of the order were also procedurally and substantively flawed.

### A. The Broad Injunction Was Procedurally Improper

#### 1. The District Court's Broad-Brush Approach Was Fundamentally Flawed

Plaintiffs' challenge stretches to cover "huge sums of money" appropriated

under the IRA and IIJA for "a wide variety of" projects, initiatives, and programs that

are "administered by various agencies." A6-7 (quotation omitted). However,

plaintiffs treat an amalgam of agency funding decisions made under a number of

statutory and regulatory schemes as a single undifferentiated action. Despite the

breadth and depth of plaintiffs' requested remedy, the district court did not require

23

them to make a stronger showing that an injunction would reach only unlawful conduct. Instead, the court accepted the characterization that plaintiffs challenge an amorphous "funding freeze," declared the freeze in the abstract to be likely unlawful, and entered universal preliminary injunctive relief. That approach was improper several times over. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (explaining that the APA does not permit plaintiffs to "seek wholesale improvement" of agency management "by court decree," even in the face of allegations of "rampant" violations (emphasis omitted)).

Plaintiffs' claims—which are untethered to any concrete agency action that is properly before the Court—constitute a thinly veiled programmatic attack on federal spending across many federal agencies. Rather than urging that any particular decision was unlawful, plaintiffs attacked—and the district court enjoined—a category of actions that allegedly reflect an unlawful program. The Supreme Court has squarely rejected that approach. Even if the district court had identified some overarching obligation, courts are not "empowered to enter general orders compelling compliance with broad statutory mandates." *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 66 (2004). Otherwise, it would "become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management." *Id.* at 66-67; *see Village of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir.

2013) (noting that the APA does not allow judicial review of general conduct like "operating a program" or "performing a contract").

What plaintiffs label as "broad freezes," A85, are, in reality, many individual decisions by several agencies across a wide array of programs, each governed by its own statutes. Attempting to amalgamate those countless decisions into a single, challengeable object is exactly the sort of programmatic attack that the Supreme Court rebuffed in *Norton*. Although the district court sought to salvage the challenge by reference to a hodgepodge of memos and emails from the agency defendants describing the need to conduct a review of existing grants, *see* A10, plaintiffs themselves characterize those documents as a "handful of examples" that serve as "evidence of a much wider freeze," A85. Furthermore, allowing a targeted challenge to a regulation that "appl[ies] some particular measure across the board to all individual" decisions across a program is different in kind than "permitting a generic challenge to all aspects of" the various decisions that allegedly make up the federal funding freeze. *Lujan*, 497 U.S. at 890 n.2. As to the latter, the legality of any particular decision may depend on specific features of the applicable statutes, regulations, or grant terms—but the district court declined to engage in this "case-by-case approach" that "is the traditional, and remains the normal, mode of operation of the courts." *Id.* at 894.

The district court thus entirely failed to perform the analysis necessary to issue its sweeping preliminary injunction. The court recognized that plaintiffs' case

"implicate[s] a breadth of statutory schemes and regulations." A16. Yet the court did not even purport to identify a statute or regulation that foreclosed the agencies from pausing any federal funds—much less all of them—pending an assessment for consistency with the President's priorities. Rather, the court disavowed any need to "evaluate the specifics of each withholding to determine its lawfulness." A48. That view is irreconcilable with the fundamental principle that courts may only enjoin conduct that they have determined to be unlawful (or, in the case of a preliminary injunction, likely unlawful). *See Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 173 (1st Cir. 2015) (upholding portions of preliminary injunction where plaintiff was likely to succeed but vacating portions where plaintiff was not likely to succeed). This case exhibits the untenable consequences of the court's approach. As detailed more fully below, *see infra* pp. 32-40, the resulting preliminary injunction wrongly prohibits permissible agency decisions.

The Supreme Court's decision in *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025), underscores the fundamental errors in the district court's approach. The plaintiffs in that case sought to invalidate a regulation on the ground that the agency lacked authority "to regulate *any* weapon parts kits or unfinished frames or receivers." *Id.* at 865. For such a facial challenge to succeed, the plaintiffs would have needed to show that "the [regulation] itself is inconsistent with the statute on its face," not that the regulation "may be invalid as applied in some cases." *Id.* (quotation omitted); *cf. United States v. Salerno*, 481 U.S. 739, 745 (1987) (explaining that a facial challenge

requires establishing that "no set of circumstances exists under which the [action] would be valid"). The Court accordingly upheld the regulation against the plaintiffs' challenge by considering a handful of examples and concluding that "at least some weapon parts kits" fall within the statute. *VanDerStok*, 145 S. Ct. at 869.

Plaintiffs similarly seek to invalidate agency pauses of federal grant funding in their entirety, completely divorced from the context of any specific grant program or funding instrument, but make no attempt to show that every implementation of the Executive Order or pause in funding would be unlawful. The district court followed this same course, declaring that the agency defendants had acted unlawfully without pinpointing any specific violation. *Cf.* A16 (noting that "the exact statutory analysis is difficult to pin down"). Even if the court were convinced that certain agency decisions were unlawful, that conclusion still would not justify the broad injunction here that sweeps in conduct that is not properly enjoined. Rather than proceeding in a blunderbuss fashion, plaintiffs and the district court were obligated to examine the particulars. *Cf. Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024) (vacating appellate decisions where the courts and the parties had not adequately "address[ed] the full range of activities the [challenged] laws cover" to determine whether a preliminary injunction was warranted on a facial challenge).

## 2. Plaintiffs Improperly Split Their Claims into Two Different Lawsuits

The sprawling nature of this lawsuit is even more objectionable because it overlaps with a separate action involving the same subject matter that plaintiffs are simultaneously pursuing in another court. This Court has condemned this vexatious practice of claim splitting—where a litigant spreads related claims into multiple, successive cases—and instead demands that a litigant "assert all his various legal theories and factually related allegations the first time he brings suit." *Kale v. Combined Ins. Co. of Am.*, 924 F.2d 1161, 1166 (1st Cir. 1991) (quotation omitted). Plaintiffs cannot maintain two different lawsuits in two different courts that assert the same injury stemming from interrelated executive actions to pause federal funds.

The National Council of Nonprofits is the lead plaintiff represented by the same counsel in an ongoing action in the District of Columbia challenging an alleged "nationwide funding freeze" effectuated by a now-rescinded OMB memorandum and the American Energy Executive Order, along with other Executive Orders. *National Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 109, 126 (D.D.C. 2025). In that case, the National Council of Nonprofits sought relief on behalf of its members, *see id.* at 112, 114, which include at least two plaintiffs in this case—Woonasquatucket River Watershed Council and Green Infrastructure Center, Inc., *see* A127; A133. In *National Council of Nonprofits*, the district court granted a preliminary injunction prohibiting the government defendants from implementing or reimposing "the unilateral, non-

individualized directives in [the OMB memorandum] with respect to the disbursement of Federal funds under all open awards." 775 F. Supp. 3d at 130.

Plaintiffs did not institute this separate lawsuit until the District Court for the District of Rhode Island addressed a similar challenge by a group of States to the same OMB memorandum and the underlying Executive Orders and issued a broader injunction. *See New York v. Trump*, 769 F. Supp. 3d 119, 141 (D.R.I. 2025). One week after that injunction, plaintiffs filed this lawsuit in the District of Rhode Island and deemed *New York* a related case. *See* A64 (listing district court docket number 25-cv-39). The resemblance between this case and *National Council of Nonprofits* is striking. *National Council of Nonprofits* involves at least three of the six plaintiffs here represented by the same counsel. Both cases allege that plaintiffs were harmed by the withholding of federal grant funds pursuant to a categorical freeze directed by OMB that was without statutory authority and that was arbitrary and capricious. *Compare* A68 (alleging that OMB directed agencies to implement "broad, non-individualized freezes of [federal] funds"), *with* Complaint at 15, *National Council of Nonprofits v. OMB*, No. 25-cv-239 (D.D.C. Jan. 28, 2025), Dkt. No. 1 (alleging that OMB directed agencies to implement "an immediate, across-the-board freeze on federal grant programs"). Given these undeniable similarities, it should come as no surprise that the district court's analysis in this case drew on *National Council of Nonprofits* and *New York* for virtually every legal issue that the court addressed. *See* A18-19; A24-25; A27-28; A35; A37; A42; A44; A51-52.

The district court recognized that "some overlap occurs" because identical "legal issues appear in both cases." A22. The court nonetheless resisted the application of the claim-splitting doctrine on the ground that plaintiffs here focus on a different OMB memorandum than the one at issue in *National Council of Nonprofits*. *See id.* But the mere existence of two OMB memoranda does not justify dividing legal claims into two separate actions. Where the allegations involve interconnected executive actions that arose close "in time" with the same "motivation" and the same asserted effects on the same plaintiffs, and where plaintiffs assert that the challenged actions are unlawful for the same basic reasons, the facts are naturally described as "a single transaction or series of related transactions" that "form a convenient trial unit." *Massachusetts Sch. of L. at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26, 38 (1st Cir. 1998) (quotation omitted). In other words, the common plaintiffs were not permitted to hold back "legal theories and factually related allegations" from their first case that seeks "redress for essentially the same basic wrong." *Kale*, 924 F.2d at 1166 (quotation omitted). This subsequent action, filed shortly after the district court in a related funding case granted sweeping injunctive relief, is precisely the sort of costly and duplicative "concurrent litigation over the same subject matter" that the doctrine of claim splitting protects against. *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000) (quotation omitted).

This case neatly illustrates the rationale for that basic legal principle. In both cases, plaintiffs' complaint, at bottom, is that there was a funding freeze. Plaintiffs

cannot manufacture a genuinely new case simply by identifying a different OMB memorandum that ostensibly provides the basis for that funding freeze, particularly where the new memorandum does not actually dictate the actions they challenge.

Moreover, the distinction between the two memoranda is not as stark as the district court believed. Each memorandum recites the American Energy Executive Order, which instructs agencies to pause the disbursement of IRA and IIJA funds—to the extent consistent with applicable law—to ensure consistency with the President's energy policy. Exec. Order No. 14,154, §§ 7(a), 10(b), 90 Fed. Reg. at 8357, 8359. It is of no moment that the OMB memorandum in *National Council of Nonprofits* encompassed a broader universe of federal funds than those at issue here.

## B.     The Broad Injunction Is Substantively Flawed

Plaintiffs' claims sweeping in various agency funding decisions under heterogenous statutory schemes in any event suffer multiple flaws on the merits. The injunction bars agencies from pausing funds in situations where it is lawful to do so. It interferes with funding decisions that are committed to agency discretion and not judicially reviewable. And it requires agencies to release funds even when the district court has no power to order that relief. These fundamental issues plague the court's injunction, and there is no principled way to fashion a narrower injunction on the present record. Because plaintiffs have failed to demonstrate their entitlement to the preliminary injunction before this Court, the injunction must be reversed.

### 1. Numerous Covered Grant Programs Allow Funding Pauses

The IRA and IIJA appropriate money for a whole host of grant programs, *see* A6-7, and it is commonplace for those programs to provide ample room for the administering agency to pause funding. Despite acknowledging the "breadth of statutory schemes and regulations" at issue, A16, the district court did not attempt to ascertain defendants' legal authority to pause funding that "was appropriated under the [IRA] or the [IIJA]" and that "has already been awarded" across the various covered programs, A61. It was improper for the court to enjoin a whole swath of conduct without any showing that the Executive Branch's actions were unlawful.

In the absence of specific congressional direction, the Executive Branch has broad discretion to determine how best to allocate grant funding. In *Lincoln v. Vigil*, for example, the agency "discontinued the direct clinical services to Indian children in the Southwest," even though Congress was aware of those services and had previously directed a pilot program for such services. 508 U.S. 182, 186-88 (1993). Because "the appropriations Acts for the relevant period [did] not so much as mention the Program," and the organic statutes spoke "about Indian health only in general terms," there was no "legally binding obligation[]" to continue the services. *Id.* at 193-94. Although certain grant programs may "circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes," the lack of such

directives leaves agencies free to "allocate[] funds . . . to meet permissible statutory objectives." *Id.* at 193.

Here, as to the programs that plaintiffs identified in district court, the relevant statutory language provides the agency significant leeway over how to achieve program purposes.  For example, plaintiffs mentioned the Urban and Community Forestry Assistance Program for which plaintiffs Woonasquatucket River Watershed Council and Green Infrastructure Center, Inc. were awarded funding.  *See* A83. Under the statute, the Department of Agriculture "is authorized to provide financial, technical, and related assistance to State foresters or equivalent State officials for the purpose of encouraging States to provide information and technical assistance to units of local government and others that will encourage cooperative efforts to plan urban forestry programs."  16 U.S.C. § 2105(c).  And in the IRA, Congress appropriated certain funds "to provide multiyear, programmatic, competitive grants" for such programs.  Pub. L. No. 117-169, § 23003(a)(2), 136 Stat. 1818, 2026 (2022).[1]  Nothing

---

[1] Other statutory provisions similarly set forth broad goals without dictating that the agency provide the funds to any particular recipient or to the precise activities in which plaintiffs wish to engage. *See, e.g.*, Pub. L. No. 117-169, § 30002(a)(1), 136 Stat. at 2027 (making funds available for loans "to fund projects that improve energy or water efficiency, enhance indoor air quality or sustainability, implement the use of zero-emission electricity generation, low-emission building materials or processes, energy storage, or building electrification strategies, or address climate resilience, of an eligible property"); *id.* § 21001(a)(4)(B)(ii), 136 Stat. at 2016-17 (providing that the agency "shall prioritize" certain agreements "that support the implementation of conservation projects that assist agricultural producers and nonindustrial private forestland owners in directly improving soil carbon, reducing nitrogen losses, or

*Continued on next page.*

in that language suggests that the agency must refrain from pausing funding to determine whether to redirect that funding to a different recipient or objective.

Consistent with the flexibility afforded to the agencies to choose how to divvy up appropriated funds to best advance broad statutory goals, federal grant agreements typically allow agencies to terminate when "an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The district court did not suggest that agencies may not impose such a termination condition. The power to terminate funding under a grant agreement based on a change in agency priorities necessarily includes the power to pause funding under a grant agreement to make that termination decision, at least where, as here, plaintiffs identify no legal requirement that funding be provided on a particular timetable. In other words, the authority to pause and redirect funding inheres in the governing statutes and appropriations laws that instruct the agencies to administer the grant programs in a manner that accomplishes broad objectives but otherwise leave the agencies with discretion over how to allocate the funding.

The district court appeared to accept that premise, acknowledging that "[i]t is probably true that . . . the greater power to administer the funds includes some lesser power to pause individual grants." A46. The court nonetheless concluded that "there is no clear statutory hook" for the agencies to freeze funding "in an across-the-board

---

reducing, capturing, avoiding, or sequestering carbon dioxide, methane, or nitrous oxide emissions, associated with agricultural production").

34

manner." A48 (quotation omitted). As explained above, it was wrong for the court to consider a collection of decisions as one unitary action. Regardless, it is difficult to see how, if an agency possesses statutory authority to take an action, the agency somehow loses statutory authority to take that same action if it does so on a larger scale. The court erred in curbing agencies' ability to suspend funding in programs they administer to evaluate whether that funding is being put to the best use.

The district court's arbitrary-and-capricious inquiry was likewise defective. Given the finite resources available in any grant program, it is plainly rational to pause funding pending a further determination whether to continue that funding or redirect it elsewhere. The district court admitted that "there is nothing inherently arbitrary and capricious about an agency conducting a review of its spending under the IIJA and the IRA." A42 (quotation omitted). The court disregarded the government's justification about "the need to safeguard valuable taxpayer resources" only by (again improperly) considering a panoply of agency funding decisions as an undifferentiated unit. *Id.* (quotation omitted). Even if it were appropriate to lump various agency decisions together, the court's analysis reduces to its own personal views that the extent and timing of the ostensible freeze were unwarranted. *See* A42-43. But arbitrary-and-capricious review does not allow a court "to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, the agencies' actions directly relate to the articulated explanation of saving taxpayer dollars and accomplishing the President's expressed goals.

The district court also opined that the agencies insufficiently considered grantees' reliance interests. *See* A44. However, the court failed to appreciate that the validity of any claim to reasonable reliance interests depends on the circumstances. As noted above, many grant contracts authorize termination on various grounds, including if "an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Grantees can hardly claim unfair surprise when a new Administration takes steps to evaluate whether existing grants serve new agency priorities. Similarly, the district court identified no legal requirement, in the terms of a grant or otherwise, that payments need to be made on a particular timetable. The court's misguided approach—which examined issues in the abstract detached from necessary factual and legal context—led the court to enjoin swaths of lawful conduct.

### 2. Funding Decisions Are Frequently Committed to Agency Discretion by Law

The district court's preliminary injunction also operates to dictate certain decisions on funding even when those decisions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Such discretionary actions fall outside the APA and are not subject to judicial review. *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020). The district court exceeded the bounds of the APA by ordering agencies to exercise or refrain from exercising their unreviewable discretion in a particular manner.

The Supreme Court has expressly held that an agency decision to discontinue a previously funded program and reallocate those funds to other uses is committed to agency discretion by law. *Lincoln*, 508 U.S. at 185-88. The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion" because the point of such appropriations "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. In making this allocation, the agency must engage in "a complicated balancing of a number of factors" within "its expertise," including "whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* at 193 (quotation omitted). As long the agency abides by the relevant statutes and by any self-imposed obligations that may arise from regulations or grant instruments, federal law "gives the courts no leave to intrude." *Id.*

Although the Supreme Court in *Lincoln* addressed lump-sum appropriations, its logic extends beyond lump-sum appropriations to other funding programs that permit the agency to decide "how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Those decisions—like decisions regarding how best to allocate lump-sum appropriations across programs—"clearly require[] a complicated balancing

of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted); *see also Policy & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018); *cf. Community Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget." (quotation omitted)). The district court contrived a distinction between "appropriated but not-yet-awarded funds" and "already awarded" funds, A38, but an agency has discretion to reallocate funds just as the agency has discretion to consider the proper allocation in the first instance.

Many of the grant programs at issue here fall under that rubric. For example, the IRA appropriates a lump sum of $7 billion for the EPA "to make grants, on a competitive basis," to "States, municipalities, Tribal governments, and eligible recipients" as part of a program called Solar for All. 42 U.S.C. § 7434(a)(1). Grants under that program are designed "to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies," including rooftop solar panels, "and to carry out other greenhouse gas emission reduction activities, as determined appropriate by the [EPA] Administrator." *Id.* The IRA similarly appropriates a lump sum of $5 billion for EPA to "competitively award grants to eligible entities to implement plans" to reduce greenhouse-gas air pollution. *Id.* § 7437(a)(1)-(2), (c)(1). Under that program, funds are to be made available to

grantees "in such amounts, upon such a schedule, and subject to such conditions" as the agency determines. *Id.* § 7437(c)(3). In assigning the agency the responsibility to decide what is "appropriate" to "carry out" a grant program and to set the terms of conditions for grants within a program, these statutory provisions leave the agency to choose how best to distribute the funds.

Similarly, plaintiffs invoke the Weatherization Assistance Program administered by the Secretary of Energy. A84. With respect to the member of plaintiff National Council of Nonprofits that "provide[s] training and technical assistance to community action staff," A171, the Secretary of Energy has discretion over whether to fund those activities at all. *See* 42 U.S.C. § 6866 ("The Secretary may provide technical assistance to any such project . . . utilizing in any fiscal year not to exceed up to 20 percent of the sums appropriated for such year under this part."); *see also* 10 C.F.R. § 440.23(e) ("The Secretary may reserve from the funds appropriated for any fiscal year an amount not to exceed 20 percent to provide, directly or indirectly, training and technical assistance to any grantee or subgrantee."). The IIJA does not constrain that discretion: it appropriates a lump sum "to remain available until expended" for the whole Weatherization Assistance Program but nowhere requires the agency to fund such training activities or to do so on a particular timeframe. *See* Pub. L. No. 117-58, § 40551, 135 Stat. 429, 1075 (2021).

The district court's preliminary injunction applies across the entire range of IRA and IIJA programs without accounting for any differences between applicable

statutory provisions, regulations, or agreements.  The injunction's prohibitions subvert the agency defendants' ability to consider the optimal distribution of funding to achieve statutory goals "in what [the agency] sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192.  The APA does not allow for judicial review of those discretionary judgments that implicate agency expertise about allocating limited resources and advancing policy priorities.  *See id.* at 193 (noting that funding decisions involve "a complicated balancing of a number of factors" (quotation omitted)).  The district court overstepped its role in enjoining funding decisions within broad statutory mandates that do not limit an agency's bases for decisionmaking.

### 3.    The District Court Lacks the Power to Order Direct Monetary Payments

The preliminary injunction further encompasses contractual disputes over which the district court lacks jurisdiction.  The court specifically ordered the agency defendants to "take immediate steps to resume the processing, disbursement, and payment of already-awarded [IRA and IIJA] funding . . . and to release awarded funds previously withheld or rendered inaccessible."  A61.  The court "lacked jurisdiction to order [such] payment of money under the APA."  *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam).

Although the APA provides a limited waiver of the federal government's sovereign immunity for claims seeking non-monetary relief, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids

the relief which is sought." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). One such statute is the Tucker Act, which provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act "impliedly forbids" bringing "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). This prohibition extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

As this Court has long recognized, a plaintiff thus may not maintain an APA suit where "the essence of the action is in contract"—and a plaintiff "cannot 'by the mystique of a different form of complaint' make it otherwise." *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (quoting *Sprague Elec. Co. v. Tax Court*, 340 F.2d 947, 948 (1st Cir. 1965)). Other courts of appeals, in determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act, have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *accord Diaz v. Johnson*, No. 19-1501, 2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020) (declining to allow litigant to

"manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act" where the alleged injury was "pecuniary in nature" and the litigant sought "monetary relief based on what he perceived as a contract").

The Supreme Court recently stayed another district court order to make payments based on certain grant agreements, concluding that the government was likely to succeed in showing that the Tucker Act grants the Court of Federal Claims jurisdiction over suits "based on any express or implied contract with the United States." *California*, 145 S. Ct. at 968 (quotation omitted). There, a number of States challenged the Department of Education's termination of various education-related grants, the district court temporarily enjoined the terminations, and this Court denied a motion to stay that injunction. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). The Supreme Court granted the government's request for relief, reaffirming that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quotation omitted).

That reasoning applies with full force here. As in *California*, plaintiffs here in part seek "to enforce a contractual obligation to pay money." 145 S. Ct. at 968 (quotation omitted). The source of plaintiffs' purported rights to payment are the grant agreements, which bear the hallmarks of a contract. *See Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (noting that many "federal grant programs" are "much in the

42

nature of a contract" (quotation omitted)); *see also Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) (describing cases "treating federal grant agreements as contracts when the standard conditions for a contract are satisfied"). Plaintiffs sought and obtained a judicial order compelling continued payment of funds under grants. *See* A61 (ordering the agency defendants "to resume the processing, disbursement, and payment of already-awarded funding" and "to release awarded funds previously withheld or rendered inaccessible").

The district court sought to distinguish *California* on the ground that here the court did not review "specific terms and conditions in the grant agreements." A31. But the relevant point is that the dispute sounds in contract because the agreements themselves create the asserted right to payment in the first instance and any obligation to continue making prompt payments would have to come from the grant terms. The district court's reliance on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), was similarly misplaced. *See* A31-35. *Bowen* did not involve a contract claim at all, let alone the APA provision in 5 U.S.C. § 702 precluding claims that are impliedly forbidden by another statute. Instead, *Bowen* involved two separate provisions: (1) the provision of 5 U.S.C. § 702 precluding APA claims for "money damages," and (2) the provision of 5 U.S.C. § 704 precluding APA claims where there is another "adequate remedy in a court" for an agency action. *Bowen* held that a State's APA claim that certain services qualified for reimbursement under the Medicaid program was not a claim for "money damages," 487 U.S. at 891-901, and that a Tucker Act suit premised on an ostensibly

43

money-mandating statute was not an alternative "adequate remedy," *id.* at 901-08. Nothing in *Bowen* addresses the separate bar in 5 U.S.C. § 702 on suits "expressly or impliedly forbid[den]" by other statutes. Far from "implicitly overrul[ing]" *Bowen*, A34 (quotation omitted), the Supreme Court in *California* reconciled *Bowen* with its conclusion that grant-termination suits are disguised breach-of-contract claims that likely belong in the Court of Federal Claims, 145 S. Ct. at 968.

In short, plaintiffs contend that the agency defendants are bound under grant agreements with plaintiffs "to pay out past-due grant obligations and to continue paying obligations as they accrue." *California*, 145 S. Ct. at 968. The proper recourse for any asserted contractual violations is a "suit in the Claims Court for damages relating to [the] alleged breach," not a suit in district court under the APA. *Boaz Hous. Auth.*, 994 F.3d at 1368. That portions of the district court's preliminary injunction reach these sorts of disputes that the court has no power to decide underscores the injunction's impropriety.

## III.  The Remaining Preliminary Injunction Factors Counsel Against Relief

Because plaintiffs have not demonstrated a likelihood of success on the merits, this Court need not consider the remaining preliminary injunction factors. *See Doe v. Trustees of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019); *OfficeMax, Inc. v. Levesque*, 658 F.3d 94, 100 (1st Cir. 2011). However, plaintiffs likewise failed to establish that these factors favor relief.

The balance of harms and public interest overwhelmingly weigh against a preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that these factors merge in cases involving the government). The injunction here interferes with agencies' ability to exercise their lawful authorities to implement the President's policy directives. The injunction thus undermines the President's unquestioned Article II authority to direct subordinate agencies how to exercise their own authorities, giving rise to an intolerable intrusion on the prerogatives of the Executive Branch. The separation-of-powers problems are especially severe because the injunction purports to govern the manner in which a range of federal agencies make funding decisions across a spectrum of federal spending programs, and it extends even to lawful implementations of the President's Executive Order. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) (holding that courts lack jurisdiction "to enjoin the President in the performance of his official duties").

The preliminary injunction's vague instructions exacerbate these harms. It enjoins the government defendants from "implementing, giving effect to, or reinstating under a different name the directive in" the OMB Memorandum "to unilaterally freeze awarded funding appropriated under the" IRA or IIJA without providing guidance as to what features matter to make that assessment—a particular problem given that the Memorandum contains no such directive. A62. And the injunction prohibits the government defendants from "freezing, halting, or pausing on a non-individualized basis the processing and payment of [already-awarded] funding"

45

appropriated under the IRA and IIJA, A61, but contains no additional detail to make clear what sort of "individualized" analysis the district court would consider an appropriate basis for agencies to exercise their authority to pause disbursements. The injunction's nebulous language lacks the requisite detail and precision about the specific "act or acts restrained." Fed. R. Civ. P. 65(d)(1)(C). If nothing else, the preliminary injunction threatens to chill agencies from taking legally permitted actions to review and realign funding.

The preliminary injunction will inflict harms on the government and the public that could not be unwound. If the government's position is later vindicated in this litigation, there would be no guarantee that funds that the government disbursed pursuant to the district court's order would be retrievable after the fact. *See California*, 145 S. Ct. at 968-69 (crediting "the Government's representation that it is unlikely to recover the grant funds once they are disbursed"). Particularly when the district court declined to impose a bond, A56-57, the government lacks adequate assurance about recovery. *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."). There is no sound basis to compel the government to continue to fund projects that may not align with the Nation's energy policy as determined by the President. And to the extent that the injunction requires the government to continue funding programs despite Congress's recent rescindment of unobligated IRA and IIJA

funds for those programs, *see* An Act to Provide for Reconciliation, H.R. 1, 119th Cong. tit. VI, the injunction undermines Congress's policy choices in addition to the Executive Branch's.

These irreversible harms far outweigh any asserted harms to plaintiffs. Plaintiffs have no cognizable interest in receiving federal funds to which they are not legally entitled or on a timeline that is not legally compelled. And regardless, the gravamen of plaintiffs' injury is monetary—the classic example of reparable harm. *See Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (alteration and quotation omitted)); *Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (holding that it is "well settled that economic loss does not, in and of itself, constitute irreparable harm"). If plaintiffs are legally entitled to specific funds on a specific timeline, they may bring claims related to those specific funds in the appropriate forum and, if they prevail, may receive funds to which they are entitled. That fact fatally undermines plaintiffs' assertions of irreparable harm.

## IV.    At a Minimum, Relief Must Be Limited to the Identified Parties

The district court's injunction prohibits defendants from freezing covered funding or implementing the OMB Memorandum as to all awards made under the IRA and IIJA, rather than only as to those awards made to plaintiffs. *See* A61-62.

Even if the court correctly granted injunctive relief to plaintiffs, the injunction is overbroad and must be vacated in part.

1. The Supreme Court's recent decision in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), which was handed down after the district court's preliminary-injunction ruling, makes clear that universal relief was improper. As the Court explained, Congress "has granted federal courts no" power to issue such "universal injunction[s]." *Id.* at 2550. Instead, consistent with the longstanding limits on equitable power that cabin the authority provided to federal courts in the Judiciary Act of 1789, federal courts sitting in equity may provide—at most—"complete relief *between the parties*." *Id.* at 2557 (quotation omitted). That principle required the district court to limit its injunction to the specific funding streams that plaintiffs themselves have been awarded.

In nonetheless entering a universal injunction, the district court did not conclude that such sweeping relief was necessary to provide plaintiffs with complete relief. Instead, the court primarily justified its broad relief on the ground that it would be inequitable if nonparties who are "similarly situated" to plaintiffs were to "remain subject to" the agencies' actions that the court believed unlawful. A59. *CASA* specifically rejected that justification, making clear that the relevant "question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." 145 S. Ct. at 2557.

48

Nor did the district court properly support its universal relief by referring to the APA's provision assertedly authorizing courts to vacate regulations universally. *See* A59-60. Although the Supreme Court in *CASA* expressly did not "resolve[] the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action," 145 S. Ct. at 2554 n.10 (citing 5 U.S.C. § 706(2), which authorizes courts to "hold unlawful and set aside agency action"), that question has no relevance here. As the Fifth Circuit has explained, a "vacatur does nothing but re-establish the status quo absent the unlawful agency action" and—unlike an injunction—"neither compels nor restrains further agency decision-making." *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) (per curiam).

In entering preliminary injunctive relief, the district court did not purport to be—and was not in fact—exercising whatever authority the APA may provide to courts. Instead, the court entered interlocutory relief that both compels and restrains, on pain of contempt, agency decisionmaking. The only power the court could have to enter such a preliminary injunction is the equitable authority provided in the Judiciary Act of 1789. *See CASA*, 145 S. Ct. at 2551 ("The Judiciary Act of 1789 endowed federal courts with jurisdiction over all suits in equity, and still today, this statute is what authorizes the federal courts to issue equitable remedies." (alteration, citation, and quotation omitted)). And as *CASA* teaches, that authority does not support the entry of universal relief.

Nor could the district court's universal injunction be properly justified as an exercise of the authority that the APA provides courts to issue—"to the extent necessary to prevent irreparable injury"—"all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of" judicial review. 5 U.S.C. § 705. For one, the district court did not itself clearly invoke that authority, *see* A61-62, and the court's interlocutory relief (again, a preliminary injunction backed by the threat of contempt) goes beyond the limited postponement authority contemplated by § 705.

Regardless, § 705 provides no avenue around the equitable limitations on non-party relief identified in *CASA*. That provision permits a court to stay agency action only "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, which incorporates constitutional and equitable limitations on non-party relief. Indeed, the legislative history makes clear that Congress intended that § 705 relief would be "equitable" and used only "to prevent irreparable injury." H.R. Rep. No. 79-1980, at 43 (1946). Thus, consistent with equitable principles, Congress understood that "[s]uch relief would normally, if not always, be limited to the parties complainant." *Id.* More generally, the APA is explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702(1). Thus, consistent with the equitable principles articulated in *CASA*, the APA requires courts to decline to enter universal relief, however styled, where other remedies would fully redress plaintiffs' injuries.

2.  For similar reasons, appropriately tailored relief would not run to the unidentified members of the National Council of Nonprofits, which asserts that it is a "network of nonprofit organizations" with "more than 30,000 organizational members" located "across the country." A70. Here, the Council identified two of the other plaintiff entities as members with standing to challenge the government's actions, *see* A127, A133 (confirming that plaintiffs Woonasquatucket River Watershed Council and Green Infrastructure Center, Inc. are members of the Council). The Council cannot properly leverage that identification of two members into a mandate to seek relief on behalf of tens of thousands of unidentified nonprofits.

As an initial matter, the Council has not properly demonstrated that it has standing to litigate on behalf of its members as a whole, because it has not shown that it is a bona fide membership organization. It has not identified any "indicia of membership," such as "a clearly articulated and understandable membership structure" with members who "elect[] the governing body," nor has it explained how its members direct or control the organization. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997) (quotation omitted).

To the contrary, the Council's assertion of more than 30,000 members—and its vague contentions that "unknown hundreds if not thousands of those members are recipients of funding through the IRA and IIJA," A118—suggests that the Council is a diffuse organization whose purported members have no substantial ability to exercise any oversight or control of the Council. Nothing in the record suggests that

51

the Council's members control—or are even aware of—this litigation that is purportedly on their behalf or that these members understand that they may be bound by an adverse judgment on their claims. In these circumstances, the Council may not properly pursue relief on behalf of all of its identified members.

Regardless, even if the Council could satisfy Article III's requirements to advance claims on behalf of all its members, equitable principles would compel forgoing relief to any member who has not been identified in district court and agreed to be bound by the judgment. As the Supreme Court explained in *CASA*, the appropriate avenue for pursuing relief on behalf of others similarly situated is a class action suit under Federal Rule of Civil Procedure 23, which includes substantial "procedural protections" for the benefit of both the plaintiffs (including members of the class who will be bound by any adverse judgment) and the defendants. 145 S. Ct. at 2556. Permitting the Council to proceed on behalf of 30,000 unidentified organizations improperly "circumvent[s]" those limits, *id.*, and undermines longstanding equitable principles that a party has one opportunity for relief and that the effect of any judgment should be bidirectional, *cf. Arizona v. Biden*, 40 F.4th 375, 397 (6th Cir. 2022) (Sutton, C.J., concurring) (explaining the equitable and historical problems with "asymmetric" suits).

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be reversed or vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

SARA MIRON BLOOM
  *Acting United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA

  *s/ Brian J. Springer*
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*
  *brian.j.springer@usdoj.gov*

August 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,931 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brian J. Springer*
Brian J. Springer

**CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Brian J. Springer*
Brian J. Springer

**ADDENDUM**

# TABLE OF CONTENTS

Memorandum and Order Granting Preliminary Injunction (Dkt. No. 45)...................A1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

WOONASQUATUCKET RIVER
WATERSHED COUNCIL;

EASTERN RHODE ISLAND
CONSERVATION DISTRICT;

CHILDHOOD LEAD ACTION
PROJECT;

CODMAN SQUARE
NEIGHBORHOOD DEVELOPMENT
CORPORATION;

GREEN INFRASTRUCTURE
CENTER; and

NATIONAL COUNCIL OF
NONPROFITS,

     Plaintiffs,

     v.

U.S. DEPARTMENT OF
AGRICULTURE;

BROOKE ROLLINS, in her official
capacity as Secretary of Agriculture;

U.S. DEPARTMENT OF ENERGY;

CHRIS WRIGHT, in his official
capacity as Secretary of Energy;

U.S. DEPARTMENT OF THE
INTERIOR;

DOUG BURGUM, in his official
capacity as Secretary of the Interior;

C.A. No. 1:25-cv-00097-MSM-PAS

A1

|  |  |
|---|---|
| U.S. ENVIRONMENTAL PROTECTION AGENCY; | ) |
|  | ) |
|  | ) |
| LEE ZELDIN, in his official capacity as Administrator of the Environmental Protection Agency; | ) |
|  | ) |
|  | ) |
|  | ) |
| U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; | ) |
|  | ) |
|  | ) |
| SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development; | ) |
|  | ) |
|  | ) |
|  | ) |
| U.S. OFFICE OF MANAGEMENT AND BUDGET; | ) |
|  | ) |
|  | ) |
| RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget; and | ) |
|  | ) |
|  | ) |
|  | ) |
| KEVIN HASSETT, in his official capacity as Director of the National Economic Council, | ) |
|  | ) |
|  | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

      This is an administrative law case. In 2021 and 2022, Congress passed and the President signed two laws—the Infrastructure Investment and Jobs Act and the Inflation Reduction Act, respectively—appropriating billions of dollars for infrastructure, agriculture, energy, climate, and housing initiatives. The laws established that federal agencies would largely be responsible for administering these

funds.   Since then, the agencies did just that through awards of grants and contracts—seemingly without much issue.

That swiftly changed in January 2025.  An executive order and a memorandum from the Office of Management and Budget temporarily forbade agencies from administering any more IIJA and IRA money, at least while the agencies reviewed spending to ensure its consistency with presidential policy directives.  So the agencies stopped providing money to the organizations spearheading these congressionally-supported initiatives, even when those same agencies had already awarded it.

It quickly became clear that these actions were part of a much larger effort that extended beyond IIJA and IRA funding—an effort now colloquially known as the federal "funding freeze."  Next came a whirlwind of litigation.  States and private organizations alike have sued a host of agencies to stop different parts of the freeze. So far, they have largely been successful in obtaining interim relief.  But as the need for this suit shows, that relief has been piecemeal and often limited in scope.

Still unable to access their funds following other court orders, six nonprofits sued several federal agencies and their heads under the Administrative Procedure Act ("APA").  The Nonprofits bring three APA claims against the Government.[1]  In

---

[1] For ease of reading, the Court uses the term "the Government" to describe the Defendants collectively.  The "Agency Defendants" or "Agencies" in turn, refers to Energy, EPA, HUD, Interior, and USDA.  That is not to say, of course, that OMB and the NEC Director are not agencies under the APA; as explained below, quite the contrary.  Instead, the collective term "Agency Defendants" is meant to encompass the group of actors directly charged with administering IIJA and IRA funds.  When necessary, the Court names Defendants with specificity.  Finally, the Court refers to the Plaintiffs collectively as "the Nonprofits."

short, the Nonprofits argue that the Government—in summarily freezing billions of dollars in IIJA and IRA funding—ran afoul of three APA provisions: its requirement that agency actions (1) are not "arbitrary and capricious," (2) are not "in excess" of the authority that Congress granted the agencies, and (3) are not otherwise contrary to law. The Nonprofits now move for a preliminary injunction—a temporary court order requiring the agencies to turn the funding spigots back on, at least while their case is pending. (ECF No. 26.)

The Nonprofits' Motion is GRANTED. To summarize: the Court first sees no threshold jurisdictional issues. The Nonprofits have demonstrated standing against all seven defendants and the doctrine of claim-splitting does not narrow their case. *See* Part III.A. Next, the Court is confident that it has jurisdiction under the APA. Most importantly, the seven agency actions here are "final," allowing APA review, and the Nonprofits' claims are not simple contract actions for money damages, such that the Tucker Act would divest the Court of jurisdiction. *See* Part III.B.1.

Looking to the merits, the Court holds that the Nonprofits have demonstrated a strong likelihood of success on two of their three APA claims. First, they have adequately shown at least three ways that the sudden, indefinite freeze of all already-awarded IIJA and IRA money was arbitrary and capricious: it was neither reasonable nor reasonably explained, and it also failed to account for any reliance interests. *See* Part III.B.2. Second, the broad powers that OMB, the NEC Director, and the five Agencies assert are nowhere to be found in federal law. The Agencies likely possess narrower powers related to individualized funding pauses and terminations, but in

cases of vast economic and political significance—like this one—the Supreme Court has urged lower courts to be skeptical of agencies' sweeping claims of power. That is to say: those narrower powers cannot justify the broad exercise of authority that OMB, the NEC Director, and the Agencies asserted here. *See* Part III.B.3. Holding that these two claims are likely to be successful, the Court declines to address the third at this point. *See* Part III.B.4.

The Court further holds that the Nonprofits have adequately demonstrated irreparable harm in several forms, *see* Part III.C, and that the balance of the equities and the public interest weigh heavily in their favor. *See* Part III.D. And because of these claims' unique nature, the broad powers that the Government asserts, and the harms inflicted on the Nonprofits and similarly situated nonparties, the Court holds that a nationwide injunction is appropriate. *See* Part III.F.

The Court wants to be crystal clear: elections have consequences and the President is entitled to enact his agenda. The judiciary does not and cannot decide whether his policies are sound. In other words, "the wisdom" of his decisions "is none of our concern." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 35 (2020) (cleaned up). But where the federal courts are constitutionally required to weigh in—meaning we, by law, have no choice but to do so—are cases "about the procedure" (or lack thereof) that the Government follows in trying to enact those policies. *Id.* Agencies do not have unlimited authority to further a President's agenda, nor do they have unfettered power to hamstring in perpetuity two statutes

passed by Congress during the previous administration.  Chief Justice Roberts put it best:

> Justice Holmes famously wrote that "men must turn square corners when they deal with the Government."  But it is also true, particularly when so much is at stake, that the Government should turn square corners in dealing with the people.

*Id.* at 24 (cleaned up).  Here, the Government failed to do so.

## I.    BACKGROUND

The Court begins with a preliminary statement of facts.

### A.    The Infrastructure Investment and Jobs Act and the Inflation Reduction Act

At the heart of this case are two laws passed by both chambers of Congress and signed by the President.  *See* U.S. Const., art. I, § 7, cl. 2–3.  The first is the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, passed in 2021.  (ECF No. 21 ¶ 25.)  The IIJA appropriated huge sums of money for an array of initiatives; since its passage, it has funded a "wide variety of critical projects and initiatives that are administered by different agencies."  *Id.* ¶ 25.  For instance, the Environmental Protection Agency ("EPA") has already awarded nearly $69 billion in IIJA funds "to create jobs, lower energy costs, save families money, support clean energy manufacturing, and help communities burdened by pollution."  *Id.* ¶ 26.  And the Department of Interior has doled out IIJA funds to "close open mine portals (protecting homes from landslides), clean up orphaned oil and gas wells, and support the federal wildland firefighting workforce."  *Id.*

The second law is the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818, passed in 2022.  Like the IIJA, the IRA authorized and appropriated "billions

of dollars in funding for grants, loans, and other forms of federal financial assistance in order to advance these goals." *Id.* ¶ 23. And like the IIJA, its programs "are administered by various agencies." *Id.* ¶ 24. The Department of Agriculture ("USDA"), for instance, handles billions of IRA dollars. *Id.* That includes nearly $20 billion for the Natural Resources Conservation Service to "help farmers, ranchers, and other landowners protect natural resources and enhance production, and $13.2 billion to build electrification infrastructure." *Id.*

### B.  Agencies' administration of IIJA and IRA funds

Following the IIJA and the IRA's respective enactments, agencies began working with states and private organizations to execute the statutes' goals.

Take the Childhood Lead Action Project ("CLAP"). (ECF No. 26-7.) It is an award-winning nonprofit that works with state and local officials to eliminate childhood lead poisoning in Rhode Island. *Id.* ¶ 1, 6. EPA awarded CLAP a $500,000 grant of IRA money "to fund a multi-pronged, multi-year campaign to address lead poisoning in Providence." *Id.* ¶ 7. It began drawing down funds from this grant in December 2024 and January 2025. *Id.* ¶ 11.

Or consider the Green Infrastructure Center ("GIC"), a conservation-focused nonprofit. (ECF No. 26-4.) In 2023 and 2024, GIC received several multi-year grants through the IRA. *Id.* ¶ 9. More specifically, the IRA provided $1.5 billion in funding for the Urban and Community Forestry Program, run by the U.S. Forest Service, and the GIC—as a subgrantee of several states—uses IRA grant funds "to help towns and localities plan and carry out plans for planting more trees and managing the forests that they have." *Id.* ¶ 8–11.

Similarly, the Codman Square Neighborhood Development Corporation ("CSNDC") applied for a grant through the Green and Resilient Retrofit Program, run by the Department of Housing and Urban Development ("HUD"). (ECF No. 26-3 ¶ 6.) CSNDC is a nonprofit community development corporation that focuses on housing initiatives. *Id.* ¶ 2. And the Green and Resilient Retrofit Program "is meant to support investments in energy efficiency, greenhouse gas reductions, and healthy housing" in HUD-run housing. *Id.* ¶ 6. The IRA provides the money for it, and CSNDC sought the grant "to help fund a rehab and renovation project on a 31-unit affordable housing development for elderly residents here in Dorchester." *Id.* ¶ 7. Last November, HUD awarded CSNDC a $750,000 grant, and it soon received the award letter. *Id.* ¶ 9.

These are only three examples of the numerous organizations whose missions and projects depend on congressional funding—as well as effective agency administration of that funding. The record shows that agencies were generally effective in administering these funds for several years following the IIJA and the IRA's passages. *See, e.g.*, ECF No. 26-5 ¶¶ 9–12; ECF No. 26-3 ¶ 9; ECF No. 26-4 ¶ 6; ECF No. 26-6 ¶¶ 6, 14; ECF No. 26-7 ¶ 6; ECF No. 26-9 ¶ 4.

### C.    The *Unleashing American Energy* executive order

That all changed on January 20, 2025, when the President issued an executive order titled *Unleashing American Energy*, Exec. Order No. 14,154, 90 Fed. Reg. 8343 (Jan. 20, 2025) (the "*Unleashing* EO").

The order provided that all "agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022

(Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58)." *Id.* § 7(a). While the funds were paused, the *Unleashing* EO required the agencies to "review their processes, policies, and program for issuing grants, loans, contracts, or any other financial disbursement of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order."[2] *Id.*

And "within 90 days," all agency heads must "submit a report to the Director of the NEC and Director of OMB "detailing their findings." *Id.* Going forward, "no funds identified in this subsection" could "be disbursed by a given agency until the Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with any review recommendations they have chosen to adopt." *Id.*

### D. Memorandum M-25-11

The next day, Matthew J. Vaeth, Acting Director of the Office of Management and Budget ("OMB"), and Kevin Hassett, Assistant to the President for Economic Policy and Director of the National Economic Council ("NEC"), issued a memorandum to the heads of departments and agencies titled, "Guidance Regarding Section 7 of the Executive Order Unleashing American Energy" ("*Unleashing* Guidance"), numbered M-25-11. (ECF No. 21-1.)

---

[2] Section 2, in turn, describes nine policy goals, including encouraging "energy exploration and production on Federal lands and waters … in order to meet the needs of our citizens and solidify the United States as a global energy leader long into the future" and protecting the country's "economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory of the nation." § 2(a), (c).

It explained that the *Unleashing* EO "requires agencies to immediately pause disbursement of funds appropriated under" the IRA and the IIJA, but that the pause "only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order." *Id.* "This interpretation" of the *Unleashing* EO, it explained, "is consistent with section 7's heading ('Terminating the Green New Deal') and its reference to the 'law and the policy outlined in section 2 of th[e] order.'" *Id.* So, "for the purposes of implementing section 7 of the Order, funds supporting the 'Green New Deal' refer to any appropriations for objectives that contravene the policies established in section 2," but "agency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget." *Id.* (cleaned up).

## E.    The "freeze"

After that, agencies broadly paused funding.  For instance, on January 27, EPA issued a memo explaining that "all disbursements for unliquidated obligations funded by any line of accounting including funds appropriated by the [IIJA and the IRA] are paused" and that, in accordance with the *Unleashing* EO, "unobligated funds (including unobligated comments) appropriated by the [IRA and IIJA] are paused." (ECF No. 21-2 at 2).  "All related actions" were paused, too.  *Id.*  EPA grant recipients soon received notice of the same.  (ECF No. 21-3.)  And similar freezes occurred at the other Agencies.  *See, e.g.*, ECF No. 21-7 (Interior); ECF No. 21-8 (USDA); ECF No. 21-9 (Energy); ECF No. 21 ¶ 24 n.3 (article describing HUD's funding freeze).

What did this about-face look like for the Government's partners on the ground? The record suggests a combination of confusion and silence. Organizations soon started to notice that their funding became inaccessible. CSNDC said that "HUD stopped communicating with us after the change in administration." (ECF No. 26-3 ¶ 10.) Weeks later, HUD told CSNDC that it was not able "to approve closings or disbursements at that time," blaming it "on an executive order called *Unleashing American Energy*." *Id.* Another nonprofit, the Woonasquatucket River Watershed Council ("WRWC"), had a grant of $1 million frozen. (ECF No. 26-4 ¶ 7.) It learned from the U.S. Forest Service that "the money was inaccessible because it was funded under the Inflation Reduction Act." *Id.*

Since the freeze, another organization has had "intermittent trouble accessing federal funding" thorough their already-awarded grants from several agencies. (ECF No. 26-6 ¶ 9.) In early February, they suddenly "became unable to access the 'ASAP' portal, which is an online system that the federal government uses for disbursing funds on grants." *Id.* ¶ 10. The result? They "couldn't make any draw downs of three grants." *Id.* CLAP—the lead nonprofit—faced similar issues. (ECF No. 26-7 ¶ 12.) It explained that sometimes, it was "blocked entirely" from accessing ASAP; other times, it "could log into the portal, but our grant was missing." *Id.* The portal tottered between functioning and not, but the point is that CLAP's grant was "missing" and "EPA [had] not explained why." (ECF No. 26-7 ¶ 15.)

### F.    This case

Enter WRWC and its co-plaintiffs: the Eastern Rhode Island Conservation District, CLAP, CSDNC, GIC, and the National Council of Nonprofits ("NCN"). They allege that the funding freeze orders issued by OMB and Director Hassett and the Agencies' actions in furtherance of the orders violated the APA. In particular, the Nonprofits have sued:

- the U.S. Department of Agriculture and its Secretary, Brooke Rollins;

- the U.S. Department of Energy and its Secretary, Chris Wright;

- the U.S. Department of the Interior and its Secretary, Doug Burgum;

- the U.S. Environmental Protection Agency and its Secretary, Lee Zeldin;

- the U.S. Department of Housing and Urban Development and its Secretary, Scott Turner;

- the U.S. Office of Management and Budget and its Director, Russell Vought; and

- the Director of the National Economic Council, Kevin Hassett.

On March 17, the Nonprofits moved for a preliminary injunction. (ECF No. 26.) Following a shortened briefing schedule, the Court held a hearing on their motion on April 3, 2025.

## II.    STANDARD

"A request for a preliminary injunction is a request for extraordinary relief." *Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022). "To secure a preliminary injunction, a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable

balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (cleaned up). Here, the last two factors merge because the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"The first two factors" here "are the most critical." *Id.* at 434. "To demonstrate likelihood of success on the merits, plaintiffs must show more than mere possibility of success—rather, they must establish a strong likelihood that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores, SEIU Loc. 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (cleaned up). In evaluating whether the Nonprofits have shown a likelihood of success on the merits, the Court must keep in mind that the merits need not be "conclusively determine[d]"; instead, at this stage, decisions "are to be understood as statements of probable outcomes only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (cleaned up).

## III.    DISCUSSION

### A.    Jurisdiction

To start, the Government makes two jurisdictional arguments trying to narrow the case's scope. The first is about standing while the second concerns claim splitting. Before addressing the preliminary injunction factors, the Court considers these arguments.

#### 1.    Defendant-specific standing

The Government first argues that the Nonprofits have not shown any injuries attributable to Energy, OMB, or the NEC Director. (ECF No. 31 at 15.) Of course,

the Nonprofits "bear the burden of demonstrating that they have standing" and must do so "with the manner and degree of evidence required at the successive stages of the litigation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021) (cleaned up). And they "must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* at 431. "To establish standing," they "must show an injury in fact caused by the defendant and redressable by a court order." *United States v. Texas*, No. 22-58, 599 U.S. 670, 676 (2023). The upshot of the Government's standing argument is that any relief should be directed "only against USDA, Interior, EPA, and HUD—and not the three other Agency Defendants for which Plaintiffs have failed to prove any ongoing injuries."[3] (ECF No. 31 at 17.) The Court addresses the standing arguments individually.

### a. Energy

As for Energy, the Government contends first that, as a matter of fact, "there is no ongoing pause of funding for the Weatherization Assistance Program since at least February 2025." (ECF No. 31 at 15.) And in any event, the alleged harm is to "a subrecipient (not a direct grantee) of DOE funding," so the entity "should contact the direct grantee to raise any concerns about any alleged improper pause of funding." *Id.* at 16.

---

[3] Aside from the same subgrantee issue raised against Energy, the Government does not contest that the Nonprofits have standing for claims against EPA, HUD, Interior, and USDA. (ECF No. 38 at 50–51.) Upon an independent review of the record, the Court is satisfied that the Nonprofits have standing as to those four agencies and their heads, at least for purposes of resolving this motion.

The Nonprofits respond that Energy has "continued to block access to IRA and IIJA funding even after February 24, when its claims to have resumed processing payments." (ECF No. 32 at 17.)  Further, the Government's subgrantee argument is a red herring, the Nonprofits say, because the record shows that "there is no concern that the direct grantee (the state in which the declarant's organization is located) is failing to pass funds on to the subgrantee." (ECF No. 32 at 16 n.5.)  In other words, the blame still lies at Energy's feet.

At this stage, the Nonprofits have adequately shown an injury-in-fact against Energy.  To start, the declarant in the Nonprofits' Exhibit T, an executive director of a nonprofit member of NCN, reported on March 11 that their IIJA funding had been frozen since January 30 and that they "have not received any communications about the cause of this freeze or if or when it will end." (ECF No. 26-11 ¶ 12.)  For now, that is enough to show that an injury caused by Energy existed at the time the Nonprofits filed their Complaint.

True, the Government has provided conflicting testimony: a signed declaration from an Energy official stating that, "since February 24, 2025, for obligations with ongoing work, DOE is proceeding with payments in the normal course." (ECF No. 31-2 ¶ 5.)  That contrary evidence, though, does not bear on the standing analysis.  Under the Government's theory, if simply offering contrary evidence always defeated standing, then few cases would ever get very far.

And the declarant's status as a subgrantee is not fatal to standing against Energy.  To start, nothing in the testimony suggests that the state "is failing to pass

funds on," as the Government suggests. *See, e.g.*, ECF No. 32-3 ¶¶ 5–6. And at argument, the Government cast this subgrantee argument as a "sort of zone of interest or rights to enforce" argument. (ECF No. 38 at 51–52.) The APA authorizes suit to challenge a federal agency by any "person" who was "adversely affected or aggrieved ... within the meaning of a relevant statute." 5 U.S.C. § 702. The Supreme Court has explained:

> We have held that this language establishes a regime under which a plaintiff may not sue unless he falls within the "zone of interests" sought to be protected by the statutory provision whose violation forms the legal basis for his complaint. We have described the "zone of interests" test as denying a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.

*Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177–78 (2011) (cleaned up). Because, as explained below, the Government's actions implicate a breadth of statutory schemes and regulations, the exact statutory analysis is difficult to pin down. But that is a problem of the Government's making, and the Nonprofits' interests in their already-awarded funds being frozen by the Agencies, even as subgrantees, at the behest of OMB and the NEC Director, are not "so marginally related to or inconsistent with the purposes implicit" in all the statutory schemes implicated here as to defeat standing. *Id.* After all, the Nonprofits' already-awarded funds are themselves "the subject of the contested regulatory action." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

Nor does the fact that some funding under Energy's purview has been temporarily unfrozen, *see* ECF No. 32-3 ¶¶ 4–7, moot the Nonprofits' case against Energy. A case only becomes moot, the First Circuit has explained, if "the defendant

meets the heavy burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 49 (1st Cir. 2010) (cleaned up). Put differently, "to show that a case is truly moot, a defendant must prove no reasonable expectation remains that it will return to its old ways." *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (cleaned up). "That much holds for governmental defendants no less than for private ones." *Id.* The Government has failed to make that showing.

All that is to say: the Nonprofits have adequately demonstrated standing against Energy.

### b.    OMB

As for OMB, the Government argues that the Nonprofits' declarations "fail to identify any injury attributable specifically to OMB's actions," so they "have not proven any injuries specifically attributable to OMB itself." (ECF No. 31 at 16.) The Nonprofits reply that OMB was "responsible for issuing OMB Memo M-25-11," which "directed executive agencies to freeze certain IRA and IIJA funding," and since then, "other agencies relied on it in withholding funds." (ECF No. 32 at 17–18.)

An injury-in-fact must be "fairly traceable to the challenged conduct of the defendant." *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 90 (1st Cir. 2025). So there must be a "causal connection between the injury and the conduct complained of," but the standard "does not require a tort-like showing of proximate causation." *Id.* (internal quotations omitted). And a plaintiff "can satisfy traceability

by showing that the defendant's conduct is one among multiple causes of the alleged injury." *Id.* (cleaned up).

The Nonprofits' injuries arising from the freeze are clearly traceable to OMB's issuance of M-25-11 and the memorandum's influence over the Agency Defendants. There are at least two reasons why. First is the Agencies' actual, cited reliance on M-25-11 as the reason for the pause. One internal memo from EPA ordering the pause stated that it was "being provided based on instruction from OMB." (ECF No. 21-2 at 2.) Another message from Interior to a grantee who was trying (and failing) to access their funding cited Memo M-25-11 "regarding the funding pause." ECF No. 21-7 at 2; *see also* ECF No. 26-9 ¶ 13 ("I understand from our government partners that they believe our IRA funds are still frozen under the authority of OMB Memo M-25-11."). That is a sufficient causal connection.

Another reason is equally illuminating: the Agencies' sudden about-face on pausing funds soon after issuance of the memo. Either release of the memo led to the pause of the Agencies' already-awarded IRA and IIJA funding or five "federal agencies, none of which had acted to cut off financial assistance" before the freeze "suddenly began exercising their own discretion to suspend funding across the board at the exact same time." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 597959, at *7 (D.D.C. Feb. 25, 2025). As between these two options, the latter "would be a remarkable—and unfathomable—coincidence." *Id.* And that "this uniform freeze occurred" in the days right "after the memorandum's issuance would be quite the happenstance, too." *Id.* In short, the Government asks

the Court "to overlook the simplest, most logical explanation" for what happened.  *Id.*
The Court declines.

### c.    NEC Director

The Government raises the same traceability arguments for the NEC Director
as it did OMB.  (ECF No. 31 at 17.)  These arguments fail for the same reasons, given
the NEC Director's co-authorship of the memorandum.  (ECF No. 21-1 at 2.)

Only in a footnote, the Government separately argues that Director Hassett is
not an "agency" under the APA.  (ECF No. 31 at 17 n.2.)  But the First Circuit has
"repeatedly held that arguments raised only in a footnote" are "waived."  *Nat'l
Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 n. 17 (1st Cir. 1999); *see also
Modeski v. Summit Retail Sols., Inc.*, 470 F. Supp. 3d 93, 110 (D. Mass. 2020) (same).

### 2.    Claim splitting

Next, the Government argues that the doctrine of claim splitting precludes this
suit, because NCN (one of several Plaintiffs here) "and its members are already
litigating a case in the United States District Court for the District of Columbia
(D.D.C.) challenging the same alleged harms from the 'federal funding freeze.'"  (ECF
No. 31 at 18.)  In its view, this case involves the same plaintiff, "represented by the
same counsel, in yet another challenge to an alleged categorical pause in grant
funding—with yet another request for emergency, expedited relief."  *Id.* at 18–19.
And even if some Nonprofits here were not NCN members, "that would at most allow
those three entities' claims to proceed—not the claims of NCN or the other two
Plaintiffs who are participants in the D.D.C. action."  *Id.* at 21–22.

The Nonprofits reply that they are here challenging "entirely separate agency actions, by a much broader set of defendants, to freeze a different category of funds—i.e., funding appropriated under the IRA and IIJA." (ECF No. 32 at 11.) And they say that their challenge here does not relate to OMB Memo M-25-13, the agency action at issue in the D.D.C. litigation. *Id.*

The doctrine precluding claim splitting relates to—but differs from—the doctrine of res judicata. *See Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000); The main difference is that claim splitting, unlike res judicata, applies where the second suit has been filed before the first suit has reached a final judgment. *See* 18 Fed. Prac. & Proc. Juris. § 4406 (3d ed.) (discussing "principles of 'claim splitting' that are similar to claim preclusion, but that do not require a prior judgment").

Still, the doctrines serve similar policies. First, "the power to dismiss a duplicative lawsuit is meant to foster judicial economy and the comprehensive disposition of litigation." *Curtis*, 226 F.3d at 138 (cleaned up). Claim splitting is "concerned with the district court's comprehensive management of its docket," while "res judicata focuses on protecting the finality of judgments." *Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833, 841 (11th Cir. 2017).

And second—more relevant here—the claim splitting doctrine "is also meant to protect parties from the vexation of concurrent litigation over the same subject matter." *Curtis*, 226 F.3d at 138 (cleaned up); *see also Clements v. Airport Auth. of Washoe Cty.*, 69 F.3d 321, 328 (9th Cir. 1995) ("A main purpose behind the rule preventing claim splitting is to protect the defendant from being harassed by

repetitive actions based on the same claim."). The point is that a "litigant with multiple related claims must not separate, or split, the claims into multiple, successive cases, but must include in the first action all of the claims that fall within the Court's jurisdiction." *Perry v. Alexander*, 2:15-cv-00310-JCN, 2017 WL 3084387, at *3 (D. Me. July 19, 2017) (cleaned up).

Federal courts borrow from the res judicata test to determine whether the claim splitting doctrine applies. So the Government must show that the first suit, if it were final, would preclude the subsequent suits. *See Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) ("Claim preclusion, like issue preclusion, is an affirmative defense" that the defendant must "plead and prove."); *Vanover*, 857 F.3d at 841.

The First Circuit employs the "transactional approach" to determine whether successive causes of action are the same as the first. *See Mass. Sch. of Law at Andover, Inc., v. Am. Bar Ass'n*, 142 F.3d 26, 38 (1st Cir. 1998). "Under this approach, a cause of action is defined as a set of facts which can be characterized as a single transaction or series of related transactions." *Id.* The essential inquiry, then, is whether "the causes of action arise out of a common nucleus of operative facts." *Id.* "In mounting this inquiry, we routinely ask whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations." *Id.* (cleaned up); *Curtis*, 226 F.3d at 139 (holding that claim splitting will apply if "the same or connected transactions are at issue and the same proof is needed to support the claims in both suits").

The Government has not met its burden here. To start, the universe of agency action in these two cases is distinct enough that the Court struggles to see them as arising "out of a common nucleus of operative facts" or especially as forming "a convenient trial unit." 142 F.3d at 38. The D.D.C. plaintiffs challenged a different agency action: OMB Memo M-25-13. *Nat'l Council of Nonprofits*, 2025 WL 597959, at *6 (D.D.C. Feb. 25, 2025). The Nonprofits here challenge another memo, M-25-11, along with five Agencies' funding freezes arising from that memo. (ECF No. 21 ¶¶ 82, 86–87, 92–95, 101–103.)

That some overlap occurs—mainly the complicated interplay between different OMB memos—is not enough. The cases are fundamentally different in their factual and legal analysis, even if some legal issues appear in both cases. *See New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *8–*9 (D.R.I. Mar. 6, 2025) (separately analyzing an OMB directive and the "Agency Defendants' acts implementing funding pauses" under the guidance). Most persuasive on this point is, as the Nonprofits describe it, the "fact that the district court in *NCN v. OMB* has enjoined the directive in that memo" and "the government has purportedly withdrawn it." (ECF No. 32 at 11 (citing *NCN II*, 2025 WL 597959, at *3, 19–20)). The Nonprofits suggest that this fact "only confirms that Defendants' ongoing freezes of IRA and IIJA funding are factually distinct" from the withdrawn memo challenged in the D.D.C. litigation. (ECF No. 32 at 11.) The Court agrees: the fact that Memo M-25-13 is withdrawn and yet the freezes at issue in this case continue illustrates why the claim-splitting doctrine is unavailing here.

## B.    Likelihood of success on the merits

The Court now turns to the Nonprofits' likelihood of success on the merits of their three APA claims.  First, they argue that the Government's funding freeze is arbitrary and capricious.  (ECF No. 26 at 14–22.)  The freeze, they contend, is neither "reasonable" nor "reasonably explained," and each is independently fatal to its viability.  *See Ohio v. EPA*, 603 U.S. 279, 292 (2024).  Second, the Nonprofits submit that the funding freeze exceeds the statutory authority that any of the Defendants possess.  (ECF No. 26 at 22–25.)  No statutes allow OMB or the NEC Director to issue guidance to freeze funds or allow the five Agencies to freeze any funding appropriated by the IRA and IIJA, goes the argument, so their actions were necessarily overreach.  Finally, the Nonprofits argue that the funding freeze is contrary to law: both the IRA and the IIJA as well as regulatory procedures setting out specific procedures for suspending and terminating grants.  (ECF No. 26 at 25–28.)

At this stage, the Nonprofits need only show a substantial likelihood of success on one of their three claims.  *See, e.g.*, *Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 215 (D. Mass. 2023) (collecting cases).

### 1.    Threshold APA issues

Before reaching the merits, though, the Court must determine several threshold issues arising under the APA.  Most pressing is whether the Nonprofits are likely to show that the funding freeze constitutes a "final agency action" under the APA.  5 U.S.C. § 704.  If the freeze is not, then it cannot be subject to judicial review.

The Government identifies four additional threshold issues.  First is that the Nonprofits do not really "identify the agency actions" they seek to challenge; the freeze is instead "comprised of many different actions by numerous different agencies," the ultimate scope being unclear.  (ECF No. 31 at 22–25.)  This matters, argues the Government, because it "realistically" cannot "be expected to defend the statutory basis for an undefined universe of agency decisions, let alone explain the reasoned decision-making behind each of those unknown decisions."  *Id.* at 24.

The Government insists that three further defects are fatal.  The claims, in the Government's view, masquerade as a challenge to an executive order, which is unreviewable under the APA.  (ECF No. 31 at 26–29).  They are also "tantamount to impermissibly broad, programmatic challenges to entire agency operations."  *Id.* at 25, 29–32.  And even viewed in their narrowest form, they are grant-specific challenges that this Court lacks the jurisdiction to adjudicate.  *Id.* at 32–37.  Instead, in the Government's view, the Tucker Act requires that these claims be asserted in the Court of Federal Claims.  *Id.* at 33–35.

### a.    Failure to identify agency action

First, the Court disagrees that the Nonprofits have not identified any agency actions.  In fact, the Nonprofits make it clear: they are challenging "Defendants' ongoing holds on IRA and IIJA funding."  (ECF No. 32 at 5.)  The First Circuit recently recognized the concrete nature of similar challenges.  *New York v. Trump*, No. 25-1236, 2025 WL 914788, at *13 (1st Cir. Mar. 26, 2025) ("The Plaintiff-States' opposition does identify specific agency actions.  The Plaintiff-States make clear that

they challenge the Agency Defendants' 'actions -- following the executive orders and [OMB] Directive -- to implement categorical funding freezes without regard and contrary to legal authority.'")

True, the Nonprofits are challenging "many different actions by numerous different agencies" all at once. (ECF No. 31 at 24.) But that does not defeat an APA claim. The First Circuit is "not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once." *New York*, 2025 WL 914788, at *13 (1st Cir. Mar. 26, 2025). Nor does the Government identify any. *Id.* And the Nonprofits' broad challenges only arise because OMB, the NEC Director, and the five Agency Defendants froze all the funding in concert. So the Government's actions here are hardly an "undefined universe of agency decisions." (ECF No. 31 at 24.)

The Court can be more specific. The universe boils down to five agencies (Energy, EPA, HUD, Interior, and USDA) deciding summarily to withhold already-awarded funds appropriated by Congress under two laws, the IIJA and the IRA, based on compliance with a directive from OMB and the NEC Director. Or more simply, there are seven agency actions here: OMB and the NEC Director's decisions to issue the *Unleashing* Guidance mandating a pause (one action from each) and Energy, EPA, HUD, Interior, and USDA's decisions to follow that guidance by summarily freezing IIJA and IRA funds (one action from each of these five agencies).[4]

---

[4] Whether these agency decisions are "final" is discussed below at Part III.B.1.e.

Record evidence makes the Government's feigned confusion on this point particularly puzzling. When one grantee logged onto the ASAP portal, for instance, the code for the pause to their funds was "IRA/BIL Hold," abbreviations for the Inflation Reduction Act ("IRA") and the Infrastructure Investment and Jobs Act (also known as the Bipartisan Infrastructure Law, or "BIL"). (ECF No. 32-4 ¶ 8.) How difficult could it really be for the Government to figure out which actions are challenged if there is already a specific computer code for these universal pauses?

### b.    Backdoor challenge to an executive order

Second, the Court does not see the Nonprofits' claims as a backdoor challenge to an executive order. The Government recognizes that the Nonprofits "do not seek relief directly against the President's Executive Order," (ECF No. 31 at 26 n.3), and in any event, the Nonprofits can challenge the implementation of an order without challenging the order itself—particularly when they cast the *Unleashing* EO as a "narrow" one and make a compelling argument that the Government has in fact failed to comply with it to the letter. *See* ECF No. 26 at 18; *see also Nat'l Council of Nonprofits*, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025) ("[F]urthering the President's wishes cannot be a blank check for OMB to do as it pleases.")

### c.    Programmatic attack

Third, the Nonprofits' claims are not the improper programmatic attack that the Government paints them to be. The Government's argument is unconvincing in part for the same reasons as its argument about the Nonprofits' failure to identify any agency action.

Further guidance from the First Circuit bolsters the Court's conclusion. It recently, roundly rejected a similar argument in *New York*, 2025 WL 914788, at *12–13, and that reasoning applies equally here. The Supreme Court previously made clear that an agency's action in "applying some particular measure across the board" could "of course be challenged under the APA." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990). And as in *New York*, that is what happened here. The First Circuit explained:

> The District Court determined here, by contrast, that the Plaintiff-States' APA claims do challenge discrete final agency actions. To be sure, those claims, like the motion for the preliminary injunction, describe those actions, collectively, as the 'Federal Funding Freeze.' The District Court at points uses that nomenclature as well. But the claims themselves, like the motion, assert that the discrete final agency actions are the decisions by the Agency Defendants to implement broad, categorical freezes on obligated funds.

*New York*, 2025 WL 914788, at *12 (1st Cir. Mar. 26, 2025). So too here.

The Court finds the Government's alternate characterization of its actions as "thousands of individual decisions made by agencies about whether particular grants or other funding should be paused" unconvincing. (ECF No. 31 at 31.) Of course, in reviewing the record, a court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (cleaned up); *New York*, 2025 WL 914788, at *13 (1st Cir. Mar. 26, 2025) (same). And, as explained above, the contention that these agencies "suddenly began exercising their own discretion to suspend funding across the board at the exact same time" is truly doubtful, because it requires "unfathomable," "coincidental assumptions" and

"contradicts the record." *Nat'l Council of Nonprofits*, 2025 WL 597959, at *7 (D.D.C. Feb. 25, 2025).

After all, it "is unclear whether twenty-four hours is sufficient time for an agency to independently review a single grant, let alone hundreds of thousands of them." *Id.* at *15 (cleaned up); *see also New York*, 2025 WL 715621, at *8 (D.R.I. Mar. 6, 2025) ("To suggest that the challenged federal funding freezes were purely the result of independent agency decisions rather than the OMB Directive or the *Unleashing* Guidance is disingenuous.").

### d.   Tucker Act

And fourth, the Court disagrees that these APA claims are outside the scope of its jurisdiction.  Most relevant to this argument, the Tucker Act does not apply here, either to the *Unleashing* Guidance or the Agencies' freezes.  *See Massachuetts v. Nat'l Institutes of Health*, No. 25-CV-10338, 2025 WL 702163, at *4–*8 (D. Mass. Mar. 5, 2025) (laying out the framework for an APA-Tucker Act analysis).

The Tucker Act "confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005).  It vests jurisdiction there with respect to "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  And in suits seeking more than $10,000 in damages, the Court of Federal Claims' jurisdiction is exclusive of the

federal district courts. *See Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1983). So plaintiffs wishing to file "a suit against the United States involving a contract" where the "relief [sought is] over $10,000" must do so in the Court of Federal Claims. *Vill. W. Assocs. v. R.I. Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 138 (D.R.I. 2009).

The "jurisdictional boundary" between the Tucker Act and the APA is well-traversed by litigants seeking relief against the federal government. *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1117 (Fed. Cir. 2007). Still, the boundary's precise contours remain elusive. *See id.* at 1124 (listing cases treading the jurisdictional line); *Bublitz v. Brownlee*, 309 F. Supp. 2d 1, 6 (D.D.C. 2004) (noting "[t]he bright-line rule" between monetary and equitable relief in the Tucker Act–APA context "turns out to be rather dim ...."). Plaintiffs sometimes attempt to "avoid Tucker Act jurisdiction by converting complaints which at their essence seek money damages from the government into complaints requesting injunctive relief or declaratory actions." *Martin v. Donley*, 886 F. Supp. 2d 1, 8 (D.D.C. 2012) (cleaned up).

The Supreme Court has made clear that "not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act." *United States v. Mitchell*, 463 U.S. 206, 216 (1983) (cleaned up). Indeed, not every "failure to perform an obligation" by the federal government "creates a right to monetary relief." *United States v. Bormes*, 568 U.S. 6, 16 (2012). When traversing the Tucker Act–APA jurisdictional boundary, courts "must look beyond the form of the pleadings to the substance of the claim," *Suburban Mortg.*, 480 F.3d at 1124, to

determine whether "the essence of the action is in contract." *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978).  The "essence" of the action encompasses two distinct aspects: the "source of the rights upon which the plaintiff bases its claim" and "the type of relief sought (or appropriate)." *Piñeiro v. United States*, No. 08-CV-2402, 2010 WL 11545698, at *5 (D.P.R. Jan. 26, 2010) (cleaned up); *see also R.I. Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d at 138.

While the First Circuit has not formally adopted the "rights and remedies" test that is used by several other circuits, district courts within it have adopted the test to determine whether the "essence" of an action is truly contractual.  *See Massachusetts*, 2025 WL 702163, at *4–*8; *R.I. Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d at 138; *Piñeiro*, 2010 WL 11545698, at *5.  This Court adopts the same framework, derived from *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982), and discusses each element in turn.

First, the Court considers the source of the Nonprofits' rights.  After examining the Complaint, the Court finds that, like in *Massachusetts v. NIH*, "the gravamen" of the Nonprofits' allegations "does not turn on terms of a contract between the parties; it turns on federal statute and regulations put in place by Congress" and the agencies. *Massachusetts*, 2025 WL 702163, at *6; *see, e.g., K-Mar Indus., Inc. v. U.S. Dep't of Def.*, 752 F. Supp. 2d 1207, 1214 (W.D. Okla. 2010) ("The source of the rights alleged in this action is not contractual, it is the procedures put in place by the defendants.")

The Government largely seems to agree.  As it explained in its brief, "Determining whether a pause on disbursement is lawful necessarily requires

examining the underlying statutes governing a program, the appropriations measures providing funding for the program, and potentially the specific terms and conditions included in the grant agreement for that program."  (ECF No. 31 at 24.)[5] Throughout their briefing, neither the Nonprofits nor the Government have pointed the Court to specific terms and conditions in the grant agreements.

To be clear: the fact that there are underlying contractual relationships between the Nonprofits and the Government does not automatically "convert a claim asserting rights based on federal regulations into one which is, at its essence, a contract claim." *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1299 (10th Cir. 2009) (cleaned up).  As in *Massachusetts*, the Nonprofits "have not requested the Court to examine any contract or grant agreement created between the parties."  *Massachusetts*, 2025 WL 702163, at *6.  Instead, they "have asked this Court to review and interpret the governing federal statute and regulations." *Id.*

Having recognized that the source of the Nonprofits' rights is federal law rather than contract, the Court now turns to the relief sought.  There is a "distinction between an action at law for damages," which provides monetary compensation, and "an equitable action for specific relief," which might still require monetary relief. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); *see Great-W. Life & Annuity Ins.*

---

[5] True, the Government suggests, in that same quote, that it is "potentially" necessary to examine "the specific terms and conditions included in the grant agreement for that program."  (ECF No. 31 at 24.)  But that caveat does not defeat its clear recognition that federal statutes and regulations largely control the analysis here.

*v. Knudson*, 534 U.S. 204, 213 (2002) ("Whether [restitution] is legal or equitable depends on the basis for [the plaintiff's] claim and the nature of the underlying remedies sought.") (cleaned up).  Simply because "a judicial remedy may require one party to pay money to another" does not necessarily "characterize the relief as money damages." *Bowen*, 487 U.S. at 893.  A hallmark of such equitable actions is the existence of prospective relief in ongoing relationships.  *Compare Bowen*, 487 U.S. at 905 (holding that the district court had jurisdiction because declaratory or injunctive relief was appropriate to clarify petitioner state's ongoing obligations under the Medicaid plan), *with Me. Cmty. Health Options v. United States*, 590 U.S. 296, 298 (2020) (holding that petitioners properly relied on the Tucker Act to sue for damages in the Court of Federal Claims because plaintiffs were strictly concerned with "specific sums already calculated, past due, and designed to compensate for completed labors").

The Nonprofits' primary purpose in bringing their claims is to seek equitable, not monetary, relief.  They do not bring claims for past pecuniary harms.  Rather, like the plaintiffs in *Bowen* and *Massachusetts*, "their claims are to preserve their ongoing and prospective" agreements with the Government.  *Massachusetts*, 2025 WL 702163, at *7.  And the various harms the Nonprofits identified correspond to that relief.  The Nonprofits indicate that the blanket IIJA and IRA funding freezes will result in lost jobs, a suspension of research and community initiatives, and a loss of goodwill.  *See infra,* Part III.C (discussing these irreparable injuries, among others).  Ultimately, these harms are the ones for which the Nonprofits are pleading

relief. It would be legal error to construe the claims as couched pleas for monetary relief for which the Nonprofits never asked.

Since the Court finds that the proper source of the Nonprofits' rights is federal statute and regulations and because the relief sought is injunctive in nature, the Court determines that the "essence" of the action is not contractual in nature. *R.I. Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d at 138. So the Nonprofits' claims cannot properly be brought under the Tucker Act in the Court of Federal Claims and this Court retains jurisdiction.

The Supreme Court's recent order in *Department of Education v. California*, 145 S.Ct. 966 (Apr. 4, 2025), is not to the contrary. The Supreme Court noted that the APA's waiver of sovereign immunity does not apply to claims seeking money damages, but also reaffirmed the general rule that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* at 968 (quoting *Bowen*, 487 U.S. at 910). The Government overreads the three-page stay order. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (explaining that the issuance of a stay "is dependent upon the circumstances of the particular case"). The Supreme Court's brief treatment of *Bowen* and *Great-West Life* in *California* and the cursory mention of potential jurisdictional issues do not appear to settle all jurisdictional issues here, despite the Government's arguments to the contrary.[6]

---

[6] The Court digresses briefly to note something funny. At oral argument following the First Circuit's decision in *California*, but prior to the Supreme Court's decision, the Government argued that *California* was not "binding at this stage given the stay

Instead, *Bowen* mandates that a careful examination of the Nonprofits' claims and the relief sought—as the Court has done here—are necessary. To the extent that the Court's order "engenders" the result of payment to the Nonprofits, "this outcome is a mere by-product" of the Court's "primary function of reviewing the [Government's] interpretation of federal law." *Bowen*, 487 U.S. 879, 910. And "even if" the Court's orders "are construed in part as orders for the payment of money by the Federal Government" to the Nonprofits, *Bowen* makes clear that those "payments are not 'money damages,'" and that the "orders are not excepted from § 702's grant of power by § 704." *Id.* Put differently, "since the orders are for specific relief (they undo the [Government's freeze of funds]) rather than for money damages (they do not provide relief that substitutes for that which ought to have been done) they are within" the Court's jurisdiction. *Id.* That is especially clear for any relief against OMB and the NEC Director, because the Nonprofits' claims against them rest solely on their lack of authority to direct other agencies to freeze funds.

In short, the Court cannot disregard *Bowen*. Even if it looks like *California* may have "implicitly overruled" it, the Supreme Court has repeatedly made clear that

---

posture of that decision" and was also "fundamentally different" and "distinguishable because that case involved actual termination of the relevant grants." (ECF No. 39 at 83–84.) But now the Government insists that *California* divests the Court of jurisdiction and says that the Nonprofits' effort "to portray [*California*] as 'readily distinguishable' ring hollow." (ECF No. 41 at 3.) What changed? The Court's best guess: a result that the Government now favors. Its change in tune—and, to be fair, the Nonprofits' as well, in their new efforts to distance themselves from *California*—highlights the challenges of pinning down the precedential effects of emergency decisions. That is part of why the Court declines to hold that the Supreme Court overruled *Bowen* and its progeny via stay order.

lower courts "should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023). That is true even if the lower court "thinks the precedent is in tension with some other line of decisions"—or here, rather than an entire competing "line of decisions," a single three-page per curiam order granting a stay. *See Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring) ("The principal dissent's catchy but worn-out rhetoric about the 'shadow docket' is similarly off target. The stay will allow this Court to decide the merits in an orderly fashion— after full briefing, oral argument, and our usual extensive internal deliberations— and ensure that we do not have to decide the merits on the emergency docket. To reiterate: The Court's stay order is not a decision on the merits"); *accord id.* at 883 (Roberts, C.J., dissenting) (critiquing the Supreme Court's emergency orders for necessitating decisions without the opportunity for "full briefing and argument— based on the scanty review this Court gives matters on its shadow docket"). And the case that "directly controls," the one that the Court must follow, is *Bowen*.

Other district courts facing similar issues have similarly held that *California* did not divest them of jurisdiction. *Maine v. United States Dep't of Agric.*, No. 1:25-CV-00131-JAW, 2025 WL 1088946, at *19 (D. Me. Apr. 11, 2025); *New York v. Trump*, No. 25-cv-39-JJM-PAS, ECF No. 182 at 5–9 (D.R.I. Apr. 14, 2025). In addition to the reasons already provided, the Court agrees and adopts their reasoning in full to the extent it applies here.

e.    "Final agency action" test

All that aside, the Court must determine whether there was "final agency action" under 5 U.S.C. § 704. A final agency action has two essential qualities. First, it "marks the consummation of the agency's decisionmaking process." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (cleaned up). And second, it either is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (cleaned up).

To the first point, the Nonprofits argue that the "sweeping halts to the ordinary payment and processing" of appropriated funds mark "the consummation" of the decision-making process because "there are no further steps the agencies need to take to determine whether they will freeze that funding." (ECF No. 26 at 13.) And to the second, they argue that "legal consequences" have flowed from the decisions, because their "direct result (and express purpose)" was "to cut off access to funding for grantees and others who would otherwise have a right to apply for, draw on, or otherwise access these funds." *Id.* at 14.

The Government declines to engage with that test. Along with the threshold issues discussed above, it instead argues that, rather than a reviewable "final agency action," the funding freeze decisions are "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2) and thus unreviewable under the APA. (ECF No. 31 at 35–36.) In its view, the Agency Defendants' "decision to stop funding for Plaintiffs' projects, and to recompete the funds associated with those projects, is the type of agency action that is presumptively unreviewable." *Id.* at 36. (quoting *Pol'y & Rsch.,*

*LLC v. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 76 (D.D.C. 2018) (Jackson, J.)).

The Nonprofits have a strong likelihood of proving that the funding freezes constitute final agency action for precisely the reasons they spell out. The decisions to issue the *Unleashing* Guidance (for OMB and the NEC Director) and to pause all IIJA and IRA funding (for Energy, EPA, Interior, HUD, and USDA) indeed mark the "consummation" of each agency's decision-making process. 603 U.S. at 808. That is because, as the Nonprofits put it, "there are no further steps the agencies need to take to determine whether they will freeze that funding," or, with OMB and the NEC Director, to order them to do so. (ECF No. 26 at 13.) And "legal consequences" surely flow, given that grant recipients cannot access previously awarded funds. *Id.*

A breadth of caselaw supports this conclusion. *See Louisiana v. Biden*, 622 F. Supp. 3d 267, 291–92 (W.D. La. 2022) (collecting more than a dozen cases where temporary stops and pauses constituted final agency action for APA purposes). As does an emerging consensus of district courts recently hearing cases about different aspects of federal funding freezes. *See, e.g.*, *New York*, 2025 WL 715621, at *8–*9 (D.R.I. Mar. 6, 2025) (finding that "the implementation of those IIJA and IRA funding pauses likely marked the consummation of each agency's decision to comply with the *Unleashing* EO, the *Unleashing* Guidance, or both"); *Nat'l Council of Nonprofits*, 2025 WL 597959, at *13 (D.D.C. Feb. 25, 2025) (finding that the OMB Pause Memorandum constituted final agency action).

Nor is it clear that the pause is the unreviewable type of agency decision "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Decisions about appropriated but not-yet-awarded funds likely fall into that bucket. *See Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion.") But this case is different: because the funds at issue here were already awarded to the Nonprofits, more obligations apply. *See, e.g.*, 2 C.F.R. §§ 200.300–200.346.

Then-Judge Jackson's decision in *Policy & Research, LLC*, shows why. After noting that many funding decisions are "presumptively unreviewable," she explained that there were two caveats:

> Congress can, of course, circumscribe agency discretion to allocate resources through its statutory provisions. What is more, agencies themselves frequently cabin their own discretionary funding determinations by generating formal regulations or other binding policies that provide meaningful standards for a court to employ when reviewing agency decisions under the APA.

*Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 76 (cleaned up). The decision ultimately held that the Department of Health and Human Services, in suddenly halting funds to a longstanding project, "violated the APA, because it failed to explain its reasoning and acted contrary to its regulations when it terminated the Plaintiffs' grants." *Id.* at 83 (cleaned up). This case closely tracks that one—the main difference being, instead of one program's termination, that the Government's actions here involve summarily, indefinitely freezing already-awarded money affecting many more.

Having held that the Nonprofits are likely to establish that the funding freeze constitutes a "final agency action" under the APA and seeing no other threshold flaws with their APA claims, the Court moves to the merits.

### 2.    Count I: "Arbitrary and capricious" claim

The Nonprofits first assert that the funding freeze was unlawfully arbitrary and capricious. The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious "if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). The Court cannot "substitute its judgment for that of the agency," but it must take care to "ensure" that the agency has "offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (cleaned up). And "an agency cannot simply ignore an important aspect of the problem." *Id.* (cleaned up).

The Nonprofits make a host of arguments explaining why the freeze is arbitrary and capricious, but they can be boiled down to six main points. First, the funding freeze is "likely substantively unreasonable" because it arises "seemingly for no reason other than hostility to the statutes at issue." (ECF No. 26 at 15–16.) Second, even if it were reasonable, it was never "reasonably explained," because "none of the Defendant Agencies has ever offered an adequate explanation for their actions." *Id.* at 16–17. Their public statements lack reasoning and do not explain how "intentional blanket freezes on funding that Congress appropriated for specific ends

39
A39

that it judged important could possibly improve the agencies' alignment with congressional authorization." *Id.* at 17.

Third, the Nonprofits separately argue that there is a disconnect between the *Unleashing* EO and the broad agency actions here. *Id.* at 17–19. "Very little—if any—IRA and IIJA appropriations contravene" the goals stated in the *Unleashing* EO, and "significant portions actively further those goals," so a blanket freeze on all IRA and IIJA funds is unlawfully overinclusive. *Id.* at 18. Fourth, the Agencies failed to consider the practical consequences of the freeze, showing a lack of reasoned decision-making. *Id.* at 19–20. Fifth, they also failed to consider reasonable alternatives and provide a reasoned explanation for why they rejected the alternatives, another indicium of a dearth of reasoned decision-making. *Id.* at 20. Sixth and finally, the freezes improperly failed to account for the Nonprofits' "weighty reliance interests in receiving already awarded funds." *Id.* at 20–22.

The Government responds with a host of its own points. First is that arbitrary and capricious review is inappropriate. That is so, the Government argues, for three reasons: because the Nonprofits' claims are an "amorphous, broad-based programmatic attack" impossible to adequately review, because review would improperly constitute "a backdoor attempt to obtain arbitrary and capricious review" of the *Unleashing* EO itself, and because without knowing which agency actions are challenged, the Government cannot "raise all possible defenses." (ECF No. 31 at 49–

50.)[7]  And even if arbitrary and capricious review were appropriate, the Government argues that the freeze was not arbitrary, because "it is perfectly rational to pause funding pending a further determination whether to continue that funding or redirect it elsewhere."  *Id.* at 50–55.

The Nonprofits have made a strong showing that the funding freeze was arbitrary and capricious.  "In arbitrary and capricious cases, we distinguish substantive unreasonableness claims from lack-of-reasoned-explanation claims." *Multicultural Media, Telecom & Internet Council v. Fed. Commc'ns Comm'n*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.).  "A substantive unreasonableness claim ordinarily is an argument that, given the facts, the agency exercised its discretion unreasonably," and a "decision that the agency's action was substantively unreasonable generally means that, on remand, the agency must exercise its discretion differently and reach a different bottom-line decision."  *Id.*  Meanwhile, "a lack-of-reasoned-explanation claim in this context ordinarily consists of a more modest claim that the agency has failed to adequately address all of the relevant factors or to adequately explain its exercise of discretion in light of the information before it."  *Id.*

The Court begins with the "more modest claim" that the Agencies' funding freezes were not reasonably explained.  *Id.*  A decision is not reasonably explained if, among other things, "the agency has relied on factors which Congress has not

---

[7] For the same reasons previously described in Part III.B.1, these arguments are unavailing.

intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024). The starting place is the reasoning that the agencies employed in executing the freeze. After all, "it is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 50 (1983).

The Court finds that the Government failed to provide a rational reason that the need to "safeguard valuable taxpayer resources" justifies a sweeping pause of all already-awarded IIJA and IRA funds with such short notice. Again, the *New York* Court's analysis is instructive:

> Rather than taking a deliberate, thoughtful approach to finding these alleged unsubstantiated "wasteful or fraudulent expenditures," the Defendants abruptly froze billions of dollars of federal funding for an indefinite period. It is difficult to perceive any rationality in this decision—let alone thoughtful consideration of practical consequences.

2025 WL 715621, at *12 (D.R.I. Mar. 6, 2025). And "the desire to review programs for efficiency or consistency" does not "have a rational connection to the directives to proceed with a sudden, blanket suspension of congressionally appropriated aid." *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378, at *10 (D.D.C. Mar. 10, 2025).

To be clear: there is "nothing inherently arbitrary and capricious" about an agency conducting a review of its spending under the IIJA and the IRA and trying to

root out waste, fraud, or excess. *Id.* "But these assertions alone do not provide a rational explanation for why such a review required an immediate and wholesale suspension" of all funding for an indefinite period. *Id.* Nor do those assertions "bear on the failure to consider the reliance interests of small and large" organizations "that would have to shutter programs or close altogether and furlough or lay off swaths of Americans in the process." *Id.*

And the Government cannot just rest on the *Unleashing* EO as its justification. That is true for at least two reasons. First, the Nonprofits persuasively argue that the Agencies' actions were overbroad based on the *Unleashing* EO's text and subsequent guidance.[8] (ECF No. 21 ¶¶ 34–35.) After all, M-25-11 states that the freeze "only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in section 2 of the order." (ECF No. 21-1.) Further, for "the purposes of implementing section 7 of the Order, funds supporting the 'Green New Deal' refer to any appropriations for objectives that contravene the policies established in section 2." *Id.* In freezing any and all funding already awarded under the IIJA and the IRA, the Agencies failed to explain why all those appropriations "contravene the policies established in section 2." *Id.*

---

[8] The Court disagrees with the Government that this argument is "foreclosed to Plaintiffs" just because "the EO specifically states that it does not create any private right of enforcement." (ECF No. 31 at 54.) True, it does not, but it does not need to for the Nonprofits to argue that the fit between the EO and subsequent agency action was "arbitrary and capricious." That is what the APA sets out to do. The result of the Government' alterative theory is that agencies can do whatever they please in service of an EO, even if the agency's action is otherwise arbitrary and capricious.

The second reason is equally important: an agency cannot avert the "arbitrary and capricious" analysis by simply deferring to the relevant EO. After all, "furthering the President's wishes cannot be a blank check" for the Agencies to do as they please. *Nat'l Council of Nonprofits*, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025). "The APA requires a rational connection between the facts, the agency's rationale, and the ultimate decision." *Id.* Here, there is none.

The Government also ignored significant reliance interests. "When an agency suddenly changes course, it must recognize 'that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). And here, the Government "entirely failed to do so."[9] *Nat'l Council of Nonprofits*, 2025 WL 597959, at *15 (D.D.C. Feb. 25, 2025). Nothing from OMB, the NEC Director, or the five Agency Defendants shows that they considered the consequences of their broad, indefinite freezes: projects halted, staff laid off, goodwill tarnished. *See infra* Part III.C. Instead, they "essentially adopted a 'freeze first, ask questions later' approach." *Nat'l Council of Nonprofits,* 2025 WL 597959, at *15.

---

[9] The Government suggests that "the Administration reached a policy judgment that safeguarding taxpayer dollars was a higher priority than providing uninterrupted funding to the IRA and IIJA recipients." (ECF No. 31 at 52.) Fair enough, but that does not entitle agencies to do anything and everything in furtherance of it. None of the Defendant Agencies explained much at all, despite the "foundational principle of administrative law" that judicial review of agency action is limited to "the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec.*, 591 U.S. at 20.

Having found no rational connection between the sweeping actions taken and the vague justifications proffered, the Court holds that the Nonprofits have a strong likelihood of success on their arbitrary and capricious claims against all the Defendants. The Nonprofits have made a strong showing that the seven actions here were neither "reasonable" nor "reasonably explained," two independent reasons that they were arbitrary and capricious. *Ohio v. EPA*, 603 U.S. at 292. Separately, the Court holds that the Nonprofits have shown a strong likelihood of success on their theory that the Defendants' failure to consider reliance interests led to an arbitrary and capricious action. *Dep't of Homeland Sec.*, 591 U.S. at 30. Given that the Court has identified three strong "arbitrary and capricious" theories, it need go no further on the question.

### 3. Count II: "Exceeds statutory authority" claim

The Nonprofits' second APA claim is that the Government's funding freeze was "in excess of statutory jurisdiction, authority, or limitations," under 5 U.S.C. § 706(2)(C). (ECF No. 21 ¶¶ 89, 92–93.) More specifically, the Agency Defendants "lack statutory authority to broadly halt the disbursement of funding appropriated by the IRA and IIJA." (ECF No. 26 at 22–24.) And the OMB and Director Hassett lack statutory authority "to direct agencies to freeze these funds (or to achieve the same result by withholding purportedly necessary approvals to the disbursement of funds …)." *Id.* at 23. This exercise of "sweeping and unprecedented" power is especially problematic, the Nonprofits insist, because of the major questions doctrine. *Id.* at 24.

The Government responds that "each of the IRA and IIJA grant programs identified by Plaintiffs affords the relevant Defendant agency with significant discretion over allocating funding among eligible recipients." (ECF No. 31 at 38.) And the Nonprofits, in turn, fail to identify "any statutory language requiring that Defendants fund their particular programs, let alone that Defendants do so on any particular timeline." *Id.* Finally, the Government suggests that there "is no need for the Court to search for a statute specifically authorizing Defendants to pause funding and redirect it to a different recipient," because the authority to do so "is implicit in the grant programs and appropriations laws themselves." (ECF No. 31 at 45.)

The Government's last point is actually the starting point for the analysis. It is well-established that an agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022). And "where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted." *W. Virginia v. EPA*, 597 U.S. 697, 721 (2022). It is probably true that, as the Government suggests, that the greater power to administer the funds includes some lesser power to pause individual grants.

But the power that the Agency Defendants have actually asserted is a much broader one. It is not to pause individual, already-awarded funds for failure to comply with a grant agreement or because of a change in policy, but rather to freeze any

access to all already-awarded funds under two statutes indefinitely, based solely on the fact that the funds came from those two statutes. ECF No. 21-2 at 2; ECF No. 32-4 ¶ 8. In doing so, the Defendant Agencies have summarily tied up a significant subset of the billions of dollars already awarded under those acts.

The Court cannot see how they can claim that power. "We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (cleaned up). And based on the Supreme Court's past applications of the "major questions doctrine," this case seems to involve similarly vast questions. *See Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 764 (2021) (applying the doctrine where the CDC implemented a nationwide eviction moratorium affecting up to 17 million tenants); *NFIB. v. OSHA*, 595 U.S. 109, 117–18 (2022) (applying the doctrine where OSHA required all federal employees to obtain COVID-19 vaccinations).

The Government seems to recognize that they lack the power to pause all IIJA and IRA funding at once. It argues, at another point in its brief, that determining "whether a pause on disbursement is lawful necessarily requires examining the underlying statutes governing a program, the appropriations measures providing funding for the program, and potentially the specific terms and conditions included in the grant agreement for that program." (ECF No. 31 at 24.) From that premise, the Government suggests that the Court needs to "evaluate the specifics of each

alleged withholding, which cannot be done in the abstract or in an across-the-board manner." *Id.*

But what the Government says the Court cannot do is exactly what the Agencies did here. Each froze all available IIJA and IRA funding that it administers "in the abstract" and "in an across-the-board manner," just based on the fundings' origins in the IIJA and the IRA. *Id.* If the Court must evaluate the specifics of each withholding to determine its lawfulness, it follows naturally that the Agencies likely exceeded their statutory authority in freezing them in totality, without regard to that same analysis. Because there is no clear statutory hook for this broad assertion of power, the Nonprofits are likely to succeed on the merits of this claim against the five Agency Defendants.[10]

The "major questions" case against OMB and Director Hassett is even more straightforward. *See Nat'l Council of Nonprofits*, 2025 WL 597959, at *16 (applying the doctrine to OMB Memo M-25-13). The Government hardly seems to resist it. OMB's organic statute is 31 U.S.C. § 503. Under subsection (a)(2), OMB may "[p]rovide overall direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements." *Id.* § 503(a)(2). But providing overall direction and establishing financial management policies do not clearly confer the power to halt all funding

---

[10] The Government's two other arguments about broad threshold discretion and funding timelines are irrelevant. The Court is not requiring the Government to do anything over than maintain their current obligations or, alternatively, pause or terminate them in an individualized way consistent with law.

arising from the IIJA and IRA, full-stop, on a moment's notice and to create a new pre-clearance regime centered around OMB.  Indeed, the structure and provisions of Section 503 strongly suggest that OMB occupies an oversight role.  Neither appears to grant the expansive authority that OMB tried to exercise here, and the Government has not pointed to specific authority that allows it to unilaterally pull the plug on nearly all federal monetary flows under the IIJA and the IRA.

Subsection (a)(5) further indicates that OMB's role is mainly supervisory, rather than directly active.  That subsection permits OMB to "monitor the financial execution of the budget in relation to actual expenditures."  *Id.* § 503(a)(5).  The language falls well short of actively deciding whether agencies "must temporarily pause" all federal financial assistance.  The Government cannot convincingly argue that "monitor" rises to that level of affirmative control described in M-25-11.  *See* Monitor, *The Oxford English Dictionary* (2d ed. 1989) (defining "monitor" as "to observe, supervise, or keep under review").[11]

The scope of power that OMB and Director Hassett seek to claim is "breathtaking," and its ramifications are massive: an indefinite pause of all money awarded under two of the largest spending statutes that Congress has passed in recent memory.  *See Ala. Ass'n of Realtors*, 594 U.S. at 764.  Because there is no clear

---

[11] The Government did not identify any statutory authority for the NEC Director to issue M-25-11, but elsewhere in its brief recognizes that its office was "not statutorily created" and its "sole function is to advise and assist the president."  (ECF No. 31 at 17 n.2.)  Given the NEC Director's attempt to assert direct power over the Agencies here, a step far beyond advising or assisting the president, the major questions case against the NEC Director is even clearer.

statutory hook for this broad assertion of power, the Nonprofits are likely to succeed on the merits of this claim against OMB and Director Hassett.

### 4.    Count III: "Contrary to law" claim

Finally, the Nonprofits argue that the Government's funding freeze was contrary to law, in violation of 5 U.S.C. § 706(2)(A).  (ECF No. 26 at 25.)  They argue that the funding freeze was contrary to the IRA and the IIJA, "to the statutes governing programs that are funded by the IRA and the IIJA, and to Defendants' own regulations governing the administration of federal grants."  *Id.*

But having found that the Nonprofits have shown a likelihood of success on two of their three claims, the Court declines to analyze the third claim for purposes of resolving this motion for preliminary relief.  *See Worthley*, 652 F. Supp. 3d at 215.

### C.    Irreparable injury

Likelihood of success on the merits is necessary but not sufficient for a preliminary injunction.  Proof of irreparable harm "constitutes a necessary threshold showing," too.  *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).  "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant."  *Id.*  "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."  *Id.*  It "most often exists where a party has no adequate remedy at law."  *Id.*  Put differently, "the necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies.  The two are flip sides of the same coin: if money damages will fully

alleviate harm, then the harm cannot be said to be irreparable." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989).  And the Court has "broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Id.*

The Nonprofits offer five forms of irreparable harm: (1) reducing hiring, (2) furloughing and laying off staff, (3) shuttering planned projects, (4) curtailing or ending current projects, and (5) incalculable damage to the relationship between the Nonprofits and the communities they serve.  (ECF No. 26 at 29–35.)

The Government offers three responses.  First, "even if the temporary pause might hypothetically result in a delay in Plaintiffs' ability to perform certain work under the grant, Plaintiffs have not proven that it would undermine their grant work as a whole."  (ECF No. 31 at 56.)  Second, the harms are "speculative" because the Government retains "the undisputed authority to terminate Plaintiffs' grants under their own authorities." *Id.* at 56–57.  Finally, "even if Plaintiffs can claim some threat of harm, there is no reason why they cannot vindicate that threatened harm through individualized, specific lawsuits challenging particular funding denials." *Id.* at 57.

The Nonprofits have more than adequately demonstrated irreparable harm. Like the States in *New York*, the Nonprofits "laid out scores of examples of obligated funding and the harm that withholding such funding has caused." *New York*, 2025 WL 715621, at *13 (D.R.I. Mar. 6, 2025).  The court's analysis there is on-point and bears repeating:

> It is so obvious that it almost need not be stated that when money is obligated and therefore expected (particularly money that has been spent and

reimbursement is sought) and is not paid as promised, harm follows—debt is incurred, debt is unpaid . . . services stop, and budgets are upended. And when there is no end in sight to the Defendants' funding freeze, that harm is amplified because those served by the expected but frozen funds have no idea when the promised monies will flow again.

*Id.*

A few examples show the myriad irreparable harms.[12] First, "new obstacles," like work stoppages arising from indefinite funding pauses, that "unquestionably make it more difficult" for the Nonprofits to "accomplish their primary mission[s]" are a form of irreparable harm. *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). One grantee's testimony is illustrative: over 8,300 hours of planning wasted on invasive management projects "that just won't happen now," another 10,000 hours of work for a Mississippi Park project down the drain, and the looming threat of terminating employees' service terms. (ECF No. 26-10 ¶¶ 6–10.) Or consider CLAP, whose work in fighting childhood lead exposure has been significantly disrupted. The challenges arising from the funding freeze "have resulted in a delay in the progress" that CLAP "reasonably expected to make towards improving lead hazard awareness, increasing local compliance with lead safety rules, and ultimately preventing childhood lead exposure during recent months." (ECF No. 26-7 ¶ 28.) And even if CLAP's access "to grant funding is fully restored today, as an organization and a community, we can never get this time back." *Id.*

---

[12] The harms described above the line are only a sample. More examples are available in the record and the Nonprofits' briefing. *See, e.g.*, ECF No. 26-4 ¶ 11; ECF No. 26-10 ¶¶ 7–9; ECF No. 26-11 ¶¶ 14, 21; ECF No. 26-9 ¶¶ 17–18, 20; ECF No. 26-6 ¶¶ 15–18; ECF No. 26-5 ¶¶ 15, 17, 20; ECF No. 26-12 ¶¶ 7, 20–22; ECF No. 26-3 ¶¶ 12–13; ECF No. 26-13 ¶¶ 6, 11–12, 15.

The record also shows that the critical pauses in the Nonprofits' work has caused issues for which "there can be no do over and no redress." *Newby*, 838 F.3d at 9. One NCN members' postponement of a planned project monitoring bark beetle attacks on vulnerable, "irreplaceable" giant sequoia trees will lead to environmental harms clearly not redressable in the long-run. (ECF No. 26-9 ¶ 7 ("We can't afford to lose any more of these trees: every single one matters.")). And again, CLAP's testimony shows how delays in its work leave no window for a do-over. "Childhood lead exposure can cause permanent damage in a single-day, and only gets worse the longer it continues." (ECF No. 26-7 ¶ 24.) But because of the freeze and the subsequent effects on CLAP's ability to work with community partners, "lead-safe repairs on local homes" in Providence will likely be "delayed." *Id.* ¶ 26.

Finally, the Nonprofits' standing in the communities that they serve has suffered. By "its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages," so this "kind of harm is often held to be irreparable." *Ross-Simons of Warwick, Inc., v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996); *see also HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (finding a "significant and irreparable" injury where, even if an organization's affiliates survived, "the community connections they have developed are likely to erode"); *see also K-Mart Corp.*, 875 F.2d at 915 (noting that "harm to goodwill, like harm to reputation," is not readily measurable and thus likely to be found irreparable).

The uncertainty surrounding the pause has caused these harms. For example, GIC's work helping Choctaw Indians in Mississippi with their forests has been

disturbed.  ECF No. 26-5 ¶ 22 ("We had multiple meetings with the tribe and tribal council in the process of getting an agreement drafted to show we were serious and would be helping with them in coming years to manage their forest.  And now we can't follow through.  If you think about America's history with the tribes—it was hard to overcome.  And then at the eleventh hour, we disappear.  That whole relationship and the trust we built won't recover if this continues.").  Other similar examples are clear from the record.  *See, e.g.*, ECF No. 26-6 ¶¶ 14–16.

On the other side of the ledger, the Government's arguments against irreparable harm are unconvincing.  The Nonprofits have shown how the pauses undermine their grant work "as a whole," mainly because of the wasted hours of labor and planning, the impending loss of staff, and the harms that the pauses have done to the Nonprofits' relationship with their communities.  As for the Government's other arguments, the Court need not delve into whether and how the Government retains the authority to end the termination agreements, because that question is not before it.  But conducting an individualized termination under federal regulations is worlds away from the sudden, indefinite, across-the-board, and likely unlawful freezes that happened here.

And again, the U.S. Supreme Court's reasoning in its recent *California* stay order is not to the contrary.  In staying the TRO, the majority relied on the fact that the state challengers "represented in this litigation that they have the financial wherewithal to keep their programs running" without the terminated federal grants.  *California*, 145 S.Ct. at 969.

Here, the opposite is true.  The Nonprofits have represented that they largely lack "the financial wherewithal to keep their programs running" without the grants.  (ECF No. 38 at 2–3.)  One grantee member of the NCN made clear that if funding "from the IRA and BIL gets held up, the consequences" for it "could be devastating," because federal funds make up more than one-third of their 2025 budget and more than 90% of their regional partnership's funding.  (ECF No. 26-6 ¶ 17.)  Without the funding, the group "would have to let go of most of our shared staff and cancel contracts with local businesses." *Id.*  Another, writing in mid-March, stated that they were "in a crisis," because they were "45 days away from having to lay off staff at this point," and the "only reason it's not sooner is thanks to what little reserve we have and the fact that Rhode Island and South Carolina have continued to pay us for work, even while they themselves still can't draw on their federal grants."  (ECF No. 26-5 ¶ 18.)

So the Nonprofits have adequately demonstrated irreparable harm arising from the Government's actions here.

## D.     Balance of the equities and the public interest

As with irreparable harm, the balance of the equities and the public interest weigh heavily in favor of injunctive relief.  The Nonprofits were left adrift as they scrambled to make sense of the Government's actions here.  The pause placed critical climate, housing, and infrastructure projects in serious jeopardy, while also threatening the livelihoods of the Nonprofits' employees as well as their fundamental missions.  *See supra*, Part III.C.

The Government is not harmed where an order requires them to disburse funds that Congress has appropriated and that Agencies have already awarded. The Court's order does not prevent the Government from making funding decisions in specific cases according to processes like those established in 2 C.F.R. § 200.340; it simply enjoins sweeping agency action that was likely arbitrary and capricious and in excess of statutory authority. And an agency is not harmed by an order prohibiting it from violating the law.

On the other hand, without injunctive relief to pause the categorical freeze of IIJA and IRA funds, the funding that the Nonprofits are owed (based on the Agencies' own past commitments) creates an indefinite limbo. While some funding has begun to flow, the Nonprofits continue to face substantial uncertainty about whether the Government will comply with federal law. The public interest lies in maintaining the status quo and enjoining any categorical funding freeze.

### E. Bond

Federal Rule of Civil Procedure 65(c) states that the court may issue a TRO or preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Government asks the Court to require the Nonprofits to "provide as security a bond commensurate with the dollar value of grant funds required to be released by any preliminary injunction the Court may enter." (ECF No. 31 at 63–64.) The Court declines.

Rule 65(c) "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (internal quotation omitted).  A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases); *cf. Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-CV-333, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because granting the defendants' request "would essentially forestall [the] [p]laintiffs' access to judicial review").  In a case where the Government is alleged to have unlawfully withheld large sums of previously committed funds to numerous recipients, it would defy logic—and contravene the very basis of this opinion—to hold the Nonprofits hostage for the resulting harm.

## F.    Scope of the remedy

Having decided that the Nonprofits have made the requisite showing under the four-factor test for a preliminary injunction, the Court must next decide the injunction's scope.  The Nonprofits argue that this is a case where a nationwide injunction is "not only appropriate, but necessary," for three reasons.  (ECF No. 26 at 37.)  First, the relief could not so easily be limited to the Nonprofits here, and it would require more work for the Government "to somehow identify which funding streams were going to NCN members." *Id.*  Second, there are similarly situated

nonparties harmed just like the Nonprofits here. *Id.* at 38. Third, the nature of this case, a successful APA challenge, favors broad relief: vacatur of the rule and its applicability to all who would have been subject to it. *Id.*

The Government responds first that there is "no basis" for extending relief to nonparties or funding streams "for which Plaintiffs have not shown harm." (ECF No. 31 at 59.) Second, it posits that 7 U.S.C. § 705 does not require the broad remedy that the Nonprofits seek, in large part because it only requires the Court to "postpone the effective date of an agency action," and that cannot be done here because the agency action has happened. *Id.* at 60–61. Third, the order should be narrow to mitigate "the significant harms it would cause to Defendants and to the Executive Branch's abilities to exercise their lawful statutory authority and discretion." *Id.* at 61–62.

While federal district courts have issued nationwide or "universal" injunctions and they have been acknowledged by the Circuit courts, the Supreme Court has not directly addressed the issue despite concerns expressed by some justices over their use. *See Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring) (expressing skepticism); *Dep't. of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).

But there are appropriate circumstances during which nationwide injunctions are not only appropriate, but necessary. *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1281–82 (11th Cir. 2021). Those include the need "to protect similarly situated nonparties," to "avoid the 'chaos and confusion' of a patchwork of

injunctions," or "where the plaintiffs are dispersed throughout the United States." *Id.* (cleaned up). To this end, in drafting equitable relief, courts must consider "what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017).

After finding that the Government's sweeping actions were likely unlawful, the Court cannot see why similarly situated nonparties should remain subject to them. *See Massachusetts*, 2025 WL 702163, at *33 (D. Mass. Mar. 5, 2025). Nonparties in exactly the same circumstances should not be forced to suffer the harms just because there was not enough time or resources for them to join the suit. "[N]ationwide injunctions provide a mechanism for courts to protect all those who could be harmed by a federal policy when only a few have the ability to quickly bring their case before a court." Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. Rev. 1065, 1094–95 (2018) ("Nationwide injunctions are at times the only way to prevent irreparable injury to individuals who cannot easily or quickly join in litigation."). After all, as the Supreme Court has explained, "one of the 'principles of equity jurisprudence' is that 'the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.'" *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Moreover, the nature of the action itself supports a nationwide injunction. The normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it. *Victim Rts. L. Ctr. v. Cardona*,

20-CV-11104-WGY, 2021 WL 3516475, at *1 (D. Mass. Aug. 10, 2021) (citing 5 U.S.C. § 706(2)(A) ("The reviewing court shall hold unlawful and set aside agency action ... found to be ... arbitrary [and] capricious ....")); William Baude et al., *The Federal Courts and the Federal System* 1354 (8th ed. 2025) (describing how the APA's providing "for the vacatur of federal agency action may confer" a power analogous to universal injunction "by statute"); *see also Gailius v. INS*, 147 F.3d 34, 47 (1st Cir. 1998) (finding that vacation and remand is appropriate when an agency has failed to give adequate explanation for its conclusions); *Nw. Env't Advocs. v. EPA*, 537 F.3d 1006, 1026 (9th Cir. 2008) ("We affirm the district court's decision to vacate the regulation and to remand for further proceedings as a valid exercise of its remedial powers."); *Lovely v. FEC*, 307 F. Supp. 2d 294, 301 (D. Mass. 2004) ("[V]acation is a proper remedy when an agency fails to explain its reasoning adequately." (quoting *Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) (cleaned up)).

Put differently, it would be anathema to reasonable jurisprudence that only the named Nonprofits should be protected from the irreparable harms of the likely unlawful agency actions. That is because "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (cleaned up). So considering the likelihood of success on the merits as to these APA claims, the nature of this case favors a nationwide injunction.

## IV.    ORDER

Upon consideration of the Nonprofits' Motion for a Preliminary Injunction (ECF No. 26), it is hereby:

1.  ORDERED that the Nonprofits' Motion for a Preliminary Injunction (ECF No. 26) is GRANTED; it is further

2.  ORDERED that Defendants Energy, EPA, HUD, Interior, and USDA are ENJOINED from freezing, halting, or pausing on a non-individualized basis the processing and payment of funding that (1) was appropriated under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act and (2) has already been awarded; it is further

3.  ORDERED that Defendants Energy, EPA, HUD, Interior, and USDA take immediate steps to resume the processing, disbursement, and payment of already-awarded funding appropriated under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act, and to release awarded funds previously withheld or rendered inaccessible; it is further

4.  ORDERED that Defendants OMB and NEC Director Hassett provide written notice of the Court's preliminary injunction to all agencies to which Memorandum M-25-11 was addressed.  The written notice shall instruct those agencies that they may not take any steps to implement, give effect to, or reinstate under a different name the unilateral, non-individualized directives in Memorandum M-25-11 with respect to the disbursement of all open awards under the Inflation Reduction Act or the Infrastructure

Investment and Jobs Act. It shall also instruct those agencies to continue releasing any disbursements on open awards that were paused due to or in reliance on Memorandum M-25-11; it is further

5. ORDERED that Defendants Energy, EPA, HUD, Interior, and USDA provide written notice of the Court's preliminary injunction to all grantees who have been awarded funds under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act; it is further

6. ORDERED that all Defendants are ENJOINED from implementing, giving effect to, or reinstating under a different name the directive in Memorandum M-25-11 to unilaterally freeze awarded funding appropriated under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act; it is further

7. ORDERED that this Order shall apply to the maximum extent provided for by Federal Rule of Civil Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706; it is further

8. ORDERED that all Defendants shall file a status report on or before April 16, 2025, at 5:00 p.m. EST, apprising the Court of the status of their compliance with this Order and providing a copy of all directives that Defendants provided pursuant to this Order.

IT IS SO ORDERED.

Mary S. McElroy
United States District Judge
April 15, 2025