**No. 25-1428**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————

WOONASQUATUCKET RIVER WATERSHED COUNCIL, et al.,

Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF AGRICULTURE, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Rhode Island

———————————

### APPENDIX

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

SARA MIRON BLOOM
  *Acting United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*

# TABLE OF CONTENTS

**Page**

Civil Cover Sheet
    (Dkt. No. 1-3) ........................................................................................... A64

First Amended Complaint
    (Dkt. No. 21) ........................................................................................... A67

Exhibits to First Amended Complaint
    (Dkt. Nos. 21-1, -2, -3, -7, -8, -9) ....................................................... A100

Excerpts of Motion for Preliminary Injunction
    (Dkt. No. 26) ......................................................................................... A116

Exhibits to Motion for Preliminary Injunction
    (Dkt. Nos. 26-3, -4, -5, -6, -7, -8, -9, -10, -11, -12, -13) ................... A121

Excerpts of Opposition to Motion for Preliminary Injunction
    (Dkt. No. 31) ......................................................................................... A189

Excerpts of Reply in Support of Motion for Preliminary Injunction
    (Dkt. No. 32) ......................................................................................... A192

Notice of Appeal
    (Dkt. No. 62) ......................................................................................... A195

District Court Docket Sheet .................................................................... A198

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Woonasquatucket River Watershed Council et al. (see attachment) | Department of Agriculture et al. (see attachment) |

**(b)** County of Residence of First Listed Plaintiff    Providence County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Amato A. DeLuca, DeLuca, Weizenbaum, Barry & Revens, Ltd., 199 North Main Street, Providence, RI 02903, (401) 453-1500 (see attachment)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☒ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. 706

Brief description of cause:
Plaintiffs challenge Defendants' freeze of federal funding as arbitrary and capricious, without statutory authority, and contrary to law under the APA.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   Hon. John J. McConnell    DOCKET NUMBER   1:25-cv-00039

DATE
Mar 13, 2025

SIGNATURE OF ATTORNEY OF RECORD
/s/ Amato A. DeLuca

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   (b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   (c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
   United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
   United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
   Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
   Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
   Original Proceedings. (1) Cases which originate in the United States district courts.
   Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
   Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
   Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
   Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
   Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
   Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
   **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
   Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
   Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**Attachment to Civil Cover Sheet**

*Additional Plaintiffs*

Eastern Rhode Island Conservation District
Green Infrastructure Center, Inc.
National Council of Nonprofits

*Additional Defendants*

Brooke Rollins, in her official capacity as Secretary of Agriculture
Department of Energy
Chris Wright, in his official capacity as Secretary of Energy
Department of the Interior
Doug Burgum, in his official capacity as Secretary of the Interior
Environmental Protection Agency
Lee Zeldin, in his official capacity as EPA Administrator
Office of Management and Budget
Russell Vought, in his official capacity as OMB Director
Kevin Hassett, in his official capacity as Director of the National Economic Council

*Additional Attorneys for Plaintiffs*

Miriam Weizenbaum (RI Bar No. 5182)
DeLuca, Weizenbaum, Barry & Ravens
199 North Main Street
Providence, RI 02903
(401) 453-1500
miriam@dwbrlaw.com

Kevin E. Friedl*
Jessica Anne Morton*
Robin F. Thurston*
Skye L. Perryman*
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090

*motion to appear *pro hac vice* forthcoming

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

WOONASQUATUCKET RIVER
WATERSHED COUNCIL;

EASTERN RHODE ISLAND
CONSERVATION DISTRICT;

CHILDHOOD LEAD ACTION
PROJECT;

CODMAN SQUARE
NEIGHBORHOOD DEVELOPMENT
CORPORATION;

GREEN INFRASTRUCTURE
CENTER; and

NATIONAL COUNCIL OF
NONPROFITS,

*Plaintiffs*,

v.

DEPARTMENT OF AGRICULTURE;

BROOKE ROLLINS, in her official
capacity as Secretary of Agriculture;

DEPARTMENT OF ENERGY;

CHRIS WRIGHT, in his official
capacity as Secretary of Energy;

DEPARTMENT OF THE INTERIOR;

DOUG BURGUM, in his official
capacity as Secretary of the Interior;

ENVIRONMENTAL PROTECTION
AGENCY;

Case No. 1:25-cv-00097-MSM-PAS

LEE ZELDIN, in his official capacity
as EPA Administrator;

DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT;

SCOTT TURNER, in his official
capacity as Secretary of Housing and
Urban Development;

OFFICE OF MANAGEMENT AND
BUDGET;

RUSSELL VOUGHT, in his official
capacity as OMB Director; and

KEVIN HASSETT, in his official
capacity as Director of the National
Economic Council,

*Defendants.*

## FIRST AMENDED COMPLAINT

From its very first day in office, the Trump administration has engaged in
concerted efforts to strangle the flow of federal funding on which Americans of all
walks of life rely. Defendants here have specifically targeted funding appropriated by
two laws passed during the prior presidential administration: the Inflation Reduction
Act and the Infrastructure Investment and Jobs Act, also known as the Bipartisan
Infrastructure Law. They have implemented broad, non-individualized freezes of
funds appropriated by those laws, and in doing so, have acted arbitrarily,
capriciously, without statutory authority, and contrary to law, in violation of the
Administrative Procedure Act. The result of Defendants' unlawful funding freeze has
been real and irreparable harm to the recipients of that funding in this District and

2

across the country, as well as to the people and communities they serve. The Court's intervention is required to stop further damage.

## PARTIES

1.     **Plaintiff Woonasquatucket River Watershed Council (WRWC)** is a nonprofit based in Providence, Rhode Island. Its mission is to create positive environmental, social, and economic change by revitalizing the Woonasquatucket River, its Greenway, and its communities. It pursues that mission through conservation work, habitat and waterway restoration, community education and skills training programs, and environmental monitoring, among other things.

2.     **Plaintiff Eastern Rhode Island Conservation District (ERICD)** is a conservation district serving Bristol and Newport Counties in Rhode Island. ERICD's mission is to promote and improve long-lasting and environmentally friendly practices that protect natural resources such as soil, water, and air. It works with a variety of people and groups including farmers, landowners, municipalities, schools, and others in the community.

3.     **Plaintiff Childhood Lead Action Project (CLAP)** is a locally based, nationally recognized 501(c)(3) nonprofit dedicated to the mission of eliminating childhood lead poisoning in Rhode Island. Since 1992, CLAP has worked to provide community input in every major lead poisoning prevention initiative in Rhode Island, spearheaded multiple campaigns to craft and implement groundbreaking lead poisoning prevention policy, and educated over 35,000 parents, tenants, homeowners, health workers, and others about lead dangers and resources.

4.    **Plaintiff Codman Square Neighborhood Development Corporation (CSNDC)** is a nonprofit community development corporation based in Boston.  CSNDC responds to the needs of its neighborhood community, particularly in the areas of affordable housing development, economic development, and community organizing.

5.    **Plaintiff Green Infrastructure Center (GIC)** is a nonprofit based in Charlottesville, Virginia with offices and staff in Rhode Island. GIC helps local governments, communities, conservation groups, and developers evaluate their green infrastructure assets—that is, the interconnected network of waterways, wetlands, woodlands, greenways, parks, farms, ranches, and open spaces that contribute to people's health and quality of life—and make plans to conserve them.

6.    **Plaintiff National Council of Nonprofits (NCN)** is the largest network of nonprofit organizations in North America, with more than 30,000 organizational members located in this District and across the country. NCN supports nonprofits in advancing their missions by identifying emerging trends, sharing proven practices, and promoting solutions that benefit charitable nonprofits and the communities they serve. NCN brings this case on behalf of its members.

7.    **Defendant Department of Agriculture** is a federal agency headquartered in Washington, D.C. Its subagencies include the United States Forest Service and the Natural Resource Conservation Service.

8.    **Defendant Brooke Rollins** is Secretary of Agriculture. She is sued in her official capacity.

9.    **Defendant Department of the Interior** is a federal agency also headquartered in Washington, D.C. Its subagencies include the National Park Service.

10.   **Defendant Doug Burgum** is Secretary of Interior. He is sued in his official capacity.

11.   **Defendant Department of Energy** is a federal agency headquartered in Washington, D.C.

12.   **Defendant Chris Wright** is Secretary of Energy. He is sued in his official capacity.

13.   **Defendant Environmental Protection Agency** is a federal agency headquartered in Washington, D.C.

14.   **Defendant Lee Zeldin** is Administrator of the EPA. He is sued in his official capacity.

15.   **Defendant Department of Housing and Urban Development** is a federal agency headquartered in Washington, D.C.

16.   **Defendant Scott Turner** is Secretary of Housing and Urban Development. He is sued in his official capacity.

17.   **Defendant Office of Management and Budget** is a federal agency headquartered in Washington, D.C.

18.   **Defendant Russell Vought** is the Director of OMB. He is sued in his official capacity.

19. **Defendant Kevin Hassett** is Director of the National Economic Council and Assistant to the President for Economic Policy. He is sued in his official capacity.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*

21. Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one Plaintiff resides in this District.

## LEGAL FRAMEWORK

22. The Inflation Reduction Act (IRA), Pub. L. 117-169, 136 Stat. 1818 (2022), is a landmark piece of legislation that aims to fight inflation, expand domestic manufacturing, lower energy costs, and reduce carbon emissions, among other notable goals.

23. Among other things, the IRA authorizes and appropriates billions of dollars in funding for grants, loans, and other forms of federal financial assistance in order to advance these goals.

24. Those programs are administered by various agencies. The Department of Agriculture, for example, administers billions of dollars in IRA funding, including $19.5 billion handled by the Natural Resources Conservation Service to help farmers, ranchers, and other landowners protect natural resources and enhance production, $13.2 billion to build electrification infrastructure, and $2.4 billion to relieve

thousands of distressed direct and guaranteed Farm Service Agency loan borrowers.[1] As of January 13, the EPA has awarded $38.4 billion in funds appropriated by the IRA, representing 93% of grant funding made available by the law.[2] And HUD has awarded more than $1.4 billion of IRA grant funding in housing investments under the Green and Resilient Retrofit Program, which protects residents in affordable housing by supporting energy and water efficiency, lowering polluting emissions, reducing housing operating and utility costs, and making homes more resilient to natural hazards.[3]

25. The Infrastructure Investment and Jobs Act (IIJA), Pub. L. 117-58, 135 Stat. 429 (2021), also referred to as the Bipartisan Infrastructure Law, or BIL, was enacted and signed into law in November 2021. It too funds a wide variety of critical projects and initiatives that are administered by different agencies.

26. Among many other examples, EPA has awarded nearly $69 billion in IIJA funds to create jobs, lower energy costs, save families money, support clean

---

[1] Dep't of Agric., *Fact Sheet: Celebrating Two Years of the Inflation Reduction Act* (Aug. 16, 2024), https://perma.cc/X37S-NKKC.

[2] Press Release, Env't Prot. Agency, *New Report Celebrates EPA's Unprecedented Successes Under Biden-Harris Administration's Investing in America Agenda* (Jan. 13, 2025), https://perma.cc/DY67-J3U2.

[3] Dep't of Housing & Urban Dev., *HUD Successfully Delivers More Than $1.4 Billion in Housing Investments from President Biden's Inflation Reduction Act* (Nov. 19, 2024), https://perma.cc/EH7E-GUA7. This program also provided up to $4 billion in loans. Matthew Goldstein, *Federal Agency Pauses Program for Energy-Efficient Upgrades in Affordable Housing*, N.Y. Times (Mar. 13, 2025), https://perma.cc/5A5C-WW6C.

energy manufacturing, and help communities burdened by pollution.[4] This includes funding to ensure that water systems are safe and more resilient to natural disasters and cyber-attack threats; to improve air quality and create jobs at U.S. ports; and to eliminate the Superfund cleanup backlog. Interior has awarded IIJA funds to close open mine portals (protecting homes from landslides), clean up orphaned oil and gas wells, and support the federal wildland firefighting workforce.[5] And Energy has deployed its $97 billion in IIJA funding[6] to upgrade America's power grid to withstand wildfires, extreme weather, and other natural disasters; develop technology to improve the extraction of rare earth minerals; and deploy cybersecurity technology to protect electric utility systems.[7]

27.    In addition to the appropriations for grants funding created by the IRA and IIRA, the regulations that govern the administration of grants by the defendant agencies set out specific conditions and procedures for terminating and suspending grants. 2 C.F.R §§ 200.339-200.343 (2024).

---

[4] Press Release, Env't Prot. Agency, *New Report Celebrates EPA's Unprecedented Successes Under Biden-Harris Administration's Investing in America Agenda* (Jan. 13, 2025), https://perma.cc/DY67-J3U2.

[5] Dep't of Interior, *Fact Sheet: Through President Biden's Investing in America Agenda, the Interior Department is Helping Create Good Jobs in the Clean Energy Economy*, https://perma.cc/3D48-LX4Z (last visited Mar. 13, 2025).

[6] Dep't of Energy, *Infrastructure Program and Funding Announcements*, https://perma.cc/9GHB-2XBT (last visited Mar. 13, 2025).

[7] Dep't of Energy, *Infrastructure Programs at Department of Energy*, https://perma.cc/9WAU-H8UH (last visited Mar. 13, 2025); Dep't of Energy, *Rare Earth Security Activities*, https://perma.cc/QG69-S3ZC (last visited Mar. 13, 2025); Dep't of Energy, *Rural And Municipal Utility Advances Cybersecurity Grant And Technical Assistance Program*, https://perma.cc/7GWT-5BPX (last visited Mar. 13, 2025).

# FACTUAL ALLEGATIONS

*The Unleashing American Energy Executive Order and OMB Memo M-25-11*

28.    On January 20, 2025, President Trump signed an executive order entitled *Unleashing American Energy*, Exec. Order No. 14,154, 90 Fed. Reg. 8353. That order laid out, in Section 2, a nine-part "policy of the United States":

a.    "to encourage energy exploration and production on Federal lands and waters";

b.    "to establish our position as the leading producer and processor of non-fuel minerals, including rare earth minerals";

c.    "to protect the United States's economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory";

d.    "to ensure that all regulatory requirements related to energy are grounded in clearly applicable law";

e.    "to eliminate the 'electric vehicle (EV) mandate' and promote true consumer choice";

f.    "to safeguard the American people's freedom to choose from a variety of goods and appliances, including but not limited to lightbulbs, dishwashers, washing machines, gas stoves, water heaters, toilets, and shower heads, and to promote market competition and innovation within the manufacturing and appliance industries";

g.  "to ensure that the global effects of a rule, regulation, or action shall, whenever evaluated, be reported separately from its domestic costs and benefits";

h.  "to guarantee that all executive departments and agencies (agencies) provide opportunity for public comment and rigorous, peer-reviewed scientific analysis"; and

i.  "to ensure that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law."

29.  In Section 7, entitled "Terminating the Green New Deal," the executive order states: "All agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58), including but not limited to funds for electric vehicle charging stations . . . and shall review their processes, policies, and programs for issuing grants, loans, contracts, or other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order."

30.  Section 7 further provides: "No funds identified in this subsection (a) shall be disbursed by a given agency until the Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with any review recommendations they have chosen to adopt."

31.  OMB adopted such review recommendations the next day, issuing a "Memorandum to the Heads of Departments and Agencies" numbered M-25-11. Ex. A. The subject line: "Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*." The memo was from Matthew J. Vaeth, the then-acting director of OMB, and Kevin Hassett, the Assistant to the President for Economic Policy and Director of the National Economic Council.

32.  The memo stated: "The directive in section 7 of the Executive Order entitled *Unleashing American Energy* requires agencies to immediately pause disbursement of funds appropriated under the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58). This pause only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order. This interpretation is consistent with section 7's heading ('Terminating the Green New Deal') and its reference to the 'law and the policy outlined in section 2 of th[e] order'" (alteration in original).

33.  The memo continued: "For the purposes of implementing section 7 of the Order, funds supporting the 'Green New Deal' refer to any appropriations for objectives that contravene the policies established in section 2. Agency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget."

34.  OMB has limited statutory authority to establish governmentwide financial management policies for executive agencies and to provide them with

guidance on financial management matters. 31 U.S.C. § 503(a). OMB lacks statutory authority to direct executive agencies to undertake a blanket freeze of even a subset of funding appropriated by the IRA and IIJA. *Cf. Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-239, 2025 WL 597959, at *15 (D.D.C. Feb. 25, 2025) (finding that OMB likely lacked statutory authority to direct broad halts of federal funding and explaining that OMB's statutory responsibilities to "provid[e] overall direction and establishing financial management policies do not clearly confer the power to halt all finances, full-stop, on a moment's notice").

*Defendants Have Broadly Frozen Funds Appropriated by the IRA and IIJA*

35. Since the *Unleashing American Energy* order, Defendants have broadly frozen funding appropriated under the IRA and IIJA. They have halted payment of these funds—and halted other activities related to the payment of these funds, such as failing to take steps necessary to finalize the obligation of awarded grants and maintaining access to online portals through which grantees can draw on open awards—en masse and on a non-individualized basis.

36. In doing so, numerous agencies have said outright what they were doing and why.

37. For example, at EPA, on January 27, the acting chief financial officer sent a memorandum entitled "Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Pause." Ex. B at 1. The memo—which, it explained, was "being provided based on instruction from OMB—stated that "all disbursements for unliquidated obligations funded by any line of accounting including funds

12

A78

appropriated by the [IRA and IIJA] are paused." *Id.* Likewise, "[i]n accordance with the Executive Order *Unleashing American Energy*, unobligated funds (including unobligated commitments) appropriated by the [IRA and IIJA] are paused." *Id.* According to the memo, "[t]his pause will allow for the review of processes, policies and programs as required by Section 7 of the Order." The memo further explains that "[a] process has been established at OMB for their review and approval of obligations and disbursements based on the Order." *Id.* at 2.[8]

38.    EPA officials have acted accordingly to carry out the freeze on IRA and IIJA-appropriated funds. Officials sent grant recipients an e-mail on January 28 with the subject "Pause EPA Grants." That e-mail stated: "Dear Grant Recipient, EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order." Ex. C.

39.    In a subsequent memo (undated, but issued after February 3), EPA's acting deputy administrator described "EPA's mission and our moral

---

[8] On February 4, EPA's CFO issued an "Update on Inflation Reduction Act and Infrastructure Investment and Jobs Act Pause" in response to court orders in other cases, directing that "federal financial assistance shall not be paused based on . . . the President's Executive Orders, while ongoing litigation proceeds or until otherwise directed by a Court." Ex. D at 1. Nonetheless, as alleged below, EPA has continued to freeze payments on IRA and IIJA funds. In any event, the court order to which that update referred has since expired.

responsibility to be good stewards of our environment for generations to come." Ex. E at 1. Expressing concerns about "the need for oversight of funds provided to [EPA] in the Inflation Reduction Act," and "potential waste, fraud, and abuse of hard-earned American taxpayer dollars," the memo directs EPA to "immediately initiate and conduct an internal review of all relevant grant programs, grant awards, grants that have not yet been awarded and obligated to specific individuals or entities (e.g., notices of funding opportunities), and issued grants." *Id.* at 1–2. "This includes a review of payments on all grant programs and awards where Agency personnel suspect that the grant is unlawful or contrary to Agency policy priorities, or suspect that the grant program implementation or payment might be fraudulent, abusive, duplicative, or implemented in a way that failed to safeguard Agency dollars." *Id.* at 2.

40.    On February 7, EPA's Budget and Planning e-mail address sent an e-mail with the subject: "RE: Additional information on IIJA and IRA - program review pause."[9] The e-mail stated: "Pursuant to the review of financial assistance programs announced by the Acting Deputy Administrator on February 6, the following accounts are temporarily paused for new obligations or disbursements for assistance agreements, loans, rebates, interagency agreements, procurements, and no-cost actions pending a review for compliance with applicable administrative rules and policies."

---

[9] Brad Johnson, *Trump EPA Again Freezes All Biden-Era Programs*, Hill Heat (Feb. 10, 2025), https://perma.cc/4CAN-3U52.

41.     As reflected in a March 7 letter from Senator Sheldon Whitehouse to EPA Administrator Lee Zeldin, EPA has recently informed senior staff that "all [funding] actions greater than $50,000 now require approval from an EPA DOGE Team member." *See* Ex. F. This process requires the program office to complete and sign an "EO Compliance Review Form" for every funding action to facilitate that review. *Id.* That form requires an explanation of how the funding action "complies with Executive Order requirements." *Id.* at 6. These actions are consistent with the "freeze first, ask questions later" approach Defendants have adopted to releasing funding.

42.     The Department of the Interior initiated a review of funding under the IRA and IIJA following the *Unleashing American Energy* executive order,[10] and has "frozen billions in grants and loans stemming from those two bills" pending that review.[11] As one example, the National Park Service, a component of Interior, has refused to release funding appropriated by the IRA and IIJA. In communications with grant recipients, the National Park Service has stated that "NPS FA [financial assistance] agreements that include BIL or IRA funding" will remain frozen.[12] As a

---

[10] Sec'y of the Interior, Order No. 3418, *Unleashing American Energy* (Feb. 3, 2025), https://perma.cc/6CUZ-A89U.

[11] Austin Corona, *Will Trump Review Lead to Smaller Monuments, More Mines on Public Lands? What to Know*, Ariz. Republic (Feb. 28, 2025), https://perma.cc/BYF8-QWMZ.

[12] *See also* Ex. G at 1 (email from Department of the Interior grant officer referring a grantee to OMB Memo M-25-11 "regarding the funding pause").

result, members of Plaintiff NCN and others have been unable to access funds on open grants administered by the Department of the Interior.

43.   The Department of Agriculture has likewise broadly frozen IRA and IIJA funding following the *Unleashing American Energy* executive order. Only on February 20 did it announce that "the first tranche of funding that was paused due to the review of funding in the Inflation Reduction Act (IRA)" would be released—a mere $20 million out of the many billions of dollars in IRA funding that the agency administers.[13] That statement acknowledges both the agency's broad freeze of IRA funding and the immense scope of USDA funding that remains under a blanket freeze. In short, the announcement confirms Plaintiff NCN's members' experiences that USDA is taking precisely the "freeze first, ask questions later" tactic that they challenge.

44.   Indeed, Agriculture grant recipients have received e-mails explicitly linking the freeze to recent executive orders, including *Unleashing American Energy*, and stating that "USDA leaders have been directed to assess whether grants, loans, contracts, and other disbursements align with the new administration's policies." Ex. H. This is consistent with reporting that IRA grant recipients under USDA were "shut out of the federal grant portal that is used to distribute money."[14] The USDA

---

[13] Press Release, Dep't of Agric., *Secretary Rollins Releases the First Tranche of Funding Under Review* (Feb. 20, 2025), https://perma.cc/UD67-F97T.

[14] Jeremy Herbet al., *'People Are Just Flipping Out': Billions in Federal Funding Remain Frozen Despite Court Orders to Keep the Taps Open*, CNN (Feb. 13, 2025), https://perma.cc/PHT3-GAJQ.

has given no indication that any further "tranches" of funding have been released from the blanket freeze.

45.     This blanket freeze has affected numerous programs at Agriculture. For example, the IRA provides $1.5 billion in funding for the Urban and Community Forestry Program. Pub. L. 117-169, § 23003(a), 136 Stat. 1818, 2026 (2022). That program is administered by the U.S. Forest Service, a component of the Department of Agriculture. The Urban and Community Forestry Program provides grants to support efforts by states and partner organizations to plant and maintain community trees, forests, and green spaces, including in disadvantaged areas. Because of the freeze, Plaintiffs WRWC and GIC, other members of Plaintiff NCN, and countless others have been unable to access funds on open grants through that program.

46.     As another example, the IRA appropriates nearly $5 billion in funding until fiscal year 2026 for the Regional Conservation Partnership Program. Pub. L. 117-169, § 21001(a)(4). That program is administered by the Natural Resource Conservation Service, a component of the Department of Agriculture. The Regional Conservation Partnership Program provides funding for public-private conservation projects by landowners and communities. In an email to program grant recipients dated March 11, NRCS stated that it would begin to authorize payments on existing grants "except for IRA/BIL funded agreements." As a result, members of Plaintiff NCN and others have been unable to access funds on open grants through that program.

47.    As to the Department of Energy, the then-Acting Secretary announced on January 20 that the agency would conduct a review of all its activities—specifically including "Funding Actions" such as actions relating to "loans, loan guarantees, [and] grants"—"to ensure all such actions are consistent with current Administration policies and priorities, including budgetary priorities." Ex. I at 1-2.

48.    Reporting indicates that IRA grant recipients under Energy were "shut out of the federal grant portal that is used to distribute money."[15] Reporting has also revealed that the Department of Energy froze grants related to the IRA and IIJA, ultimately requiring review and approval by a political appointee before disbursement.[16] As that reporting explains, because there are "easily thousands of transactions a week that a political appointee would suddenly now have to approve," payments from these funding lines "just won't get made or may be made late." *Supra* note 15.

49.    As one example of the effect of that freeze: The IIJA appropriates $3.5 billion in funding for the Weatherization Assistance Program. Pub. L. 117-58, § 40551, 135 Stat. 448, 1075-76 (2021). That program is administered by the Department of Energy and enables low-income families to permanently reduce their energy bills by making their households more energy efficient. As a result of the freeze, members of Plaintiff NCN and others have been unable to access funds on open grants through that program.

---

[15] Jean Chemnick, *Effects of Trump's Spending Freeze Ripple Across Energy Projects*, Politico (Feb. 6, 2025), https://perma.cc/NCT2-9AYS.
[16] *Id.*

18

50.     HUD, too, has frozen IRA appropriations under its Green and Resilient Retrofit program. *See supra* n.3. HUD has claimed that the program is, in the words of one news report, "being reviewed to ensure it was carried out consistent with the housing agency's core mission to promote affordable housing." *Id.*[17] But HUD has communicated to grant recipients that the freeze was due to the *Unleashing American Energy* executive order. As a result of this freeze, CSNDC and others have been unable to access funds on open grants through that program.

51.     Because of these broad freezes, funding appropriated by the IRA and IIJA for particular grant programs has halted. The handful of examples described above are merely evidence of a much wider freeze; Defendants have broadly frozen numerous other sources of funding appropriated by the IRA and IIJA.

52.     On information and belief, OMB has acted in concert with the other agency defendants to freeze funding appropriated by the IRA and IIJA.

53.     First, OMB has directed agencies to freeze funds "for objectives that contravene the policies established in section 2" of the *Unleashing American Energy* executive order, without legal basis, and without explaining how an agency should determine what "contravene[s]" those policies.

---

[17] Earlier reporting suggested that HUD was halting this program indefinitely, before HUD issued this statement regarding a "review." *See, e.g.*, Jesse Bedayn, *Affordable Housing Threatened as Trump Halts $1 Billion Slated for Extending Life of Aging Buildings*, Associated Press (March 12, 2025), https://apnews.com/article/trump-doge-affordable-housing-preservation-crisis-de27d7846271779157550fcec0a78ea6. Whatever the precise terminology HUD employs, the impact is the same: an indefinite halt to this congressionally appropriated funding.

54. Second, OMB has directed agencies that they "may disburse funds as they deem necessary after consulting with the Office of Management and Budget." On information and belief, to the extent that agencies have consulted with OMB about the disbursement of funds they deem necessary, OMB has acted unreasonably and without basis in withholding that consent, and requiring the agencies to continue withholding funds.

55. Officials affiliated with DOGE (encompassing the Department of Government Efficiency, the U.S. DOGE Service, and/or the DOGE Service Temporary Organization) have helped or directed EPA to freeze funding appropriated by the IRA and IIJA. On information and belief, officials affiliated with DOGE have done the same at other defendant agencies. DOGE lacks any statutory authority to itself freeze this funding.

*Defendants' Freezes of These Funding Lines Are Final Agency Action*

56. The Administrative Procedure Act authorizes judicial review of final agency action. 5 U.S.C. § 704.

57. Final agency actions are those (1) that "mark the 'consummation' of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

58. Each Defendant's freeze on funding appropriated by the IRA and IIJA is final agency action subject to the Court's review.

59.     The freeze of funds appropriated by the IRA and IIJA marks the consummation of the agencies' decisionmaking process because it immediately suspends the processing and payment of funding appropriated by the IRA and IIJA.

60.     The freeze of funds appropriated by the IRA and IIJA is also an action by which rights or obligations have been determined or from which legal consequences will flow because it halts the processing and payment of funding appropriated by the IRA and IIJA that would otherwise be paid.

### PLAINTIFFS' INJURIES

61.     Defendants' freeze of funding appropriated by the IRA and IIJA has caused, and if not enjoined will continue to cause, serious and irreversible harm to Plaintiffs' members and many others.

62.     Countless states, localities, businesses, and nonprofits—including Plaintiffs and other members of NCN—have been awarded grants and other financial assistance through the IRA and IIJA. That money funds vital programs ranging from wildfire prevention efforts to lead pipe remediation to efforts to control and contain invasive species to important scientific and ecological research to reforestation efforts and much more.

63.     Many of the recipients of such funding—and, in particular, nonprofit recipients such as Plaintiffs and other NCN members—rely on those sources of funding in order to hire and pay staff, carry out what are frequently multiyear projects for the benefit of the communities where they operate, and plan for the future.

64. Defendants' freeze has already seriously damaged those nonprofits' ability to carry out their core missions and led them to have to halt ongoing projects.

65. For example, WRWC has a $1 million grant (as a subgrantee) funded by the U.S. Forest Service—but it has been frozen since January because the grant was funded under the IRA. That freeze has completely halted WRWC's planned project of building capacity for urban forestry along the Woonasquatucket Greenway, and also disrupted WRWC's operations more broadly.

66. ERICD has a nearly $350,000 grant from EPA (as a subgrantee) that is funded under the IRA. Those funds were intended to support education and outreach efforts to reduce food waste and its negative impacts on the environment, including setting up the first municipal composting site in Rhode Island. But because ERICD's grant has been frozen on and off for weeks, it hasn't been able to carry out the work it planned. ERICD is also a subgrantee of a USDA grant funded by the IRA—and that grant has remained completely frozen since January. ERICD planned to use that money to hire another full-time staff person to help farmers use technology and data to grow more efficiently and sustainably. But because of the freeze, ERICD has not been able to hire that staff person, and so fewer farmers receive help.

67. CLAP is unable to access a critical $500,000 grant administered by the EPA that it needs in order to carry out an initiative to combat childhood lead poisoning in Providence, Rhode Island. That initiative was to include trainings for contractors and other workers on lead-safe practices that are needed to keep those workers healthy and to avoid contaminating the homes in which they work with lead

A88

particles. CLAP also intends to use the grant to fund efforts to coordinate local and state officials to ensure landlords are operating in compliance with lead-safety laws. CLAP is a small organization that lacks the resources to carry out these projects on anything like the same scale if their already awarded EPA grant remains frozen. Already, they have had to defer hiring an extra staff member because of the freeze. As a result, CLAP has been significantly hampered in its ability to carry out its vital mission, to the detriment of CLAP itself and the community it serves.

68.    CSNDC has been awarded a $750,000 grant from HUD, funded under the IRA. CSNDC has planned to use these funds to rehab and renovate a thirty-one-unit affordable housing unit for older residents, including upgrading ventilation systems and better weatherizing the units to increase energy efficiency. These improvements will not only help the environment; they will also save CSNDC money it can then put towards other initiatives, and it will improve air quality for vulnerable, low-income seniors in an area with high asthma rates. But even though the grant has been awarded, the grant agreement has been fully negotiated, and CSNDC has executed the agreement, HUD has refused to take any further steps, including executing the finalized agreement and disbursing funds—because of the funding freeze. As a result, CSNDC will not be able to complete the project on the scale it had planned, losing money for its mission and impacting its senior residents' health.

69.    GIC, one of NCN's members that operates in Rhode Island and several other states, receives both IRA and IIJA funding. Those grants make up fully

80 percent of their budget. Their IRA funding comes through the Department of Agriculture and goes toward efforts to plant and maintain community trees, forests, and green spaces, including in disadvantaged areas.

70.     GIC has had to stop work as a result of the Department of Agriculture's freeze on funding. They hired new staff specifically to complete IRA-funded work but now have had to furlough some staff and, if the funds remain frozen, will need to lay off not only their new hires but the rest of their staff as well. They have been unable to plan for the future and do not know, for example, whether they will have the money to pay for trees they need to order now to have ready for planting seasons in the fall. They worked hard to build trust in communities that are frequently skeptical of government programs in order to be able to successfully carry out long-term projects; the freeze has shattered that trust.

71.     Another NCN member carries out research and conservation work to protect giant sequoias and other large trees. They rely on funds from both the IRA and IIJA from the Department of Interior. Because of Defendants' funding freeze, they have been unable to draw on IRA-appropriated funds through a grant supporting work to research and monitor bark beetles that can infest and kill giant sequoia trees.

72.     If the freeze continues, the group is likely to have to postpone the project until next year, even as bark beetles are currently in the process of attacking ancient trees that cannot be replaced. Halting that data collection will have cascading impacts on their scientific progress as well. And because of the funding freeze, the

group has already had to postpone hiring a new full-time employee to add to their staff of four, as well as hiring up to six part-time contractors. Not being able to add that extra capacity has a meaningful impact on the amount of work the group is able to do to fulfill its mission.

73.     Another NCN member is dedicated to watershed protection and restoration in a Western state. They too receive funds appropriated under the IRA and IIJA for a number of different projects but have seen funds administered by the Department of Agriculture frozen as a result of Defendants' actions.

74.     That freeze has already put on hold a land-management project to clear vegetation in order to reduce the risk of wildfires and improve habitat and water quality in the area. Keeping that project on ice increases the danger of wildfires this summer and threatens local water quality. It is also already hurting the group. They hired new staff in reliance on a grant of IRA funds they cannot currently access. As a result, they do not know how much longer they will be able to continue paying their new employee or when their work might resume.

75.     Yet another NCN member, which engages hundreds of youth and young adults in programs to improve access to outdoor recreation, restore natural habitats, protect waterways, and respond to community needs and natural disasters, has approximately $621,000 in federal grants from Interior frozen.

76.     As a result, that organization can no longer use those funds as planned to support an invasive plant management team that would work with national parks in the central United States. That will result in potentially thousands of acres not

being managed, with negative impacts for visitors to public lands, hunting and fishing, and wildlife populations due to loss of habitat. And the organization cannot make up for that delay: If they are ever able to manage these invasive species in the future, it will be more difficult and more expensive because they will have spread more.

77.     And yet another NCN member runs a weatherization training center, which helps weatherize the homes of low-income Americans in an effort to lower their utility bills when they are struggling to make ends meet, which helps them stay in their homes and also improves air quality and health and safety in the home. That member typically trains over 200 people in about 40 classes per year. But the funding for that weatherization program comes entirely from IIJA funds awarded by the Department of Energy, and those funds have been frozen since January.

78.     As a result, that member has had to stop offering weatherization training, which means that people living in poverty are less safe in their homes and less able to make ends meet. Because of the funding freeze, that member has also had to pause all work on a two-year program to gain expertise in offering training to weatherization departments, which would ultimately enable them to weatherize more homes. And the member has had to cancel a planned conference, undermining their relationships with speakers and attendees from their community.

79.     These stories are just a few examples of a much broader picture of instability, confusion, and irreparable harm created by Defendants' actions.

## CLAIMS FOR RELIEF

### Count One
### Violation of the Administrative Procedure Act—706(2)(A)
### Arbitrary and Capricious
### (Against All Defendants)

80.    Plaintiffs reallege all paragraphs above as if fully set forth here.

81.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

82.    Defendants' freeze on funding appropriated by the IRA and IIJA is arbitrary and capricious in multiple respects. Several examples follow.

83.    First, Defendants' funding freeze fails to account for the catastrophic practical consequences that it has already produced and, if not stopped, will continue to produce. In this and other respects, Defendants "entirely failed to consider an important aspect of the problem." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

84.    Second, Defendants' funding freeze fails to account for the substantial reliance interests in the ordinary processing and disbursement of funding authorized by the IRA and IIJA that the freeze radically disrupts. "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," and the failure to do so is arbitrary and capricious. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted).

85.    Third, Defendants' funding freeze contradicts Defendant OMB's own directive. That directive instructs agencies that the order to pause funding in the

*Unleashing American Energy* executive order does not apply to all funding authorized by the IRA and IIJA but only "to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order." Defendants, however, have continued to pause funding authorized by the IRA and IIJA well outside that scope. By freezing funding without reason and in contravention of the administration's own interpretation of the executive order, Defendants have acted arbitrarily and capriciously.

86.     Defendants Department of Agriculture, Department of Energy, Department of the Interior, Department of Housing and Urban Development, EPA, and their leaders have acted arbitrarily and capriciously by halting funding appropriated by the IRA and IIJA.

87.     In addition or in the alternative, on information and belief, Defendants OMB, Director Vought, and Director Hassert have acted arbitrarily and capriciously by withholding purportedly necessary approvals to the other Defendants to release funding appropriated by the IRA and IIJA.

### Count Two
### Administrative Procedure Act–706(2)(C)
### In Excess of Statutory Authority
### (Against All Defendants)

88.     Plaintiffs reallege all paragraphs above as if fully set forth here.

89.     Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

90. "An agency . . . literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (internal quotation marks and citation omitted).

91. No statutory provision authorizes Defendants Department of Agriculture, Department of Energy, Department of the Interior, or EPA to freeze funding appropriated by the IRA and IIJA.

92. Defendants Department of Agriculture, Department of Energy, Department of the Interior, Department of Housing and Urban Development, EPA, and their leaders therefore have acted in excess of statutory jurisdiction, authority, or limitations, or short of statutory right in withholding those funds.

93. In addition or in the alternative, on information and belief, Defendants OMB, Director Vought, and Director Hassett have acted in excess of statutory authority by withholding purportedly necessary approvals to the other Defendants to release funding authorized by the IRA and IIJA.

94. OMB's organic statute gives it responsibilities for establishing financial management policies and requirements for executive agencies, *see* 31 U.S.C. §§ 503(a), 504, which can include providing guidance to agencies on understanding executive orders.

95. But no statutory provision authorizes OMB, Director Vought, or Director Hassett to require executive agencies to freeze funding authorized by the IRA and IIJA.

## Count Three
### Administrative Procedure Act–706(2)(A)
### Contrary to Law
### (Against All Defendants)

96.     Plaintiffs reallege all paragraphs above as if fully set forth here.

97.     Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

98.     The APA's reference to "law" in the phrase "not in accordance with law," "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original).

99.     The IRA and IIJA appropriate money for specific purposes and expressly direct that the money be put to those purposes.

100.     By freezing funds appropriated under the IRA and IIJA and refusing to direct that money to the purposes Congress specified in those laws, Defendants are acting contrary to law.

101.     The regulations that govern the administration of grants by Defendants Department of Agriculture, Department of Energy, Department of the Interior, Department of Housing and Urban Development, and EPA set out specific conditions and procedures for terminating and suspending grants.

102.     Defendants have not followed the procedures set out in those governing regulations and have frozen grants in circumstances in which the regulations would not allow those grants to be terminated or suspended. By doing so, Defendants are acting contrary to law.

A96

103. In addition or in the alternative, on information and belief, Defendants OMB, Director Vought, and Director Hassert have acted contrary to law by withholding purportedly necessary approvals to the other Defendants to release funding appropriated by the IRA and IIJA.

## PRAYER FOR RELIEF

Plaintiffs request that the Court enter the following relief:

a. Declare unlawful and set aside Defendants' freeze on funding appropriated by the IRA and IIJA as arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A), in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C), and not in accordance with law under 5 U.S.C. § 706(2)(A);

b. For the same reasons, declare and hold unlawful OMB Memo M-25-11 insofar as it directs agencies to freeze any funding authorized by the IRA and IIJA;

c. Issue preliminary and permanent relief, including a stay under 5 U.S.C. § 705, barring Defendants, their officers, employees, and agents from continuing to carry out the freeze on funding appropriated by the IRA and IIJA and requiring the processing and disbursement of funding previously frozen;

d. Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate;

e. Grant such other relief as the Court deems necessary, just, and proper.

Dated: March 17, 2025         Respectfully submitted,

/s/ Miriam Weizenbaum

Miriam Weizenbaum (RI Bar No. 5182)
DeLuca, Weizenbaum, Barry & Revens

199 North Main Street
Providence, RI 02903
(401) 453-1500
miriam@dwbrlaw.com

Kevin E. Friedl* (Admitted only in New
York; practice supervised by D.C. Bar
members)
Jessica Anne Morton* (DC Bar No.
1032316)
Robin F. Thurston* (DC Bar No. 1531399)
Skye L. Perryman* (D.C. Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kfriedl@democracyforward.org
jmorton@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*admitted *pro hac vice*

# CERTIFICATE OF SERVICE

On March 17, 2025, I caused the foregoing and accompanying exhibits to be served by certified mail on Defendants, the Attorney General, and the U.S. Attorney's Office for the District of Rhode Island at the below addresses. On the same day, I further caused these documents to be served via email on Alex Haas, Diane Kelleher, and John Griffiths, Assistant Directors, Federal Programs Branch, Department of Justice, and on Kevin Hubbard, Civil Chief, U.S. Attorney's Office for the District of Rhode Island.

Department of Agriculture and
Secretary Brooke Rollins
Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250

Department of Energy and
Secretary Chris Wright
1000 Independence Ave., SW
Washington, DC 20585

Department of the Interior and
Secretary Doug Burgum
1849 C Street, N.W.
Washington DC 20240

Environmental Protection Agency
and Administrator Lee Zeldin
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Department of Housing and Urban
Development and Secretary Scott
Turner
451 Seventh Street, S.W.
Washington, DC 20410

Office of Management and Budget
and Director Russell Vought
725 17th Street, NW
Washington, DC 20503

Attorney General Pam Bondi
Department of Justice
950 Pennsylvania Avenue, NW,
Washington, DC 20530

Director Kevin Hassett
National Economic Council
1600 Pennsylvania Ave NW
Washington, DC 20500

United States Attorney's Office
District of Rhode Island
One Financial Plaza, 17th Floor
Providence, RI 02903

/s/ Miriam Weizenbaum
Miriam Weizenbaum

# EXHIBIT A



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

January 21, 2025

M-25-11

MEMORANDUM TO THE HEADS OF DEPARTMENTS AND AGENCIES

FROM:            Matthew J. Vaeth, Acting Director, Office of Management and Budget

                 Kevin Hassett, Assistant to the President for Economic Policy and Director of the National
                 Economic Council

SUBJECT:         Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*

The directive in section 7 of the Executive Order entitled *Unleashing American Energy*
requires agencies to immediately pause disbursement of funds appropriated under the Inflation
Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act
(Public Law 117-58). This pause only applies to funds supporting programs, projects, or
activities that may be implicated by the policy established in Section 2 of the order. This
interpretation is consistent with section 7's heading ("Terminating the Green New Deal") and its
reference to the "law and the policy outlined in section 2 of th[e] order."

For the purposes of implementing section 7 of the Order, funds supporting the "Green
New Deal" refer to any appropriations for objectives that contravene the policies established in
section 2. Agency heads may disburse funds as they deem necessary after consulting with the
Office of Management and Budget.

# EXHIBIT B



## THE CHIEF FINANCIAL OFFICER

WASHINGTON, D.C. 20460

January 27, 2025

## CUI//SP-BUDG

**MEMORANDUM**

**SUBJECT:**    Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause

**FROM:**    Gregg Treml, Chief Financial Officer (Acting)

GREGG TREML
Digitally signed by GREGG TREML
Date: 2025.01.27 16:59:02 -05'00'

**TO:**    Deputy Assistant Administrators
Deputy Associate Administrators
Deputy Regional Administrators

This message is being provided based on instruction from OMB.

In accordance with the Executive Order _Unleashing American Energy,_ unobligated funds (including unobligated commitments) appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the Infrastructure Investment and Jobs Act (P.L. 117-58) are paused. Pursuant to this pause, the Compass financial system will temporarily not allow obligations to be made in these lines of accounting. EPA is in discussions with the Office of Management and Budget on the continuation of payroll in IIJA and IRA.

Additionally, all disbursements for unliquidated obligations funded by any line of accounting including funds appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the Infrastructure Investment and Jobs Act (P.L. 117-58), are paused. Additional details on the pause in disbursements will be provided separately by the Office of the Controller.

This pause will allow for the review of processes, policies and programs as required by Section 7 of the Order.

All related actions, including new contract, grant, rebate and interagency actions, to include drawdowns, for IIJA and IRA are paused. Offices are not to put IIJA or IRA lines of accounting on any actions and all current actions are paused. Further, no IIJA or IRA funded travel is permissible at this time and all upcoming travel funded from either should be cancelled.

A process has been established at OMB for their review and approval of obligations and disbursements based on the Order. We will continue to update the community. We appreciate your work to ensure compliance with the Order.

cc: Lek Kadeli
    Meshell Jones-Peeler
    Paige Hanson
    Senior Resource Officials
    Senior Budget Officers
    Regional Comptrollers
    Funds Control Officers

# Controlled by U.S. Environmental Protection Agency

# EXHIBIT C

| From: | EPA_Grants_Info |
| --- | --- |
| Subject: | Pause EPA Grants |
| Date: | Tuesday, January 28, 2025 4:49:41 PM |

**EXTERNAL: This email originated from outside of the State of Maine Mail System. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Dear Grant Recipient,

EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

# EXHIBIT G

 Outlook

## RE: [EXTERNAL] ASAP error - D22AP00170

**From** Sarris, Eleni V <eleni_sarris@ibc.doi.gov>
**Date** Wed 2/5/2025 5:02 PM
**To** Frauenberger, Mark E (DEC) <Mark.Frauenberger@dec.ny.gov>
**Cc** Maio, James A <james_maio@ios.doi.gov>; orphanedwells, DOI <orphanedwells@ios.doi.gov>; IBC-AQD-FA
States <aqd-fa.states@ibc.doi.gov>

---

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

---

Hi Mark,

Thank you for your recent email regarding Treasury's Automated Standard Application for Payments or ASAP.GOV. Please refer to the following memo, *Unleashing American Energy* – OMB Memo M-25-11, regarding the funding pause.

We will be in contact as soon as we have additional information or updates. Thank you!

Best wishes,



Eleni Sarris
Lead Grant Management Officer, Team 3
Acquisition Services Directorate, AQD D5/B4
Interior Business Center
U.S. Department of the Interior
Direct: 571-513-3033 | Mobile: 720-276-9105
www.doi.gov/IBC

*Uniform Guidance for Grants and Agreements*
*GrantSolutions Training and Assistance*

**From:** Frauenberger, Mark E (DEC) <Mark.Frauenberger@dec.ny.gov>
**Sent:** Tuesday, February 4, 2025 11:12 AM
**To:** Sarris, Eleni V <eleni_sarris@ibc.doi.gov>
**Subject:** [EXTERNAL] ASAP error - D22AP00170
**Importance:** High

---

**This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

---

Hi Eleni,

I am attempting to do a draw in ASAP for grant D22AP00170 and am receiving an error message.

*ERROR 2048: Summary payments cannot include draws that are subject to agency review.*

Hoping you can give some guidance on how to proceed.

Thanks for your help,
Mark

**Mark Frauenberger**
Associate Accountant, Division of Fiscal Management

**New York State Department of Environmental Conservation**
625 Broadway, Albany, NY 12233-4751
P: (518) 402-9371 | mark.frauenberger@dec.ny.gov
www.dec.ny.gov | 



# EXHIBIT H



-----Original Message-----
From: "Marriott, Emily - FPAC-NRCS, MA" ███████████████
Sent: Tuesday, February 11, 2025 9:59am
To: "Ryan Voiland" <███████████████>, "Barker Plotkin, Jeremy - FPAC-NRCS, MA"
███████████████
Subject: RE: [External Email]RE: receipts for SCA spreading

Hi Ryan,

Thank you for sending the receipts. We will work on getting this certified ASAP. However,
payments on contracts funded through the Inflation Reduction Act are currently on pause.

On January 20, 2025, President Trump signed an Executive Order that placed a freeze on
spending authorized by the Inflation Reduction Act (IRA) of 2022 and the Infrastructure
Investment and Jobs Act (IIJA). This includes payments under NRCS conservation program
contracts that are funded through the IRA and IIJA.

USDA leaders have been directed to assess whether grants, loans, contracts, and other
disbursements align with the new administration's policies. Once Brooke Rollins is
confirmed—hopefully later this week—she will have the opportunity to review the programs
and work with the White House to make determinations as quickly as possible.

In the meantime, USDA appreciates farmers' patience and recognizes the vital role the
agricultural community plays in strengthening and sustaining our nation. We understand
that uncertainty can be challenging, especially for those already navigating the
unpredictable forces of nature.

I will keep you informed as I receive more information.

Best,
Emily

Emily Marriott
Soil Conservationist
Western Massachusetts | Hampden, Hampshire, and Franklin Counties
Hadley Field Office



Natural Resources Conservation Service
███████████████████████████████
███████████████



# EXHIBIT I



Entry ID: 6742102    Date Filed: 08/08/2025    Page: 52    Document: 0011832454D    Case: 25-1428

**The Secretary of Energy**
Washington, DC 20585

January 20, 2025

MEMORANDUM FOR HEADS OF DEPARTMENTAL ELEMENTS

FROM:            INGRID C. KOLB
                 ACTING SECRETARY

SUBJECT:         Agency-wide Review of Program and Administrative Activities

As we navigate through this transition period for a new Administration within the Department of Energy (DOE), it is imperative to ensure a deliberate approach to the Administration's programmatic and administrative policies and priorities.  To that end, effective immediately and until further notice, prior to any actions or decisions on all herein described activities, a review under varying criteria will be undertaken to ensure all such actions are consistent with current Administration policies and priorities, including budgetary priorities.[1]  The broad spectrum of actions include but are not limited to: personnel actions; awarding of grants, loans, funding opportunities, and cost sharing agreements; contracting, procurement announcements, and actions; rulings, decisions or other actions on any applications, enforcement action, or settlements of any contested matter; submissions to the Federal Register for publication; and the publication or announcement of reports, studies, congressional correspondence, and public statements. This includes all studies or reports that are either ongoing, set to be released, are already under review, or have not yet begun.

The reviews are necessary to facilitate a comprehensive review of the Department's ongoing activities and to align these efforts with Congressional authorizations and the Administration's priorities, to ensure that resources are allocated efficiently, and that the Department's initiatives are in line with the statutory mission of DOE and the priorities of the Administration.

As discussed below, a process will be in place for the submission of requests for action by the Secretary (acting) to ensure the important work of the Department continues to serve the American people.

Scope of Actions:

1. **Personnel Actions:**  All personnel actions, including appointments, promotions, and transfers, are to be halted.  This includes both internal staff movements and external hiring processes, unless expressly and unambiguously authorized with the prior approval of the acting Secretary, after the date of issuance of this order.

---

[1] With respect to NNSA, nothing herein is intended to contradict 50 USC Ch. 41but to be construed broadly consistent with the Secretary's authority thereunder, include §2402(d).

2. **Procurement Announcements and Actions:** Any announcements or awards regarding procurement opportunities and contracts are to be put on hold, other than for routine building operations and supplies for contracts with a value of less than $100,000. This includes, but is not limited to, requests for proposals (RFPs), requests for quotations (RFQs), and contract negotiations. Such approvals will be made in writing by the Secretary (acting) or the Head of Departmental Element with the prior approval of the Secretary (acting).

3. **Funding Actions:** All funding and financial assistance activities including loans, loan guarantees, grants, cost sharing agreements, funding opportunity announcements, and contracts shall not be announced, approved, finalized, modified, or provided until a review of such takes place to ensure compliance with Congressional authorization and Administration policy. Such approvals will be made in writing by the Secretary (acting) or the program head with the prior approval of the Secretary (acting).

4. **Release of Reports, Studies, Congressional Correspondence, and Public Announcements:** Submission of actions to the Secretary (acting) for approval shall be completed through relevant program heads prior to continuation of development and dissemination of any reports, studies, requests for information (RFIs) or congressional correspondence, including both finalized documents and those in draft form; conducting and scheduling public meetings related to any studies or reports. Relative to studies and reports being conducted by the National Laboratories, approvals must be obtained by the Head of Departmental Element with concurrence by the Administration designee within the Departmental Element. If reports or studies are subject to statutory or other requirements, a request for waiver from the reviews may be made to the Secretary (acting), who may grant the waiver. Submission of actions to the Secretary (acting) for approval shall be completed before publishing any Department social media posts, press releases, or other public announcements including website changes, even if previously scheduled and approved.

5. **Federal Register Notices:** Nothing should be sent to the Federal Register (FR) for publication without written approval of the Secretary (acting) or designee. The Office of the General Counsel is directed to: (i) immediately withdraw all items that have been submitted to the FR but have not yet been published, and (ii) provide the Secretary (acting) by noon on January 23 a list of all items that have been published but have not yet reached the date by which any such item is considered final (including the date such item becomes final).

6. **Actions under the National Environmental Policy Act (NEPA):** NEPA work may continue. However, the Secretary (acting) shall be informed of all NEPA work by January 24, 2025; or if new action is taken, at least 10 days before initiated. The scope of the NEPA reviews shall be reviewed by the Principal Deputy General Counsel or other person as designated by the Secretary (acting). Final Environmental Assessments and Environmental Impact Statements shall be

Entry ID: 6742102    Date Filed: 08/08/2025    Page: 54    Document: 00118324540    Case: 25-1428

reviewed and approved by the Principal Deputy General Counsel or other person as designated by the Secretary (acting).

The reviews shall be conducted by all DOE offices, field offices, National Laboratories, and NNSA. There are no exemptions other than for routine building operations and supplies for contracts with a value of less than $100,000 without prior approval by the Secretary (acting).

**Rescinding of Signature Authority.**

To ensure compliance with this Directive, all signature authority for any of the actions provided herein are rescinded. Any actions requiring signature authority should not proceed until explicit authorization is provided in writing by the Secretary (acting) or designee.

The heads or administrators of each of the program, administrative, and support offices, National Laboratory Directors, field offices, and NNSA shall immediately disseminate this memorandum within their respective organizations and ensure full compliance with the directives as applicable.

Further guidance regarding the full resumption of activities, results of the review process, additional changes in DOE priorities, interagency collaboration, and legal compliance guidance will be forthcoming. Your cooperation and understanding are greatly appreciated as we work to enhance the effectiveness and efficiency of the Department.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

WOONASQUATUCKET RIVER
WATERSHED COUNCIL, *et al.*,

*Plaintiffs,*

v.                                                   Case No. 1:25-cv-00097-MSM-PAS

DEPARTMENT OF AGRICULTURE,
*et al.*,

*Defendants.*

---

### PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Since taking office, the Trump administration has cut off federal funding for vital services and projects in this District and across the country. A series of unprecedented and sweeping executive orders and agency directives have halted duly authorized payments and processing of grants, loans, reimbursements, and other financial assistance. That funding is critical to sustain programs that touch nearly every aspect of American life.

Without regard for the consequences, the administration has pulled the rug out from under those programs and the communities that rely on them. The full extent of the harm caused by those efforts is still unfolding and "difficult to fully grasp," but already they have led to "chaos" and "far-reaching effects." *Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-239, 2025 WL 368852, at *13 (D.D.C. Feb. 3, 2025) (*NCN I*); *see also New Yor  v. Trump*, No. 1:25-cv-39, 2025 WL 715621, at *14 (D.R.I. Mar. 6, 2025) (finding that precipitous halt to federal funding "threaten[s] the loss of

*Island*, 684 F. Supp. 3d 47, 49 (D.R.I. 2023) (citing *Braintree Labs., Inc. v. Citigroup Glob. Mar ets Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010)).

In addition to issuing injunctions under Rule 65, courts hearing APA cases "may 'issue all necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings' when doing so is 'necessary to prevent irreparable injury.'" *Nat'l Council of Nonprofits v. Office of Management  Budget*, 2025 WL 597959, at \*11 (D.D.C. Feb. 25, 2025) ("*NCN II*") (quoting 5 U.S.C. § 705) (alteration omitted). "Both provisions [Rule 65 and § 705] provide a mechanism for issuing injunctive relief and operate under the same four-factor test." *Id.*

## ARGUMENT

## I    Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to prevail on their claims that Defendants' widespread freeze on funding appropriated by the IRA and IIJA is arbitrary and capricious, undertaken without statutory authority, and contrary to law. Defendants have no legal basis on which they can unilaterally institute a non-individualized, across-the-board freeze on funds duly appropriated by Congress. And even if they had that authority—which they do not—Defendants' actions were both substantively unreasonable and unsupported by any reasonable explanation.

### A    Defendants' free ing of IRA and IIJA funds constitutes final agency action

The Administrative Procedure Act makes reviewable "final agency action." 5 U.S.C. § 704. For agency action to be "final" it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations

are forced to divert resources from their missions in order to deal with the disruption created by the sudden halt in previously reliable sources of funding. Defendants' hollow words about waste and fraud cannot outweigh the concrete harms caused by their own actions. *See NCN II*, 2025 WL 597959, at *19 ("Because the public's interest in not having trillions of dollars arbitrarily frozen cannot be overstated, Plaintiffs have more than met their burden here.").

## IV    Relief Should Extend to All Recipients of IRA and IIJA Funding Administered by Defendants

"[I]n drafting equitable relief, courts must consider 'what is necessary, what is fair, and what is workable.'" *Massachusetts v. NIH*, 2025 WL 702163, at *33 (quoting *North Carolina v. Covington*, 581 U.S. 486, 488 (2017)). "[T]here are appropriate circumstances during which nationwide injunctions are not only appropriate, but necessary." *Id.* This case presents just such circumstances.

First, it would be impracticable, if not impossible, to limit relief in this case just to Plaintiffs and their members. Plaintiff NCN represents 30,000 members nationwide, and unknown hundreds if not thousands of those members are recipients of funding through the IRA and IIJA. *See id.* (explaining that broad relief may be necessary "where the plaintiffs are dispersed throughout the United States"). Artificially limiting the scope of relief in this case to Plaintiffs and their members would require Defendants to somehow identify which funding streams were going to NCN members. That task that would be made even more formidable by the fact that some NCN members receive grant funding not directly from Defendants but as

37

A118

subgrantees from other organizations that are themselves the direct recipients from the agencies. *See, e.g.*, Ex. N ¶ 9; Ex. Q ¶ 9.

Second, "there are certainly other similarly situated nonparties" who are being harmed in the same way as Plaintiffs and by the same unlawful actions. *Massachusetts v. NIH*, 2025 WL 702163, at *33–44. It is thus appropriate that they receive the same measure of relief as Plaintiffs here. *See id.*; *HIAS, Inc.*, 985 F.3d at 326 ("[A] nationwide injunction may be appropriate when the government relies on a 'categorical policy,' and when the facts would not require different relief for others similarly situated to the plaintiffs.").

Third, the nature of this case also weighs in favor of broad relief. "The normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." *Massachusetts v. NIH*, 2025 WL 702163, at *34 (citing, among others, *Gailius v. INS*, 147 F.3d 34, 47 (1st Cir. 1998)). Given that final relief in this case would apply "to all who . . . have been subject to" Defendants' unlawful conduct, it is appropriate that preliminary relief be so extensive as well. *Id.*; *see also District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 47, 49 (D.D.C. 2020) (explaining that "'[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed" and that "[t]he same reasoning has force in the preliminary injunction context" (internal citation omitted)).

Moreover, a stay under 5 U.S.C. § 705 provides for a court reviewing agency action to "issue all necessary and appropriate process to . . . preserve the status or

rights pending conclusion of the review proceedings." This, too, contemplates setting aside the agency action itself, rather than providing limited relief to only the parties who happen to appear in court.[10]

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' motion and enter a preliminary injunction as set forth in the attached proposed order.

Dated:  March 17, 2025              Respectfully submitted,

/s/ Miriam Weizenbaum

Miriam Weizenbaum (RI Bar No. 5182)
DeLuca, Weizenbaum, Barry & Ravens
199 North Main Street
Providence, RI 02903
(401) 453-1500
miriam@dwbrlaw.com

Kevin E. Friedl* (Admitted only in New
York; practice supervised by DC Bar
members)
Jessica Anne Morton* (DC Bar No.
1032316)
Robin F. Thurston* (DC Bar No. 1531399)
Skye L. Perryman* (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kfriedl@democracyforward.org
jmorton@democracyforward.org

---

[10] Plaintiffs respectfully submit that, if the Court enters a preliminary injunction, it should also either waive any bond requirement under Rule 65(c) or set the amount at $0. Defendants could not plausibly claim to suffer any cognizable form of "costs and damages" merely from having to administer funding appropriated by the IRA and IIJA as Congress directed, so no security is required here.

# EXHIBIT L

## DECLARATION OF GAIL LATIMORE

I, Gail Latimore, declare as follows:

1.      I am the Executive Director of Codman Square Neighborhood Development Corporation (CSNDC).

2.      CSNDC is a nonprofit community development corporation that responds to the needs of our community, particularly in the areas of affordable housing development, economic development, and community organizing. We're also very involved in environmental sustainability issues.

3.      For more than 40 years, we have operated in the Codman Square district in Dorchester, a neighborhood of Boston. Codman Square is one of the biggest inner-city neighborhoods in Boston and has many low-income residents.

4.      The neighborhood is predominantly a neighborhood of color, with a large percentage of that being Afro-American, Afro-Caribbean, with a significant Latino population and a small but meaningful Asian population as well. The median income is probably in the area of forty or fifty thousand dollars. People speak a variety of languages: English, Spanish, Haitian Creole, Cape Verdean Creole, Vietnamese and Cambodian.

5.      As Codman Square experienced arsons for profit, block busting and white flight in the 1970s, community leaders mobilized to create affordable homeownership solutions, and eventually CSNDC was incorporated in September 1981 as a 501(c)(3) organization.

6. Last August, we applied for a grant through the Green and Resilient Retrofit Program, which is run by the Department of Housing and Urban Development. That program is meant to support investments in energy efficiency, greenhouse gas reductions, and healthy housing specifically in HUD-assisted multifamily housing in affordable housing communities. The funding for that program comes from the Inflation Reduction Act.

7. CSNDC plans to use the money from that grant to help fund a rehab and renovation project on a 31-unit affordable housing development for elderly residents here in Dorchester.

8. That project will involve a number of energy-related upgrades, including better weatherizing of the units to increase energy efficiency, which helps the environment and also helps us save money we can put back into the operations of the property. It will also involve upgrading the building's ventilation with installation of a new energy recovery ventilation system. This system will improve the indoor air quality, lower humidity, and reduce mold growth potential, which is important for our elderly residents. These are very vulnerable, low-income seniors and there are high asthma rates in this neighborhood.

9. HUD awarded us the grant in November, and we received the award letter. The grant is for $750,000, and 70% of the grant will be used to improve the ventilation of the building with the installation of the new ERV system. We countersigned the Elements Award Commitment letter in November and sent it back. The staff we had working on this had a virtual meeting with a HUD representative

2

A123

at an initial kickoff call with the grants administrator which took place early this year. The next step was supposed to be HUD uploading the Elements Award Commitment Letter into their system called Greenlight, but this did not happen.

10.     HUD stopped communicating with us after the change in administration. On February 11, they finally told us in response to our inquiries that they weren't able to upload the Commitment Letter to approve closings or disbursements at that time. They blamed it on an executive order called Unleashing American Energy.

11.     Since then, we're still waiting for the fully executed Commitment Letter to be uploaded into Greenlight. Communication from HUD has been pretty limited so far. We just contacted them on March 11 and received a response saying they had no information and would update us when they did.

12.     CSNDC was counting on this grant we were awarded to help fund the rehab and renovation of this building. Our plan was to start work early this summer, but we don't know if that's going to happen if the grant remains frozen.

13.     We may be able to complete some work without the grant coming through, but it would be on a much smaller scale than what we planned. And that impacts our senior residents. It's updates to their housing that we wouldn't be able to provide, including installation of the new ventilation and air quality systems. It also means the loss of savings from improvements in weatherization, savings that would help us to fund additional social services. Without the upgrades we planned to do, it means money lost every month that we could be putting toward our mission.

14.     Another result of the freeze to our grant is that, the longer the delay, the more the costs of our project go up. I've been doing this for 30 years, and there's almost never a time that construction costs go down. They always go up. And they can go up quickly. This is especially a concern right now because of how new tariffs are already impacting the construction industry. So, every delay to this project means our costs go up, and that's ultimately money we can't use to carry out other parts of our work.

15.     Right now, our contractor has quoted us a set price for the work, but we don't know how long he'll hold that price. He's been nice, but a lot of things have happened since then. Contractors are really nervous about the tariffs right now. This delay just creates a lose-lose situation for us and the residents.

I declare under the penalty of perjury that foregoing is true and correct. Executed on March 17, 2025.

*Gail Latimore*
_____
Gail Latimore

# EXHIBIT M

## <u>DECLARATION OF ALICIA LEHRER</u>

I, Alicia Lehrer, declare as follows:

1. I am the Executive Director of the Woonasquatucket River Watershed Council (WRWC), a nonprofit based in Providence, Rhode Island. WRWC is a member of the Alliance for Nonprofit Impact in Rhode Island, a member of the National Council of Nonprofits.

2. The statements in this declaration are based on my personal knowledge and my review of WRWC business records.

3. WRWC incorporated as a nonprofit in Providence in 2001. Its mission is to create positive environmental, social and economic change by revitalizing the Woonasquatucket River, its Greenway, and its communities. The Greenway is a seven-mile-long multiuse trail and linear park that follows the river from downtown Providence to neighboring Johnston. It has been recognized as a model community revitalization effort.

4. We pursue our work on a number of different fronts. One is environmental restoration, where we work to improve natural habitats, restore fish passage on the river, and protect stream banks that have been damaged due to flooding, particularly in the urban sections of the lower watershed where the impacts are the greatest and affect the largest populations. There are parts of the trail and riverbank that have really become compromised by strong storms in recent years. Taking care of riparian buffers and wetlands is important for protecting against future damage from flooding.

1

5.     In addition, we care for and extend, expand, and activate the Greenway, including by removing invasive plants so we can bring back native species that provide a great home for birds, mammals, amphibians, and other local animals. We do community education programs for children and adults and skills and job training initiatives. And for many years, we have worked with all levels of government to address severe dioxin contamination at the Centerdale Manor Superfund Site in North Providence and Johnston, RI.

6.     WRWC receives about 70–80% of our funding from federal grants. We work with a pretty diverse group of agencies: several USDA subagencies, the Department of Transportation, Housing and Urban Development, and the US Environmental Protection Agency. We employ around 32 staff members, some of whom are part time.

7.     Since the end of January, we have had a grant of $1 million frozen that we cannot access while it is under review. We are actually a subgrantee and were contracted to receive these funds through another nonprofit group that has a grant directly from the U.S. Forest Service. They notified us that the money was inaccessible because it was funded under the Inflation Reduction Act.

8.     That pause to our grant has completely halted the project we planned to carry out and disrupted our operations more broadly. The grant was meant to fund a project to build capacity for urban forestry along the Woonasquatucket Greenway. It was a pilot program to create what is known as a Miyawaki forest, a method of

forestry that is meant to create the conditions to mimic multilayered, old growth forests in a short amount of time.

9.      Besides providing a habitat for a broader variety of animal species and creating a relaxing place for people to enjoy and keep cooler during the summer, the advantage of old-growth forests is that they are much more resilient than younger forests. They can better withstand different types of stressors—fungus, bacteria, and other things that can damage and kill trees. That kind of resilience is particularly important at a time of rapid changes to the climate, which can introduce new stressors on local forests.

10.     We planned to engage resident community leaders and students to build these forests. On top of the conservation benefits of this project, it also feeds our education and community action programs. We train students and adults in restoring and improving the environment and give them leadership skills and job-related skills such as forest management and tree stewardship. This and other projects create job opportunities for people that live near the Greenway. But none of that is happening now as a result of this pause, which means the loss of a workforce-development opportunity.

11.     We planned to use this grant to hire people to help with this project and with other parts of our mission that we cannot now hire. Our River Ranger team, led by year-round professionals, and including six to eight seasonal Rangers, care for the river and the Greenway. Through this funding, we planned to hire two new full-time Ranger staff that will become our tree experts and will lead more than 10 trainees

and community members that will receive stipends as tree stewards. Now, because this grant is frozen, we are unable to hire those two full-time positions and employ the many other members of the team that will be responsible for all the other planting and tree projects we have throughout the Greenway. We were counting on those team members who are critical when we are caring for 7 miles and 75 acres of public green spaces and multi-use trail. So this freeze creates problems not only for the pilot forestry program but for WRWC's other work as well. We are now unable to hire for positions we planned to fill.

12.    Another challenge is that so much of our work is seasonal. The season runs basically April through November. Now is when we need to be doing our hiring so we can have a team in place and trained up by the time we need people out in the field. If the money stays tied up long enough, we won't be able to carry out the grant project until next year at the earliest.

13.    It is hard to plan for the future when we cannot trust that grants we've been awarded are going to be available when we need them. I already had to put together the organizational budget for 2025. The positions we intended to fill were integrated into quite a few of our program areas. Without those positions, we're going to be stretched thin and simply unable to get done all that we hoped to be able to achieve for the river and the local community.


I declare under penalty of perjury that the foregoing is true and correct. Executed on March 11, 2025.

Alicia J. Lehrer

Alicia Lehrer

# EXHIBIT N

## DECLARATION OF KAREN FIREHOCK

I, Karen Firehock, declare as follows:

1.      I am the co-founder and executive director of Green Infrastructure Center, Inc. (GIC), a nonprofit based in Charlottesville, Virginia. We have an office and 2 full-time and 1 part-time employees in Providence, Rhode Island and carry out on-going work in that state and others, as described below.

2.      The statements made in this declaration are based on my personal knowledge and review of GIC business records.

3.      GIC is a member of the National Council of Nonprofits.

4.      GIC was formed in 2006 to help local governments, communities, and developers evaluate their green infrastructure assets and make plans to conserve them.

5.      "Green infrastructure" is the interconnected network of waterways, wetlands, woodlands, and other natural habitats; greenways and parks; farms and ranches; and other open spaces that support native species, maintain natural ecological processes, sustain air and water resources, and contribute to people's health and quality of life. This green infrastructure needs to be planned and cared for just as localities plan for their "grey infrastructure" of roads, power lines, and sewage systems.

6.      We provide the communities we work with the tools needed to protect and restore their natural assets, such as economic analysis, mapping, and land-use planning and asset assessment. We help them to execute these plans too. We work at

1

the regional and local scale in rural, suburban and urban environments across multiple states, including on-going programs in Rhode Island, Virginia, South Carolina, Mississippi, and Georgia as well as projects in many other states including, but not limited to Montana, New York, Florida, Puerto Rico, and others. We have a staff of 20 people.

7.      GIC participates in the Urban and Community Forestry Program. That's a program run by the U.S. Forest Service that funds efforts by states and partner organizations to plant and maintain community trees, forests, and green spaces, including in disadvantaged areas.

8.      The Inflation Reduction Act provided $1.5 billion in funding for the Urban and Community Forestry Program to support those efforts.

9.      GIC relies on funding through that program for many of our projects. That funding has been awarded as grants to states and then to us as state subrecipients. We were awarded several multiyear grants in late 2023 and early 2024, which we draw from the states after they've drawn it from the federal government. Those grants range from about $200,000 over a year and a half to more than $2 million over five years. They are hugely important for work and our mission, accounting for 80 percent of our budget. We expanded with new field staff specifically to meet the goals for the IRA funds.

10.     We also receive funding from the Bipartisan Infrastructure Law. Those grants are for technical support to help cities and towns in Virginia to improve policies to protect trees in their communities and for plans such as new tree-canopy

goals for small and rural towns such as Buena Vista, as well as storm recovery plans for hurricane-ravaged Damascus to help restore trees there and the Creeper Trail, which is the town's primary economic driver. This money has been frozen since February 14.

11.    We use the funds from our IRA grants to help towns and localities plan and carry out plans for planting more trees and managing the forests they have.

12.    For example, last year we announced an initiative with the Mississippi Forestry Commission to help Natchez, Gulfport, and Laural, Mississippi to plan and manage trees in disadvantaged neighborhoods. That effort will help ensure equitable access to the many benefits healthy trees provide, such as cleaner air and water, cooler summer temperatures, reduced flooding and erosion, and increased property values. That same initiative expanded to three additional communities this spring, including working with the Mississippi Band of Choctaw Indians to help manage their forests. The initiative is funded with money from the Inflation Reduction Act.

13.    These efforts take time—usually several years—because we have to map existing tree cover, set goals and then plant and care for the trees themselves, which need time to grow. The initiative in Mississippi, for example, is supposed to run through 2027. For our projects to be a success, we need time to build trust before, during, and after the actual planting, especially in the kind of communities where we work. These smaller communities are often overlooked and lack the resources to restore tree cover on their own, many of them still recovering from past hurricanes.

14.     I don't know how much time we'll have, though, because the funding for these projects has been frozen by the Forest Service. As a result, the states we work with have been unable to draw funds on the federal grants they were awarded.

15.     The states in turn have told us to stop work because they lack the funds to pay. We have a multimillion dollar grant with Virginia, for example, but they've told us to stop work. Mississippi has told us the same thing. Georgia told us we didn't have to stop our projects but that they would not pay bills, until the Forest Service restarts reimbursements. Well, we can't afford to carry out work, place large tree orders for this fall, and set community meetings, when we don't know if we'll be able to draw on the grants we were awarded. We've cancelled many community events and trainings that took months to plan and organize, and now we've let everybody down. And possibly lost their trust in us.

16.     Staff at the Forest Service don't know what's going on and haven't been able to say when payments might resume or even whether they will resume at all. They're just being told by leadership that they're having a "pause" on these programs.

17.     We are in a crisis at this point. I've already had to furlough four members of our staff to half time status in Virginia and Mississippi. We're lucky that we had a small operating reserve to make it this long, but we can't keep absorbing losses and won't be able to support staff indefinitely.

18.     I estimate we're 45 days away from having to lay off staff at this point. The only reason it's not sooner is thanks to what little reserve we have and the fact that Rhode Island and South Carolina have continued to pay us for work, even while

they themselves still can't draw on their federal grants. We don't know how long they will continue to do so, meaning that our work there may have to stop as well.

19.     If we did have to lay people off, they probably won't be coming back because they're going to have to find other jobs. Some of our staff are young people who don't own their homes and are early in their careers; they don't  have the ability to wait for funds to resume. And it's really hard to hire for these positions and train people up. Each staff person underwent 6 months of training to perform highly technical work for us,

20.     We're already feeling the effects in other ways too. For example, now is the time we need to be ordering trees for planting in the fall. And we order a lot of them, so this has to be done well ahead of time. If we bought those trees, and then found out these grants are done, we'd be left holding the bag for hundreds of thousands of dollars. I don't know what we're going to do if payments remain halted.

21.     If this funding does not resume, our projects in Virginia, Mississippi, and other states won't either. And if the freeze continues, I don't think we're ever going to regain the trust we built in some of these communities before we started working there.

22.     In Mississippi, for example, we've worked with the Chocktaw Indians. We had multiple meetings with the tribe and tribal council in the process of getting an agreement drafted to show we were serious and would be helping with them in coming years to manage their forest. And now we can't follow through. If you think about America's history with the tribes—it was hard to overcome. And then at the

eleventh hour, we disappear. That whole relationship and the trust we built won't recover if this continues.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 13, 2025.

Karen Firehock

Karen Firehock

# EXHIBIT O

## <u>DECLARATION OF</u> ███████

I, ██████, declare as follows:

1.    I am the Director of Programs of the █████████████ ████, a nonprofit organization based in ███████████, and a recognized leader in science- and community-based watershed protection and restoration.

2.    The statements made in this declaration are based on my personal knowledge and information made available to me in the course of my duties.

3.    ██████ works closely with local people and organizations as well as state and federal agencies to help maintain and improve water quality and habitat conditions of the █████ River and its watershed.

4.    To give just a couple of examples, we have worked with landowners and other local partners on prairie habitat restoration, we regularly carry out projects to improve stream habitats and connectivity for fish migration, and we assist local businesses and other urban property owners plan for and undertake storm water management projects.

5.    One of the big goals of our work is to improve fish and wildlife populations that are enjoyed by conservationists and also pursued by hunters and anglers in our area. Part of that means removing pollutants and other harmful toxins from the local waterways that make their way into wildlife habitats, but also into the homes of the people who reside in this shared community. We work hard to engage all stakeholders in our service area, and the work we do represents this wide range of interests.

6.     We compete for and receive a number of federal grants, some directly and some as a subrecipient from other grantees. These grants are administered by several different agencies, including the Department of Agriculture, the Environmental Protection Agency, and the National Oceanic and Atmospheric Administration. Some of these grants are funded by the Inflation Reduction Act and some are funded by the Bipartisan Infrastructure Law.

7.     ████ has a staff of 12, including our newest staff member we brought onboard in February.

8.     ████ is a member of the National Council of Nonprofits.

9.     Since February, we've had intermittent trouble accessing federal funding through our awarded grants.

10.     Early that month, we became unable to access the "ASAP" portal, which is an online system the federal government uses for disbursing funds on open grants. That meant we couldn't make any draw downs of three grants.

11.     That freeze continued for 6 days, which led to delays in work planning and contracting, as well as uncertainty that has led to many hours of lost productivity and wasted time.

12.     More recently, we learned on March 6 that normal payments on another open grant were frozen.

13.     The grant is through the Regional Conservation Partnership Program, which funds public-private conservation projects by landowners and communities. The program is run by the Natural Resource Conservation Service—part of the

2

A141

Department of Agriculture. We're a subrecipient of funds through that program that flow to us through the direct grantee, the ███ Agricultural Trust. The program is funded with money from the Inflation Reduction Act.

14.    The goal of this specific grant is to remove vegetation in order to reduce the risk of wildfires and improve habitat and water quality in the area. The money from that grant funds our staff time directly and also helps cover costs for participating landowners to do work on their property. The grant provides us with about $4.4 million for those purposes, and between $5 and 6 million more for conservation and agricultural land easements, which are important for protecting farmland.

15.    Even though it's only been a few days, ███s work is already being disrupted as a result of this money becoming unavailable. We hired a person based on getting this grant. She started in early February. We did the recruiting late last year. That position is three quarters funded by this program. Now we're scrambling to figure out how to pay this person.

16.    If ███ isn't able to resume drawing those funds in the ordinary course, the whole project is going to have to halt, which means worse outcomes for the watershed here and everything that lives in it, people included, in terms of wildfire risk and water and habitat quality.  It will also lead to the loss of trust from landowners interested in carrying out restoration and stewardship on their properties, the loss of projects that would considerably increase the quantity and quality of oak habitat in our area, and the inability to build local capacity for

3
A142

sustainable fuels reduction and wildfire prevention work. All of this endangers our credibility and effectiveness, puts our local landowners at risk, and reduces our long term ability to achieve our organizational and shared mission, which benefits all residents within our service area.

17.     If more funding from the IRA and BIL gets held up, the consequences for ██████ could be devastating. Those grants are essential for our work. Federal funds make up nearly 36% of our fiscal year 2025 budget. Federal funds account for more than 90% of the funds that our regional partnership, the ███████████ ████████████████, has secured over the last five years. Losing those funds now would mean a huge setback to our collaborative work, ecological impact, efforts to decrease wildfire risk and improve drinking water quality, and eliminate the positive contributions to our local economy that our work provides through the hiring of local contractors. We would have to let go of most of our shared staff and cancel contracts with local businesses.

18.     Already, these freezes have caused problems for us. It's hard for us to plan for the future if we don't even know if we'll be able to draw on these grants when we need them.   We are a small non-profit with widespread support from all constituents in our service area. We don't have sufficient reserves or alternate funding sources to make up for the loss of these federal funds.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 13, 2025.



Case: 4:25-cv-00097-MSM-PAS Document 26-7 Filed 03/17/25 Page 1 of 9 PageID #: 2102
Case 4:25-cv-00097-MSM-PAS Document 26-7 Filed 03/17/25 Page 251 of 9 PageID #: 42102
249

# EXHIBIT P

# DECLARATION OF LAURA BRION

I, Laura Brion, declare as follows:

1.      I am the Executive Director of Childhood Lead Action Project (CLAP), a nonprofit dedicated to eliminating childhood lead poisoning in Rhode Island.

2.      CLAP was founded in the early 1990s by parents of lead-poisoned children, medical professionals, activists, and others who saw how lead poisoning was affecting their communities and wanted to do something to stop it.

3.      Many people are at risk of lead poisoning due to the presence of lead in old paint on homes, contamination in soil from leaded gasoline, lead from drinking water pipes, and other sources. Lead is a neurotoxin, and even exposure to small amounts can lead to permanent, lifelong harms. Children are especially at risk; no amount of lead exposure has been proven to be safe. Children can experience a range of negative effects, many of which are irreversible and impede success in school, decrease earning potential and can even increase the likelihood of committing violent crime as a young adult. Put most simply, lead poisoning causes brain damage, with increasing severity due to length and degree of exposure.

4.      CLAP works statewide, prioritizing the areas that are hardest hit by lead poisoning. Our community education methods include door-to-door outreach, tabling at community events, and workshops for a variety of audiences. Instead of expecting people to have the time to come to us, we try to find where people most at risk of lead poisoning are likely to be so we can reach them. We also organize families who are affected to work on education and advocacy campaigns to improve

overall conditions. And we help connect homeowners to information about steps they can take themselves and to sources of funding that can help them finance work to make their homes safer.

5.     We're also a licensed training provider to teach lead-safe practices to landlords and workers, and we engage in policy and advocacy work at multiple levels.

6.     CLAP is a small, but highly effective organization. We have four full-time and one-part time employees. In the past, we've had a number of federal grants through EPA that have made a big difference for our ability to carry out our mission. We've been a good fit for those grants and performed well. In 2005, we were honored to receive an EPA Children's Environmental Health Excellence Award.

7.     We have an open grant of $500,000 through EPA that we can't access right now. The purpose of the grant is to fund a multi-pronged, multi-year campaign to address lead poisoning in Providence. The grant is funded with money from the Inflation Reduction Act.

8.     Part of that campaign means providing free trainings on lead-safe practices to workers who are involved in renovating old homes and doing work that may disturb old lead paint. We teach them to work safely so that they can protect themselves and those living in the homes they work on.

9.     Part of the campaign also involves bringing together state and city officials, along with community members, to develop and execute on a plan to bring landlords into compliance with lead-safety laws. It will also include lead safety

workshops for landlords, neighborhood canvassing, and a training program to educate community health workers about lead poisoning hazards so they can identify those and teach families how to address them.

10. The goal of the project is that all these efforts will complement and reinforce each other in order to turn some of these homes and areas of the city from being dangerous for lead exposure to being a safe place for little kids to grow up. We were phenomenally excited when we got the grant because this really represents a step up for CLAP; it would allow us to scale up our work to a new level in order to help so many more people than we could before.

11. CLAP began to draw down grant funds in December 2024 and January 2025–about $ 49,745. But that didn't last long.

12. In late January, we lost access to the funds. Sometimes, we were blocked entirely from accessing the online portal, ASAP, which is what EPA uses to disburse money for grants. Other times, we could log into the portal, but our grant was missing. We reached out to tech support for the ASAP system, to our grant office, to everyone we could think of. At one point, tech support said our grant had been suspended and that we would need to contact EPA. EPA acknowledged it was happening, but didn't give a reason why.

13. We kept trying to access the grant, and on Friday, February 7 we regained access through ASAP. But on Monday, February 10, the grant had disappeared again in ASAP. I have heard of other grantees who experienced the same thing.

14.     Access turned back on 9 days later, but by March 10, it was back off again. I noticed that the grant became frozen again just a few days after the district court in *New York v. Trump* entered an injunction that seemed to apply only to the states, but not to groups like CLAP.

15.     Right now, we're back where we were about a month ago: We can log into ASAP, but the grant is missing. EPA has not explained why. I have not gotten anything from them about termination.

16.     If the grant remains frozen, we're not going to be able to carry out our planned initiative in Providence, or at least not on nearly the same scale. CLAP does not have a big budget, and that $500,000 was huge for us and our work.

17.     We had immediate plans to launch a big door-to-door outreach campaign to connect with tenants and homeowners starting as soon as the weather warmed up enough this spring–to talk with them about topics including lead hazards, short-term lead safety methods to immediately reduce contamination, and financial assistance available to address lead hazards in the medium and long term. This represents information and a connection to resources that could make the difference between a child growing up safe and healthy and a child suffering irreparable harm.

18.     We have already had to scale back recent plans for grant-funded trainings and workshops, as described below. Even if we are able to do some of what we wanted, we're not going to be able to pursue the multi-front strategy we've planned, which means each piece is going to be significantly less effective than if

they all worked in tandem. That hurts our core mission and the kids and adults we're trying to protect.

19. The way the grant works, CLAP draws down funds from EPA to cover grant-related expenses within five business days of when those expenses occur. What that means is that we need to be able to access the grant reliably and predictably or it's almost like not having it at all. We can't incur big upfront costs only to find out later that we can't get reimbursed with money from the grant that was awarded to us.

20. Already, the disruption caused by the freeze of this grant has hurt us. The full scope of the grant-funded work we expected to carry out in early 2025 was impossible due to the uncertainty and lower staffing than expected caused by our inability to access grant funding when we needed it. CLAP planned to add another full-time position to our staff with the money from the grant, but I've had to hold off on doing that. I can't hire someone if I have no idea if I'm going to be able to pay them. That means we're missing that extra set of hands we'd planned on, which makes all our work harder and stretches our existing staff and resources thinner.

21. The other piece of this is that I would need to be transparent about the situation even if we were to be able to hire someone. I'd have to tell them when they applied about the uncertainty that we'd be able to count on federal grants in the future. And that's going to make CLAP less competitive for getting the best candidates we possibly can and bringing someone on board who can help expand our capacity to carry out our mission.

22.     We also had to postpone plans to schedule the first series of lead safety workshops for community health workers to be supported by this grant. The trainees we would have recruited from partner social service agencies and community groups have broad community networks and caseloads and would have been able to help to share information about lead hazards and prevention resources with families at risk. In turn, families could then take action and get help before their children were lead poisoned, or before children already affected suffered further exposure.

23.     We know from past experience that this is a highly effective, "train the trainer" community education method that leverages funds and resources beyond the investment of a single grant or funder.

24.     The delay in implementing these plans means that there are families who would have been reached and helped sooner, won't be reached in time to prevent significant harm, or may never be reached at all. Childhood lead exposure can cause permanent damage in a single day, and only gets worse the longer it continues.

25.     We also ended up with a waiting list of workers who wanted to take our grant-funded Lead Paint Renovation, Repair, and Painting Rule trainings. In these classes, we teach workers and DIY homeowners and landlords how to stay safe during repairs on pre-1978 homes that may contain lead paint. This course is required by law for many jobs and gives workers the skills they need to protect

themselves, their own families, and the families who will live in the homes they are working on from the dangers of lead paint dust.

26. Because of the grant drawdown pause, we were unable to change our existing schedule to add additional trainings that would have been supported by our EPA grant, despite the demand. We have been unable to train as many local workers to conduct lead-safe repairs as we would have otherwise. At a minimum, this means that lead-safe repairs on local homes may have been delayed.

27. On top of this, multiple staff and board members had to devote unexpected effort to monitoring grant drawdown access and to developing, implementing, and adjusting contingency plans needed to manage this unprecedented level of uncertainty—for both the grant-funded project and the organization overall. This meant extra, unnecessary stress and time taken away from other important activities.

28. These challenges have resulted in a delay in the progress we reasonably expected to make towards improving lead hazard awareness, increasing local compliance with lead safety rules, and ultimately preventing childhood lead exposure during recent months. Our work is all about empowering stakeholders throughout the community to work together to prevent lead poisoning, and the timing is critical. The sooner we act, the more children are protected from the permanent harm caused by lead exposure. Even if our access to grant funding is fully restored today, as an organization and a community, we can never get this time back.

29.     In short, the drawdown pause has hampered progress towards our mission of eliminating childhood lead poisoning. This damage will increase if our access to grant funding continues to be blocked. Immediate restoration of our grant funding can prevent future harm and is urgently needed.

30.     Going forward, even as we continue to do our best to work as effectively as we can, the reduced capacity caused by the pause means that every day, more local children will be at risk for longer than they would have been otherwise. This has the potential to leave a long-lasting impact on our organization, local children and families, and the community overall.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Providence, Rhode Island, on March 17, 2025.

_Laura A Brion_

_____

Laura Brion

Case: 4:25-cv-00097-MSM-PAS Document 26-8 Filed 03/17/25 Page 1 of 5 PageID #:2102
Case 1:25-cv-00097-MSM-PAS Document 26-8 Filed 03/17/25 Page 1 of 5 PageID #:42102
258

# EXHIBIT Q

## DECLARATION OF SARA CHURGIN

I, Sara Churgin, declare as follows:

1.      I am District Manager of the Eastern Rhode Island Conservation District (ERICD). We were established by state statute in 1944, and ERICD has been a 501(c)(3) organization since 2019.  ERICD has five full-time and one part-time staff.

2.      We're one of three conservation districts here in Rhode Island. There are more than 3,000 across the country.

3.      Conservation districts were established to help farmers through the hardships they faced as a result of the Dust Bowl. Today, seventy-five percent of our clientele are still farmers.

4.      We help with the conservation of prime farmland so that we can make sure that our farmers can keep the family farms their families have worked for decades, and even centuries, and make sure our communities can have local food from local farmers.

5.      We also provide financial and technical assistance to farmers and other landowners. Imagine a beginning farmer who just got a piece of property and doesn't know what to do with it. We can help, for example, by doing soil testing and working with them on how to care for and get the best out of their land.

6.      We're a free resource for practical knowledge to get started or for problems that will come up even with experienced farmers. We advise on best management practices. Anybody who comes to me or calls me about a natural resource concern, I direct them to get the help they need.

7.    We also work with local municipalities and do outreach education in schools, teaching children about taking care of the land for future generations. We help run the Portsmouth AgInnovation Farm, a sustainable farm that includes an afterschool and camp program. We also work to help develop best management practices for soil and water conservation and teach those to landowners.

8.    We're heavily reliant on federal grants to continue to operate and provide the services we do. But right now, we have two major grants we can't access.

9.    One comes from the EPA. It's a Community Change Grant funded through the Inflation Reduction Act. The ███████████████ received a $███████ grant from EPA through that program, and we are a subrecipient through them. We were set to receive $349,077.

10.   That money was set to address food waste in Rhode Island. We planned to use it to fund education and outreach efforts to reduce food waste and its negative impacts on the environment. Those efforts were going to include setting up the first municipal composting site in Rhode Island. Presently, there are none. That would be a really significant step and an opportunity for education and better resource management that might not happen now.

11.   That's because the grant has been frozen off and on for weeks. The ██████████████████████ hasn't been able to access those funds reliably through the online portal that grantees use to seek payment on open awards from EPA. As a result, they've had to instruct us to stop work. We don't have the reserve to work without being paid or knowing we'll be paid in the future. We're such a tiny

organization. We don't have a big donor base or anything like that. We haven't been able to carry out the work we planned with those funds.

12.     We also have a five-year USDA grant that is also funded by the IRA. We're a subrecipient of that through the Rhode Island Association of Conservation Districts. Each conservation district was able to hire one full-time staff member to work on this agreement.

13.     The continued money for that grant is to help develop smart agriculture practices for our landowners, which means using technology and data to help them grow more efficiently and sustainably. The freeze on funding has meant we are no longer to work on this agreement and provide the needed support to our community.

14.     The grant has been completely frozen since late January. Not being able to continue work on this contract has significantly limited the work we are able to do. We have had to very quicky shift staff around to other agreements, which is seriously stretching ERICD's resources.  This is causing irreparable harm to the organization.

15.     Without being able to access this federal funding, I'm going to have to let someone go, or definitely do a reorganization. I won't be able to keep four staff members plus myself. Unless things change and we can regain access to these funds for our work, I can probably go for two pay periods, which is a month, before needing to let someone go. That's no time at all. And if there's a shutdown, that only makes it worse because then we know we're going to have to go longer without access to our funding.

16.     Our community suffers too. The farmers are already suffering because a lot of the USDA payments for cost-share that farmers have to front aren't being reimbursed. And then, with all that suffering already going on, we're not going to be able to be there to help them with anything. Farmers count on us for programs we aren't going to be able to provide because these grants are locked. That resource will just not be there for farmers.

17.     We've been in existence so long. If we have to shut down, it means the loss of so many services that people here rely on. Besides our work on farm practices, we work on emergency watershed protection. We work with the municipalities on programs to address flooding. If we had a hurricane tomorrow, I don't know if we'd be able to help people rebuild if we aren't able to operate.


I declare under penalty of perjury that the foregoing is true and correct. Executed on March 13, 2025.

*sara churgin*
_____
Sara Churgin

# EXHIBIT R

## DECLARATION OF █████████

I, █████████████, declare as follows:

1.    I am the Executive Director of the ███████████████ a nonprofit in ████████.  The ████████████████ is a member of Plaintiff National Council of Nonprofits.

2.    I co-founded the ████████████████ in 2020.  Our organizational mission is to study and protect old trees and ancient forests, especially giant sequoias.  We are an affiliate member of the ████████████████████, so we work with all of the landowners across the Sierra Nevada whose property has sequoia groves.  Our work is aimed at assisting the National Parks and other landowners with the conservation and protection of trees and forests.

3.    My specialty is canopy science.  We climb these massive trees and make measurements, collect samples, and install sensors in the canopies to help us (and other scientists) understand the impact of climate change, drought, and fire—and how to protect these trees.  We also collect cones from the trees for reforestation efforts and genetic seed banking.

4.    We are primarily funded by federal grants through a Cooperative Agreement with the National Park Service.  We have ten different accounts in ASAP.gov, which is the payment portal we use to draw down funds from those grants.  Some of these funding lines are from the Inflation Reduction Act or the Infrastructure Investment and Jobs Act, and some (our Disaster Relief funds) are

1

A160

not.   As of January 24, 2025, we had a total cumulative authorization of about $2.159 million.

5.       One of our funding lines from the Inflation Reduction Act is a grant for $210,000 to start a giant sequoia bark beetle monitoring project.  This grant is from the Department of the Interior, through the National Park Service.

6.       The bark beetle monitoring project is important because it will fill a major informational gap on the status of bark beetle attacks on giant sequoias.  Fire damage and drought have made giant sequoias weakened and vulnerable to beetle attack, where they are normally able to resist.  So this is an emerging threat:  a number of trees have already been attacked and killed.

7.       These iconic trees are irreplaceable.  There are so few of them:  there are only approximately 25,000 acres of mature giant sequoias in the world—and new estimates suggest that about 20% have been killed by fire since 2015.  We can't afford to lose any more of these trees: every single one matters.

8.       The bark beetle monitoring project is therefore a major threat that all land managers with giant sequoias are concerned about, but there is currently no systematic tracking of which trees have been attacked and the extent of the problem.  Our project is an attempt to systematically track beetle attack over time to understand the severity and develop a strategy to counteract.  Because we work across different land management agencies and jurisdictions, we can develop an understanding throughout the range, sharing information with land managers to

reduce the threat.  This is an intensive project that will require tracking, mapping, and climbing individual trees to monitor bark beetle activity.

9.    Because bark beetles are in the process of attacking trees even now, this project cannot be delayed.  But if we are not able to start the project very soon, we will likely have to postpone it until next year:  summer is the field season, and it is already very late in the calendar year to plan and hire for that work.

10.    Unfortunately for us—and the giant sequoias—it is likely that we will have to postpone this project, because this funding line has been frozen, and we are not able to access it.

11.    On January 27, I saw in the news that federal funds might be frozen.  I had been preparing some invoicing for payments, so I tried to submit them on January 29.  When I tried to do so, I was prevented from accessing our funds in ASAP.gov.  ASAP.gov displayed a screen showing that the funds had been frozen on January 24.

12.    On January 31, I received the following message from our awarding officer:  "Effective 1/30/25:  In accordance with M-25-14, which rescinded M-25-13 and the rescission of the associated DOI PGM PAN, NPS has begun to remove the hold on all financial assistance ASAP accounts to restore availability of funds for recipient draw down with the exception of NPS FA agreements that include BIL or IRA funding.  While many NPS FA ASAP accounts are now available we expect it to take a couple days to restore all applicable ASAP availability."  On February 4, I received an identical message.

13.     I understand from our government partners that they believe our IRA funds are still frozen under the authority of OMB Memo M-25-11.  This does not make sense to me.  OMB Memo M-25-11 specifically says that "[t]he directive in section 7 of the Executive Order entitled *Unleashing American Energy* requires agencies to immediately pause disbursement of funds appropriated under the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58).  This pause only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order."  It also says that "[f]or the purposes of implementing section 7 of the Order, funds supporting the 'Green New Deal' refer to any appropriations for objectives that contravene the policies established in section 2."

14.     I went back and re-read section 2 of the *Unleashing American Energy* Executive Order, and it says that it is the policy of the United States: (a) "to encourage energy exploration and production on Federal lands and waters"; (b) "to establish our position as the leading producer and processor of non-fuel minerals"; (c) "to protect the United States' economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible"; (d) "to ensure that all regulatory requirements related to energy are grounded in clearly applicable law"; (e) "to eliminate the 'electric vehicle (EV) mandate'"; (f) to safeguard the American people's freedom to choose from a variety of goods and appliances; (g) "to ensure that the global effects of a rule, regulation, or

4

A163

action shall, whenever evaluated, be reported separately from its domestic costs and benefits"; (h) "to guarantee that all executive departments and agencies provide opportunity for public comment and rigorous, peer-reviewed scientific analysis"; and (i) "to ensure that no Federal funding be employed in a matter contrary to the principles outlined in this section, unless required by law."

15.    I do not see how monitoring bark beetle attacks on giant sequoias in order to better protect these national treasures could possibly contravene any of those policy objectives.

16.    Not being able to access these funds is incredibly harmful for the █████████████████ and for scientific progress more generally.

17.    We were about to hire a new full-time employee to start March 1, funded by this IRA grant, to work on the bark beetle monitoring project.  We had to hold off, and if the funds aren't unfrozen, we cannot hire them.  We also had planned to hire up to six part-time contract tree climbers to assist with this project, but cannot do this without this funding.

18.    We have only four full-time employees, so adding a fifth would have made a big difference to our capacity.  Although the bulk of their work would have been leading the bark beetle effort, in such a small organization, everyone pitches in and contributes to every project.  Not having a fifth employee has a meaningful impact on the amount of work we are able to do to fulfill our mission.

19.    In addition to the harms that the █████████████ will experience, I am worried about the consequences for the trees themselves.  Without

5

the information we are able to provide, parks will not be able to manage them as well.

20.    The fifth employee we planned for would have been able to pitch in on projects like maintaining sensors we've installed to study drought impacts on these trees, and to help complete our cone collection before the cones burn in a wildfire, forever losing the genetic components of unique groves.

21.    Partners and researchers rely on our data for their own research, and so halting our data collection will have cascading impacts on their scientific progress as well.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 8, 2025, in

6

A165

# EXHIBIT S

## DECLARATION OF ███████

I, ███████, declare as follows:

1.     I am the Field Crew Programs Director at the ███████ ███████. ███████ is a member of Plaintiff National Council of Nonprofits.

2.     ███████ is a nonprofit organization and AmeriCorps grantee that engages hundreds of youth and young adults in programs to improve access to outdoor recreation, restore natural habitats, protect waterways, and respond to community needs and natural disasters.  Our programs also provide technical skills training, educational activities, and career-building skills.

3.     We work across a large portion of the central United States—in more than a dozen states, on an average year—to partner with federal, state, and local agencies and nonprofits to do conservation work and help with disaster responses for hurricanes, wildfires, and floods.

4.     As part of this work, we receive federal grants from the Department of the Interior and Department of Agriculture.  Right now, we have approximately $621,927.88 of that federal grant money (from Interior) that is frozen.  We understand from our project managers and from staff at the National Park Service that these funds are frozen because they were appropriated under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act.

5.     I found out these funds were suspended when I logged into the Automated Standard Application for Payments (ASAP) system, which is an online

portal we use to draw on our federal grants. I went to draw funds as usual and they were marked red in the system and suspended. We don't know when they'll be unfrozen.

6. We had planned on these funds supporting an invasive plant management team that would work with national parks in the center of the United States, ranging from Arkansas to Ohio to Minnesota. We estimated spending about 8,300 hours on planned invasive plant management that just won't happen now. This means that potentially thousands of acres will not be managed, with negative impacts on access for visitors to public lands, hunting and fishing, and wildlife populations due to loss of habitat. If we are ever able to manage these invasive species in the future, it will be more difficult and more expensive because they will have spread more: we can't readily make up for this delay.

7. We had also planned on these funds supporting two individual placements of invasive plant management and restoration specialists at the St. Croix National Scenic Riverway. But now we cannot pay for them. Their work would have supported high park priority invasive plant management and vegetation restoration practices, assisting with manual and chemical plant control, native plant seeding and planting, equipment maintenance, data collection, outreach, and education.

8. We had also planned on these funds supporting a crew dedicated to the Mississippi Park Connection. We had planned about 10,000 hours of work—the equivalent of five full-time employees. We are now not able to complete this project.

9. Although we have not yet ended any members' AmeriCorps service terms, and are working to reassign them to other projects and roles, if this freeze lasts, or we lose additional funds, we may have to terminate members' service terms.

10. In addition to these impacts we are already feeling, we know there is more to come. We have millions of dollars in fee-for-service agreements with states and other nonprofits that may be frozen, but the impact hasn't flowed down yet. But we're already starting to see that partner organizations have eliminated positions. We expect that the funding freeze has even more impact to come.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 14th, 2025, in ████████████████ .



# EXHIBIT T



## <u>DECLARATION OF</u> ███████

I, ██████████ declare as follows:

1.       I am the executive director of the ███████████████ ████████████████ is a member of the National Council of Nonprofits through its state affiliate, the ██████████████.

2.       Community Action Agencies were established under the Economic Opportunity Act of 1964 as part of the War on Poverty.  CAAs are local nonprofits that work to improve the lives of low-income residents through increased self-sufficiency and community participation.   In other words, the federal government puts funding in local communities to address poverty in ways the local community sees as most appropriate and most effective.

3.       There are ████████ CAAs in █████████ all of which are members of the ████████ █████████ board comprises the █████████ directors of those CAAs.

4.       ██████████ primary role is to provide training and technical assistance to community action staff.  That includes putting on conferences for them to attend, webinars, and mental health and wellness training.  We also manage several grants that we distribute to CAAs, while ensuring grant compliance.  And we also advocate at the state level for policies that benefit CAAs and ██████████ who live in poverty.

5.       ██████████ training role also includes running a weatherization training center, which we have done since 2011.  The basis of this program is to help weatherize the homes of low-income Americans in an effort to lower their utility

bills when they are struggling to make ends meet, which helps them stay in their homes. Weatherization includes an energy audit of a home to see if there are places where cold air is getting in during winter months, or escaping in summer months. The audit checks to see if there is a hole in the roof, if leakage is coming in under the doors, if the attic needs insulation, if windows need to be recaulked so less air gets through—it includes a lot of different things that make a home run more efficiently.

6.      The audit also includes a lot of important health and safety factors. For example, the audit will check to see if a bathroom is sufficiently ventilated so that mold won't grow in the house, and may result in installing a fan in the bathroom for better ventilation. The audit will also check the carbon monoxide output on appliances and make sure they are vented appropriately so carbon monoxide is not getting into the home. This weatherization process has a big impact on air quality in the home.

7.      █████████ has a 6,000-square foot lab and classroom space for our training center with mini-module homes that we can use to help people learn how to run an energy audit on a house. We have also used grant funds appropriated under the Bipartisan Infrastructure Law (BIL) to rent a home near our office, so we have one full-sized two-bedroom house that we use in trainings so they can see the process on an actual house. This is really helpful because we can take them into the attic to test for leaks, and show them how to check for temperature variations. We train folks on how to use insulation machines to put insulation in the attic to

regulate the temperature in the house. We have both technical equipment (like carbon monoxide meters and kits to test for lead-based paint) and equipment to do hands-on activities (like going to the lab kitchen to test a stove and see if it's venting properly).

8. ████████ employs an expert who understands the federal and state specifications for weatherization programs to run these trainings. The trainings can run from a two-to-three day class on a specific issue, like duct leakage, to a weeklong class aimed at different certification levels, all the way from retrofit installer (the base-level installer on a team) to quality control inspector (the highest level of certification).

9. Our training center is one of only twenty-two in the country that is certified by the Interstate Renewable Energy Council, which accredits weatherization centers to qualify for Department of Energy programs. So our training center serves not only ████████ (including the six of our member CAAs that have weatherization departments), but also folks in other states.

10. In typical times, we usually train over 200 people in about 40 classes per year. But, since January, we have not been in typical times.

11. Our funding for this weatherization program comes entirely from grant funds appropriated under the BIL, awarded by the U.S. Department of Energy, and passed through the state of ████████ When the BIL passed, Community Action Agencies were urged by both the federal and state government to ramp up their weatherization efforts, and so they hired more staff and put more time and effort

into this project. My association entered talks with prospective trainers with a plan to increase our training staff. Our BIL weatherization grant accounts for around fifteen percent of our total budget.

12.    But since January 30, those funds have been frozen. We are no longer able to draw down on the roughly $250,000 left in this grant line. And we also have about $75,000 in unpaid invoices for work already done in November and December for which we cannot be reimbursed. We have not received any communications about the cause of this freeze or if or when it will end. When I e-mailed contacts at the Department of Energy, I simply got a form response saying that they will reply when they can respond—and I understand from other organizations in the same boat that they have received the same (non)response.

13.    As a result of this funding freeze, we are currently not able to offer weatherization training to our network, because there is no way for us to be paid for it.

14.    The BIL weatherization funds pay 100% of our training director's salary, 75% of our weatherization program assistant's salary, and 25% of my own salary. So far, I have been able to shift my and the program assistant's work to other grants, and have been able to continue paying our full salaries. But just yesterday, I had to e-mail the training director about the fact that we are probably going to need to move him to at least some portion of unpaid leave, because we have just run out of our reserves, and can't bill him to any other grant.

15.     When we aren't able to train folks on weatherization, it means that fewer people living in poverty are getting their homes weatherized.  And that means they are less safe in their homes, and less able to make ends meet.  Even if we get the money back later, it will never make up for the time lost to training and weatherization now.

16.     We were also in the process of putting together a weatherization conference planned for July 2025, but that is now on hold.  We haven't been able to move forward with the contractor or the hotel, because there is too much uncertainty.

17.     Because these funds are frozen, we have also had to cancel a conference we had planned for this April.  That conference was set to focus on three main areas:  mental health, leadership, and community action skills.  We've held this spring conference before, but this is the first time that we designed the conference theme to appeal not only to CAA staff, but also to the broader nonprofit sector, to help strengthen skills and abilities for anyone working in the nonprofit arena.  We were also excited because it was the first time we have been able to partner with a tribal nation to have a conference at one of their facilities.

18.     We already had the entire agenda and speakers lined up for the conference.  We had included speakers from state agencies and from the City of ████████ and were really excited for this opportunity to partner with them and their employees.  It is very important to us to build those relationships because we are all trying to help the same population.  We called this a conference for

5

A175

community builders, so the idea was to get all sorts of folks in a room together working on building community to build partnerships and increase their skill sets. But now, none of that can happen.  And having to cancel the conference has had an impact on our relationships with other nonprofits and the governments we had made this outreach to.  It is really important in this line of work to build successful relationships built on trust, and when we can't follow through on commitments because our funding has been precipitously stopped, that undermines those relationships and makes it harder to rebuild.

19.    Additionally, the conference would have brought in revenue through registrations and sponsorships, which account for a big portion of the unrestricted funds ████████ has in a given year.  This exacerbates the funding crunch we are already experiencing, and ties our hands with what we can do with the money we do have, reducing the flexibility that has become even more important in light of the freeze.

20.    The BIL funding freeze is also already affecting our plans for the next several years.  In November, we entered into a two-year contract with the Community Action Association of ████████ under the Unified Weatherization Workforce Initiative.  The program was intended to train our training director, officer manager, and myself on how we could, in turn, conduct trainings on workforce issues.  The goal was for the three of us to gain expertise and learn how to offer training to the six weatherization departments at our member CAAs, with a further goal of improving their efforts at employee recruitment and

retention—enabling them to weatherize more homes. We knew that this expertise would be value to our entire network, well beyond the two years of this program.

21.     Our proposal to spend BIL funds on this program had already been approved by the state when we signed the contract with ▮▮▮▮ We had made one payment to ▮▮▮▮ for the first three months (November 2024 to January 2025) when the funding freeze occurred. We are therefore no longer able to meet the budgeted $156,000 for 2024–2025 and $141,000 for 2025–2026, as those were all BIL funds. As a result of the freeze, we were forced to pause all efforts for this program indefinitely.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 11, 2025.



# EXHIBIT U

## DECLARATION OF DIANE YENTEL

I, Diane Yentel, declare as follows:

1.    I am the President and CEO of the National Council of Nonprofits (NCN), which is the largest sector-wide network of nonprofits in the United States.

2.    Our members include state associations that collectively represent more than 30,000 nonprofit members across the country, including 425 in Rhode Island.

3.    The statements in this declaration are based on my firsthand knowledge and on review of NCN's business records.

4.    My job as the leader of NCN is to give voice to the many nonprofits across the United States, many of which are small, and do not have the capacity to advocate on their own behalf—because they are so focused on fulfilling their missions of service.

5.    As part of that job, I spend significant time engaging and listening to our nonprofit members. In the less than two months since the administration began freezing money appropriated by the Inflation Reduction Act and Infrastructure Investment and Jobs Act, I and my colleagues have heard from hundreds of our nonprofit members about their experience with that freeze.

6.    Of these member organizations from whom we have heard, all share that the impact of not being able to access their funding ranges from deeply worrying to potentially catastrophic. These nonprofits often rely on scheduled disbursement of federal grants to keep their doors open.

1

7.    Many of these nonprofits are small. They have no savings to fall back on. Missing expected payments from an open grant can mean they miss payroll and are forced to lay people off, unable to pay rent, cover operating expenses, or maintain programs. For many nonprofits, continuing to miss payments could mean shutting down.

8.    The two laws the defendants have targeted are important to our members and to the people our members serve because they fund so many different programs and services that ultimately are carried out on the ground by nonprofits. Those programs are administered by a number of different agencies, and we have many members who receive funding from each of the agencies named as defendants in this case.

9.    I realize that hearing from me is different from hearing from each of these nonprofits individually. I submit this declaration for two reasons: 1) because there is no feasible way to capture all of the stories of our nonprofit members who are currently unable to access federal funds appropriated under the IRA or IIJA and who face severe consequences as a result. It would take weeks, if not months, to do so. And 2) because small nonprofit organizations that receive federal funding to do their vital work may fear potential retribution and a longer-term loss of the funding that is essential for their work.

10.   The examples being submitted with this filing today are just that: examples, of an extremely widespread problem caused by the defendants.

2

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 16, 2025.

_Diane Yentel_

Diane Yentel

3

Case: 2:23-cv-00097-MSM-PAS Document: 26-13 Filed: 03/08/2025 Page: 1 of 7 Page ID #: 286

# EXHIBIT V

# DECLARATION OF █████████

I, ███████, declare as follows:

1.    I am the President of the Board of the ████████████
███████, which is a 501(c)(3) organization.  The ██████ is a member of Plaintiff National Council of Nonprofits.

2.    The ██████'s mission is to promote an equitable, accessible, environmentally sustainable and economically vibrant food system in Rhode Island. We do that by creating partnerships and programs across the entire food system that enhance food businesses, environmental sustainability, and access to food for all Rhode Islanders.  The ██████ works with the state Department of Health to support Food Is Medicine related initiatives, collaborates with the state Department of Commerce to create and implement the state's food strategy, leverages work done by the state Department of Environmental Management to provide programs for farmers and fisherpeople, provides technical assistance to small farmers and small businesses, and advocates for policy in alignment with its mission as directed by its members.

3.    Last year, the ██████ acted as lead applicant in a successful grant application with the Environmental Protection Agency. This project included nine subawardees, including two municipalities, three community-based organizations, and four other nonprofit organizations. The project takes a multilevel approach to food waste reduction, donation and recycling. By engaging many collaborators, the project was designed to decrease the food wasted within schools, businesses and

homes, increase donations from food businesses to non-profits and increase both the capacity for compost processing and participation in these programs. This includes direct technical assistance for schools and businesses, training community members, setting up local and centralized composting options, and community outreach.

4.    There are several  nonprofit organizations and small businesses in Rhode Island that collect food scraps, and they've proven that these composting programs can be effective. But they have limited capacity. Only one commercial-scale composting facility exists in the state. This project would grow capacity exponentially through 37 food waste collection stations (15 community-based and 22 school-based) and nine new composting sites (7 small, 1 medium, 1 large).

5.    The project will support workforce development and new community leadership opportunities, create high-quality jobs, build community engagement in environmental- and climate-related issues, and reduce wasted food, which will, in turn decrease methane outputs;  increase food donation rates to food security organizations; and establish stronger, more climate resilient local farming, landscaping, and gardening practices.

6.    The following impacts were estimated by ▉▉▉ and partners:

- 206 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ members and peer educators identified and trained to lead resident and business engagement, provide

2

behavior change education, and participate in communal food recovery efforts

- 343 businesses, schools, and other organizations engaged

- 23,166 residents engaged

- 582 people trained for the circular economy

- 36 direct jobs created / maintained

- 32 construction jobs created / maintained

- 15,825 households participating in composting

- 15 food waste collection stations installed (in addition to sites at 22 schools)

- 2,477 tons surplus food recovered and donated

- 8,708 tons food scraps composted

- 11,185 tons total of food waste diverted from landfills

- 9 composting sites/facilities built or upgraded (7 small, 1 medium, 1 large)

- 5,500 tons new compost processing capacity / year from the medium and larger sites alone

- 26 school and community gardens built or upgraded that receive free finished compost

- 4,354 tons of finished compost produced

- 15,265 Metric Tons of $CO_2$ Equivalent reduced

- 12,896.5g particulate matter reduced

- 569 million gallons water conserved

7.      EPA awarded us around $18.7 million over three years.  These funds were appropriated under the Inflation Reduction Act.

8.      Our work started on January 1, 2025.  We had a signed contract with the EPA, and had our first coalition meeting to get everyone kicked off on January 13, 2025.

9.      On January 28, 2025 we received an official communication from EPA saying that the project and funds were paused.  The first time that we were unable to access funds because the ASAP portal was frozen was on January 29, 2025. Funds have been frozen/suspended and then unfrozen/open a few times.  We were able to bill for $23,195.70 for January expenses on February 10, 2025 and draw down an advance for equipment of $9,416.30 on March 4, 2025.  We have not been able to access funds since March 4, 2025.

10.      After the freeze, we ultimately had to tell everyone to stop work, because we did not know if funds to reimburse expenses would become available. The way our grant is structured is that we and our grant partners have to pay costs up front, and then get reimbursed, so if we can't draw down from our grant as we expect, then we are out that money that we fronted.

11.      As a result of the freeze, most of our work on this project will not continue unless or until the grant is officially unpaused.  We and many of our partners have had to pause hiring, selecting contractors from RFPs, and most of the work.

12.     The ████ was planning to hire three full-time employees to run this project.  We had started the search, but not yet hired anyone, when the funds were frozen. Nearly 50 applications were submitted for these three jobs. All applicants were told that the process had been postponed, and that we would contact them if/when it was possible to move forward again.

13.     Although these three new employees would have been focused on this new project, their presence would also have created meaningful efficiencies of scale for our current employees.  We currently have two full-time employees working on a state-level organic waste plan that includes composting and waste diversion—in other words, the same problem, but from a different angle.  Two of the new hires' work would have created efficiencies and lessons that we would pull into the state-level plan, which we now cannot make up for, while the other hire would have been responsible for ensuring we remained compliant with EPA financial, reporting, procurement, and other administrative requirements.

14.     While the funds are frozen, and we cannot undertake our planned work, the landfill continues to fill up.  Once wasted food is dumped in a landfill, you can't claw it back.

15.     Not only is our landfill rapidly filling, but organic waste itself produces a lot of methane, which is a known contributor to global warming.  It has a real environmental impact for state air quality.  Our project was expected to divert 11,000 tons of food waste from the landfill, eliminating over 15,000 tons of $CO_2$

5

equivalent from the atmosphere.  But while the funds are frozen, those emissions will continue.  And you can't claw those back, either.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 17, 2025.



UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

WOONASQUATUCKET RIVER
WATERSHED COUNCIL, *et al.*,

                       Plaintiffs,

             v.

DEPARTMENT OF AGRICULTURE,
*et al.*,

                       Defendants.

Civil Action No. 1:25-cv-97 (MSM)

## **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

members that "it would be impracticable, if not impossible, to limit relief in this case just to Plaintiffs in their members," PI Mot. at 37, gets the analysis backwards—Plaintiffs are not entitled to *any* emergency injunctive relief, *see Munaf*, 553 U.S. at 689-90, and if Plaintiffs have not pled their claims in a way that allows for appropriately tailored relief, the result should be to deny relief entirely, not expand relief to operate on a universal basis.

Accordingly, any preliminary injunction should explicitly confirm that all obligations in the injunctive order apply only with respect to awards involving the Plaintiffs and their members (and really, at most, only those three Plaintiff entities not already pursuing claims in the D.D.C. action). *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). Plaintiffs' requested order to release *all* funding appropriated under the IRA and IIJA, regardless of recipient, would not serve the purpose of preserving the current positions of the parties until a trial on the merits can be held, nor would it be consistent with basic principles of equity. Pls.' Proposed Order, ECF No. 26-1.

Second, Plaintiffs' proposed order, *id.*, invokes 5 U.S.C. § 705 as an authority for requesting broad relief. However, Section 705 provides in relevant part that, "to the extent necessary to prevent irreparable injury," a reviewing court "may issue all necessary and appropriate process to *postpone the effective date of an agency action* or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705 (emphasis added). But here, it is not possible for the Court to "postpone" the

effective date of actions that have already been in effect. To "postpone" means "to defer to a future or later time; to put off; delay." Webster's New International Dictionary 1682 (1928) (def. 1); *see* Black's Law Dictionary 1389 (3d ed. 1933) ("To put off; defer; delay"). Section 705 thus requires that any postponement be contemporaneous with or predate the effective date of the challenged agency action; otherwise, there would be no way for a court to postpone that effective date. Section 705 does not authorize an interim form of vacatur; instead, courts reviewing agency action must apply the traditional equitable principles governing the propriety and scope of any preliminary relief. *See*, *e.g.*, *Winter*, 555 U.S. at 20, 24; *see also* H.R. Rep. No. 79-1980, at 43 (1946) (explaining that the authority granted by Section 705 "is equitable" and "would normally, if not always, be limited to the parties complainant"). And even if postponement were available, postponing the effective date on a universal basis would not be "necessary to prevent irreparable injury" to Plaintiffs. 5 U.S.C. § 705. For these reasons, Section 705 does not provide a basis for any of Plaintiffs' requested relief in their proposed order.

Third, any order should be limited to mitigate (albeit not eliminate) the significant harms it would cause to Defendants' and the Executive Branch's abilities to exercise their lawful statutory authority and discretion. *See, e.g.*, *New York v. Trump*, No. 25-cv-39, 2025 WL 715621, at *16 (D.R.I. Mar. 6, 2025) ("The Court's order does not prevent the Defendants from making funding decisions in situations under the Executive's actual authority in the applicable statutory, regulatory, or grant terms[.]"); *see also New York v. Trump*, No. 25-1236 (1st Cir. Mar. 26, 2025),

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

WOONASQUATUCKET RIVER
WATERSHED COUNCIL, *et al.*,

*Plaintiffs*,

v.

DEPARTMENT OF AGRICULTURE,
*et al.*,

*Defendants*.

Case No. 1:25-cv-00097-MSM-PAS

---

## PLAINTIFFS' REPLY IN SUPPORT OF
## MOTION FOR A PRELIMINARY INJUNCTION

Defendants have—without authority or justification—frozen billions of dollars in funding that was appropriated under the Inflation Reduction Act and the Infrastructure Investment and Jobs Act and awarded to recipients. They did so without regard for the damage their freezes would cause, including the jobs lost, local economies impacted, unsafe homes unremediated, access to local food denied, disaster recovery efforts stymied, and environmental problems left unaddressed. In opposing a preliminary injunction, Defendants barely defend these actions; they certainly do not deny them. Instead, they seek to escape the Court's review with a flurry of threshold arguments. But Defendants largely ignore the many recent decisions in other funding cases—including by the First Circuit—rejecting their arguments. They are no more persuasive here. Nor are Defendants' half-hearted claims on the merits, irreparable injury, and the public interest. The Court should order immediate relief to halt the ongoing harm caused by Defendants' actions.

1

Defendants' words (at 57), "be consistent with basic principles of equity."

Rather than engage with any of this authority, Defendants cite (at 59–60) a stream of irrelevant cases. They quote lines from two cases about relief *at final judgment*, but the question those cases address about remanding to agencies is inapplicable at the preliminary injunction stage here. Opp'n at 59 (quoting *N. Air Cargo v. U.S. Postal Serv.*, 674 F. 3d 852, 861 (D.C. Cir. 2012), and *State Farm*, 463 U.S. at 46). *Public Employees. for Environmental Responsibility v. National Par Service* analyzed the doctrine of ratification, which is likewise inapplicable. 605 F. Supp. 3d 28, 49 (D.D.C. 2022). *In re Microsoft Corp. Antitrust Litigation* merely confirms that the point of a preliminary injunction is to maintain the status quo, which is precisely what Plaintiffs seek. 333 F.3d 517, 525 (4th Cir. 2003). And *Sherley v. Sebelius* was a case about notice-and-comment rulemaking that held that NIH was not required to specifically address certain comments, but Plaintiffs do not make a similar claim here. 689 F.3d 776, 784–85 (D.C. Cir. 2012).

Defendants also challenge (at 58) the propriety of a stay under 5 U.S.C. § 705, largely on the basis that, they say, there is no agency action to "postpone." Defendants' argument misses that Section 705 empowers courts not only to postpone agency action but also "to issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. *That* is what Plaintiffs seek here. So Defendants' exegesis of the word "postpone" is entirely beside the point. *See, e.g.*, *Maryland v. Dep't of Agriculture*, No. 25-0748, 2025 WL 800216, at *1, 25 (D. Md. Mar. 13, 2025), *appeal pending*, No. 25-1248 (4th Cir.). And

as Plaintiffs have explained, Mot. at 38–39, and the Fifth Circuit recently emphasized, "[n]othing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited to [the plaintiff] or its members." *Career Colls.     Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).

Defendants next complain (at 59) that the proposed prohibition on "implementing, giving effect to, or reinstating under a different name OMB Memo M-25-11" is inappropriately vague. They ignore that several courts have entered parallel language, which is necessary and appropriate to avoid obvious attempts at evasion. *See, e.g.*, *California v. Dep't of Educ.*, 2025 WL 760825, at *5; *Massachusetts Fair Housing Ctr. v. HUD*, No. 25-cv-30041, 2025 WL 941380, at *1 (D. Mass. Mar. 26, 2025); *NCN II*, 2025 WL 597959, at *19. And that the First Circuit has already rejected an argument identical to theirs. *See New Yor*   Stay Op., 2025 WL 914788, at *16 (explaining that the court "cannot agree that the Defendants have made the case that the preliminary injunction is vague" for the reasons Defendants urge here). Nor is it necessary that the Court's order specify that Defendants may "exercis[e] the authorities granted to them under applicable statutes, regulations, and grant agreements." Opp'n at 59. Of course they can, so long as in doing so, they comply with the Court's injunction against continuing to broadly freeze IRA and IIJA funding on a non-individualized basis.

Moving on from scope of relief, Defendants ask the Court (at 60) to stay any injunctive relief. As other courts have observed, such a request is "premature" before

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| WOONASQUATUCKET RIVER WATERSHED COUNCIL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF AGRICULTURE, *et al.*, <br><br> Defendants. | Civil Action No. 1:25-cv-97 (MSM) |

## <u>NOTICE OF APPEAL</u>

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States

Court of Appeals for the First Circuit from this Court's preliminary injunction, as set

forth in the Memorandum and Order dated April 15, 2025 and docketed at ECF No.

45.

Dated: April 30, 2025              Respectfully Submitted,

                                   YAAKOV M. ROTH
                                   Acting Assistant Attorney General

                                   ALEXANDER K. HAAS
                                   Director

                                   DANIEL SCHWEI
                                   Special Counsel

                                   */s/ Eitan R. Sirkovich*
                                   EITAN R. SIRKOVICH
                                   ANDREW F. FREIDAH
                                   Trial Attorneys
                                   United States Department of Justice
                                   Civil Division, Federal Programs Branch

1100 L Street NW
Washington, DC 20005
Tel.:      (202) 353-5525
Email:    eitan.r.sirkovich@usdoj.gov

*Counsel for Defendants*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on April 30, 2025, I electronically filed the within Certification with the Clerk of the United States District Court for the District of Rhode Island using the CM/ECF System, thereby serving it on all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 305.


<u>*/s/ Eitan R. Sirkovich*</u>
Eitan R. Sirkovich

APPEAL

**U.S. District Court**
**District of Rhode Island (Providence)**
**CIVIL DOCKET FOR CASE #: 1:25-cv-00097-MSM-PAS**

| | |
|---|---|
| Woonasquatucket River Watershed Council et al v. Department of Agriculture et al | Date Filed: 03/13/2025 |
| Assigned to: District Judge Mary S. McElroy | Jury Demand: None |
| Referred to: Magistrate Judge Patricia A. Sullivan | Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision |
| Case in other court: First Circuit, 25-01428 | |
| Cause: 05:551 Administrative Procedure Act | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**Woonasquatucket River Watershed Council**                    represented by    **Amato A. DeLuca**
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
02903
Providence, RI 02903
401-453-1500
Fax: 401-453-1501
Email: bud@dwbrlaw.com
*ATTORNEY TO BE NOTICED*

**Jessica Anne Morton**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-843-1642
Email: jmorton@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katelyn M. Revens**
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
02903
Providence, RI 02903
401-453-1500
Fax: 401-453-1501
Email: kate@dwbrlaw.com
*ATTORNEY TO BE NOTICED*

**Kevin E. Friedl**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

202-894-6035
Email: kfriedl@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
Democracy Forward Foundation
P.O Box 34553
Washington, DC 20043
202-448-9090
Fax: 202-796-4426
Email: rthurston@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye L. Perryman**
Democracy Forward Foundation
P.O Box 34553
Washington, DC 34553
202-448-9090
Fax: 202-796-4426
Email: sperryman@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Miriam Weizenbaum**
DeLuca, Weizenbaum, Barry & Revens,
Ltd.
199 North Main Street
Providence, RI 02903
401-453-1500
Fax: 401-453-1501
Email: miriam@dwbrlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Eastern Rhode Island Conservation District**    represented by    **Amato A. DeLuca**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Anne Morton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katelyn M. Revens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin E. Friedl**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye L. Perryman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Miriam Weizenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Green Infrastructure Center**    represented by    **Amato A. DeLuca**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Anne Morton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katelyn M. Revens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin E. Friedl**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye L. Perryman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Miriam Weizenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**National Council of Nonprofits**    represented by    **Amato A. DeLuca**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Anne Morton**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katelyn M. Revens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin E. Friedl**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye L. Perryman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Miriam Weizenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Childhood Lead Action Project**                  represented by    **Amato A. DeLuca**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Anne Morton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katelyn M. Revens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin E. Friedl**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Miriam Weizenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye L. Perryman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Codman Square Neighborhood            represented by    **Amato A. DeLuca**
Development Corporation                                    (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Jessica Anne Morton**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Katelyn M. Revens**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Kevin E. Friedl**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Miriam Weizenbaum**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Robin F. Thurston**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Skye L. Perryman**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

Department of Agriculture              represented by    **Daniel Schwei**
                                                          DOJ-Civ
                                                          1100 L St., N.W.
                                                          Room 11532
                                                          Washington, DC 20530
                                                          202-305-8693
                                                          Email: daniel.s.schwei@usdoj.gov
                                                          *TERMINATED: 06/05/2025*
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Andrew Freidah**

DOJ-Civ
1100 L Street NW
Ste 12308
Washington, DC 20005
202-305-0879
Email: andrew.f.freidah@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
DOJ-Civ
1100 L Street NW
Room 12310
Washington, DC 20005
585-694-1124
Email: eitan.r.sirkovich@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Brooke Rollins**<br>*in her official capacity as Secretary of Agriculture* | represented by | **Daniel Schwei**<br>(See above for address)<br>*TERMINATED: 06/05/2025*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Andrew Freidah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Department of Energy** | represented by | **Daniel Schwei**<br>(See above for address)<br>*TERMINATED: 06/05/2025*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Andrew Freidah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Chris Wright**<br>*in his official capacity as Secretary of Energy* | represented by | **Daniel Schwei**<br>(See above for address)<br>*TERMINATED: 06/05/2025*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Andrew Freidah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of Interior**                    represented by   **Daniel Schwei**
(See above for address)
*TERMINATED: 06/05/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Freidah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Doug Burgum**                               represented by   **Daniel Schwei**
*in his official capacity as Secretary of the*                (See above for address)
*Interior*                                                    *TERMINATED: 06/05/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Freidah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Environmental Protection Agency**           represented by   **Daniel Schwei**
(See above for address)
*TERMINATED: 06/05/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Freidah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lee Zeldin**                                represented by   **Daniel Schwei**
*in his official capacity as EPA Administrator*               (See above for address)
*TERMINATED: 06/05/2025*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Freidah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Office of Management and Budget**                represented by   **Daniel Schwei**
                                                                    (See above for address)
                                                                    *TERMINATED: 06/05/2025*
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Andrew Freidah**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Eitan Sirkovich**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Russell Vought**                                 represented by   **Daniel Schwei**
*in his official capacity as OMB Director*                          (See above for address)
                                                                    *TERMINATED: 06/05/2025*
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Andrew Freidah**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Eitan Sirkovich**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Kevin Hassett**                                  represented by   **Daniel Schwei**
*in his official capacity as Director of the*                       (See above for address)
*National Economic Council*                                         *TERMINATED: 06/05/2025*
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Andrew Freidah**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Eitan Sirkovich**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of Housing and Urban
Development**                              represented by   **Daniel Schwei**
                                                           (See above for address)
                                                           *TERMINATED: 06/05/2025*
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Andrew Freidah**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Eitan Sirkovich**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Scott Turner**                           represented by   **Daniel Schwei**
*in his official capacity as Secretary of*                 (See above for address)
*Housing and Urban Development*                            *TERMINATED: 06/05/2025*
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Andrew Freidah**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Eitan Sirkovich**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/13/2025 | 1 | COMPLAINT ( filing fee paid $ 405.00, receipt number ARIDC-2110259 ), filed by Green Infrastructure Center, Eastern Rhode Island Conservation District, Woonasquatucket River Watershed Council, National Council of Nonprofits. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Civil Cover Sheet)(DeLuca, Amato) (Entered: 03/13/2025) |
| 03/13/2025 | 2 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits. (DeLuca, Amato) (Entered: 03/13/2025) |
| 03/13/2025 | 3 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits. (DeLuca, Amato) (Entered: 03/13/2025) |
| 03/13/2025 | 4 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits. (DeLuca, Amato) (Entered: 03/13/2025) |

| 03/13/2025 | 5 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits. (DeLuca, Amato) (Entered: 03/13/2025) |
|---|---|---|
| 03/13/2025 | 6 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits. (DeLuca, Amato) (Entered: 03/13/2025) |
| 03/13/2025 | 7 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits. (DeLuca, Amato) (Entered: 03/13/2025) |
| 03/13/2025 | 8 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits. (DeLuca, Amato) (Entered: 03/13/2025) |
| 03/13/2025 | 9 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits. (DeLuca, Amato) (Entered: 03/13/2025) |
| 03/13/2025 | 10 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits. (DeLuca, Amato) (Entered: 03/13/2025) |
| 03/13/2025 | 11 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits. (DeLuca, Amato) (Entered: 03/13/2025) |
| 03/13/2025 | 12 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits. (DeLuca, Amato) (Entered: 03/13/2025) |
| 03/13/2025 | 13 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits. (DeLuca, Amato) (Entered: 03/13/2025) |
| 03/13/2025 | 14 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits. (DeLuca, Amato) (Entered: 03/13/2025) |
| 03/14/2025 | | CASE CONDITIONALLY ASSIGNED to Chief Judge John J. McConnell, Jr. and Magistrate Judge Patricia A. Sullivan. Related Case Number 25-cv-39 based upon the indication on the cover sheet that a related case previously was assigned to the presiding judge. The assignment is subject to the presiding judge's determination that the cases, in fact, are related. (Hill, Cherelle) (Entered: 03/14/2025) |
| 03/14/2025 | 15 | CASE OPENING NOTICE ISSUED (Hill, Cherelle) (Entered: 03/14/2025) |
| 03/14/2025 | | CASE RANDOMLY REASSIGNED: Chief Judge John J. McConnell, Jr. has determined that this case is not related to 25cv39. Case randomly assigned to Judge District Judge Mary S. McElroy for all further proceedings. (Simoncelli, Michael) (Entered: 03/14/2025) |
| 03/14/2025 | 16 | Summons Issued as to Doug Burgum, Department of Agriculture, Department of Energy, Department of Interior, Environmental Protection Agency, Kevin Hassett, Office of Management and Budget, Brooke Rollins, Russell Vought, Chris Wright, Lee Zeldin, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Chris Wright Summons, # 2 Department of Agriculture Summons, # 3 Department of Energy Summons, # 4 Department of Interior, # 5 Doug Burgum, # 6 Environmental Protection Agency Summons, # 7 Kevin Hassett Summons, # 8 Lee Zeldin Summons, # 9 Office of |

| | | |
|---|---|---|
| | | Management and Budget Summons, # 10 Pam Bondi Summons, # 11 Russell Vought Summons, # 12 US Attorney)(Hill, Cherelle) (Entered: 03/14/2025) |
| 03/14/2025 | 17 | MOTION for Jessica Anne Morton to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2110813 ) filed by All Plaintiffs. (DeLuca, Amato) (Entered: 03/14/2025) |
| 03/14/2025 | 18 | MOTION for Kevin E. Friedl to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2110842 ) filed by All Plaintiffs. (DeLuca, Amato) (Entered: 03/14/2025) |
| 03/14/2025 | 19 | MOTION for Robin F. Thurston to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2110845 ) filed by All Plaintiffs. (DeLuca, Amato) (Entered: 03/14/2025) |
| 03/14/2025 | 20 | MOTION for Skye L. Perryman to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2110849 ) filed by All Plaintiffs. (DeLuca, Amato) (Entered: 03/14/2025) |
| 03/14/2025 | | TEXT ORDER granting 17 Motion to Appear Pro Hac Vice of Jessica Anne Morton. So Ordered by District Judge Mary S. McElroy on 3/14/2025. (Hill, Cherelle) (Entered: 03/14/2025) |
| 03/14/2025 | | TEXT ORDER granting 18 Motion to Appear Pro Hac Vice of Kevin Friedl. So Ordered by District Judge Mary S. McElroy on 3/14/2025. (Hill, Cherelle) (Entered: 03/14/2025) |
| 03/14/2025 | | TEXT ORDER granting 19 Motion to Appear Pro Hac Vice of Robin F. Thurston. So Ordered by District Judge Mary S. McElroy on 3/14/2025. (Hill, Cherelle) (Entered: 03/14/2025) |
| 03/14/2025 | | TEXT ORDER granting 20 Motion to Appear Pro Hac Vice of Skye L. Perryman. So Ordered by District Judge Mary S. McElroy on 3/14/2025. (Hill, Cherelle) (Entered: 03/14/2025) |
| 03/17/2025 | 21 | AMENDED COMPLAINT against All Defendants, filed by Green Infrastructure Center, Eastern Rhode Island Conservation District, Woonasquatucket River Watershed Council, National Council of Nonprofits, Childhood Lead Action Project, Codman Square Neighborhood Development Corporation. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit) (Weizenbaum, Miriam) *Docket text modified on 3/17/2025 to include the 2 new Plaintiffs.* (Gonzalez Gomez, Viviana) (Entered: 03/17/2025) |
| 03/17/2025 | 22 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits, Childhood Lead Action Project, Codman Square Neighborhood Development Corporation. (Weizenbaum, Miriam) *Docket text modified on 3/17/2025 to include the 2 new Plaintiffs.* (Gonzalez Gomez, Viviana) (Entered: 03/17/2025) |
| 03/17/2025 | 23 | Summons Request filed by Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits, Childhood Lead Action Project, Codman Square Neighborhood Development Corporation. (Weizenbaum, Miriam) *Docket text modified on 3/17/2025 to include the 2 new Plaintiffs.* (Gonzalez Gomez, Viviana) (Entered: 03/17/2025) |
| 03/17/2025 | 24 | Summons Issued as to Department of Housing and Urban Development, Scott Turner. (Attachments: # 1 Summons Issued as to S. Turner) (Gonzalez Gomez, Viviana) (Entered: 03/17/2025) |
| 03/17/2025 | 25 | NOTICE by Childhood Lead Action Project, Codman Square Neighborhood Development Corporation, Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits (Weizenbaum, Miriam) (Entered: 03/17/2025) |

| | | |
|---|---|---|
| 03/17/2025 | 26 | MOTION for Preliminary Injunction filed by All Plaintiffs. **Responses due by 3/31/2025.** (Attachments: # 1 Exhibit Exhibit J, # 2 Exhibit Exhibit K, # 3 Exhibit Exhibit L, # 4 Exhibit Exhibit M, # 5 Exhibit Exhibit N, # 6 Exhibit Exhibit O, # 7 Exhibit Exhibit P, # 8 Exhibit Exhibit Q, # 9 Exhibit Exhibit R, # 10 Exhibit Exhibit S, # 11 Exhibit Exhibit T, # 12 Exhibit Exhibit U, # 13 Exhibit Exhibit V, # 14 Proposed Order)(Weizenbaum, Miriam) (Entered: 03/17/2025) |
| 03/17/2025 | 27 | MOTION to Expedite *Briefing* filed by All Plaintiffs. **Responses due by 3/31/2025.** (Attachments: # 1 Proposed order)(Weizenbaum, Miriam) (Entered: 03/17/2025) |
| 03/18/2025 | | TEXT ORDER. The Plaintiffs' Motion for Expedited Briefing Schedule (ECF No. 27 ) is Granted in part and Denied in part. Defendants shall have until March 27, 2025, to file their response to Plaintiffs' Motion for a Preliminary Injunction (ECF No. 26 ). Plaintiffs shall file any replies by March 31, 2025.. So Ordered by District Judge Mary S. McElroy on 3/18/2025. (Potter, Carrie) (Entered: 03/18/2025) |
| 03/24/2025 | 28 | NOTICE by Childhood Lead Action Project, Codman Square Neighborhood Development Corporation, Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits *Supplemental Notice of Related Cases* (Weizenbaum, Miriam) (Entered: 03/24/2025) |
| 03/26/2025 | 29 | NOTICE of Appearance by Daniel Schwei on behalf of All Defendants (Schwei, Daniel) (Entered: 03/26/2025) |
| 03/26/2025 | 30 | NOTICE of Appearance by Eitan Sirkovich on behalf of Department of Housing and Urban Development, Scott Turner, Doug Burgum, Lee Zeldin, Office of Management and Budget, Russell Vought, Kevin Hassett, Department of Agriculture, Brooke Rollins, Department of Energy, Chris Wright, Department of Interior (Sirkovich, Eitan) (Entered: 03/26/2025) |
| 03/27/2025 | 31 | RESPONSE In Opposition to 26 MOTION for Preliminary Injunction filed by All Defendants. **Replies due by 4/3/2025.** (Attachments: # 1 Exhibit OMB Memo M-25-13, # 2 Exhibit DOE Declaration)(Schwei, Daniel) (Entered: 03/27/2025) |
| 03/28/2025 | | NOTICE of Hearing on Motion 26 MOTION for Preliminary Injunction : Motion Hearing set for 4/3/2025 at 10:00 AM in Courtroom 2 before District Judge Mary S. McElroy. (Potter, Carrie) (Entered: 03/28/2025) |
| 03/31/2025 | 32 | REPLY to Response re 31 Response to Motion, filed by All Plaintiffs. (Attachments: # 1 Exhibit Exhibit W, # 2 Exhibit Exhibit X, # 3 Exhibit Exhibit Y, # 4 Exhibit Exhibit Z, # 5 Exhibit Exhibit AA, # 6 Exhibit Exhibit BB)(Weizenbaum, Miriam) (Entered: 03/31/2025) |
| 04/01/2025 | | TEXT ORDER : For Thursday's hearing (4/3/2025) on the Preliminary Injunction motion (ECF No. 26), the following schedule will be followed: Plaintiffs shall have up to one hour for presentation, Defendants will then have up to one hour for presentation, and then Plaintiffs will have up to 15 minutes for rebuttal.. So Ordered by District Judge Mary S. McElroy on 4/1/2025. (Potter, Carrie) (Entered: 04/01/2025) |
| 04/02/2025 | 33 | NOTICE by Childhood Lead Action Project, Codman Square Neighborhood Development Corporation, Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits *Notice of Factual Development* (Weizenbaum, Miriam) (Entered: 04/02/2025) |
| 04/02/2025 | 34 | AFFIDAVIT of Service, filed by Codman Square Neighborhood Development Corporation, Eastern Rhode Island Conservation District, Woonasquatucket River Watershed Council, Green Infrastructure Center, National Council of Nonprofits, Childhood Lead Action Project Doug Burgum served on 3/21/2025, answer due 4/11/2025; Department of Energy served on 3/21/2025, answer due 4/11/2025; Department of |

| | | |
|---|---|---|
| | | Housing and Urban Development served on 3/21/2025, answer due 4/11/2025; Department of Interior served on 3/21/2025, answer due 4/11/2025; Environmental Protection Agency served on 3/21/2025, answer due 4/11/2025; Kevin Hassett served on 3/21/2025, answer due 4/11/2025; Office of Management and Budget served on 3/21/2025, answer due 4/11/2025; Brooke Rollins served on 3/21/2025, answer due 4/11/2025; Scott Turner served on 3/21/2025, answer due 4/11/2025; Russell Vought served on 3/21/2025, answer due 4/11/2025; Chris Wright served on 3/21/2025, answer due 4/11/2025; Lee Zeldin served on 3/21/2025, answer due 4/11/2025. (Attachments: # 1 Affidavit USDA, # 2 Affidavit OMB, # 3 Affidavit HUD, # 4 Affidavit Hassett (NEC), # 5 Affidavit Vought (OMB), # 6 Affidavit Burgum (DOI), # 7 Affidavit Wright (DOE), # 8 Affidavit Rollins (USDA), # 9 Affidavit Turner (HUD), # 10 Affidavit US AG (Bondi), # 11 Affidavit RI US Attorney, # 12 Affidavit DOI, # 13 Affidavit EPA, # 14 Affidavit Zeldin)(Weizenbaum, Miriam) (Entered: 04/02/2025) |
| 04/03/2025 | | Minute Entry for proceedings held before District Judge Mary S. McElroy: Motion Hearing held on 4/3/2025 re 26 MOTION for Preliminary Injunction: A. DeLuca, J. Morton, K. Friedl, P. Thurston, M. Weizenbaum and D. Schwei in attendance. Parties argue motion; Court questions. Court takes 26 Motion for Preliminary Injunction under advisement. Plaintiffs to file revised proposed order. Recess. (Court Reporter D. Veitch in Courtroom 2 at 10:00 am.) (Potter, Carrie) (Entered: 04/03/2025) |
| 04/03/2025 | 35 | TRANSCRIPT ORDER for proceedings held on 04/03/2025 before Judge Mary S. McElroy. 3-Day Transcript Selected. Transcript to be delivered within 3 calendar days.. (Weizenbaum, Miriam) (Entered: 04/03/2025) |
| 04/03/2025 | 36 | TRANSCRIPT ORDER ACKNOWLEDGMENT Entered re: 35 Transcript Order. Court Reporter/Transcriber: Denise Veitch. (Dias, Jennifer) (Entered: 04/03/2025) |
| 04/04/2025 | 37 | NOTICE by Childhood Lead Action Project, Codman Square Neighborhood Development Corporation, Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits *Notice re Revised Proposed Order* (Attachments: # 1 Revised Proposed Order)(Weizenbaum, Miriam) (Entered: 04/04/2025) |
| 04/06/2025 | 38 | NOTICE by Childhood Lead Action Project, Codman Square Neighborhood Development Corporation, Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits *Regarding Department of Education v. California* (Weizenbaum, Miriam) (Entered: 04/06/2025) |
| 04/08/2025 | 39 | TRANSCRIPT of Plaintiffs' Motion for Preliminary Injunction. held on April 3, 2025, before District Judge Mary S. McElroy. Court Reporter Denise P. Veitch, Telephone number (401) 752-7031. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter or PACER. **NOTICE TO COUNSEL: Redaction Requests must be filed for personal identifiers only. All other redactions must be requested by motion. For local policy and sample redaction request visit our website at www.rid.uscourts.gov and select Transcripts under the Case Information menu option. Redaction Request due 4/29/2025. Redacted Transcript Deadline set for 5/9/2025. Release of Transcript Restriction set for 7/7/2025.** (Veitch, Denise) (Entered: 04/08/2025) |

| 04/08/2025 | 40 | RESPONSE IN OPPOSITION by Department of Housing and Urban Development, Scott Turner, Doug Burgum, Environmental Protection Agency, Lee Zeldin, Office of Management and Budget, Russell Vought, Kevin Hassett, Department of Agriculture, Brooke Rollins, Department of Energy, Chris Wright, Department of Interior re 37 Notice (Other), *to Plaintiffs' Revised Proposed Order*. (Schwei, Daniel) (Entered: 04/08/2025) |
| 04/08/2025 | 41 | RESPONSE IN OPPOSITION by Department of Housing and Urban Development, Scott Turner, Doug Burgum, Environmental Protection Agency, Lee Zeldin, Office of Management and Budget, Russell Vought, Kevin Hassett, Department of Agriculture, Brooke Rollins, Department of Energy, Chris Wright, Department of Interior re 38 Notice (Other), *Regarding Department of Education v. California*. (Schwei, Daniel) (Entered: 04/08/2025) |
| 04/09/2025 | 42 | REPLY to Response re 41 Reply to Response, *Regarding Department of Education v. California* filed by All Plaintiffs. (Weizenbaum, Miriam) (Entered: 04/09/2025) |
| 04/12/2025 | 43 | NOTICE by Childhood Lead Action Project, Codman Square Neighborhood Development Corporation, Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits *Notice of Supplemental Authority* (Weizenbaum, Miriam) (Entered: 04/12/2025) |
| 04/14/2025 | 44 | NOTICE by Childhood Lead Action Project, Codman Square Neighborhood Development Corporation, Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits *Notice of Supplement Authority* (Attachments: # 1 Attachment)(Weizenbaum, Miriam) (Entered: 04/14/2025) |
| 04/15/2025 | 45 | MEMORANDUM AND ORDER granting 26 Motion for Preliminary Injunction. So Ordered by District Judge Mary S. McElroy on 4/15/2025. (Urizandi, Nissheneyra) (Entered: 04/15/2025) |
| 04/16/2025 | 46 | NOTICE of Appearance by Andrew Freidah on behalf of All Defendants (Freidah, Andrew) (Entered: 04/16/2025) |
| 04/16/2025 | 47 | STATUS REPORT *Regarding Preliminary Injunction and Request for Clarification* by All Defendants. (Attachments: # 1 Exhibit Exhibit A - OMB Notice, # 2 Exhibit Exhibit B - DOE Notice, # 3 Exhibit Exhibit C - HUD Notice, # 4 Exhibit Exhibit D - EPA Notice) (Freidah, Andrew) (Entered: 04/16/2025) |
| 04/18/2025 | | NOTICE of Hearing: Zoom Chambers Conference re: Status of Compliance and Scheduling set for 4/21/2025 at 11:30 AM before District Judge Mary S. McElroy. Zoom Meeting ID/Passcode provided to counsel of record via email. (Simoncelli, Michael) (Entered: 04/18/2025) |
| 04/18/2025 | 48 | NOTICE of Appearance by Katelyn M. Revens on behalf of All Plaintiffs (Revens, Katelyn) (Entered: 04/18/2025) |
| 04/20/2025 | 49 | NOTICE by Childhood Lead Action Project, Codman Square Neighborhood Development Corporation, Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, Green Infrastructure Center, National Council of Nonprofits *Notice Regarding Status of Compliance* (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3)(Weizenbaum, Miriam) (Entered: 04/20/2025) |
| 04/21/2025 | | Minute Entry for proceedings held before District Judge Mary S. McElroy: Zoom Chambers Conference held on 4/21/2025. Counsel present: M. Weizenbaum, J. Morton, R. Thurston, and K. Friedl for Plaintiffs; D. Schewi for Defendants. Parties directed to submit status reports by 12:00 PM on Wednesday, April 23, 2025. Court to hold follow-up |

| | | conference, if needed, at 4:00 PM on Wednesday, April 23, 2025. (By Zoom Video Conference at 11:40 AM.) (Simoncelli, Michael) (Entered: 04/21/2025) |
|---|---|---|
| 04/21/2025 | | NOTICE of Hearing: Status Conference set for 4/23/2025 at 04:00 PM by Zoom Video Conference before District Judge Mary S. McElroy. Zoom Meeting ID/Passcode provided to counsel of record by email. (Simoncelli, Michael) (Entered: 04/21/2025) |
| 04/23/2025 | 50 | STATUS REPORT by All Plaintiffs. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Weizenbaum, Miriam) (Entered: 04/23/2025) |
| 04/23/2025 | | NOTICE of Hearing: On the record In Chambers Conference/Hearing set for 4/23/2025 at 04:00 PM via Remote Hearing before District Judge Mary S. McElroy. Zoom Meeting ID/Passcode previously provided to counsel of record via email. A remote viewing option will be made available for the public and information on that will be available on the Court's website at https://www.rid.uscourts.gov/ (Potter, Carrie) (Entered: 04/23/2025) |
| 04/23/2025 | 51 | STATUS REPORT *Regarding Compliance* by All Defendants. (Attachments: # 1 Exhibit Coogan Decl (EPA))(Schwei, Daniel) (Entered: 04/23/2025) |
| 04/23/2025 | | Minute Entry for proceedings held before District Judge Mary S. McElroy: In Chambers Conference held on 4/23/2025. D. Schwei, J. Morton, K. Friedl, R. Thurston, M. Weizenbaum. Court questions; parties respond. Parties must file a Status Report on 4/25/2025 by 12:00 pm EST. Court to schedule a conference on 4/25/2025 at 1:00 pm via Zoom or telephone. (Court Reporter D. Webb in Courtroom Zoom at 4:00 pm.) (Potter, Carrie) Modified on 4/24/2025 to correct typo (Potter, Carrie). (Entered: 04/23/2025) |
| 04/24/2025 | 52 | ORDER : As discussed at the conference, the parties are directed to address all issues described above by 12:00pm noon tomorrow - Friday, April 25 - for a 1:00pm conference. The Court requests that the parties structure their updates as this order does-organizing issues using the agencies as headings. So Ordered by District Judge Mary S. McElroy on 4/24/2025. (Potter, Carrie) (Entered: 04/24/2025) |
| 04/24/2025 | 53 | TRANSCRIPT ORDER for proceedings held on 04/23/2025 before Judge Hon. Mary S. McElroy. <span style="color:red">Daily Transcript selected.</span> Transcript to be delivered following adjournment and prior to the normal opening hour of court on the following morning.. (Weizenbaum, Miriam) (Entered: 04/24/2025) |
| 04/24/2025 | 54 | TRANSCRIPT ORDER ACKNOWLEDGMENT Entered re: 53 Transcript Order,. Daily Transcript Ordered. Court Reporter/Transcriber: Denise Webb. (Dias, Jennifer) (Entered: 04/24/2025) |
| 04/24/2025 | | NOTICE of Hearing: Status Conference set for 4/25/2025 at 01:00 PM in Remote Hearing before District Judge Mary S. McElroy. Zoom Meeting ID/Passcode to be provided to counsel of record via email. A remote viewing option will be made available for the public and information on that will be available on the Court's website at https://www.rid.uscourts.gov/ (Potter, Carrie) (Entered: 04/24/2025) |
| 04/25/2025 | 55 | STATUS REPORT by All Plaintiffs. (Attachments: # 1 Exhibit 1)(Weizenbaum, Miriam) (Entered: 04/25/2025) |
| 04/25/2025 | 56 | STATUS REPORT *Regarding Preliminary Injunction* by All Defendants. (Attachments: # 1 Exhibit Whitehead Declaration (Interior), # 2 Exhibit Whitney Declaration (USDA)) (Schwei, Daniel) (Entered: 04/25/2025) |
| 04/25/2025 | 57 | TRANSCRIPT of Status Conference held on 04/23/2025 before District Judge Mary S. McElroy. Court Reporter Denise A Webb, Telephone number 401-752-7045. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. <span style="color:red">NOTICE TO COUNSEL: Redaction Requests</span> |

| | | |
|---|---|---|
| | | **must be filed for personal identifiers only. All other redactions must be requested by motion. For local policy and sample redaction request visit our website at www.rid.uscourts.gov and select Transcripts under the Case Information menu option.** Redaction Request due 5/16/2025. Redacted Transcript Deadline set for 5/27/2025. Release of Transcript Restriction set for 7/24/2025. (Webb, Denise) Modified on 4/25/2025 (McGuire, Vickie). (Entered: 04/25/2025) |
| 04/25/2025 | | Minute Entry for proceedings held before District Judge Mary S. McElroy: Status Conference held on 4/25/2025. D. Schwei, R. Thurston, K. Friedl. M. Weizenbaum in attendance. Court questions; parties response. Court orders Status Reports due by 12:00 pm on 5/2/2025. Court to schedule status conference on 5/5/2025. (Court Reporter D. Veitch in Courtroom Zoom Conference at 1:00 pm.) (Potter, Carrie) (Entered: 04/25/2025) |
| 04/25/2025 | | NOTICE of Hearing: Status Conference set for 5/5/2025 at 02:00 PM via Zoom before District Judge Mary S. McElroy. Zoom Meeting ID/Passcode to be provided to counsel of record via email. A remote viewing option will be made available for the public and information on that will be available on the Court's website at https://www.rid.uscourts.gov (Potter, Carrie) (Entered: 04/25/2025) |
| 04/28/2025 | 58 | ORDER regarding 4/25/2025 status cnference. So Ordered by District Judge Mary S. McElroy on 4/28/2025. (Potter, Carrie) (Entered: 04/28/2025) |
| 04/28/2025 | 59 | TRANSCRIPT ORDER for proceedings held on 04/25/2025 before Judge Hon. Mary S. McElroy. Daily Transcript selected. Transcript to be delivered following adjournment and prior to the normal opening hour of court on the following morning.. (Weizenbaum, Miriam) (Entered: 04/28/2025) |
| 04/28/2025 | 60 | TRANSCRIPT ORDER ACKNOWLEDGMENT Entered re: 59 Transcript Order,. Daily Transcript Ordered. Court Reporter/Transcriber: Denise Veitch. (Dias, Jennifer) (Entered: 04/28/2025) |
| 04/29/2025 | 61 | TRANSCRIPT of Status Conference, held on April 25, 2025, before District Judge Mary S. McElroy. Court Reporter Denise P. Veitch, Telephone number (401) 752-7031. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter or PACER. **NOTICE TO COUNSEL: Redaction Requests must be filed for personal identifiers only. All other redactions must be requested by motion. For local policy and sample redaction request visit our website at www.rid.uscourts.gov and select Transcripts under the Case Information menu option.** Redaction Request due 5/20/2025. Redacted Transcript Deadline set for 5/30/2025. Release of Transcript Restriction set for 7/28/2025. (Veitch, Denise) (Entered: 04/29/2025) |
| 04/30/2025 | 62 | NOTICE OF APPEAL by Department of Housing and Urban Development, Scott Turner, Doug Burgum, Environmental Protection Agency, Lee Zeldin, Office of Management and Budget, Russell Vought, Kevin Hassett, Department of Agriculture, Brooke Rollins, Department of Energy, Chris Wright, Department of Interior as to 45 Order on Motion for Preliminary Injunction (No fee paid, USA, Waived by Statute, or IFP.) **NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** Appeal Record due by 5/7/2025. (Sirkovich, Eitan) (Entered: 04/30/2025) |
| 04/30/2025 | 63 | CLERK'S CERTIFICATE AND APPELLATE COVER SHEET: Abbreviated record on appeal consisting of notice of appeal, order(s) being appealed, and a certified copy of the |

| | | |
|---|---|---|
| | | district court docket report transmitted to the U.S. Court of Appeals for the First Circuit in accordance with 1st Cir. R. 11.0(b). 62 Notice of Appeal,,,. (Attachments: # 1 Record on Appeal)(Hill, Cherelle) (Entered: 04/30/2025) |
| 04/30/2025 | | USCA Case Number 25-1428 for 62 Notice of Appeal,,, filed by Kevin Hassett, Environmental Protection Agency, Department of Housing and Urban Development, Doug Burgum, Chris Wright, Department of Interior, Lee Zeldin, Department of Agriculture, Department of Energy, Brooke Rollins, Office of Management and Budget, Scott Turner, Russell Vought. (Hill, Cherelle) (Entered: 04/30/2025) |
| 05/02/2025 | 64 | STATUS REPORT *Regarding Preliminary Injunction* by All Defendants. (Attachments: # 1 Exhibit Suppl Whitehead Decl (Interior), # 2 Exhibit Suppl Whitney Decl (USDA), # 3 Exhibit Suppl Coogan Decl (EPA))(Schwei, Daniel) (Entered: 05/02/2025) |
| 05/02/2025 | 65 | STATUS REPORT by All Plaintiffs. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Weizenbaum, Miriam) (Entered: 05/02/2025) |
| 05/05/2025 | | Minute Entry for proceedings held before District Judge Mary S. McElroy: Status Conference held on 5/5/2025.J. Morton, K. Friedl, R. Thurston, M. Weizenbaum, D. Schwei in attendance. Status Reports discussed. Defendant to file Motion to Stay. Recess. (Court Reporter D. Veitch in Courtroom Zoom Conference at 2:00 pm.) (Potter, Carrie) (Entered: 05/05/2025) |
| 05/06/2025 | 66 | TRANSCRIPT ORDER for proceedings held on 05/05/2025 before Judge Mary S. McElroy. Daily Transcript selected. Transcript to be delivered following adjournment and prior to the normal opening hour of court on the following morning.. (Morton, Jessica) (Entered: 05/06/2025) |
| 05/06/2025 | 67 | TRANSCRIPT ORDER ACKNOWLEDGMENT Entered re: 66 Transcript Order,. Daily Transcript Ordered. Court Reporter/Transcriber: Denise Veitch. (Dias, Jennifer) (Entered: 05/06/2025) |
| 05/06/2025 | 68 | ORDER : The Court directs the Government to file that motion by the end of the day on Monday, May 19. Any opposition should be submitted by the end of the day on Monday, May 26. If the Government ultimately decides not to move for a stay of further proceedings, or if the Court denies the motion, the Court will then schedule a conference for the parties to discuss appropriate next steps. Meanwhile, the Court welcomes status reports from the parties if further compliance issues arise. Otherwise, no further action-beyond briefing the motion to stay-is necessary for now.. So Ordered by District Judge Mary S. McElroy on 5/6/2025. (Potter, Carrie) (Entered: 05/06/2025) |
| 05/06/2025 | 69 | TRANSCRIPT of Status Conference, held on May 5, 2025, before District Judge Mary S. McElroy. Court Reporter Denise P. Veitch, Telephone number (401) 752-7031. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter or PACER. **NOTICE TO COUNSEL: Redaction Requests must be filed for personal identifiers only. All other redactions must be requested by motion. For local policy and sample redaction request visit our website at www.rid.uscourts.gov and select Transcripts under the Case Information menu option.** Redaction Request due 5/27/2025. Redacted Transcript Deadline set for 6/6/2025. Release of Transcript Restriction set for 8/4/2025. (Veitch, Denise) (Entered: 05/06/2025) |
| 05/19/2025 | 70 | MOTION to Stay *Proceedings* filed by All Defendants. **Responses due by 6/2/2025.** (Freidah, Andrew) (Entered: 05/19/2025) |
| 05/22/2025 | 71 | RESPONSE In Opposition to 70 MOTION to Stay *Proceedings* filed by All Plaintiffs. **Replies due by 5/29/2025.** (Weizenbaum, Miriam) (Entered: 05/22/2025) |

| 05/29/2025 | 72 | REPLY to Response re 71 Response to Motion *to Stay Proceedings* filed by All Defendants. (Freidah, Andrew) (Entered: 05/29/2025) |
|---|---|---|
| 05/30/2025 | | TEXT ORDER. The Government's Motion to Stay (ECF No. 70 ) is GRANTED IN PART, DENIED IN PART, and RESERVED IN PART. It is ORDERED that the Government shall produce an administrative record on or before June 25, 2025. The Nonprofits shall submit requests for additional discovery, if any, on or before July 9, 2025. It is further ORDERED that this matter is otherwise STAYED pending the First Circuit's resolution of the preliminary injunction appeal in New York v. Trump, No. 25-1236 (1st Cir.). It is further ORDERED that the Government shall notify the Nonprofits' counsel of the First Circuits resolution of the preliminary injunction appeal in New York v. Trump within 48 hours of its issuance. It is further ORDERED that the parties shall file a joint status report within one week of the First Circuit's resolution of the New York v. Trump appeal, proposing next steps in this litigation. The Court will then determine whether a further stay, pending the First Circuits resolution of the preliminary injunction appeal in this case (Woonasquatucket River Watershed Council v. USDA, No. 25-1428 (1st Cir.)), is appropriate.. So Ordered by District Judge Mary S. McElroy on 5/30/2025. (Potter, Carrie) (Entered: 05/30/2025) |
| 06/05/2025 | 73 | NOTICE by Doug Burgum, Department of Agriculture, Department of Energy, Department of Housing and Urban Development, Department of Interior, Environmental Protection Agency, Kevin Hassett, Office of Management and Budget, Brooke Rollins, Scott Turner, Russell Vought, Chris Wright, Lee Zeldin *of Withdrawal of Counsel* (Schwei, Daniel) (Entered: 06/05/2025) |
| 06/25/2025 | 74 | NOTICE by Doug Burgum, Department of Agriculture, Department of Energy, Department of Housing and Urban Development, Department of Interior, Environmental Protection Agency, Kevin Hassett, Office of Management and Budget, Brooke Rollins, Scott Turner, Russell Vought, Chris Wright, Lee Zeldin re Order on Motion to Stay,,,, *Notice of Production of Administrative Record* (Sirkovich, Eitan) (Entered: 06/25/2025) |
| 07/07/2025 | 75 | Consent MOTION for an Extension of Time two-week extension to submit additional discovery filed by All Plaintiffs. **Responses due by 7/21/2025.** (Weizenbaum, Miriam) (Entered: 07/07/2025) |
| 07/09/2025 | | TEXT ORDER: The Plaintiffs' Consent Motion for Extension of Time (ECF No. 75) is GRANTED. Plaintiffs shall have until July 23, 2025, to submit any requests for additional discovery. So Ordered by District Judge Mary S. McElroy on 7/9/2025. (Simoncelli, Michael) (Entered: 07/09/2025) |
| 07/23/2025 | 76 | MOTION for Discovery filed by All Plaintiffs. **Responses due by 8/6/2025.** (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(Weizenbaum, Miriam) (Entered: 07/23/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/05/2025 16:52:49 | | |
| **PACER Login:** | bjspringer | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-00097-MSM-PAS |
| **Billable Pages:** | 19 | **Cost:** | 1.90 |

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2025, I electronically filed the foregoing

appendix with the Clerk of the Court for the United States Court of Appeals for the

First Circuit by using the appellate CM/ECF system.  Service will be accomplished by

the appellate CM/ECF system.

*s/ Brian J. Springer*
Brian J. Springer