# United States Court of Appeals for the First Circuit

WOONASQUATUCKET RIVER WATERSHED COUNCIL; EASTERN RHODE ISLAND
CONSERVATION DISTRICT; GREEN INFRASTRUCTURE CENTER; NATIONAL COUNCIL OF
NONPROFITS; CHILDHOOD LEAD ACTION PROJECT; CODMAN SQUARE NEIGHBORHOOD
DEVELOPMENT CORPORATION,

*Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, IN THEIR OFFICIAL CAPACITY AS
SECRETARY OF AGRICULTURE; U.S. DEPARTMENT OF ENERGY; CHRIS WRIGHT, IN THEIR
OFFICIAL CAPACITY AS SECRETARY OF ENERGY; U.S. DEPARTMENT OF THE INTERIOR;
DOUG BURGUM, IN THEIR OFFICIAL CAPACITY AS SECRETARY OF THE INTERIOR;
U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, IN THEIR OFFICIAL CAPACITY
AS ADMINISTRATOR OF THE ENVIRONMENTAL PROTECTION AGENCY; U.S. OFFICE OF
MANAGEMENT AND BUDGET; RUSSELL VOUGHT, IN THEIR OFFICIAL CAPACITY AS
DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET; KEVIN HASSETT, IN THEIR
OFFICIAL CAPACITY AS DIRECTOR OF THE NATIONAL ECONOMIC COUNCIL;
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, IN THEIR
OFFICIAL CAPACITY AS SECRETARY OF HOUSING AND URBAN DEVELOPMENT,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Rhode Island
Case No. 1:25-cv-00097-MSM

## RESPONSE BRIEF OF PLAINTIFFS-APPELLEES

Kevin E. Friedl
Jessica Anne Morton
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kfriedl@democracyforward.org
jmorton@democracyforward.org
rthurston@democracyforward.org

## RULE 26.1 DISCLOSURE STATEMENT

Plaintiffs-Appellees have no parent corporations, and no publicly held corporations hold a 10% or greater ownership interest in any of the Plaintiff entities.

# TABLE OF CONTENTS

INTRODUCTION ............................................................. 1

JURISDICTIONAL STATEMENT ..................................... 2

STATEMENT OF ISSUES ................................................ 3

STATEMENT OF THE CASE ............................................ 3

    A.  Congress enacts the Inflation Reduction Act and
Infrastructure Investment and Jobs Act to fund important
services and programs ................................................ 3

    B.  Defendants abruptly halt processing and payment of IRA
and IIJA funding ........................................................ 4

    C.  Defendants' actions to freeze IRA and IIJA funding
produce immediate and severe harms ....................... 8

    D.  This litigation ............................................................ 11

SUMMARY OF ARGUMENT ......................................... 14

STANDARD OF REVIEW ............................................... 16

ARGUMENT ................................................................. 16

I.  Plaintiffs are likely to succeed on their claims against the
Administering Agencies .................................................. 16

    A.  The district court properly found that each Administering
Agency instituted a broad, blanket freeze ................. 17

    B.  The Administering Agencies' actions were likely arbitrary
and capricious ............................................................ 19

    C.  The Administering Agencies' actions were likely in excess
of statutory authority ................................................ 26

    D.  The government's other arguments fail ...................... 31

        1.  Plaintiffs are not "claim-splitting." ..................... 31

        2.  Plaintiffs are not pursuing a "programmatic"
challenge .............................................................. 35

3. The challenged actions are not "committed to agency discretion by law."............................................37

4. The Tucker Act did not divest the district court of jurisdiction ..............................................41

II. Plaintiffs are likely to succeed on their claims against the OMB Defendants...............................................42

A. The district court properly understood the OMB Defendants' memo ...................................43

B. The OMB Defendants' actions were likely arbitrary and capricious ...................................................45

C. The OMB Defendants' actions were likely in excess of statutory authority ...................................47

III. Plaintiffs amply demonstrated irreparable injury, and the public interest favors affirmance ...................51

IV. The remedy ordered was consistent with APA principles and well within the district court's discretion ......................58

CONCLUSION ........................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agatha v. Trump,*
--- F.4th ---, 2025 WL 2538860 (1st Cir. Sept. 4, 2025) ..................... 57

*Am. Fed'n of Tchrs. v. Dep't of Educ.,*
--- F. Supp. 3d ---, 2025 WL 2374697 (D. Md. Aug. 14, 2025) ........... 61

*Am. Public Health Ass'n v. NIH,*
145 F.4th 39 (1st Cir.) .............................................................. 38, 42, 55

*Armadillo Hotel Grp., LLC v. Harris,*
84 F.4th 623 (5th Cir. 2023) ........................................................... 32

*Ass'n of Am. Univs. v. Dep't of Def.,*
--- F. Supp. 3d ---, 2025 WL 2022628 (D. Mass. July 18, 2025) ......... 62

*Biden v. Nebraska,*
600 U.S. 477 (2023) ....................................................................... 30

*Bondi v. VanDerStok,*
145 S. Ct. 857 (2025) ..................................................................... 37

*Cabrera v. Dep't of Labor,*
--- F. Supp. 3d ---, 2025 WL 2092026 (D.D.C. July 25, 2025) ........... 61

*California v. Dep't of Educ.,*
132 F.4th 92 (1st Cir.) ........................................................ 38, 40, 53, 55

*Career Colls. & Schs. of Tex. v. Dep't of Educ.,*
98 F.4th 220 (5th Cir. 2024) ........................................................... 61

*Carson v. Am. Brands, Inc.,*
450 U.S. 79 (1981) ........................................................................... 3

*City of Columbus v. Kennedy,*
--- F. Supp. 3d ---, 2025 WL 2426382 (D. Md. Aug. 22, 2025) ........... 61

*Comcast of Me./N.H., Inc. v. Mills,*
988 F.3d 607 (1st Cir. 2021) ..................................................... 16, 25

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
603 U.S. 799 (2024) ....................................................................... 60

*Dep't of Com. v. New York,*
 588 U.S. 752 (2019) ............................................................... 38

*DHS v. Regents of the Univ. of Cal.,*
 591 U.S. 1 (2020) .......................... 19, 20, 23, 24, 35, 39

*District of Columbia v. USDA,*
 444 F. Supp. 3d 1 (D.D.C. 2020) ..................................... 61

*Doe v. Trump,*
 142 F.4th 109 (1st Cir. 2025) ........................................... 65

*Elgin v. Dep't of Treasury,*
 567 U.S. 1 (2012) ................................................................. 32

*FEC v. Cruz,*
 596 U.S. 289 (2022) .................................................... 27, 28

*Hiser v. Franklin,*
 94 F.3d 1287 (9th Cir. 1996) ............................................ 34

*Immigrant Defs. Law Ctr. v. Noem,*
 145 F.4th 972 (9th Cir. 2025) .......................................... 62

*Int'l Org. of Masters, Mates & Pilots, ILA, AFL-CIO v. NLRB,*
 61 F.4th 169 (D.C. Cir. 2023) ........................................... 23

*Kale v. Combined Ins. Co. of Am.,*
 924 F.2d 1161 (1st Cir. 1991) .......................................... 32

*K-Mart Corp. v. Oriental Plaza, Inc.,*
 875 F.2d 907 (1st Cir. 1989) ............................................ 51

*League of Women Voters of the U.S. v. Newby,*
 838 F.3d 1 (D.C. Cir. 2016) ................................. 53, 54, 57

*Lincoln v. Vigil,*
 508 U.S. 182 (1993) .................................................... 38, 39

*Lujan v. Nat'l Wildlife Fed'n,*
 497 U.S. 871 (1990) ........................................................... 35

*Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,*
 142 F.3d 26 (1st Cir. 1998) .............................................. 33

iv

*Michigan v. EPA,*
   268 F.3d 1075 (D.C. Cir. 2001) ......................................................... 49

*Michigan v. EPA,*
   576 U.S. 743 (2015) ....................................................................... 26

*Milk Train, Inc. v. Veneman,*
   310 F.3d 747 (D.C. Cir. 2002) ......................................................... 39

*Mississippi v. Johnson,*
   71 U.S. 475 (1867) ........................................................................ 55

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut.*
   *Auto. Ins. Co.,* 463 U.S. 29 (1983) ................................................... 21

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
   595 U.S. 109 (2022) ................................................................. 27, 30

*Nat'l TPS Alliance v. Noem,*
   --- F.4th ---, 2025 WL 2487771 (9th Cir. Aug. 29, 2025) ................... 62

*National Council of Nonprofits v. OMB,*
   775 F. Supp. 3d 100 (D.D.C. 2025) ....................................... 31, 34, 51

*New Jersey v. Trump,*
   131 F.4th 27 (1st Cir. 2025) ............................................................ 55

*New York v. Trump,*
   133 F.4th 51 (1st Cir. 2025) .............................. 18, 36, 46, 55, 56

*Ohio v. EPA,*
   603 U.S. 279 (2024) ..................................................... 19, 20, 22, 26

*Policy & Research, LLC v. HHS,*
   313 F. Supp. 3d 62 (D.D.C. 2018) ................................................... 40

*R.I. Coal. Against Domestic Violence v. Bondi,*
   --- F. Supp. 3d ---, 2025 WL 2271867 (D.R.I. Aug. 8, 2025) ............... 61

*Reps. Comm. for Freedom of the Press v. Rokita,*
   147 F.4th 720 (7th Cir. 2025) ......................................................... 65

*Rhode Island v. Trump,*
   --- F.4th ---, 2025 WL 2621593 (1st Cir. Sept. 11, 2025) ............. 48, 53

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
  102 F.3d 12 (1st Cir. 1996) ................................................................ 53

*Scholz v. United States*,
  18 F.4th 941 (7th Cir. 2021) ........................................................ 32, 33

*Sparkle Hill, Inc. v. Interstate Mat Corp.*,
  788 F.3d 25 (1st Cir. 2015) ................................................................ 30

*Spirit Airlines, Inc. v. Dep't of Transp.*,
  997 F.3d 1247 (D.C. Cir. 2021) ........................................................ 25

*Students for Fair Admissions, Inc. v. President & Fellows of
  Harvard Coll.*,
  600 U.S. 181 (2023) ............................................................................ 64
  980 F.3d 157 (1st Cir. 2020) ............................................................ 64

*Texas v. Becerra*,
  No. 24-cv-211, 2024 WL 4490621 (E.D. Tex. Aug. 30, 2024) ............ 61

*Thomas v. Rhode Island*,
  542 F.3d 944 (1st Cir. 2008) ...................................................... 50, 63

*Trump v. Am. Fed'n of Gov't Emps.*,
  145 S. Ct. 2635 (2025) .............................................................. 48, 49

*Trump v. CASA*,
  606 U.S. 831 (2025) ................................................ 58, 60, 62, 63, 65

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ............................................................................ 51

*Vasquez Perdomo v. Noem*,
  148 F.4th 656 (9th Cir. 2025) ............................................................ 63

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ............................................................................ 30

*Wyoming v. Dep't of Interior*,
  No. 18-8027, 2018 WL 2727031 (10th Cir. June 4, 2018) .............. 3

**Statutes**

5 U.S.C. § 701(a)(2) ...................................................... 12, 38

5 U.S.C. § 702 ................................................................ 41

5 U.S.C. § 705 ............................................... 12, 58, 59, 60

5 U.S.C. § 706 ................................................................ 58

5 U.S.C. § 706(2)(A) ....................................................... 12

5 U.S.C. § 706(2)(C) ....................................................... 12

28 U.S.C. § 1292 ............................................................... 3

28 U.S.C. § 1331 ............................................................... 2

28 U.S.C. § 1491(a)(1) ...................................................... 41

31 U.S.C. § 503(a) ........................................................... 50

31 U.S.C. § 503(a)(2) ................................................... 49, 50

Inflation Reduction Act,
   Pub. L. No. 117-169, 136 Stat. 1818 (2022) ........................ 3

Infrastructure Investment and Jobs Act,
   Pub. L. No. 117-58, 135 Stat. 429 (2021) ........................... 3

**Other Authorities**

18 Wright & Miller's Federal Practice & Procedure § 4406 (3d
   ed. 2025) ................................................................ 32

Exec. Order No. 14,154,
   90 Fed. Reg. 8353 (Jan. 20, 2025) ............................. 4, 5, 43

## INTRODUCTION

Defendants are thirteen government agencies and officials that—without authority or justification—froze many billions of dollars in funding for critical projects and programs across the country. They did so without giving any consideration to the particular awards they were freezing, and for the sole reason that the money was appropriated under two statutes that the administration dislikes: the Inflation Reduction Act and the Infrastructure Investment and Jobs Act. And they did so without regard for the damage their respective freezes would cause, including the jobs lost, local economies impacted, unsafe homes unremediated, access to local food halted, disaster recovery efforts stymied, and environmental problems left unaddressed.

In a thorough, well-reasoned opinion, the district court concluded that these broad, categorical freezes were likely arbitrary and capricious and outside statutory authority, in violation of the Administrative Procedure Act; that they were causing irreparable harm to Plaintiffs; and that the balance of the equities favored relief. It accordingly entered an order halting the agencies' damaging actions.

Defendants now say the district court abused its discretion. Their arguments, however, turn this case on its head. They accuse the court of having erred by failing to consider the specifics of each frozen award and any applicable statutes and regulations before ordering relief. But it was not the court's job to do that—it was Defendants' responsibility to do so before indiscriminately cutting off those funds. Defendants' complete failure to conduct that or any other reasonable analysis before they acted is a significant part of why the challenged agency actions likely violated the APA.

The government's remaining arguments are equally unavailing: They largely ignore the standard of review, were waived below, or fail to address, much less account for, contrary evidence in the record or reasoning in the district court's opinion. The government provides no basis on which this Court could conclude that the district court abused its discretion. The Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. It granted Plaintiffs' motion for preliminary relief on April 15, 2025. A1–63. Defendants timely appealed on April 30. A195. This Court has

jurisdiction under 28 U.S.C. § 1292(a)(1). *See Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83–84 (1981); *Wyoming v. Dep't of Interior*, No. 18-8027, 2018 WL 2727031, at *1 (10th Cir. June 4, 2018) (unpublished).

## STATEMENT OF ISSUES

Whether the district court acted within its discretion in preliminarily halting federal agencies from categorically freezing billions of dollars in already awarded funds without notice or rational explanation, where the agencies' respective freezes were causing significant ongoing harm to Plaintiffs and the communities they serve.

## STATEMENT OF THE CASE

**A.    Congress enacts the Inflation Reduction Act and Infrastructure Investment and Jobs Act to fund important services and programs.**

The Inflation Reduction Act (IRA), Pub. L. No. 117-169, 136 Stat. 1818 (2022), and the Infrastructure Investment and Jobs Act (IIJA), Pub. L. No. 117-58, 135 Stat. 429 (2021), also referred to as the Bipartisan Infrastructure Law (BIL), are significant pieces of legislation passed during the previous presidential administration. Each law appropriates and allocates billions of dollars for programs and projects that Congress determined were important and in the national interest.

3

Those projects are wide-ranging and include promoting domestic energy security, combating climate change, conservation initiatives, modernizing and expanding infrastructure, programs to promote health and safety, and expanding broadband access. Congress chose to pursue many of these objectives by way of grants, loans, and other financial assistance programs to nonprofit organizations and others that would play a key role in carrying out the actual work on the ground. Defendants the Departments of Agriculture, Energy, Interior, HUD, and EPA are each charged with awarding and administering significant amounts of funding appropriated under the IRA and IIJA. *See* A6–7.

## B. Defendants abruptly halt processing and payment of IRA and IIJA funding.

On January 20, 2025, President Trump issued an executive order entitled *Unleashing American Energy*. Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 20, 2025). Section 7(a) of that order commands "[a]ll agencies" to "immediately pause the disbursement of funds appropriated through the [IRA] or the [IIJA]." *Id.* at 8357. It further tells agencies to "review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of

such appropriated funds for consistency with the law and the policy outlined in section 2 of this order." *Id.*

Section 2, in turn, sets out nine policy objectives, such as "encourag[ing] energy exploration and production on Federal lands and waters" and "ensuring that an abundant supply of reliable energy is readily accessible." *Id.* at 8353. The order goes on to state that:

> No funds identified in this subsection (a) shall be disbursed by a given agency until the Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with any review recommendations they have chosen to adopt.

*Id.* at 8357.

The order provides no explanation why it targets those two laws in particular and likewise does not explain why an immediate halt to the congressionally authorized spending in those statutes is necessary.

Following the *Unleashing* order, Defendants took steps to broadly halt the processing and payment of funding appropriated under the IRA and IIJA. Those agency actions are the subject of this litigation.

Specifically, Defendants the Office of Management and Budget, OMB Director Russ Vought, and Director of the National Economic Council Kevin Hassett ("the OMB Defendants") quickly issued a memo,

M-25-11, entitled *Guidance Regarding Section 7 of the Executive Order Unleashing American Energy*. A101; *see also* A9–10. That memo told agencies they were "require[d]" to "immediately pause" disbursement of IRA and IIJA funds for projects "that may be implicated by" or "that contravene" the policies in section 2 of the *Unleashing* order. A101. It stated that "[a]gency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget." *Id.*

For their part, Defendants the Departments of Agriculture, Energy, Interior, HUD, and EPA ("the Administering Agencies") each instructed agency staff to cease processing or payment of grants and other financial awards funded under the IRA or IIJA that those agencies are responsible for administering. A10. For example, on January 27, EPA issued a memorandum telling staff that, "in accordance with the Executive Order *Unleashing American Energy*, unobligated funds . . . appropriated by the [IRA] and the [IIJA] are paused." A103; *see also* A10. "Additionally, all disbursements for unliquidated obligations funded by any line of accounting including [IRA or IIJA funding] are paused." A103. "All related actions," the memo went on, "including new contract, grant, rebate and interagency

actions, to include drawdowns, for IIJA and IRA are paused." *Id.*
It concluded by noting that "[a] process has been established at OMB for their review and approval of obligations and disbursements based on the [*Unleashing*] Order." A104. The other Administering Agencies issued similar commands to their staff to broadly halt the processing and payment of IRA and IIJA funding. *See, e.g.*, A114 (Energy memo directing that "[a]ll funding and financial assistance activities" be halted pending further review).[1]

Those instructions are reflected in and confirmed by other documents in the record, such as communications to grantees and other recipients of financial awards. The Department of Agriculture, for example, acknowledged to grant recipients that "payments on contracts funded through the Inflation Reduction Act are currently on pause." A111. In response to another awardee's question why it could not draw down on its grant, the Department of Interior stated, "Please refer to the following memo, *Unleashing American Energy* – OMB Memo M-25-11, regarding the funding pause." A108. When another awardee sought

---

[1] A number of these specific instructions are confirmed by documents outside the record in this interlocutory appeal but that the government has since produced to Plaintiffs as part of the administrative record.

to access its Interior-administered grant through an online portal, it saw in that system that the grant was marked "on hold" and the "Reason for Review" given was "IRA/BIL HOLD" (referring to the IIJA's other common name, the Bipartisan Infrastructure Law). A26; Dkt. 32-4 ¶ 8. More broadly, the record confirms that recipients who had been awarded grants and other financial assistance funded under the IRA and IIJA suddenly lost access to that funding. A11.

### C. Defendants' actions to freeze IRA and IIJA funding produce immediate and severe harms.

The consequences of the freezes were both predictable and dire. Billions of dollars for planned and ongoing projects were abruptly halted, with "devastating" consequences for the awardee organizations and the people they serve. A55 (quotation marks omitted).

As one organization explained, federal funds accounted for "more than one-third of their 2025 budget and more than 90% of their regional partnership's funding"; without it, the organization "'would have to let go of most of our shared staff and cancel contracts with local businesses.'" *Id.* (quoting A143). Another grant subrecipient, as of mid-March, was "'in a crisis,'" only "'45 days away from having to lay off staff.'" *Id.* (quoting A136). Plaintiff Woonasquatucket River Watershed

Council was unable to hire for new positions and was forced to halt training programs in forest management and tree stewardship—resulting in lost job opportunities for the local community. A129–30.

Plaintiff Childhood Lead Action Project was forced to delay planned trainings—meaning that lead-safe repairs on homes may likewise have been delayed—impeding the progress CLAP otherwise expected to make towards increasing compliance with lead safety rules and preventing childhood lead exposure. A52–53, A151–52. CLAP "can never get this time back," A52, A152, but "[c]hildhood lead exposure can cause permanent damage in a single day, and only gets worse the longer it continues," A53, A151.

Another NCN member had to postpone its work to help weatherize the homes of low-income Americans. A171. This work not only helps struggling homeowners lower their utility bills—and thus stay in their homes—but also provides critical health and safety protections, such as ensuring appropriate ventilation to prevent mold, avoid carbon monoxide, and improve air quality. A171–72. And Plaintiff Codman Square Neighborhood Development Corporation had to put on hold plans to use its grant funds to improve ventilation in an affordable

housing development for elderly residents in a neighborhood with high asthma rates. A123–24.

Plaintiff Eastern Rhode Island Conservation District was forced to stop grant-supported work developing smart agricultural practices for local farmers that use technology and data to help them grow more efficiently and sustainably. A157. Plaintiff Green Infrastructure Center lost funds to manage trees in communities that would have benefited from the "cleaner air and water, cooler summer temperatures, [and] reduced flooding and erosion" they would have provided. A135. An NCN member organization halted a planned food-waste reduction and composting project, resulting in additional methane, a known contributor to global warming. A187–88.

Another NCN member couldn't conduct 8,300 hours of planned invasive plant management, a delay for which it "can't readily make up," because the invasive species will have spread in the meantime. A168. Yet another NCN members' "postponement of a planned project monitoring bark beetle attacks on vulnerable, irreplaceable giant sequoia trees will lead to environmental harms clearly not redressable

in the long run," A53, A161 (quotation marks omitted), and will result in "cascading impacts on . . . scientific progress," A90.

Green Infrastructure Center had invested many hours in building relationships with Choctaw Indians, only to learn it would not be able to follow through on a planned project—jeopardizing that hard-won trust. A53–54, A137–38. And other organizations likewise saw critical relationships undermined when they were forced to cancel planned events and projects. A142–43, A175–76.

These harms represent only a sample of the immediate and widespread damage caused by Defendants' funding freezes. A180.

**D. This litigation.**

Plaintiffs are five individual nonprofit organizations and the National Council of Nonprofits, a nationwide membership association representing nonprofits. All of the individual nonprofits—and countless members of NCN—previously applied for and were awarded grants or other financial assistance funded under the IRA and IIJA; all faced irreparable harm once Defendants abruptly shut off that funding.

Plaintiffs sued to challenge those broad freezes. They alleged that each Administering Agency's freeze constituted final agency action

subject to judicial review under the APA. Each freeze was arbitrary and capricious, in excess of statutory authority, and contrary to law, in violation of 5 U.S.C. § 706(2)(A), (C). Plaintiffs further alleged that the OMB Defendants acted arbitrarily and capriciously, in excess of statutory authority, and contrary to law when they: (1) issued Memo M-25-11 commanding other agencies to halt processing and payment of IRA and IIJA funding and, (2) on information and belief, withheld purportedly necessary approvals to the Administering Agencies to release IRA and IIJA funding. A93–97.

Plaintiffs moved for a preliminary injunction, also asking that the district court stay the challenged agency actions under 5 U.S.C. § 705. A117, A119–20. The court granted the motion on April 15, 2025. A1–63.

The court first dispatched Defendants' numerous threshold arguments, including, as relevant here, with respect to claim-splitting, the identification of discrete "final agency action," the Tucker Act, and agency actions that are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2). A19–39. On the merits, the court determined that Plaintiffs had shown a likelihood of success on their claims that the challenged agency actions were arbitrary and capricious and in excess

of statutory authority. A39–50. The court thus found it unnecessary to address Plaintiffs' third claim, that the actions were also contrary to law. A50. The court further found that the evidence "more than adequately demonstrated irreparable harm" in several forms, including from Plaintiffs having to furlough or lay off staff and shutter planned projects, among other harms to Plaintiffs' ability to carry out their core missions. A50–55. And the court concluded that the balance of equities favored preliminary relief. A55–56.

In crafting that relief, the court took account of the broad nature of Defendants' unlawful conduct. A59–60. The court also noted that "[t]he normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." A59. On that basis, the court determined that nationwide relief was appropriate. A60. It entered an order barring the Administering Agencies from continuing to freeze on a non-individualized basis funding that was appropriated under the IRA or IIJA and that had already been awarded. A61. The court further barred all Defendants from taking steps to implement or reinstate under a different name OMB Memo M-25-11. A62. And it provided that its order "shall apply to

the maximum extent provided for by Federal Rule of Civil Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706." A62.

## SUMMARY OF ARGUMENT

Plaintiffs, a group of six nonprofits, challenge actions by each of the Defendant agencies and officials to halt the payment and processing of billions of dollars in duly authorized funding. Defendants cut that funding off precipitously, without explanation, without giving recipients warning or time to prepare, without considering the consequences of their actions for recipients and the communities they serve, without any timetable to resume funding, without any individualized consideration of particular awards or awardees, and "based solely on the fact that the funds came from [two particular statutes]." A47. Those unthinking blanket freezes were exemplars of arbitrary and capricious agency decisionmaking. And the agencies have never identified any statutory provision that would authorize them to simply shut off all funding appropriated under two sweeping laws, much less a provision that clearly authorizes that action, as the major-questions doctrine requires.

The government can identify no abuse of discretion in the district court's finding that these actions likely violated the Administrative

Procedure Act—and it barely even tries. Instead, it denies the reality of what Defendants did, claiming that their respective freezes in funding were just a coincidence of countless separate funding decisions. But that implausible claim finds no support in—and is directly contradicted by—the evidence before the court. The government also disputes the involvement of OMB and several other Defendants that do not themselves directly administer funding. But the record shows that these Defendants ordered other agencies to freeze funds until OMB said they could be released, and other agencies acted in reliance on those orders. The government's other threshold arguments fare no better.

The remaining preliminary-relief factors likewise favored Plaintiffs. The district court marshalled significant evidence of irreparable harm, which the government does not meaningfully contest on appeal. And the court correctly judged that the public interest did not favor allowing Defendants to continue their arbitrary and unlawful actions. The court accordingly ordered a remedy that—appropriately for an APA case—matched the scope of the challenged agency actions. This Court should affirm in full.

## STANDARD OF REVIEW

This Court "will uphold a decision to grant a preliminary injunction unless it constitutes an abuse of discretion." *Comcast of Me./N.H., Inc. v. Mills*, 988 F.3d 607, 611 (1st Cir. 2021). Findings of fact are reviewed for clear error and conclusions of law de novo. *Id.*

## ARGUMENT

The district court found that Plaintiffs will likely succeed on their claims against the Administering Agencies and the OMB Defendants; that they and their members would suffer irreparable harm if denied relief; and that the balance of equities favored relief. It thus ordered appropriate preliminary relief. There was no error—let alone an abuse of discretion—in the court's decision.

## I. Plaintiffs are likely to succeed on their claims against the Administering Agencies.

Plaintiffs challenge five discrete actions by the five Administering Agencies (i.e., the Departments of Agriculture, Energy, Interior, HUD, and EPA): for each, the agency's blanket halt to the payment or processing of already-awarded funding appropriated under the IRA or IIJA. *See* A25–26. The district court correctly concluded that Plaintiffs

were likely to show that these actions were arbitrary and capricious and in excess of statutory authority, in violation of the APA.

## A. The district court properly found that each Administering Agency instituted a broad, blanket freeze.

As the district court well understood, Plaintiffs challenge "one action from each of the[] five [Administering A]gencies": to "summarily freez[e] IIJA and IRA funds." A25. Plaintiffs have consistently framed their challenge as concerning "[e]ach Defendant's freeze on funding appropriated by the IRA and IIJA." A86; *see also, e.g.*, A78 (alleging that Defendants have "broadly frozen funding appropriated under the IRA and IIJA . . . en masse and on a non-individualized basis"). And the evidence amply supported the court's finding that each of the Administering Agencies instituted such a blanket freeze.

Take, for example, the EPA's directive to staff that all disbursements of IRA and IIJA funding were immediately paused, A103; *see also* A106, a statement from a USDA component that payments on contracts "funded through the IRA and IIJA" were on pause, *see* A111, or Energy's directive that "[a]ll funding and financial assistance activities" be halted pending further review, A114.

Or consider that HUD blamed the *Unleashing* order when it stopped processing an award of IRA funding, A124, and that Interior designated frozen IRA and IIJA awards with the code "IRA/BIL Hold," A26. *Cf. New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (rejecting motion to stay similar conclusion that agencies' decisions "to implement broad, categorical freezes on obligated funds" constituted "discrete final agency actions"); *id.* at 68–69 (noting that the record "included numerous notices and emails authored by Agency Defendants that support the finding that their funding freezes were categorical in nature," as well as "numerous declarations" from awardees).[2]

Despite this and other evidence, the government repeatedly contends that these broad freezes were, "in reality, many individual decisions . . . across a wide array of programs," and that "it was wrong for the court to consider a collection of decisions as one unitary action." Br. at 23–25, 35. Indeed, this revisionist history runs throughout the

---

[2] To be sure, it appears that some agencies, after implementing these broad freezes, eventually took steps to *un*freeze some particular funds they had previously halted. *See, e.g.*, A82. That fact does nothing to undermine—and is entirely consistent with—the district court's finding that each agency had instituted a blanket halt on IRA and IIJA awards, applying a "freeze first, ask questions later" approach.

government's arguments on appeal. *See* Br. at 1, 2, 12, 13, 17, 27, 32, 36, 41, 45. But it is false. The court correctly found the government's "alternate characterization of its actions as thousands of individual decisions" to be "unconvincing." A27 (quotation marks omitted). And that conclusion is amply supported by the record evidence.

The government does not dispute any of that evidence, but merely dismisses it (at 25), without explanation, and without a single citation to any contrary evidence, as a "hodgepodge." But the government's failure to address the facts in evidence provides no basis to conclude that the court erred—much less clearly so—in this key factual finding.

## B. The Administering Agencies' actions were likely arbitrary and capricious.

The APA "requires agencies to engage in reasoned decisionmaking and directs that agency actions be set aside if they are arbitrary or capricious." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quotation marks and citation omitted). In applying that standard, "a court may not substitute its judgment for that of the agency," but it must ensure that the agency action was both "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quotation marks omitted). This requires, among other things, "that the agency

has offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made," and has not "simply ignore[d] an important aspect of the problem." *Id.* at 292–93 (quotation marks and brackets omitted). When an agency changes course, it also must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Univ. of Cal.*, 591 U.S. at 33.

The district court correctly applied that law in concluding that Plaintiffs were likely to show that each of the Administering Agencies' halts of awarded IRA and IIJA funding was arbitrary and capricious. *See* A41–45. The court found that the agencies had "failed to provide a rational reason" for precipitously halting all IRA and IIJA awards, A42, and that they "ignored significant reliance interests," A44, also suggesting (but not needing to analyze) that the respective freezes were substantively unreasonable, A45. Each of these rationales is independently sufficient. The scant two paragraphs the government devotes to them (at 35–36) do nothing to undermine the court's well-reasoned exercise of its discretion.

First, the court's finding that the agencies "failed to provide a rational reason" for precipitously halting all IRA and IIJA awards, A42, was plainly correct. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Yet the government has not pointed to any explanation offered by any of the Administering Agencies at the time they acted. It merely invokes (at 35) "the articulated explanation of saving taxpayer dollars and accomplishing the President's expressed goals." But it fails to identify, and provides no citation to show, where that explanation was "articulated" by the agencies themselves.

At best, the government quotes (at 35) the district court's reference to "the need to safeguard valuable taxpayer resources," but this appears to have been the court's paraphrase of arguments made by government counsel during this litigation. "[C]ounsel's *post hoc* rationalizations for agency action" cannot suffice, however, whether they come in the district court or on appeal. *See State Farm*, 463 U.S. at 50. The government gets no further by accusing (at 35) the district court of ruling based on its "personal views." That accusation is unwarranted

and contradicted by the court's meticulous opinion; more to the point, it is irrelevant to the question whether the agencies provided a reasonable explanation—or even any explanation—for their actions.

Even if the Court were to credit the government's unsupported post hoc rationale that the agencies were merely acting to safeguard the public fisc, that still would not answer the district court's observation that the agencies had "failed to provide a rational reason" why that goal would "justif[y] a sweeping pause of all already-awarded IIJA and IRA funds with such short notice." A42. Simply identifying a goal is not enough to satisfy arbitrary-and-capricious review; the agency also must pursue its goals by reasonable means and with adequate explanation. *See, e.g.*, *Ohio*, 603 U.S. at 292 (agency action must be "reasonable and reasonably explained"). The Administering Agencies did neither.

Second, the district court correctly determined that the Administering Agencies "ignored significant reliance interests" when freezing these funds. A44. As it observed, "[n]othing" in the record "shows that they considered the consequences of their broad, indefinite freezes" on recipients who reasonably expected to be able to draw on funding they had already been awarded. *Id.* The government is unable

to point to any fact in the record that would permit this Court to reach a different conclusion, and that alone is enough to affirm the court's holding on the arbitrary and capricious claim against the Administering Agencies. *See, e.g.*, *Univ. of Cal.*, 591 U.S. at 35–36; *Int'l Org. of Masters, Mates & Pilots, ILA, AFL-CIO v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023) (concluding that "we are left with no choice but to vacate the Board's arbitrary and capricious decision" because it acted "with no regard for the parties' reliance interests").

On appeal, the government argues (at 36) not that it did consider reliance interests but that it didn't need to. According to the government, "many" grant contracts provide for termination in specified circumstances; grantees therefore "can hardly claim unfair surprise" from the sudden halt to all awarded IRA and IIJA funding. No part of that argument withstands scrutiny, including the suggestion that awardees were on notice that the government would undertake an unprecedented immediate halt to all IRA and IIJA funding. But it is enough here simply to point out that this argument is directly foreclosed by the Supreme Court's decision in *DHS v. Regents of the University of California*, 591 U.S. at 30–33.

In that case, the government argued that it was not required to consider reliance interests because certain disclaimers in its prior policy made any reliance on that policy unreasonable. *Id.* at 30–31. The Court disagreed, explaining that disclaimers in the prior policy "are surely pertinent in considering the strength of any reliance interests, but that consideration must be undertaken by the agency in the first instance, subject to normal APA review." *Id.* at 31; *see also id.* at 32 (noting that, had DHS conducted the necessary consideration of reliance interests, it may have concluded "that reliance on forbearance and benefits was unjustified, . . . but the agency failed to do it"). The same reasoning applies here, where the Administering Agencies took no account of the (significant and reasonable) reliance interests of not only the awardees, but also the communities they serve and other affected parties.[3]

---

[3] The government also says (at 36) the Administering Agencies were not required to consider reliance interests because "the district court identified no legal requirement . . . that payments need to be made on a particular timetable." That ignores the fact that, until the court ordered relief, the freezes were slated to continue indefinitely. More to the point, if the agencies thought that something about the terms of the awards made the expectation of continued access to funding unreasonable, they—not the court—were required to consider that at the time they acted. *See Univ. of Cal.*, 591 U.S. at 30–33.

The Administering Agencies' challenged actions were arbitrary and capricious in numerous other respects too. *See Comcast*, 988 F.3d at 612 ("We can affirm the entry of the preliminary injunction on any ground supported by the record."). For example, it is well established that an agency must "consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). Here, obvious alternatives included providing sufficient notice to recipients before freezing funds, freezing funds for a specified amount of time instead of indefinitely, or simply reviewing awards and funding programs *before*—rather than after—cutting off awardees' access to funding. The agencies considered none of these other paths.

The arbitrary and capricious nature of the Administering Agencies' actions is further underscored by the fact that their broad, blanket freezes far exceeded the administration's own "narrow construction" of the *Unleashing* order, *see* Br. at 17, as stated in OMB Memo M-25-11, which directed agencies to freeze IRA and IIJA funding

only to the extent that such funding "may be implicated by the policy established in Section 2 of the" order, A101.

More fundamentally, nothing in the record on appeal—or in the administrative record the government has since produced—reflects that the agencies gave any consideration to the predictable, serious, and widespread harms that would result from their sudden halt to these already awarded funds. *See Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions."). Instead, the agencies simply cut off billions of dollars in funding to countless vital projects and programs that they had made no effort to evaluate or understand—"essentially adopt[ing] a 'freeze first, ask questions later' approach," A44. In these and other ways, the Administering Agencies utterly failed to consider "important aspect[s] of the problem." *Ohio*, 603 U.S. at 293 (quotation marks omitted).

## C. The Administering Agencies' actions were likely in excess of statutory authority.

Nor did the district court abuse its discretion in holding that Plaintiffs will likely succeed in showing that the Administering

Agencies lacked statutory authority to broadly halt all awarded IRA and IIJA funding.

"Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quotation marks omitted). The district court correctly determined that "there is no clear statutory hook for [the Administering Agencies'] broad assertion of power" to simply turn off all awards of IRA and IIJA funding. A48. That itself was enough to establish Plaintiffs' likelihood of success on this claim.

In response, the government claims (at 32–34) that the court erred by not analyzing the Administering Agencies' actions at a program-by-program level. That claim, however, ignores the nature of the actions challenged—each agency's unitary freeze of *all* IRA and IIJA awards, for which there is certainly no authorizing statute—and the fact that the agencies themselves failed to conduct the analysis the government now says was required. Even on its own terms, the government's

argument gets it nowhere, because the government is unable to point to a single program-specific statute that expressly authorizes a freeze on awards. Instead, the statutes it cites (at 33–34 & n.1) describe authorization to *provide* awards, or guidance for how to prioritize them—not authorization to halt them. The government's reliance on a regulation is likewise unavailing, as "[a]n agency literally has no power to act—*including under its regulations*"—unless authorized by Congress. *Cruz*, 596 U.S. at 301 (emphasis added; quotation marks omitted).

The government suggests (at 34) that authority to freeze "inheres" in the statutes it cites. But the government cites no case law that would support its claim of inherent agency authority, and that claim is contrary to binding precedent requiring agencies to identify specific statutory authority to act. *See, e.g.*, *Cruz*, 596 U.S. at 301.

The government further asserts (at 33–34) that no statute bars it from pausing funding. But that gets the rule exactly backwards: The question is whether Congress authorized the agency action at issue, not whether Congress affirmatively prohibited it. And while it is true that the Administering Agencies are authorized to allocate and award IRA

and IIJA funding, it does not follow (as the government suggests at 32) that they may take whatever other actions they want with respect to funds they have awarded.

The government fares no better arguing (at 35) that because it has power to freeze one award, it has the power to freeze all awards. First, the government has not established its premise that the agencies had statutory authority to freeze any particular award. And second, even if the agencies did possess that authority with respect to some awards, that would not confer on them the authority to take the actions they actually took and that are the subject of this litigation—i.e., instituting immediate blanket halts on *all* such awards. A46–47. The government's argument also overlooks that, to the extent any agency did have statutory power to halt individual awards, the court's order would leave the agency free to do so, so long as it proceeded on an individualized— rather than blanket—basis. A61 (addressing the agencies' "freezing, halting, or pausing" of funding "on a non-individualized basis").

The Administering Agencies' lack of relevant statutory authority is only confirmed by the Supreme Court's frequent emphasis in recent years that Congress must "speak clearly when authorizing an agency to

exercise powers of vast economic and political significance." *OSHA*, 595 U.S. at 117; *see also Biden v. Nebraska*, 600 U.S. 477, 505 (2023) (holding that the same rule applies in cases involving regulatory obligations and those "involving benefits").

There can be no doubt that the power the agencies claim here—to halt disbursement of many billions of dollars in duly appropriated funding under two major recent statutes—is one of "vast economic and political significance." *OSHA*, 595 U.S. at 117. The district court therefore rightly "hesitate[d] before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quotation marks omitted); *see also* A46–47.

The government, however, entirely ignores the major-questions doctrine, thereby waiving any argument that the court erred in applying it here. *See, e.g., Sparkle Hill, Inc. v. Interstate Mat Corp.*, 788 F.3d 25, 29 (1st Cir. 2015) ("Our precedent is clear: we do not consider arguments for reversing a decision of a district court when the argument is not raised in a party's opening brief."). The government likewise fails to argue that Congress "sp[oke] clearly" in authorizing the agency actions at issue—nor could it, as Congress did not, on this point,

speak at all. Those concessions alone are fatal to the government's prospects on appeal.

## D. The government's other arguments fail.

The government focuses its defense not on the merits but on a grab-bag of threshold arguments. It claims that Plaintiffs are improperly claim-splitting; that Plaintiffs do not challenge discrete action, but launch a programmatic attack; that the agencies' actions are unreviewable because "committed to agency discretion by law"; and that relief is barred by the Tucker Act. These arguments are all wrong.

### 1. Plaintiffs are not "claim-splitting."

The government says (at 28–31) the district court should have denied relief because Plaintiffs engaged in "claim-splitting." But as the court rightly found, A22, Plaintiffs here challenge entirely different agency actions from the one at issue in the other case the government points to, *National Council of Nonprofits v. OMB*, No. 25-cv-239 (D.D.C.). That case concerned a different OMB memo, M-25-13, which purported to freeze nearly all federal funding across the government and which OMB has since purported to rescind. The government fails to identify any error—let alone an abuse of discretion—in the district

court's conclusion that these different cases address "factually distinct" freezes, leaving "the claim-splitting doctrine . . . unavailing." A22.

The claim-splitting doctrine provides a district court discretion to dismiss an action, *see, e.g.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 14 (2012), as "a matter of docket management," 18 Wright & Miller's Federal Practice & Procedure § 4406 (3d ed. 2025). As such, decisions about claim-splitting are reviewed only for abuse of discretion. *E.g.*, *Scholz v. United States*, 18 F.4th 941, 950 (7th Cir. 2021). Dismissal for claim-splitting is permitted only where "there is an identity of the parties and of the causes of action between the two lawsuits." *Id.* at 952; *accord Armadillo Hotel Grp., LLC v. Harris*, 84 F.4th 623, 628 (5th Cir. 2023); *cf. Kale v. Combined Ins. Co. of Am.*, 924 F.2d 1161, 1165–66 (1st Cir. 1991) (explaining the similar standard for the related but different doctrine of claim preclusion). Neither of those factors would have permitted the district court to dismiss this case, much less required it to do so.

To begin, any "identity of the parties . . . between the two lawsuits," *Scholz*, 18 F.4th at 952, is limited to the National Council of Nonprofits on the plaintiff side and OMB and Director Vought on the

defense side.[4] None of the Administering Agencies are parties to *National Council of Nonprofits*. Thus, at the outset, the doctrine of claim-splitting could, at most, affect only what relief would be available to NCN against OMB.

It does not affect even that. That is because there is no "identity of . . . the causes of action between the two lawsuits." *Id.* This Court has "adopted a transactional approach" to determining whether causes of action are sufficiently similar to support preclusion-based defenses. *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 38 (1st Cir. 1998). Under that approach, it asks "whether the causes of action arise out of a common nucleus of operative facts." *Id.* The government's arguments (at 29) about overlapping *legal* issues between the cases are therefore irrelevant.

As the district court rightly held, the claims in this case and those in *National Council of Nonprofits* do not arise out of a common nucleus of operative facts. *National Council of Nonprofits* concerns a different

---

[4] The other case, *National Council of Nonprofits v. OMB*, is brought by four nonprofit groups, including NCN, against OMB and Director Vought. This case is brought by six nonprofit groups, including NCN, against thirteen government defendants, including OMB and Director Vought. Four of the six plaintiffs in this case are members of NCN.

OMB directive to freeze funding—OMB Memo M-25-13—which that

agency quickly purported to rescind, *see* 775 F. Supp. 3d 100, 109–10

(D.D.C. 2025), *appeal pending*, No. 25-5148 (D.C. Cir.), and which was

not the cause of the continued funding freezes challenged here, A22.

Contrary to the government's claim (at 30–31), the mere fact that each

case involved (different) actions by (different sets of) agencies to freeze

(different) funds does not mean they arise from a common nucleus of

fact. *Cf. Hiser v. Franklin*, 94 F.3d 1287, 1292 (9th Cir. 1996)

("Although Hiser's [second] challenge implicates the same right of

'access to the courts' as was addressed in [his first challenge], it is based

on a different set of operative facts and is not merely an alternative

remedy or theory of recovery."). Indeed, as the district court noted, the

fact that the OMB directive at issue in *National Council of Nonprofits*

was purportedly withdrawn—and also preliminarily halted by court

order—at the time Plaintiffs brought this case, yet the freezes Plaintiffs

challenged here continued, "illustrates" their distinction. A22. To the

extent the government means to suggest (at 28–31) something

untoward in Plaintiffs' conduct, that suggestion is incorrect and a

distraction from the court's well-supported finding that the challenged agency actions were likely unlawful.

## 2. Plaintiffs are not pursuing a "programmatic" challenge.

The government also claims (at 24–25) that Plaintiffs are pursuing an unfocused "programmatic" challenge of the type disapproved in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). Not at all. This argument relies on the government's fundamental misconception of the claims at issue, *see supra* Section I.A, but Plaintiffs challenge discrete action by each of the Administering Agencies, A25: each agency's directive to halt payment and processing of IRA and IIJA awards. Those specific directives constitute final agency action and "provide[] a focus for judicial review." *See Univ. of Cal.*, 591 U.S. at 18. The fact that the agencies' actions had broad effects does not render them immune from review, as *Lujan* itself makes clear. 497 U.S. at 890 n.2 ("If . . . some specific order or regulation[ ] appl[ied] some particular measure across the board to all individual classification terminations and withdrawal revocations, and . . . that order or regulation is final . . . it can of course be challenged under the APA."). Indeed, this Court previously came to the same

conclusion in *New York v. Trump*, rejecting the government's appeal to *Lujan* and finding no cause to disturb the district court's conclusion that the plaintiffs challenged "discrete final agency actions" in the form of "the decisions by the Agency Defendants to implement broad, categorical freezes on obligated funds." 133 F.4th at 67.

The government tries mightily (at 23–27, and throughout) to shift the burden of considering the specific details of particular awards, award programs, and applicable regulations and statutes onto Plaintiffs or onto the district court. But it was the Administering Agencies—not Plaintiffs or the court—that chose to institute blanket freezes of funding without first considering or even identifying their specific legal authorities, applicable regulatory requirements, or obvious practical consequences. This burden was theirs alone.

The government also repeatedly claims (at 13, for example) that because, in its (unsupported) view, the agencies could have lawfully chosen to freeze at least *some* funds, the district court's order "improperly prohibits substantial lawful conduct." But that argument again misses the point that Plaintiffs challenge broad, across-the-board freezes, and the breadth of the court's order appropriately matched the

breadth of those agency actions. At the same time, the order leaves agencies free to exercise whatever lawful authorities they have to manage or restrict funding on an individualized basis going forward. The government thus is notably unable to identify any "lawful conduct" it wishes to pursue and that the order would prohibit.

The government is not saved by its reliance (at 26–27) on *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025). The Court in that case carefully emphasized that it was merely "address[ing] the parties' dispute as they have chosen to frame it" and specifically was not deciding "what test courts should apply when a party contends that an agency has acted in excess of its statutory authority in a pre-enforcement challenge under the APA." *Id.* at 865–66 & n.2; *see also id.* at 882 n.5 (Thomas, J., dissenting) (speculating that "[p]erhaps the majority's analysis would differ if it were asking whether the Rule was arbitrary and capricious"). The Court's description of "the parties' dispute as they have chosen to frame it" in that case has no bearing here.

### 3. The challenged actions are not "committed to agency discretion by law."

The government seeks refuge (at 36–40) in the APA's limitation on review of agency actions "to the extent that . . . [such action] is

committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

This exception, however, applies "quite narrowly" and only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quotation marks omitted). This Court rejected application of this exception in *California v. Department of Education*, 132 F.4th 92, 97 (1st Cir.), *stay granted on other grounds*, 604 U.S. 650 (2025), and *American Public Health Ass'n v. NIH*, 145 F.4th 39, 45, 53 (1st Cir.), *partial stay granted on other grounds*, 145 S. Ct. 2658 (2025), and the government offers no basis for a different conclusion here.

Ignoring those cases, the government primarily relies (at 37) on *Lincoln v. Vigil*, 508 U.S. 182 (1993), but that case is inapposite. *Lincoln* involved an agency's decision to discontinue a program for which "Congress never expressly appropriated funds" and that was instead paid for out of "yearly lump-sum appropriations" that were generally designated "for the benefit, care, and assistance of the Indians." *Id.* at 185–86. The Court held that "[t]he allocation of funds from a lump-sum appropriation is . . . committed to agency discretion"

and hence presumptively unreviewable, at least so long as the agency "is not . . . disregard[ing] statutory responsibilities." *Id.* at 192–93.

Plaintiffs do not challenge Defendants' allocation of money from a lump-sum appropriation. Instead, as the district court properly understood, A38, they challenge Defendants' indefinite blanket halt to funding that Congress appropriated for specific purposes and that Defendants previously obligated to recipients. *Cf. Univ. of Cal.*, 591 U.S. at 18–19 ("Unlike an agency's refusal to take requested enforcement action, access to these types of benefits is an interest courts often are called upon to protect." (quotation marks omitted)).

The government (at 38) offers nothing to the contrary other than a conclusory, unsubstantiated statement that the distinction is "contrived." But the very cases on which it relies (at 37–38) confirm that an agency's discretion in awarding funds does not place all other actions the agency may take with respect to those funds beyond review. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002) (declining to review agency's allocation of funds among eligible recipients but reviewing its determination of who was eligible to receive funds); *Policy & Research, LLC v. HHS*, 313 F. Supp. 3d 62, 76–78

(D.D.C. 2018) (K.B. Jackson, J.) (finding reviewable agency's decision with respect to grants). And to the extent the Court considers the individual statutory provisions the government cites (at 38–39)—despite that the agencies froze funds broadly and without regard to statutory authority, *see supra* Section I.A—those citations undermine the government's position. They "set forth the purposes of the grants" and provide directions about what the funds may be used for—thus placing "limits on the [agency's] discretion." *Cal.*, 132 F.4th at 98.

There is also no basis for the government's claim (at 39–40) that the district court's order "subvert[s] the agency defendants' ability to consider the optimal distribution of funding." The order does no such thing. It prevents the Administering Agencies from continuing to impose blanket freezes on IRA and IIJA awards while leaving them free to take other actions with respect to those awards (as well as unobligated sums). The court's order addresses only the "freezing, halting, or pausing" of awards, and only on a "non-individualized basis." A61. Indeed, the government did not see the district court's order as an obstacle to terminating over 800 awards administered by EPA, and the

district court later confirmed that the terminations "did not violate" its order. Dkt. 68 at 1–5.

### 4. The Tucker Act did not divest the district court of jurisdiction.

The government contends (at 40–44) that the Tucker Act "impliedly forbids" part of the relief Plaintiffs sought here, 5 U.S.C. § 702, because it vests jurisdiction in the Court of Claims for contract claims against the United States, *see* 28 U.S.C. § 1491(a)(1). Specifically, the government raises this objection with respect to Section 3 of the district court's order, which requires the Administering Agencies to take immediate steps to resume payment and processing of IRA and IIJA awards. Br. at 40 (quoting Section 3 of the order), 44 (confirming that this argument is limited to "portions" of the order).

The Tucker Act, however, simply does not apply here. Plaintiffs do not bring contract claims. All Plaintiffs challenge broad directives by each agency to halt the payment and processing of all IRA and IIJA funding, rather than actions on a particular award (as in *California*). (Nor has the government ever explained how a membership association like NCN or subgrantees like Woonasquatucket River Watershed Council, Eastern Rhode Island Conservation District, and Green

41

Infrastructure Center—all of which receive funding through other entities, rather than directly from the government—could bring a contract claim against the United States.)

In this respect, Plaintiffs' challenge is materially identical to the challenge to agency funding directives that the Supreme Court recently allowed to move forward in *American Public Health*. As Justice Barrett explained in her separate, controlling opinion in that case, "[t]hat the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear." 145 S. Ct. at 2661 (Barrett, J., concurring). "Plaintiffs frequently seek vacatur of internal agency guidance on arbitrary-and-capricious grounds in district court." *Id.* Just as the district court was the proper venue for that challenge in *American Public Health*, the district court here had jurisdiction to resolve Plaintiffs' similar challenge.

## II. Plaintiffs are likely to succeed on their claims against the OMB Defendants.

There was likewise no abuse of discretion in the district court's finding that the OMB Defendants (i.e., OMB, Director Vought, and Director Hassett) likely violated the APA. The government's contrary

argument hinges on its effort (at 16) to recast OMB Memo M-25-11 as "simply internal guidance" that did not itself lead to the freezing (or keeping frozen) of any IRA or IIJA awards. This view is inconsistent with both Plaintiffs' claims and the record, and the district court was well within its discretion to find otherwise. There was likewise no error in the court's conclusions that the memo was likely arbitrary and capricious and beyond the OMB Defendants' statutory authority.

### A.   The district court properly understood the OMB Defendants' memo.

Memo M-25-11 straightforwardly informs the Administering Agencies (and others) of their obligations, as OMB sees them. A101. The *Unleashing* order states that funds may not be "disbursed by a given agency until the Director of OMB and Assistant to the President for Economic Policy [Kevin Hassett] have determined that such disbursements are consistent with any review recommendations they have chosen to adopt." 90 Fed. Reg. at 8357. Memo M-25-11—issued the next day by the OMB Defendants—is therefore best understood as the "review recommendations they have chosen to adopt."

M-25-11 explains, in turn, that the agencies are "require[d] . . . to immediately pause disbursement of funds appropriated under" the IRA

or IIJA, to the extent they "may be implicated by the policy established in Section 2 of the" *Unleashing* order. A101. Even excepting that carve-out, Memo M-25-11 still directs a pause of significant funds, without providing either a basis for that freeze or an explanation of how an Administering Agency should determine what "contravene[s] the policies established in section 2." *Id.* And the memo does not merely restate the executive order, but makes clear OMB's role in directing the freezes: "Agency heads may disburse funds as they deem necessary *after consulting with the Office of Management and Budget*." *Id.* (emphasis added). In other words: Per OMB, *all* IRA- and IIJA-appropriated funds were to be frozen unless or until OMB approved their disbursement— not merely those funds that contravene section 2.

The record further supports the district court's finding that the Administering Agencies, too, understood M-25-11 as a directive. *See* A18. As the court recounted, several Administering Agencies cited the memo and stated that their respective freezes were "on instruction from OMB." *Id.* (quotation marks omitted); *see also* A103 ("This message is being provided based on instruction from OMB."); A104 ("A process has been established at OMB for their review and approval

of obligations and disbursements based on the Order."); A106 ("EPA is continuing to work with OMB . . . ."); A108 (referring query about freeze to M-25-11 "regarding the funding pause").

The district court made clear, moreover, that it (correctly) analyzed Plaintiffs' claims against the OMB Defendants under both of Plaintiffs' theories: that the OMB Defendants "lack statutory authority to [1] direct agencies to freeze these funds (or [2] to achieve the same result by withholding purportedly necessary approvals to the disbursement of funds . . .)." A45 (quotation marks omitted; ellipsis in original). In their rush to elide M-25-11, Defendants fail to acknowledge Plaintiffs' allegations regarding the withholding of approvals at all.

## B. The OMB Defendants' actions were likely arbitrary and capricious.

As with the Administering Agencies, and for similar reasons, the OMB Defendants' freeze order was likely arbitrary and capricious. It was neither reasonable nor reasonably explained, *see Ohio*, 603 U.S. at 292, including because it failed entirely to account for the significant reliance interests of award recipients and the communities they serve on the continued flow of already awarded funding. *See* A44–45.

The government offers little (at 21–23) to disturb the district court's analysis on these points; it largely rehashes its crabbed reading of M-25-11. It contends (at 22) that M-25-11 was reasonable because it was consistent with the administration's policy, and that it was "necessary to minimize the expenditure of funds inconsistent with the Administration's policy priorities" while they were under review. But it is beyond question, and this Court has already made clear, that the government's interest in carrying out a presidential policy preference is limited to doing so lawfully. *New York*, 133 F.4th at 70–71. And the OMB Defendants' action suffers from the same deficiencies as those of the Administering Agencies. *See supra* Section I.B.

The government likewise offers no meaningful argument that the OMB Defendants' actions were "reasonably explained." It simply states (at 22) that the rationale for the *Unleashing* order—a document not challenged in this lawsuit—was "plain" (without quoting any actual rationale in that order). M-25-11, however, does not itself contain any explanation ("plain" or otherwise), *see* A101, and Defendants, who conspicuously fail to cite to that memo while arguing it was reasonably explained, offer none here, *see* A43. As before, the government cannot

defend this action based on a post hoc rationalization that the OMB Defendants did not offer at the time they acted. *See supra* Sec. I.B.

As to reliance, the government merely states (at 22) that because M-25-11 narrowed the *Unleashing* order, it "advanced, rather than impaired, any reliance interests." In other words: The government does not even attempt to argue that the OMB Defendants actually did consider reliance interests, and so offers no basis on which to conclude the district court abused its discretion in finding otherwise.[5]

### C. The OMB Defendants' actions were likely in excess of statutory authority.

The government likewise fails to identify any abuse of discretion in the district court's finding that the OMB Defendants' actions likely exceeded their statutory authority. Nearly all of the government's arguments on this score address not the OMB Defendants' actions, but the President's. It argues, for example, that "the President may issue policy guidance," Br. at 18, that no claim against the *Unleashing* order

---

[5] Defendants state (at 22–23) that Memo M-25-11 "allowed agencies to continue to disburse funds as required by law" and that this protected "recipients who had reasonable reliance interests in continued disbursement." That is not true. M-25-11 contains no such savings clause, but makes clear that agencies may disburse funds only after consulting with OMB. A101.

could succeed, *id.* at 20, and that an argument about a "particular agency . . . cannot be shoehorned into a challenge to an Executive Order," *id.* at 20–21. These discursions are wholly irrelevant, as Plaintiffs do not challenge the executive order or any other presidential action in this suit, while it is black letter law that they may challenge an agency's actions implementing presidential policy preferences.

Nevertheless, the government doubles down on that approach, suggesting (at 21) that this case is governed by the Supreme Court's recent stay order in *Trump v. American Federation of Government Employees*, 145 S. Ct. 2635 (2025). That order stated that the government was likely to succeed on its argument that an executive order and an agency memo about restructuring federal agencies were lawful. The Court's order itself contained no further explanation, however, making it difficult to assess how this case could involve "relevantly similar circumstances," Br. at 21; *see also Rhode Island v. Trump*, --- F.4th ---, 2025 WL 2621593, at *4 (1st Cir. Sept. 11, 2025). The government points (at 21) to Justice Sotomayor's solo concurrence, which highlights language in the executive order and agency memo directing that action be taken "consistent with applicable law." *AFGE,*

145 S. Ct. at 2635 (Sotomayor, J., concurring). But resort to that concurrence gets the government nowhere, first, because Plaintiffs do not challenge an executive order and, second, because Memo M-25-11—which they do challenge—says nothing about "consisten[cy] with applicable law," A101.[6]

The government focuses (at 19) on the provision of OMB's authorizing statute permitting it to "[p]rovide overall direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements." 31 U.S.C. § 503(a)(2). This, the government argues tautologically, means "OMB is clearly authorized to issue guidance regarding the management of budgetary matters." The government did not even mention section 503 (or point to any other authority for OMB's action) in the district court. *See* Dkt. 32, at 26–27 & n.9. It has therefore

---

[6] Plaintiffs say (at 19) that as an office within the Executive Office of the President, OMB is entitled to help the President implement his policies. But the general purpose or goals of an agency do not authorize it to act as a "roving commission" with "default authority" to take whatever actions it believes would advance its general goals. *Michigan v. EPA*, 268 F.3d 1075, 1084 (D.C. Cir. 2001).

waived this argument. *See Thomas v. Rhode Island*, 542 F.3d 944, 949 (1st Cir. 2008).

To the extent the Court nevertheless considers that argument, it still fails. As the district court persuasively explained, A48–49, and Defendants do not dispute in their opening brief, the rest of OMB's authorizing statute makes clear that "OMB's role is mainly supervisory, rather than directly active." A49. The remainder of the subsection on which Defendants rely requires "monitoring the establishment and operation of Federal Government financial management systems," 31 U.S.C. § 503(a)(2), and other provisions speak to authorization to "[r]eview," "[m]onitor," [o]versee," "[p]rovide advice," "[a]ssess," and "[c]ommunicate." *Id.* § 503(a)(2)–(6), (8)–(10), (13). This language does not authorize OMB to freeze significant already-awarded funds indefinitely and without warning.

That conclusion is again confirmed by the major-questions doctrine, which the government does not contest should guide the Court's inquiry here. As the district court made clear, the "scope of power" claimed by the OMB Defendants is "breathtaking, and its ramifications are massive," given the billions of dollars at issue. A49

(quotation marks omitted). And, as the court correctly understood, courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." A47 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). A general authorization to "establish[] financial management policies" is hardly enough to show that Congress "clearly" conferred on the OMB Defendants the power they claim "to halt all funding arising from the IIJA and IRA, full-stop, on a moment's notice and to create a new pre-clearance regime centered around OMB." A48–49; *see also Nat'l Council of Nonprofits*, 775 F. Supp. 3d at 126.

## III. Plaintiffs amply demonstrated irreparable injury, and the public interest favors affirmance.

As to the remaining factors: A district court has "broad discretion to evaluate the irreparability of alleged harm." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quotation marks omitted). The court here correctly found that Plaintiffs "more than adequately demonstrated irreparable harm," indeed, that those harms were "myriad." A51–52. Relying on roughly a dozen uncontested declarations, A121–89, the court recognized that Plaintiffs suffered five separate forms of irreparable harm: "(1) reducing hiring, (2) furloughing and

laying off staff, (3) shuttering planned projects, (4) curtailing or ending current projects, and (5) incalculable damage to the relationship between the Nonprofits and the communities they serve." A51. These conclusions are amply supported by the record.

The government does not directly contest that any of these harms were occurring as a result of their actions, that the harms were well documented in the record before the district court, or that those specific harms qualify as forms of irreparable injury sufficient to warrant preliminary relief. The government therefore has effectively waived any argument that the court erred in assessing irreparable injury.

The best the government can offer (at 47) is the vague suggestion that "the gravamen of plaintiffs' injury is monetary," and two out-of-circuit cases standing for the unremarkable proposition that monetary damages that can be later compensated are not irreparable. But the claim that the damage and disruption to Plaintiffs' ongoing projects, relationships with community partners, and overall ability to carry out their core missions caused by Defendants' freezes could be cured later by a money judgement is both waived and wrong. It is waived because the government never made this argument in district court. *See* Dkt. 31,

at 52–54. And it is wrong because the government cannot show that the court abused its discretion in finding otherwise. That is particularly true given circuit precedent that injuries "to goodwill and reputation," A53 (quotation marks omitted), like some of those described here, *e.g.*, A90, A135–38, A142–43, A175–76, are "not easily measured or fully compensable in damages," *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996), and persuasive authority that "obstacles" that "make it more difficult" for Plaintiffs to "accomplish their primary mission[s]," *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016), such as those Plaintiffs suffered here, *see, e.g.*, A124, A136–37, A152, A161, A164–65, A168, A175, A177, A180, A186–87, are likewise irreparable. *See Cal.*, 132 F.4th at 100 (noting that injuries such as "staff layoffs" and "program disruptions" "cannot be fully remedied with late-arriving funds")[7]; *Rhode Island*, 2025 WL 2621593, at *10 (explaining that "impediments to planning, hiring, and operations" may be irreparable (quotation marks omitted)).

---

[7] Unlike the plaintiffs in *California*, Plaintiffs here have shown that they do not have resources to keep their programs running absent this funding. *See, e.g.*, A143, A136–37.

The government also calls back (at 47) to its merits arguments, suggesting that Plaintiffs are not injured because they are not entitled to receive federal funds on a given timeline, and that if they are, they should bring a challenge in the Court of Federal Claims. This argument is no more availing as to irreparable harm than it is on the merits. *See New York*, 133 F.4th at 73 (rejecting identical argument as "repackag[ing]" the merits).

Defendants' account of the public interest (merged, here, with the balance of the harms) is no more persuasive. "There is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. And, as the district court found, the record is replete with evidence of harms to the public that "weigh heavily in favor of injunctive relief," including placing "critical climate, housing, and infrastructure projects in serious jeopardy." A55. The freezes affected the safety of Americans' homes, communities' ability to weather natural disasters, and access to a clean and safe environment, among much else. *See* A123–24, A129, A134–35, A140, A142–43, A147, A149, A151, A155, A158, A165, A168, A171–72, A175, A184–85, A187–88.

Ignoring that evidence altogether, Defendants primarily argue (at 45) that the injunction interferes with the implementation of the President's policy preferences. But (in a stay posture) this Court has repeatedly rejected that argument where it has "concluded that the government has failed to show a likelihood of success on the merits." *Am. Public Health Ass'n*, 145 F.4th at 55; *see also Cal.*, 132 F.4th at 100; *New Jersey v. Trump*, 131 F.4th 27, 40–41 (1st Cir. 2025), *partially stayed*, *Trump v. CASA, Inc.*, 606 U.S. 831 (2025).

Indeed, the government has already made this precise argument to this Court—in precisely the same words. *Compare* Br. at 45, *with New York*, 133 F.4th at 71. The government offers no explanation why its argument, repeated verbatim, should be more persuasive this time around. Instead, it cites only to an irrelevant 1867 case stating that courts cannot enjoin the President—who is, indisputably, not a party to this lawsuit. *See* Br. at 45 (citing *Mississippi v. Johnson*, 71 U.S. 475, 501 (1867)).

Defendants next complain (at 45–46) that the preliminary injunction is vague. But this, too, is a recycled argument that has previously failed as to a similar order. *See New York*, 133 F.4th at 56,

71–72 (rejecting complaints about language enjoining defendants from "implementing, giving effect to, or reinstating under a different name"). As the Court has explained, "Rule 65 requires injunctions to describe in *reasonable* detail" the acts restrained, not "that an order list the components of a term whose boundaries are understood by common parlance." *Id.* at 72 (quotation marks omitted; emphasis in original). Particularly in the context of this case—where the difference between individualized and across-the-board funding freezes sits at the heart of the merits—there is no basis to find that the term "individualized" is simply too confusing. Indeed, when invited to weigh in on Plaintiffs' proposed order in the district court, the government did not raise this purported issue at all, *see* Dkt. 40, and in fact itself drew a contrast between categorical and individualized freezes, *see* Dkt. 31, at 58–59. And as to the portion of the order relating to Memo M-25-11, the government merely reiterates its mistaken understanding of what that memo requires. *See supra* Section II.A.

The government likewise repeat (at 46) familiar arguments about the possibility that funds it disburses may not be recoverable. But this, too, ignores that the government has no interest in "the perpetuation of

unlawful agency action." *Newby*, 838 F.3d at 12. Nor do Defendants

explain how they would be harmed by the outlay of money that was

frozen (but not terminated). And Defendants' recourse (at 46–47) to

"Congress's policy choices" in recently rescinding *unobligated* IRA and

IIJA funding is a red herring: The order at issue addresses only

"already-awarded funding" that *has* been obligated, A61–62—a

vindication, rather than repudiation, of Congress's policy choices.

Defendants' arguments are familiar to this Court. They "mostly

describe[] certain long-term institutional interests of the executive

branch that may be harmed if the challenged policy is enjoined," in

"contrast" with "the district court['s] factual findings that the plaintiffs

will suffer a variety of immediate and irreparable harms." *Agatha v.*

*Trump*, --- F.4th ---, 2025 WL 2538860, at *3 (1st Cir. Sept. 4, 2025).

"In light of the district court's factual findings on irreparable harm, and

the government's failure to contest the plaintiffs' evidence before the

district court, the government has not sufficiently demonstrated that

the balance of harms and equities favors upending the status quo and

subjecting the plaintiffs to the immediate harms identified by the

district court." *Id.* (quotation marks omitted).

**IV. The remedy ordered was consistent with APA principles and well within the district court's discretion.**

There was no error in the scope of relief the district court ordered. The court's order properly focused on the agency actions at issue, rather than on specific plaintiffs. A61–62. This framing was consistent with APA principles, appropriate in light of the nature of Defendants' actions and the irreparable harm those actions caused, and well within the court's discretion. The government's arguments to the contrary are unsupported in fact or law.

The government primarily argues (at 48–50) that the district court's order conflicts with *Trump v. CASA*, 606 U.S. 831 (2025). But the court awarded relief under the APA of the type the Supreme Court specifically emphasized it was not addressing in *CASA*. *See id.* at 847 n.10; *id.* at 869 (Kavanaugh, J., concurring). The court's order states that it "shall apply to the maximum extent provided by . . . 5 U.S.C. §§ 705 and 706." A62. And the court's opinion explicitly rejected the government's arguments about the scope of relief under section 705, A58–60, citing to numerous authorities to support its conclusion that "[t]he normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been

subject to it," A59–60. This level of engagement is unsurprising, because the parties devoted significant briefing to section 705. *See* A97 (invoking section 705 in prayer for relief); A117, A119–20 (requesting section 705 remedy in opening brief); A190–91 (Defendants acknowledging, in opposition, that Plaintiffs have "invoke[d] 5 U.S.C. § 705"); A193–94 (reiterating section 705 arguments on reply). The government's arguments (at 49–50) that the court was not purporting to exercise APA authority thus strain credulity.

Lacking textual support for their position, Defendants say (at 49) that the order cannot be read as a section 705 stay because it "both compels and restrains" agency action. But this argument applies, at most, only to section 3 of the order, and so even if the Court were to credit it, there would be no basis for vacating any other part. Section 3 requires that the Administering Agencies "take immediate steps to resume the processing, disbursement, and payment" of the relevant funding. A61. That is nothing more than a statement of the natural consequence of staying the agencies' respective freezes; it is difficult to see how that provision orders the government to do anything that is not already required by the section 705 stay. And even if section 3 were to

be considered in isolation, section 705 provides a sound textual basis for a district court to "issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

As a fallback, Defendants argue (at 50) that even if this were a section 705 order (and it is), relief under section 705 should be limited to Plaintiffs, "consistent with the equitable principles articulated in *CASA*." But *CASA*, again, specifically did not address the scope of relief under the APA, *see CASA*, 606 U.S. at 847 n.10, and its reasoning does not translate to that different context. The Court's holding, after all, turned on its interpretation of the Judiciary Act of 1789; the Court found that the Act did not provide courts with "equitable authority to issue universal injunctions." *Id.* at 839. Yet, as Justice Kavanaugh has explained, even if "equitable relief is ordinarily limited to the parties in a specific case[,] . . . in the APA, Congress did in fact depart from that baseline and authorize vacatur." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring). In simplest terms: Section 705 offers a statutory basis distinct from the Judiciary Act of 1789.

Consistent with that understanding, there is a widespread judicial consensus—which the government simply ignores—that a section 705 stay operates directly on agency *action*, not on particular parties, and thus is necessarily non-party-specific in its scope. *See, e.g.*, *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024); *Texas v. Becerra*, No. 24-cv-211, 2024 WL 4490621, at *1 (E.D. Tex. Aug. 30, 2024); *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020). It is therefore unsurprising that the vast majority of courts to have considered the government's argument in the wake of *CASA* have rejected it. *See, e.g.*, *R.I. Coal. Against Domestic Violence v. Bondi*, --- F. Supp. 3d ---, 2025 WL 2271867, at *10 (D.R.I. Aug. 8, 2025); *Cabrera v. Dep't of Labor*, --- F. Supp. 3d ---, 2025 WL 2092026, at *8–9 (D.D.C. July 25, 2025), *appeal pending*, No. 25-5340 (D.C. Cir.); *City of Columbus v. Kennedy*, --- F. Supp. 3d ---, 2025 WL 2426382, at *33–34 (D. Md. Aug. 22, 2025), *appeal pending*, No. 25-2012 (4th Cir.); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, --- F. Supp. 3d ---, 2025 WL 2374697, at *32 & n.19 (D. Md. Aug. 14, 2025); *Ass'n of Am. Univs. v.*

*Dep't of Def.*, --- F. Supp. 3d ---, 2025 WL 2022628, at *27, *28 n.84 (D. Mass. July 18, 2025).[8]

To the extent, however, that this order is understood as a preliminary injunction under the Judiciary Act of 1789, and thus subject to *CASA*, the district court should have the opportunity, with the benefit of that ruling, to assess whether the scope of its remedy is necessary to afford complete relief to Plaintiffs. *See* 606 U.S. at 851–52. This is particularly relevant to Plaintiff NCN as a membership organization, given that at least one court of appeals in the wake of *CASA* has found that a "list-of-protected people injunction" was "inadequa[te]" in part because "[r]equiring organizations to share membership lists with Defendants could raise additional constitutional problems regarding the freedom of association and privacy." *Vasquez Perdomo v. Noem*, 148 F.4th 656, 687 (9th Cir. 2025), *stay granted on*

----

[8] Although the Ninth Circuit stated in one opinion that *CASA* provided "useful guidance" in addressing a stay petition in an APA case, the decision is of minimal persuasive value because it did not address the significant case law on the scope of 705 remedies. *See Immigrant Defs. Law Ctr. v. Noem*, 145 F.4th 972, 995–96 (9th Cir. 2025). And in only the few weeks since that decision was issued, another Ninth Circuit panel has already cabined its reasoning. *See Nat'l TPS Alliance v. Noem*, --- F.4th ---, 2025 WL 2487771, at *20 (9th Cir. Aug. 29, 2025).

*unspecified grounds*, No. 25A169, 2025 WL 2585637 (Sept. 8, 2025).

(Indeed, some awardees were forced to submit declarations in this case

anonymously because they reasonably feared retaliation by Defendants.

*See* Dkt. 26 at 21 n.6.) Although the government contends (at 52) that

"equitable principles" from *CASA* would preclude relief from any NCN

member not explicitly identified in district court, *CASA* does no such

thing: That decision explicitly declined to address the government's

identical argument on that point. 606 U.S. at 838 n.2.

Finally, the government also expresses (at 51)—for the first time

on appeal—skepticism that NCN is "a bona fide membership

organization." To the extent the Court considers this argument instead

of treating it as waived, *see Thomas*, 542 F.3d at 949, it should soundly

reject it.

Relying on a single Fifth Circuit case from 1997, the government

argues that NCN has failed to establish "indicia of membership"

sufficient to proceed under a theory of associational standing. But NCN

has shown that it is a traditional voluntary membership organization,

whose members have provided declarations in this case, A141, A160,

A167, A171, A183,[9] and it is established as a 501(c)(3) under federal law. Binding precedent holds that nothing more was required, and that the "indicia of membership" test the government invokes does not apply here. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023) ("The indicia of membership analysis . . . has no applicability in these cases. Here, SFFA is indisputably a voluntary membership organization with identifiable members . . . ."); *see also Students for Fair Admissions*, 980 F.3d 157, 183 (1st Cir. 2020) ("[W]e hold that the indicia of membership test does not apply to SFFA . . . because it is, on its face, a traditional voluntary membership organization[.]"), *rev'd on other grounds*, 600 U.S. 181. "Where, as here, an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates." *SFFA*, 600 U.S. at 201. The government does not address—or even acknowledge—this contrary precedent, but it forecloses the government's (waived) argument.

---

[9] Defendants erroneously claim (at 51) that NCN identified only two members, ignoring that Childhood Lead Action Project and Eastern Rhode Island Conservation District are also identified NCN members, as are numerous declarants that are not plaintiffs themselves.

In sum, the Court can affirm the district court's order as a proper exercise of authority under section 705. But if any confusion remains about the basis for or scope of that order, the appropriate course is not reversal, but remand. The district court itself is best positioned to clarify its order in the first instance. *See CASA*, 606 U.S. at 854; *Doe v. Trump*, 142 F.4th 109, 112 (1st Cir. 2025) (remanding "for the limited purpose of enabling the District Court to consider the bearing, if any, of that guidance in *CASA* on the scope of the preliminary injunction"). To prevent further irreparable harm, the court's order should remain in effect for the pendency of any remand. *See, e.g.*, *Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 734 (7th Cir. 2025) (affirming and remanding preliminary injunction without vacating).

## CONCLUSION

For all these reasons, the Court should affirm.

Dated:  September 26, 2025

Respectfully submitted,

*/s/ Kevin E. Friedl*
Kevin E. Friedl
Jessica Anne Morton
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

(202) 448-9090
kfriedl@democracyforward.org
jmorton@democracyforward.org
rthurston@democracyforward.org

**CERTIFICATE OF COMPLIANCE**

This document complies with Federal Rule of Appellate Procedure 32(a)(7) because, excluding the portions exempted by Rule 32(f), it contains 12,906 words.

/s/ *Kevin E. Friedl*
Kevin E. Friedl