No. 25-1428

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

Woonasquatucket River Watershed Council;
Eastern Rhode Island Conservation District;
Green Infrastructure Center; National Council of Nonprofits;
Childhood Lead Action Project;
Codman Square Neighborhood Development Corporation,

*Plaintiffs-Appellees*,

*(caption continued on inside cover)*

On Appeal from the United States District Court
for the District of Rhode Island (No. 1:25-cv-00097-MSM)

**BRIEF OF *AMICI CURIAE* JANE ADDAMS SENIOR CAUCUS,
LAKESIDE TOWER TENANT UNION, MASSACHUSETTS LAW
REFORM INSTITUTE, NATIONAL HOUSING LAW PROJECT,
POVERTY AND RACE RESEARCH ACTION COUNCIL,
SHRIVER CENTER ON POVERTY LAW, AND TENANT
ADVOCACY CLINIC AT NORTHWESTERN PRITZKER SCHOOL
OF LAW IN SUPPORT OF PLAINTIFFS-APPELLEES**

Andrea Moon Park
1st Cir. Bar No. 1217858
Massachusetts Law Reform Institute
40 Court Street, Suite 700
Boston, MA 02108
Tel: 617-357-0700
Fax: 617-357-0777
apark@mlri.org

v.

U.S. Department of Agriculture; Brooke Rollins, in her official capacity as Secretary of Agriculture; U.S. Department of Energy; Chris Wright, in his official capacity as Secretary of Energy; U.S. Department of the Interior; Doug Burgum, in his official capacity as Secretary of the Interior; U.S. Environmental Protection Agency; Lee Zeldin, in his official capacity as Administrator of the Environmental Protection Agency; U.S. Department of Housing and Urban Development; Scott Turner, in his official capacity as Secretary of Housing and Urban Development; U.S. Office of Management and Budget; Russell Vought, in his official capacity as Director of the Office of Management and Budget; and Kevin Hassett, in his official capacity as Director of the National Economic Council,

*Defendants-Appellants.*

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* Jane Addams Senior Caucus, Lakeside Tower Tenant Union, Massachusetts Law Reform Institute, National Housing Law Project, Poverty and Race Research Action Council, and Shriver Center on Poverty Law are nonprofit corporations or organizations. The Tenant Advocacy Clinic at Northwestern Pritzker School of Law is a law school clinic provided by, but not speaking on behalf of, a larger academic institution. None has a parent corporation and no publicly owned corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

STATEMENT OF INTEREST .................................................................. 1

ARGUMENT ........................................................................................ 4

I. The Inflation Reduction Act's Green and Resilient Retrofit Program ("GRRP") Is a Critical Tool for Preserving Affordable Housing ............................................................ 5

    A. The Nation's Federally Assisted Housing Stock Is Deteriorating ............................................................ 5

    B. The GRRP Offers a Once-in-a-Generation Opportunity to Preserve Aging Affordable Housing ................................... 7

    C. GRRP Funding Helps Improve Living Conditions for Low-Income Tenants Across the Country .......................... 9

    D. GRRP Helps to Close The "Energy Poverty" Gap .............. 11

II. HUD's Freeze of GRRP Awards Was Arbitrary and Capricious ....................................................................... 14

    A. HUD Failed to Establish a Rational Connection Between the Funding Freeze and Purported Savings ......... 15

    B. HUD Failed to Consider Owners' Substantial Reliance on the GRRP Awarding ............................................... 17

III. The District Court's Injunction Avoids Irreparable Harm and Furthers the Public Interest by Preventing GRRP-Funded Renovations of Low-Income Tenants' Homes from Collapsing ... 21

    A. GRRP Awardees' Renovation Projects Will Be Irreparably Harmed if the Funding Freeze Resumes .......... 21

    B. Without GRRP Funding, Tenants Will Endure Years of Disrepair, Causing Irreparable Harm ............................... 24

    C. GRRP Eliminates Energy Inefficiencies that Harm Tenants ................................................................. 30

IV. The District Court Correctly Applied its Injunction to All GRRP Grantees, not just the Parties to this Case .................. 32

CONCLUSION ...................................................................... 33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ..........................17

*Texas v. United* States, 40 F.4th 205 (5th Cir. 2022) ............................32

*Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025) ........................................32

**Statutes**

42 U.S.C. § 1437(a)(1)(A)............................................................................5

Pub. L. No. 117-169, § 30002, 136 Stat. 1818, 2027 (2022).....................8

Pub. L. No. 119-21, § 70422, 139 Stat. 72, 234–35 (2025)......................6

Pub. L. No. 119-4, § 1902, 139 Stat. 9, 31 (2025)..................................17

**Regulations and Administrative Guidance**

Dep't of Hous. & Urb. Dev., Handbook 4350.1 (REV-1),
    *Multifamily Asset Management and Project Servicing* § 7-24
    (Sept. 1992).....................................................................................31

Dep't of Hous. & Urb. Dev., Notice H 2023-05, *Green and Resilient
    Retrofit Program for Multifamily Housing (GRRP)* (Jan. 8,
    2023) .................................................................................. 8, 16, 22

**Other Authorities**

*2020 Residential Energy Consumption Survey Data,* U.S. Energy
    Info. Admin., HC11.1 (Mar. 2023), http://bit.ly/48wP72y..............13

Alyvia McTague & Elisa Trujillo-Baute, *Energy Prices, Energy
    Poverty and Health: Evidence From a US Cohort Study*, 87
    Econ. Analysis & Pol'y 315 (2025)................................ 12, 13, 14, 25

Amber Howard et al., *Housing Typologies and Asthma: A Scoping
    Review*, 23 BMC Pub. Health no. 1766, (2023)..............................10

iv

Amy Burdette et al., *Household Disrepair and the Mental Health of Low-Income Urban Women*, 88 J. Urb. Health 142 (2011).. 10, 11

Ankur Singh et al., *Housing Disadvantage and Poor Mental Health: A Systemic Review*, 57 Am. J. Preventative Med. 252 (2019) ........................................................................... 10

*Austin Renaissance Apartments (Chicago, IL): Impact of GRRP Comprehensive Freeze* (Aug. 2025), http://bit.ly/4nMuPGC ... 21, 23, 27

Dan Emmanuel et al., *Picture of Preservation 2024*, Nat'l Low Income Hous. Coal. (Dec. 2024), http://bit.ly/4gC7xBb .............. 6, 7

Dep't of Hous. & Urb. Dev., *Achieving Utility Savings in HUD-Assisted Housing: Progress Report to Congress* (2019) ................. 16

Dep't of Hous. & Urb. Dev., *GRRP Funding Overview* (Nov. 2024), http://bit.ly/46FhiKl ........................................................................ 8

Dep't of Hous. & Urb. Dev., Handbook 4350.1 (REV-1), *Multifamily Asset Management and Project Servicing* § 7-24 (Sept. 1992) ................................................................................... 13

Emily Pontecorvo, *Trump's Forgotten Funding Freeze,* Heatmap (July 31, 2025), http://bit.ly/3IgYRDA ...................................... 9, 22

Gary Pivo, *Energy Efficiency and Its Relationship to Household Income in Multifamily Rental Housing,* Fannie Mae  (Sept. 2, 2012), http://bit.ly/42BxT0c........................................................... 16

Gov't Accountability Off., GAO-24-105532, *HUD Rental Assistance: Improved Guidance and Oversight Needed for Utility Allowances* 36 (2024) ......................................................... 31

HUD Office of Policy Dev. & Research, Dataset: Picture of Subsidized Households (2024 based on 2020 census), http://bit.ly/46QDbY6 (last visited Aug. 29, 2025) ........................ 10

Interview (Aug. 4, 2025) (on file with author) ....................................... 26

Interview (Aug. 5, 2025) (on file with author) .................................. 26, 30

James Krieger & Donna Higgins, *Housing and Health: Time
        Again for Public Health Action*, 92 Am. J. Pub. Health 758
        (2002) ......................................................................... 9, 10

Jennifer Ludden, *For These Seniors, DOGE's Affordable Housing
        Pause Means Suffering Longer Without AC*, NPR (Apr. 6,
        2025), http://bit.ly/4pFfE3U ........................................... 27

Jesse Bedayn, *Affordable Housing Threatened as Trump Halts $1
        Billion Slated for Extending Life of Aging Buildings*, Assoc.
        Press (Mar. 12, 2025), http://bit.ly/4nQoHNU ............. 18, 19, 27, 28

Kriston Capps & Sarah Holder, *Affordable Housing Renovations
        Stalled by Blocked Federal Funds*, Bloomberg: CityLab (Mar.
        25, 2025), http://bit.ly/46hZbLs ...................................... 18

Letter from Juliana Bilowich, Housing Operations and Policy
        Director, LeadingAge to Lauren Ross, Senior Adviser, Dep't
        of Hous. And Urb. Dev. (October 27, 2022),
        http://bit.ly/3KhJBXC ................................................. 15

Lori Bamberger, *Scaling the Nationwide Energy Retrofit of
        Affordable Multifamily Housing: Innovations and Policy
        Recommendations*, Brookings (Dec. 2010),
        http://bit.ly/4mwMgdu ................................................. 16

Matthew Goldstein, *Federal Agency Pauses Program for Energy-
        Efficient Upgrades in Affordable Housing*, N.Y. Times (Mar.
        13, 2025), http://bit.ly/3W5kr0U .................................... 18

Molly Parker, *How HUD's Inspection System Fails Low-Income
        Tenants Nationwide*, ProPublica (Nov. 16, 2018),
        http://bit.ly/4nS9RX7 .................................................. 24

Nat'l Low Income Hous. Coal., *Who Lives in Federally Assisted
        Housing?*, Hous. Spotlight (Nov. 2012), http://bit.ly/3IEnw4S ..... 25

Priya Jayachandran, *In the Rush to Build, Existing Affordable Housing is Falling Apart*, Shelterforce (May 9, 2024), http://bit.ly/3IBO0n .......................................................................... 7

Raquel Harati et al., *The Gap: A Shortage of Affordable Homes*, Nat'l Low Income Hous. Coal. (Mar. 2025), http://bit.ly/4ndfI9r .................................................................. 6, 29

Robert Davis, *A Little-Known Federal Program is Keeping Senior Housing Affordable in Denver*, Next City (Dec. 5, 2024), http://bit.ly/4pDwPmv .................................................................. 29

Ross Beall & Carolyn Hronis, *U.S. Energy Insecure Households Were Billed More for Energy Than Other Households*, U.S. Energy Info. Admin. (May 30, 2023), http://bit.ly/3Kkaquc .... 12, 30

S.D. Platt et al., *Damp Housing, Mould Growth, and Symptomatic Health State*, 298 BMJ 1673 (1989) ............................................... 10

Sameed Ahmed M. Khatana et al., *Projections of Extreme Temperature-Related Deaths in the US*, 7 JAMA Network Open no. e2434942 (Sept. 20, 2024), http://bit.ly/4gAQuzb ... 13, 14, 25

Stephanie Tham et al., *Indoor Temperature and Health: A Global Systemic Review*, 127 Pub. Health 9 (2019) ................................... 10

Steve Sadin, *Mold, Fecal Matter and Gunfire: Waukegan Apartment Building Residents Complain About Conditions as Management is Debated*, Lake Cnty. News-Sun (Sept. 30, 2022), http://bit.ly/3VyMFks ........................................................ 26

Steve Sadin, *Owners say Federal Grant Will Bring Improvements to Waukegan's Lakeside Tower; 'It Has to Happen Soon,'* Lake Cnty. News-Sun (June 6, 2024), http://bit.ly/42CRvRC ....... 27

Susan Du, *A St. Paul Complex Was the Only Minnesota Property Awarded a First-of-Its-Kind HUD Grant. The Money Isn't Coming.*, Minn. Star Trib. (Apr. 5, 2025), http://bit.ly/3IFbb0r........................................................................ 11

*Terri Manor Apartments (Cincinnati, Ohio): Impact of GRRP's Comprehensive Freeze* (July 2025), http://bit.ly/4gFRoKJ  19, 20, 23

*The Highlands Apartments (Carthage, MO): Impact of GRRP's Comprehensive Freeze* (Aug. 2025), http://bit.ly/46StoRn ....... 20, 23

Vincent Reina, *The Preservation of Subsidized Housing: What we Know and Need to Know* (Lincoln Inst. Land Pol'y, Working Paper WP18VR1, 2018), http://bit.ly/3W5N1iG ............................. 7

## STATEMENT OF INTEREST

*Amici curiae* are groups who advocate on behalf of low-income tenants in federally subsidized housing in the United States.[1] *Amici* have a compelling interest in maintaining the district court's injunction to ensure continued access to critical funding programs for the preservation of subsidized housing.

The **Jane Addams Senior Caucus ("JASC")** is a Chicago-based nonprofit organization that focuses on organizing and educating tenants on their rights. JASC worked with the Lakeside Tower tenants to establish their union and continues to support them in improving their living environment.

The **Lakeside Tower Tenant Union ("LTTU")** is a voluntary unincorporated organization composed of tenants at the Lakeside Tower Apartments, a subsidized housing complex located at 200 Julian Street in Waukegan, Illinois. LTTU was formed pursuant to 24 C.F.R. part 245 to help Lakeside Tower tenants address issues related to their living

---

[1]    No party's counsel authored this brief in whole or in part and no party's counsel, party, or other person—other than the *amici*, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief. All parties consented to the filing of this brief.

environment. As beneficiaries of the federal funding programs at issue, LTTU's members are directly impacted by this case's outcome.

The **National Housing Law Project ("NHLP")** is a nonprofit organization that advances housing justice for poor people and communities, predominantly through technical assistance and training to legal aid attorneys and through co-counseling on important litigation. NHLP works with organizers and other advocacy and service organizations to strengthen and enforce tenants' rights, increase housing opportunities for underserved communities, and preserve and expand the nation's supply of safe and affordable homes.

The **Massachusetts Law Reform Institute** ("MLRI") is a statewide law and poverty center and principal support center for Massachusetts civil legal aid agencies. Our mission is to advance economic, social, and racial justice for low-income individuals and communities through legal action, legislative and administrative advocacy, coalition building, and legal education.

The **Poverty and Race Research Action Council ("PRRAC")** is a civil rights law and policy organization based in Washington, D.C. Our mission is to promote research-based advocacy strategies to address

structural inequality and change the systems that disadvantage low-income people of color. PRRAC has worked extensively to ensure that agencies including the U.S. Department of Housing and Urban Development administer federally assisted housing programs in a manner that protects tenants' rights and is consistent with applicable civil rights laws.

The **Shriver Center on Poverty Law** is a national nonprofit based in Chicago that fights for economic and racial justice through legal and policy advocacy. For over 60 years, the Shriver Center has helped low-income households access the critical resources—such as housing—that they need to thrive.

The **Tenant Advocacy Clinic at Northwestern Pritzker School of Law** is a law school clinic which partners with tenant associations advocating to improve the living conditions of tenants in federally subsidized housing. Students enrolled in the Clinic gain hands-on experience working with low-income tenants and tenant organizations. The Clinic signs on as amici exclusively on its own behalf and cannot speak for any institution with which it is associated.

## ARGUMENT

The district court correctly enjoined the Government's freeze of funds awarded under the Infrastructure Investment and Jobs Act of 2021 ("IIJA") and the Inflation Reduction Act of 2022 ("IRA"). *Amici* offer this brief to illustrate the stakes of this decision for one specific IRA-funded program—the Green and Resilient Retrofit Program ("GRRP")—and the communities that it benefits.

The GRRP is a once-in-a-generation funding source that helps owners of federally subsidized housing repair and modernize their aging properties. This housing, a critical resource for our nation's most vulnerable tenants, is at risk of disappearing forever through physical degradation and expiring affordability restrictions. The GRRP offers a chance to revitalize our affordable housing stock for a new generation of low-income tenants while also saving taxpayers millions of dollars through energy-efficient upgrades.

While the GRRP is by no means the only program at issue, it is a uniquely salient case study of the consequences of the Government's hasty and ill-conceived funding freeze. When the Department of Housing and Urban Development ("HUD") froze GRRP awards in early 2025,

planned renovations across the country were thrown into chaos, upending owners' carefully assembled financing dependent on GRRP dollars. The irreparable harms necessitating the district court's order remain present. Given the complexity of such financing, another HUD freeze will cause countless projects to fail. In many instances, GRRP-funded renovations are necessary to bring federally subsidized housing into compliance with basic health and safety standards. If GRRP funding remains frozen, low-income families will be forced to live in substandard housing—which threatens their health—and the nation's affordable housing stock will continue to deplete. A*mici* thus urge this Court to affirm the district court's injunction.

## I.    The Inflation Reduction Act's Green and Resilient Retrofit Program ("GRRP") Is a Critical Tool for Preserving Affordable Housing

### A. The Nation's Federally Assisted Housing Stock Is Deteriorating

The Housing Act of 1937 set forth our national goal of "remedy[ing] the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families." 42 U.S.C. § 1437(a)(1)(A). These aims remain as pressing today as they were decades ago: the United States currently faces a shortage of almost four million affordable units for

extremely low-income tenants. Raquel Harati et al., *The Gap: A Shortage of Affordable Homes*, Nat'l Low Income Hous. Coal. 4 (Mar. 2025), http://bit.ly/4ndfI9r. Federally assisted housing, which generally restricts tenants' rent contributions to a portion of their income, is often the only viable option for tenants living in poverty.

This "deeply" affordable housing stock, however, is aging and at risk of disappearing. "Project-Based Section 8" housing – which receives subsidies tied to a particular unit rather than a tenant—has been a vital source of affordable housing for over fifty years. Dan Emmanuel et al., *Picture of Preservation 2024*, Nat'l Low Income Hous. Coal. 9 (Dec. 2024), http://bit.ly/4gC7xBb.

The repairs necessary to keep these homes habitable are often financially infeasible for owners working under tight margins. *Id.* at 12. While the Low-Income Housing Tax Credit ("LIHTC"), and other subsidies can help defray costs, these programs are not rehabilitation-specific, and existing buildings must compete with new-construction projects for these finite resources.[2] Priya Jayachandran, *In the Rush to*

---

[2]    Congress's recent expansion of LIHTC through the One Big Beautiful Bill Act, Pub. L. No. 119-21, § 70422, 139 Stat. 72, 234–35 (2025), will not fill this gap. While LIHTC can be used for rehabilitation,

*Build, Existing Affordable Housing is Falling Apart*, Shelterforce (May 9, 2024), http://bit.ly/3IBO0nD. Owners must thus defer maintenance and capital improvements, leaving tenants facing years of delayed repairs and degraded conditions. *Id.* If these delays persist, homes will deteriorate to the point of physical obsolescence and be lost forever.

Federally subsidized housing will also be lost if owners "exit" subsidy programs by converting their properties to market-rate units once their affordability restrictions expire. The result is an impending "perfect storm of housing affordability," with hundreds of thousands of subsidized units' affordability periods set to end just as the demand for housing reaches unprecedented levels. Vincent Reina, *The Preservation of Subsidized Housing: What We Know and Need to Know* 7 (Lincoln Inst. Land Pol'y, Working Paper WP18VR1, 2018), http://bit.ly/3W5N1iG.

## B. The GRRP Offers a Once-in-a-Generation Opportunity to Preserve Aging Affordable Housing

Congress responded to this housing crisis in 2022 by creating the GRRP through the IRA, authorizing up to $1 billion in direct grant

---

its relatively "shallow" rent subsidies—tied to area median income levels rather than actual household income—are often insufficient to meet extremely low-income tenants' needs. Emmanuel et al., *supra*, at 18.

funding and $4 billion in loans for "projects that improve energy or water efficiency, enhance indoor air quality or sustainability," and other greening and resiliency efforts. Pub. L. No. 117-169, § 30002(a), 136 Stat. 1818, 2027 (2022). Eligibility was limited to owners already receiving HUD multifamily subsidies. *Id.* § 30002(c)(2).

However, the GRRP is far more than a greening program. It is an exceedingly rare capital infusion which allows owners to extend their affordable properties' useful lifespan to a new generation of tenants. Further, GRRP staves off owner "exit," as owners receiving GRRP funds agree to extend their affordability periods for up to 25 years. Dep't of Hous. & Urb. Dev., Notice H 2023-05, *Green and Resilient Retrofit Program for Multifamily Housing (GRRP)* § 6.4 (Jan. 8, 2023) [hereinafter "Notice H 2023-05"].

As of late 2024, the GRRP was set to fund over $1.1 billion dollars in renovations across 270 properties and 30,000 units. Dep't of Hous. & Urb. Dev., *GRRP Funding Overview* (Nov. 2024), http://bit.ly/46FhiKl . The program is divided into three funding cohorts; owners may receive up to: 1) $750,000 under the "Elements" cohort to supplement existing retrofit plans; 2) $10 million under the "Leading Edge" cohort for more

involved projects requiring a green certification, and; 3) $20 million under the "Comprehensive" cohort for more complicated, full-building retrofits. Emily Pontecorvo, *Trump's Forgotten Funding Freeze,* Heatmap (July 31, 2025), http://bit.ly/3IgYRDA.

### C. GRRP Funding Helps Improve Living Conditions for Low-Income Tenants Across the Country

Research consistently links poor living conditions to adverse physical and mental health outcomes. By improving low-income tenants' living conditions, the GRRP promotes improved physical and mental-health outcomes. Unhealthy and substandard housing conditions have devastating neighborhood-wide impacts on long-term physical health, mental health, and the community's "social cohesion." James Krieger & Donna Higgins, *Housing and Health: Time Again for Public Health Action*, 92 Am. J. Pub. Health 758, 760 (2002).

Substandard housing with significant structural defects is associated with chronic physical and mental health conditions. *Id.* at 758–59. Poor ventilation and damp and moldy housing conditions are associated with respiratory, cardiovascular, dermatological, and neurological health concerns, especially for children who are at higher risk of disability and poor health for decades afterwards. Amber Howard

et al., *Housing Typologies and Asthma: A Scoping Review*, 23 BMC Pub. Health no. 1766, at 9 (2023); S.D. Platt et al., *Damp Housing, Mould Growth, and Symptomatic Health State*, 298 BMJ 1673, 1677–78 (1989); Krieger & Higgins, *supra*, at 759. Roughly, 25% of Project-Based Section 8 households include children. HUD Office of Policy Dev. & Research, Dataset: Picture of Subsidized Households (2024 based on 2020 census), http://bit.ly/46QDbY6 (last visited Aug. 29, 2025).

The housing conditions addressed by the GRRP are also associated with the exacerbation of mental illness. *See, e.g.,* Stephanie Tham et al., *Indoor Temperature and Health: A Global Systemic Review*, 127 Pub. Health 9, 13 (2019) (dementia, schizophrenia, secondary conditions) ).; Ankur Singh et al., *Housing Disadvantage and Poor Mental Health: A Systemic Review*, 57 Am. J. Preventative Med. 252, 262–63, 267–70 (2019) (depression, anxiety, stress

When housing conditions improve, physical and mental health improve. Amy Burdette et al., *Household Disrepair and the Mental Health of Low-Income Urban Women*, 88 J. Urb. Health 142, 150 (2011). Initiatives focused on "green" repair and renovation of subsidized housing are associated with improved tenant health, particularly

regarding respiratory disease and other highly environment-dependent conditions. *Id.*

Properties receiving GRRP funds require a wide range of repairs and rehabilitation. One recipient, Vista Village, a multifamily development in Minnesota, has like many GRRP awardees gone decades without desperately needed rehab. Susan Du, *A St. Paul Complex Was the Only Minnesota Property Awarded a First-of-Its-Kind HUD Grant. The Money Isn't Coming.*, Minn. Star Trib. (Apr. 5, 2025), http://bit.ly/3IFbb0r. During winter, tenants suffer due to broken radiators and poor weatherization; ice spreads into units through cracked windows; some must use broomstick to keep windows closed. Vista Village's owner took advantage of this "amazing opportunity" to improve conditions for their tenants and was awarded GRRP funds to replace windows, insulation, and heating systems. *Id.* For properties like Vista Village, GRRP funds are a pathway to safer living conditions for tenants.

### D. GRRP Helps to Close The "Energy Poverty" Gap

GRRP funds also help to ameliorate the effects of "energy poverty"—when "households are unable to access essential energy services and products or when energy bills represent such a high

percentage of consumers' income that energy consumption must be reduced to a degree that can negatively impact health and well-being." *See* Alyvia McTague & Elisa Trujillo-Baute, *Energy Prices, Energy Poverty and Health: Evidence From a US Cohort Study*, 87 Econ. Analysis & Pol'y 315 (2025).

Energy poverty directly causes physical ailments. Energy poor tenants may forego adequately heating or cooling their homes in order to afford other necessities. Living in too-cold or too-hot housing can cause cardiovascular and respiratory illness, exacerbate symptoms of preexisting conditions, and threaten tenants' lives. Tham, *supra*, at 12–13. Energy-poor households also bear the brunt of generally rising utility costs. Ross Beall & Carolyn Hronis, *U.S. Energy Insecure Households Were Billed More for Energy Than Other Households*, U.S. Energy Info. Admin. (May 30, 2023), http://bit.ly/3Kkaquc.

Tenants assisted by HUD's multifamily rental assistance programs generally pay 30% of their income towards rent. Tenants who pay utility bills directly receive a "utility allowance" which functions as a credit when calculating their share of the rent. But these allowances only cover "reasonable consumption" of energy and thus does not adequately cover

high utility costs, putting tenants at risk of energy poverty or subsidy termination. *See*, Dep't of Hous. & Urb. Dev., Handbook 4350.1 (REV-1), *Multifamily Asset Management and Project Servicing* § 7-24 (Sept. 1992).

As climate change results in longer, more intense heatwaves and freezes, this issue will only compound. Over a quarter of American households faced some type of energy insecurity in 2020. *2020 Residential Energy Consumption Survey Data,* U.S. Energy Info. Admin., HC11.1 (Mar. 2023), http://bit.ly/48wP72y. Nearly 20% of households sacrificed food or medicine to pay for energy costs, while just under 10% reported leaving their homes at unhealthy temperature levels due to energy insecurity. *Id.* Energy-insecure households—"including the elderly, families with children, and low-income workers" — face the greatest risks. McTague & Trujillo-Baute, *supra*, at 316. Additionally, poor health outcomes due to energy poverty are disproportionately worse for Black and Hispanic individuals. *Id.* at 328; Sameed Ahmed M. Khatana et al., *Projections of Extreme Temperature-Related Deaths in the US*, 7 JAMA Network Open no. e2434942, at 2 (Sept. 20, 2024), http://bit.ly/4gAQuzb.

Terrifyingly, energy poverty is directly associated with temperature-related mortality among households. McTague & Trujillo-Baute, *supra*, at 315. As climate change affects weather patterns, researchers predict the number of deaths associated with extreme temperatures could double or triple by 2065. Khatana et al., *supra*, at 11. When tenants cannot afford their utility bills, they are forced to choose between safe housing and other necessities, such as food and medical care. McTague & Trujillo-Baute, *supra,* at 315. Subsidized tenants who cannot afford these increasing utility costs risk subsidy termination.

By improving energy efficiency in housing, GRRP funds counteract the rising costs of utilities for tenants. Energy-efficient upgrades help tenants save money to afford other basic necessities. The economic burden of utility bills in energy-inefficient households is severe, widespread, and dangerous to the health and wellbeing of subsidized housing tenants. When tenants save on energy bills, they can protect their health long-term, reducing medical costs and burdens on the healthcare system.

## II. HUD's Freeze of GRRP Awards Was Arbitrary and Capricious

Despite the GRRP's myriad of benefits for low-income tenants, in March 2025, HUD chose to summarily stop the processing and disbursement of already-awarded GRRP funds. The district court correctly held HUD's decision was arbitrary and capricious.

### A.    HUD Failed to Establish a Rational Connection Between the Funding Freeze and Purported Savings

The district court appropriately determined that the Government "failed to provide a rational reason that the need to safeguard valuable taxpayer resources justifies a sweeping pause of all already-awarded IIJA and IRA funds with such short notice." A42 (internal quotations omitted). The Government failed to show a rational connection between its purported desire to protect taxpayer dollars and the elimination of programs like GRRP, which ultimately save taxpayers money.

Most of HUD's multifamily housing was built prior to 1980; older multifamily housing consumes double the amount of energy in comparison to buildings built after 2000. Letter from Juliana Bilowich, Housing Operations and Policy Director, LeadingAge to Lauren Ross, Senior Adviser, Dep't of Hous. And Urb. Dev. (October 27, 2022), http://bit.ly/3KhJBXC; *see* also Lori Bamberger, *Scaling the Nationwide Energy Retrofit of Affordable Multifamily Housing: Innovations and*

*Policy Recommendations*, Brookings (Dec. 2010), http://bit.ly/4mwMgdu. "[I]n rented multifamily units, energy expenditures run 37% higher per square foot than in owner-occupied multifamily units (i.e. condos or cooperatives), 41% higher than in tenant-occupied single family detached units, and 76% higher than in owner-occupied single family detached units. Gary Pivo, *Energy Efficiency and Its Relationship to Household Income in Multifamily Rental Housing,* Fannie Mae 1–2 (Sept. 2, 2012), http://bit.ly/42BxT0c.

HUD spends approximately one-fifth of its public and assisted housing operating budgets on utilities. HUD reported that in 2017, 73% of all assisted tenants received utility allowances, totaling approximately $6.9 billion. Dep't of Hous. & Urb. Dev., *Achieving Utility Savings in HUD-Assisted Housing: Progress Report to Congress* 5, 10 (2019). These allowances, however, may not fully cover utility costs, causing some tenants to become rent-burdened and pay more than 30 percent of their incomes toward their housing. *Id; see supra* Section I.D. GRRP directly "reduce[s] utility bills, greenhouse gas emissions, and the cost of property operations, thereby benefitting tenants, Owners, and communities at large" Notice H 2023-05, *supra*, at 1-2.

16

Taxpayers not only fund utility allowances, but also other utility assistance programs such as the Low-Income Home Energy Assistance Program ("LIHEAP"), which assists families with energy costs. In 2025, The Government provided $401.5 million in LIHEAP funding. Pub. L. No. 119-4, § 1902, 139 Stat. 9, 31 (2025). Taxpayers benefit when the Government undertakes initiatives which reduce utility costs. The Government has failed to show how the elimination of GRRP—which would help to reduce overall energy costs and preserve affordable housing—would save taxpayers money.

### B.  HUD Failed to Consider Owners' Substantial Reliance on the GRRP Awarding

The district court appropriately determined HUD failed to consider the substantial reliance interests on GRRP. "When an agency changes course, as [HUD] did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). It is hard to imagine more tangible reliance interests than those of GRRP grantees. Affordable housing rehabilitation projects are notoriously hard to finance, and owners must cobble together scarce funding from different sources. Finding this money can be "like building a Jenga tower, where

17

one of the program's grants or loans—which range from hundreds of thousands to millions of dollars—is a bottom block and each new block is another investment." Jesse Bedayn, *Affordable Housing Threatened as Trump Halts $1 Billion Slated for Extending Life of Aging Buildings*, Assoc. Press (Mar. 12, 2025), http://bit.ly/4nQoHNU. "The loss of any one funding source can upend the project" and bring the entire Jenga tower crashing down. Matthew Goldstein, *Federal Agency Pauses Program for Energy-Efficient Upgrades in Affordable Housing*, N.Y. Times (Mar. 13, 2025), http://bit.ly/3W5kr0U.

HUD's funding freeze immediately threw hundreds of rehabilitation projects across the country into chaos. Grantees received little communication from HUD on the status of their funds in the weeks after the freeze, forcing them to push back their scheduled closings and scramble to keep other funding sources from being withdrawn. *Id.* "[W]ithout these commitments that ha[d] already been made by the federal government," grantees were left wondering whether their projects would "be able to proceed at all." Kriston Capps & Sarah Holder, *Affordable Housing Renovations Stalled by Blocked Federal Funds*, Bloomberg: CityLab (Mar. 25, 2025), http://bit.ly/46hZbLs. (quoting

18

managing director for Jonathan Rose Companies). And "[e]ach day of funding uncertainty increase[d] the odds that deals w[ould] disintegrate." Bedayn, *supra* (quoting senior vice president at LeadingAge).

The Government has doubled down on its position that the funding freezes did not implicate reliance interests, arguing "[g]rantees can hardly claim unfair surprise when a new Administration takes steps to evaluate whether existing grants serve new agency priorities" and that the district court "identified no legal requirement . . . that payments need to be made on a particular timetable." (Gov't Br. at 36.) The experiences of GRRP grantees who have invested time and resources in reliance on HUD's promises amply support the district court's decision.

Consider, for example, the Terri Manor renovation project in Cincinnati, Ohio, which was awarded a GRRP Comprehensive loan for $6,480,000 in late 2023. Terri Manor is an 81-unit property home to more than 160 people, of whom 125 are children, seniors, people with disabilities, or working adults. *Terri Manor Apartments (Cincinnati, Ohio): Impact of GRRP's Comprehensive Freeze (*July 2025*), http://bit.ly/4gFRoKJ [hereinafter "Terri Manor Fact Sheet"].

Since receiving its GRRP award, Terri Manor and its public- and private-sector partners have advanced the project's financing and design development process in reliance on HUD's funding commitment. *Id*. The project has also been awarded funds from the City of Cincinnati and could receive LIHTC financing from the Ohio Housing Finance Agency. *Id*. Terri Manor has invested more than 650 staff hours and over $700,000 in pre-development costs, since receiving its GRRP award. *Id*.

This is just one example of awardees facing these funding dilemmas. Another, the Highland Meadows and Highland Acres properties (collectively, "the Highlands") in Carthage, Missouri were awarded GRRP mid-2024 to fund renovations for 79 senior or disabled tenants' units. *The Highlands Apartments (Carthage, MO): Impact of GRRP's Comprehensive Freeze* (Aug. 2025), http://bit.ly/46StoRn [hereinafter "Highlands Fact Sheet"]. The Highlands has invested $53,625 in predevelopment costs, including $26,959 since being awarded GRRP funds. *Id*.

Austin Renaissance, a 71-unit GRRP awardee in Chicago, invested $181,211 in predevelopment costs to conduct in-depth analysis of structural reviews, energy savings modeling, and methods to improve the

buildings' longevity and healthy living standards. *Austin Renaissance Apartments (Chicago, IL): Impact of GRRP Comprehensive Freeze* (Aug. 2025), http://bit.ly/4nMuPGC [hereinafter "Austin Renaissance Fact Sheet"].

HUD's failure to even acknowledge any of these reliance interests rendered its decision arbitrary and capricious.

## III. The District Court's Injunction Avoids Irreparable Harm and Furthers the Public Interest by Preventing GRRP-Funded Renovations of Low-Income Tenants' Homes from Collapsing

While the district court's preliminary injunction saved some GRRP-funded projects from failure, risk of failure remains for many other awardees. Dozens of GRRP projects across the country, impacting tens of thousands of tenants, remain dependent on the district court's order to continue. Given the immense financial, social, and environmental harms of allowing these projects to fail, the balance of equities clearly weighs in Plaintiffs' favor, and this Court should sustain the injunction.

### A. GRRP Awardees' Renovation Projects Will Be Irreparably Harmed if the Funding Freeze Resumes

A refusal to honor GRRP funding awards would inflict irreparable harm on owners who have already made significant investments in their

21

projects. The district court's injunction has not mooted the issue as HUD's guidance requires most awardees to draw down funds gradually during the period of performance, which for some projects is over four years. *See* Notice H 2023-05, *supra*, §§ 3.5, 4.6, 5.8.

HUD has resumed processing the GRRP awards for the smaller cohorts, Elements and Leading Edge. Yet, these cohorts are less than a third of the total funding. And while some GRRP awardees have been able to proceed since the decision below, roughly 101 projects in the "Comprehensive" cohort, representing over $760 million (about 68%) of total GRRP funding remain stuck in limbo due to HUD's cancellation of consulting contracts that its own guidance requires of awardees, necessitating further litigation before the district court to enforce the injunction. Pontecorvo, *supra*. HUD is in the process of revising the guidance to allow the processing of comprehensive awards, but "HUD's standard process for amending program requirements involves a rigorous review that takes a matter of months". Gov't's Response to Fourth Status Report at 5 citing Davis Decl. at ¶22. Without any indication when HUD may issue revised notices, many of the projects may fail due to the

continuing delays. HUD's current actions illustrate the irreparable harm that will occur if the GRRP is not fully awarded as promised.

For the Terri Manor project, the LIHTC investor has already withdrawn, due in part to concerns about viability if the GRRP funds are lost. Terri Manor Fact Sheet, *supra*, at 1. The project's HOME funds from the City of Cincinnati are due to expire without an immediate path to closing. *Id*. The Highlands project was awarded a $1 million grant from the Federal Home Loan Bank of Des Moines in 2023 but cannot use these funds without GRRP and continues to incur costs due to the funding delays. Highlands Fact Sheet*, supra*, at 1.

Beyond funding loss, the loss of GRRP funds will have longer-term harms that are more difficult to quantify. The Austin Renaissance project initially contemplated an overhaul of the building's mechanical, ventilation, and heating and cooling systems, the installation of solar panels to offset utility costs, and new windows. Austin Renaissance Fact Sheet, *supra*, at 1. Without the GRRP award, this will be drastically curtailed to prioritize structural reinforcement and masonry repair over other quality-of-life upgrades.

The Government claims that since "the gravamen of [grantees']
injuries is monetary," there is no risk of irreparable harm since they "may
bring claims related to th[eir] specific funds in the appropriate forum
and, if they prevail, may receive funds to which they are entitled." (Gov't's
Br. at 47.) The dilemma faced by GRRP grantees puts the lie to this claim.
A grantee cannot simply put their closing schedule on pause to litigate
their individual case for damages against the Government and expect to
proceed as planned afterwards. Once the Government has pulled the
block of GRRP funding from the grantees' tower of funding, the tower has
already collapsed.

## B. Without GRRP Funding, Tenants Will Endure Years of Disrepair, Causing Irreparable Harm

The true costs of the HUD's freeze on GRRP funding, however, will
be borne by the low-income tenants who have been waiting years, or even
decades, to see their homes made livable again. The federally assisted
housing stock is deteriorating due to structural resource gaps. HUD
compounded this problem through decades of poor oversight and
enforcement. *See,* Molly Parker, *How HUD's Inspection System Fails
Low-Income Tenants Nationwide*, ProPublica (Nov. 16, 2018),
http://bit.ly/4nS9RX7. Obtaining redress has proven nearly impossible as

HUD has kept tenants, communities, and advocates in a constant "loop," where one oversight entity habitually redirects them to another regardless of how serious issues have become. GRRP awards allowed owners to break this cycle of disrepair and invited tenants to take part in the preservation planning.

Tenants living in GRRP-awardee properties are uniquely vulnerable. They are definitionally low-income and disproportionately Black, Brown, elderly, and disabled. Nat'l Low Income Hous. Coal., *Who Lives in Federally Assisted Housing?*, Hous. Spotlight 1–3, (Nov. 2012), http://bit.ly/3IEnw4S. They also have disproportionately worse health outcomes due to energy poverty. McTague & Trujillo-Baute, *supra*, at 328; Khatana et al., *supra*, at 2. If the lower court's decision is reversed, and their buildings' planned renovations collapse, tenants will suffer irreparable harm in the form of deteriorating health, unsafe communities, and the risk of displacement.

For example, the members of *amicus curiae* Lakeside Tower Tenant Union have for years contended with conditions including overflowing sewage, malfunctioning elevators, leaky windows, and a lack of central ventilation or air conditioning. Steve Sadin, *Mold, Fecal Matter and*

*Gunfire: Waukegan Apartment Building Residents Complain About Conditions as Management is Debated*, Lake Cnty. News-Sun (Sept. 30, 2022), http://bit.ly/3VyMFks. As one tenant described:

> [I]f you don't have AC in the summertime, you're going to suffer. . . . [T]he part of my house, the back where my children be would be like 90; even sometimes in my living room, my AC doesn't seem like it's working. . . . [Sometimes] it's hotter in the building than it is outside. . . . You can't sit in the house or you're gonna suffocate. The windows don't blow no air— like, it's hot. It's stuffy. No ventilation. The vents are so clogged with everything you can't breathe in here. . . . My son, he says he'll be having headaches. His nose is always stuffed up.

Interview (Aug. 5, 2025) (on file with author). The building's water damage and leaks are so extensive that, for another tenant:

> You can see the mold coming through the walls . . . The roofing was so bad in the building that it would rain in my apartment. I had two living room sets that I had to throw away, that I had purchased with my own money . . . [O]ne of the custodians here, it was so bad . . . [t]he wall was so molded he had to knock much of it out. You could see clear . . . outside to the parking lot through my apartment.

Interview (Aug. 4, 2025) (on file with author). Lakeside Tower's owner received a $9 million GRRP grant in 2024 to address these conditions through a building-wide overhaul. Steve Sadin, *Owners say Federal Grant Will Bring Improvements to Waukegan's Lakeside Tower; 'It Has to Happen Soon,'* Lake Cnty. News-Sun (June 6, 2024),

26

http://bit.ly/42CRvRC. Due to the uncertain future of its GRRP funding, the project has not started, forcing tenants to endure months of the same conditions with no clear end in sight. As one tenant put it, "[i]t's just been delay after delay after delay after delay after delay." Interview (Aug. 4, 2025), *supra*.

Similarly, elderly tenants in Emporia, Virginia have endured years without air conditioning in sweltering summer weather since their building's aging central system failed. As one noted, "We've sacrificed so much in our lives already . . . and to think that we cannot live in a comfortable, safe environment as we're older is just devastating to me." Jennifer Ludden, *For These Seniors, DOGE's Affordable Housing Pause Means Suffering Longer Without AC*, NPR (Apr. 6, 2025), http://bit.ly/4pFfE3U. The GRRP freeze has created uncertainty and distress for Austin Renaissance's tenants in Chicago, who were briefed on the planned renovations and had been anticipating much-needed improvements to their homes. Austin Renaissance Fact Sheet, *supra*, at 2. And in Vancouver, Washington, tenants in a 170-unit high-rise building are awaiting fire-safety upgrades "needed to sustain [its] livability . . . and to keep it viable for another 60 years." Bedayn, *supra*.

27

In the words of one tenant, the freeze was "almost like getting news from a doctor that something's going to take your life in six months or a year . . . It's the difference between living and not being able to live." *Id.*

Without the GRRP, these tenants may endure years more of living in substandard conditions as their homes slowly age and fall apart around them. If this Court reverses the district court's injunction, preservation projects are at risk of defaulting or being indefinitely postponed. Without this already-promised funding, owners often cannot afford to bring their properties into compliance with either HUD guidance or state and local laws dedicated to ensuring that buildings are kept in a decent, safe, and habitable condition. Just as it irreparably harms subsidized housing tenants for their homes to remain noncompliant with health and safety codes, it irreparably harms tenants for HUD to withhold already-allocated GRRP funds which owners need to make their properties safe and habitable.

Further, if these affordable homes are not renovated with GRRP money, they may soon be lost altogether due to depreciation. HUD's poor oversight and enforcement of its condition standards have allowed troubled properties to remain in disrepair, which places the properties at

risk of losing its affordability through condemnation or HUD's termination of the subsidy. When HUD does not take preservation seriously, this important subsidy is lost forever. Decreasing the affordable housing stock, which already fails to meet the current need, will only increase the housing demand and strain on public resources. Harati et al., *supra*, at 23.

GRRP funding disrupted the cycle of disrepair for awardees and their tenants. *See* Robert Davis, *A Little-Known Federal Program is Keeping Senior Housing Affordable in Denver*, Next City (Dec. 5, 2024), http://bit.ly/4pDwPmv. If awardees lose access to this capital, efforts to preserve and maintain these properties are at risk. HUD's failure to allocate awarded GRRP funds could cause owners to lose other funding, which will ultimately impact the owner's future ability to reinvest in the property. That reinvestment is critical to prevent property degradation and maintaining a community's affordable housing stock. Harati et al., *supra*, at 4. A property's exit from a HUD housing program can result in a huge loss for a community's deeply affordable housing units or units that meet the needs of large families or those with accessibility needs.

Destabilization and the loss of housing puts additional stress on federal, state, and local resources.

### C. GRRP Eliminates Energy Inefficiencies that Harm Tenants

Along with the harms to their health, the collapse of GRRP will also irreparably harm tenants' finances. Energy-insecure tenants pay more than higher-income tenants due to the building's energy inefficiencies. Beall & Hronis, *supra*. Utility allowances often fail to fully cover subsidized tenants' actual utility expenditures in energy-inefficient buildings. As one Lakeside Tower tenant observed,

> The utility checks don't be really enough . . . Sometimes my light bill will go up to like $100, $200 before I can blink and I don't have anything on besides like the TV and the lights . . . When we want cold air, we have to put an air conditioner in the wall that has to take up more electricity . . . It's causing a lot of people to have to pay a lot of money . . . taking a lot of energy, a lot of money out of our pockets.

Interview (Aug. 5, 2025) (on file with author).

HUD's utility allowance guidance to property owners is broad and directs property owners to use their "best estimate of the average monthly utility cost," noting that "[t]he utility allowance is not meant to pay all actual utility costs." Dep't of Hous. & Urb. Dev., Handbook 4350.1

(REV-1), *Multifamily Asset Management and Project Servicing* § 7-24 (Sept. 1992).

As a result of these broad guidelines and HUD's limited oversight tenants have "limited assurance that allowances are current and reasonable. Gov't Accountability Off., GAO-24-105532, *HUD Rental Assistance: Improved Guidance and Oversight Needed for Utility Allowances* 36 (2024). While the national average price for electricity rose approximately 20%, and the average price for piped gas rose 64% between 2019 and 2022, approximately 97,000 households in subsidized housing did not receive any increase in their utility allowance during this time. *Id.* at 26–27. Based on these findings, a "substantial share" of HUD-assisted tenants may be rent-burdened due to "outdated or inconsistent utility costs." *Id.* at 36.

When utility allowances are not commensurate with actual utility costs, tenants suffer. Inability to afford utilities threatens their health and ultimately their ability to remain housed. If a tenant's portion of the rent does not properly cover high energy costs, then families are paying more than 30% of their income towards housing, making them "housing cost-burdened." When housing costs excessively diminish a tenant's

income, they cannot afford their housing. A tenant's failure to pay utilites could then result in subsidy termination and eviction, both of which detrimentally impact the person's ability to secure future housing. This financial stress endangers the tenant's mental and physical wellbeing. GRRP-funded renovations effectively reduce utility bills, and by extension, housing costs for low-income tenants.

## IV.    The District Court Correctly Applied its Injunction to All GRRP Grantees, not just the Parties to this Case

The Supreme Court's intervening decision on the propriety of universal injunctions in *Trump v. CASA, Inc*., 145 S. Ct. 2540 (2025), has no bearing on this case. The *CASA* Court declined to resolve "the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate agency action," as the district court did here. *Id*. at 2554 n.10.  The Government attempts to sidestep this clear language by citing an out-of-circuit case analyzing a specific statutory restraint on agency action in the immigration context for the position that the district court's order exceeded its authority under the APA to "re-establish the status quo absent the unlawful agency action." *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022). Even if *Texas* applied here, the district court's order did just that by restoring grantees' funding to the status quo

preceding the freeze. The district court's decision was not only legally sound, but crucially necessary for the hundreds of GRRP grantees across the country who cannot easily litigate their own individual cases against HUD without jeopardizing their renovations.

## CONCLUSION

For the foregoing reasons, this Court should affirm the decision below.

Respectfully submitted,

September 29, 2025

/s/ *Andrea Moon Park*
Andrea Moon Park
1st Cir. Bar No. 1217858
Massachusetts Law Reform Institute
40 Court Street, Suite 700
Boston, MA 02108
Tel: 617-357-0700
Fax: 617-357-0777
apark@mlri.org

33

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7) and Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6249 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

September 29, 2025          /s/ *Andrea Moon Park*
                            Andrea Moon Park
                            1st Cir. Bar No. 1217858
                            Massachusetts   Law   Reform
                            Institute
                            40 Court Street, Suite 700
                            Boston, MA 02108
                            Tel: 617-357-0700
                            Fax: 617-357-0777
                            apark@mlri.org

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2025 I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Andrea Moon Park*
Andrea Moon Park
1st Cir. Bar No. 1217858
Massachusetts Law Reform Institute
40 Court Street, Suite 700
Boston, MA 02108
Tel: 617-357-0700
Fax: 617-357-0777
apark@mlri.org