No. 25-1428

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————

WOONASQUATUCKET RIVER WATERSHED COUNCIL; EASTERN
RHODE ISLAND CONSERVATION DISTRICT; GREEN INFRASTRUCTURE
CENTER; NATIONAL COUNCIL OF NONPROFITS; CHILDHOOD LEAD
ACTION PROJECT; CODMAN SQUARE NEIGHBORHOOD
DEVELOPMENT CORPORATION,
*Plaintiffs-Appellees,*

*(caption continued on inside cover)*

———————————

On Appeal from the United States District Court
for the District of Rhode Island

———————————

## REPLY BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
*Assistant Attorney General*

SARA MIRON BLOOM
*First Assistant United States Attorney*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
*Attorneys, Appellate Staff*
*Civil Division, Room 7537*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5446*

v.

U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in their official capacity as Secretary of Agriculture; U.S. DEPARTMENT OF ENERGY; CHRIS WRIGHT, in their official capacity as Secretary of Energy; U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in their official capacity as Secretary of the Interior; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in their official capacity as Administrator of the Environmental Protection Agency; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in their official capacity as Director of the Office of Management and Budget; KEVIN HASSETT, in their official capacity as Director of the National Economic Council; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in their official capacity as Secretary of Housing and Urban Development,

Defendants-Appellants.

———————————

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION AND SUMMARY ...............................................................1

ARGUMENT ....................................................................................................2

I.    Plaintiffs' Challenges to Various Asserted Blanket Directives Fail on Their Own Terms ....................................................................................2

    A.    Plaintiffs Fail to Identify Blanket Freezes Properly Subject to Challenge ................................................................................2

    B.    The OMB Memorandum Is Lawful and, Regardless, Plainly Provides No Basis to Enjoin Other Conduct ...............................9

    C.    Plaintiffs' Claims Independently Fail Because They Reflect Improper Claim Splitting................................................................13

II.    Even if Plaintiffs Were Correct on the Merits of Their Claims, The District Court's Broad Relief Was Improper ....................................... 14

    A.    The Injunction Impermissibly Extends Beyond Enjoining the Unlawful Agency Action Plaintiffs Purport to Have Identified..............14

    B.    The District Court's Injunction Improperly Extended to Nonparties................................................................................17

III.    The Equitable Factors Also Counsel Against a Preliminary Injunction ........... 22

CONCLUSION ............................................................................................ 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                               **Page(s)**

*Agatha v. Trump*,
    151 F.4th 9 (1st Cir. 2025) ............................................... 24

*American Pub. Health Ass'n v. National Insts. of Health*,
    145 F.4th 39 (1st Cir. 2025) ............................................. 24

*Bondi v. VanDerStok*,
    145 S. Ct. 857 (2025) ................................................... 8-9

*California v. U.S. Dep't of Educ.*,
    132 F.4th 92 (1st Cir. 2025) ............................................. 24

*Department of Educ. v. California*,
    604 U.S. 650 (2025) .................................................. 15, 24

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) ..................................................... 24

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024) ..................................................... 26

*FDA v. R. J. Reynolds Vapor Co.*,
    606 U.S. 226 (2025) ..................................................... 16

*June Med. Servs., LLC v. Phillips*,
    22 F.4th 512 (5th Cir. 2022) ............................................. 22

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ...................................................... 7

*Lujan v. G&G Fire Sprinklers, Inc.*,
    532 U.S. 189 (2001) ..................................................... 25

*Lujan v. National Wildlife Fed'n*,
    497 U.S. 871 (1990) ...................................................... 5

*Make the Road N.Y. v. Noem*,
    2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ............................... 18

*Massachusetts Sch. of L. at Andover, Inc. v. American Bar Ass'n*,
    142 F.3d 26 (1st Cir. 1998) ............................................. 13

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ................................................................................... 9

*National Insts. of Health v. American Pub. Health Ass'n,*
  145 S. Ct. 2658 (2025) ........................................................................ 16, 24

*New Jersey v. Trump,*
  131 F.4th 27 (1st Cir. 2025) ........................................................................ 24

*Norton v. Southern Utah Wilderness All.,*
  542 U.S. 55 (2004) ....................................................................................... 6

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
  600 U.S. 181 (2023) ................................................................................... 20

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) .............................................................................. 19, 24

*Trump v. Orr,*
  2025 WL 3097824 (U.S. Nov. 6, 2025) ..................................................... 24

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .................................................................................. 23, 24

**Statutes:**

5 U.S.C. § 705 ............................................................................................ 17

31 U.S.C. § 503 ........................................................................................... 13

31 U.S.C. § 6307 ......................................................................................... 13

**Regulatory Materials:**

Exec. Order No. 14,154,
  90 Fed. Reg. 8353 (Jan. 29, 2025) ................................................. 10, 11, 12

FAR 52.242-15(a) .......................................................................................... 6

## INTRODUCTION AND SUMMARY

Plaintiffs recognize that in order to obtain an injunction against multiple agencies, they need to be challenging discrete final agency actions by each agency defendant in this case.  And they insist that they have done so, asserting that each agency took action to freeze certain categories of federal funding.  But they do not identify those actions, specifically, for each agency. Instead, they mostly rely on what they characterize as illustrative examples, which on their own terms do not generally effect the sort of categorical freezes that plaintiffs posit.  It is not too much to ask for plaintiffs to identify each agency action that they seek to invalidate and to demonstrate that it is contrary to law.  To make matters worse, plaintiffs then turn around and fault the agencies for failing to explain the actions that plaintiffs have not even identified.  And plaintiffs fare no better in attacking an OMB Memorandum that merely describes and issues a narrowing construction of an Executive Order as to which plaintiffs expressly and repeatedly disclaim any challenge.  *See* Br. 48 ("Plaintiffs do not challenge the executive order or any other presidential action in this suit[.]"); Br. 49 ("Plaintiffs do not challenge an executive order[.]").

Finally, plaintiffs fail to rehabilitate the broad relief entered by the district court, which enjoins substantial conduct that is lawful or not subject to review under the APA and which operates universally rather than confining itself to funding tied to plaintiffs.  Plaintiffs offer no cogent justification for allowing them to leverage challenges to poorly defined "freezes" into relief against actions that both comported

with law and would not, in any event, be properly challenged in district court.  Worse, in defending the plainly overbroad universal injunction, plaintiffs twist the relief entered by the district court, claiming that it is not actually an injunction that must be party-limited because it does not (at least, plaintiffs say, for the most part) compel or restrain defendants' actions.  At every turn, the injunction belies plaintiffs' characterization, forbidding and requiring a litany of specific actions.  It must be vacated.

## ARGUMENT

I.   **Plaintiffs' Challenges to Various Asserted Blanket Directives Fail on Their Own Terms**

A.   **Plaintiffs Fail to Identify Blanket Freezes Properly Subject to Challenge**

Plaintiffs begin their brief by asserting that they "challenge one action from each of the five Administering Agencies: to summarily freeze IIJA and IRA funds." Br. 17 (alterations and quotation omitted).  Thus, plaintiffs assert that this case, at bottom, seeks to invalidate five discrete agency actions.  One would therefore expect plaintiffs to identify those five agency actions and demonstrate that they were unlawful.  Plaintiffs do not even come close.

1.  Agency actions typically take the form of a regulation, memorandum, or other directive, so plaintiffs could be expected to identify five documents that carry out the measures that they attribute to each agency.  But instead, they purport to rely on "evidence" that each agency instituted "a blanket freeze." Br. 17.  And the

2

evidence is not strong. For two of the agencies—the Departments of Housing and Urban Development and Interior—plaintiffs identify nothing more than evidence that the agencies froze one or some awards as a result of the American Energy Executive Order. *See* Br. 18; *see also* A26, A124. Similarly, as to the Department of Agriculture, plaintiffs point only to an email from an employee seemingly informing a grant recipient that its receipts will not be immediately processed, citing the Executive Order, and mentioning by way of explanation that payments are "currently on pause." *See* Br. 17; *see also* A111.

These actions are neither evidence of a categorical funding freeze nor unlawful. There is no dispute that the Executive Order directed the agencies to pause disbursement of certain funds, to the extent permitted by law, or that agencies were expected to (and did) implement that Executive Order by pausing certain awards. Plaintiffs' "evidence" thus demonstrates only that the agencies were carrying out the Executive Order, to which plaintiffs disclaim any challenge.

As to the Department of Energy, plaintiffs point to a memorandum which appears to direct that future "funding and financial assistance activities," including contracts and grants, "shall not be announced, approved, finalized, modified, or provided until" the Department may undertake a review. *See* Br. 17; *see also* A114. That memorandum says nothing about how to treat the already awarded contracts and grants that are the subject of this suit. It is only as to the Environmental Protection Agency that plaintiffs identify a directive reflecting the sort of categorical funding

3

freeze that plaintiffs seek to challenge, *see* Br. 17, and even there, plaintiffs' claims run into the many other problems discussed below.

To make matters worse, even setting aside plaintiffs' inability to identify an initial, challengeable "blanket freeze" from all of the relevant agencies, plaintiffs themselves admit (at 18 n.2) that by the time of their complaint, "some agencies" were releasing "funds they had previously halted." Thus, if nothing else, plaintiffs have failed to identify challengeable blanket freezes that existed at the time they filed their complaint or received relief from the district court.

Instead of properly identifying a discrete final agency action challengeable under the APA for each agency, plaintiffs and the district court have improperly amalgamated many different implementations of the Executive Order to different funding streams into a single object of plaintiffs' challenge. But that is an improper programmatic challenge. *See* Opening Br. 23-27. In response, plaintiffs emphasize (at 35-36) that even broad agency actions may properly be challenged under the APA. But that gets matters backward. The problem is not that plaintiffs have identified broad agency actions but rather that they have identified narrow agency actions and tried to infer that there must be a broad agency action underlying them. That is precisely the kind of programmatic challenge that the Supreme Court has prohibited. And plaintiffs have not advanced any argument that the narrow actions that they have identified are unlawful, which would require analysis of specific applicable statutes, regulations, or grant terms.

4

Plaintiffs underscore the fundamental error in their approach when they complain that the requisite action-by-action challenge would "shift the burden of considering the specific details of particular awards, award programs, and applicable regulations and statutes onto Plaintiffs." Br. 36. There is nothing novel about putting plaintiffs who challenge a wide swath of conduct to the burden of demonstrating— based on the "specific details" of the relevant awards, statutes, and regulations—that the conduct they challenge was unlawful. Although that "case-by-case approach" may be "understandably frustrating" for plaintiffs who would prefer "across-the-board" relief, it remains the proper "mode of operation." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 894 (1990).

2. Plaintiffs' errors in identifying the relevant agency actions doom their arguments on the merits. Perhaps most blatantly, plaintiffs seek to turn the lack of identified agency actions to their advantage on their arbitrary-and-capricious claims. Although the government has explained why the agencies' many varied decisions were plainly reasonable in context, *see* Opening Br. 35-36, plaintiffs fault the government for failing to point to where the agencies provided the unified explanation plaintiffs seek "at the time [the agencies] acted," Br. 21-24. But plaintiffs' inability to identify discrete agency actions that could contain the requisite explanation is a flaw in plaintiffs' claims, not a reason that they succeed.

Plaintiffs also misunderstand the type of justification that would be needed to temporarily pause funding. Plaintiffs take the radical position (at 28) that the

5

government must have clear statutory authority to pause disbursing grant funds—and cannot rely on, for example, a regulation or contract term as the source of the necessary authority.  The terms of the relationship between an agency and a grantee are governed primarily by the relevant agreements, and government contracts and grants routinely incorporate terms permitting the government to direct a funding recipient to stop work temporarily.  *See, e.g.*, FAR 52.242-15(a) (standard procurement contract term allowing the government to "require the Contractor to stop all, or any part, of the work called for by this contract for a period of 90 days").  Plaintiffs point to no authority to support their view that such clauses are unlawful unless expressly authorized by a specific statute in a particular context.

And plaintiffs' failure to identify any such authority makes sense.  For one, the government's decision to *not* authorize work or disburse funds is not agency action that requires express statutory authority.  Instead, it is agency inaction, for which no statutory authority is needed.  To the contrary, if a party thinks that the government is required to disburse funds on a particular timeline, the obligation is on that party to identify some affirmative legal requirement—in the relevant statutes or regulations or in the contract—to that effect.  *See Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (describing the demanding standard in the nature of mandamus required to support an order requiring an agency to take a particular action).  And beyond that, the relevant statutes' provision of broad discretion—including in many cases unreviewable discretion—to allocate funding and administer the relevant programs

encompasses authority to pause individual grants, as the district court believed to be "probably true." *See* A46.

Indeed, not only is altering the disbursement of grant funds, either temporarily or permanently, often lawful but such actions are also often judicially unreviewable because they are committed to agency discretion by law. "[T]he very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). Agencies' decisions to pause current funding to consider whether to redirect it to a different objective or recipient is part and parcel of that discretionary judgment over which the APA precludes judicial second-guessing.

Nor are plaintiffs correct that some of the statutes discussed in the government's opening brief relevantly constrain the agencies' discretion by providing certain purposes for which the funds must be used and other limitations on the funds. Br. 40. As plaintiffs do not dispute, those statutes nowhere compel the agencies to expend funds on plaintiffs or any other specific recipient, instead leaving it to the agencies to determine how best to use the limited funding available to advance the statutory purposes. *See* Opening Br. 38-39. So long as the agencies fund projects that fall within the relevant limitations, they retain unreviewable discretion to choose among permissible recipients—and plaintiffs have nowhere contended that the agencies have transgressed the limitations of any such program by, for example,

7

redirecting funds to an ineligible project. And regardless, even if plaintiffs were correct that one or some of the programs highlighted by the government is not sufficiently discretionary to be unreviewable, there is no meaningful dispute that many of the programs administered by the defendant agencies—and covered by the district court's injunction—do confer such discretion.

For the same reason, plaintiffs' attempt to invoke the major questions doctrine (and to claim that the government has waived any arguments about that doctrine) fails. The district court did not conclude that the major questions doctrine was triggered by the decision to pause individual grants or programs. Instead, the court believed that doctrine applied only because the agencies acted in a similar fashion to implement the President's directions across many programs. *Cf.* A46-47. But the government's argument has not been that the agencies enjoy freestanding authority to freeze all grant funding regardless of the specific terms of the relevant statutes, regulations, and agreements. The major questions doctrine is thus inapplicable when it comes to assessing the actual authority that the government has claimed.

Moreover, plaintiffs' attempt to leverage their programmatic challenges into programmatic relief runs into its own problems. As explained, *see* Opening Br. 26-27, basic principles governing facial challenges make clear that such challenges cannot succeed unless the plaintiff can demonstrate that every implementation of the challenged directive would be unlawful—and certainly cannot justify relief against lawful conduct. In response, plaintiffs argue only (at 37) that *Bondi v. VanDerStok*, 145

8

S. Ct. 857 (2025), which applied those principles to an APA challenge, has no bearing in this case because the Court there emphasized that it was addressing the dispute as framed by the parties. But *VanDerStok* itself draws on settled principles governing facial challenges, *cf. Moody v. NetChoice, LLC*, 603 U.S. 707, 723-24 (2024), and plaintiffs provide no reason why those principles should apply any differently when plaintiffs challenge a regulation rather than a statute. Those principles have particular force in this case, where plaintiffs have hypothesized a broad-based policy and then used it to receive relief against many discrete agency actions that are not only lawful but may not even be subject to APA review in the first place. Thus, even if this Court believes that plaintiffs properly identified challengeable actions, the district court's broad injunction should be vacated for failure to examine the lawfulness and reviewability of the specific enjoined conduct.

### B. The OMB Memorandum Is Lawful and, Regardless, Plainly Provides No Basis to Enjoin Other Conduct

There is a reason plaintiffs begin their brief by discussing ostensible agency actions apart from the OMB Memorandum that at least has the benefit of being concrete and well defined. Plaintiffs continue to advance an understanding of the OMB Memorandum that cannot be reconciled with the text of the Memorandum itself and the underlying Executive Order. Entitled "Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*," the Memorandum reads, in its entirety, as follows:

9

> The directive in section 7 of the Executive Order entitled Unleashing American Energy requires agencies to immediately pause disbursement of funds appropriated under the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58). This pause only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order. This interpretation is consistent with section 7's heading ("Terminating the Green New Deal") and its reference to the "law and the policy outlined in section 2 of th[e] order."
>
> For the purposes of implementing section 7 of the Order, funds supporting the "Green New Deal" refer to any appropriations for objectives that contravene the policies established in section 2. Agency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget.

A101 (alteration in original). Plaintiffs are thus plainly incorrect to assert that the OMB Memorandum "directs a pause of significant funds." Br. 44. As the Memorandum makes clear, it is not the OMB Memorandum that does so but rather the Executive Order, which plaintiffs expressly disclaim challenging, Br. 48. The fact that some agencies referred to the Memorandum, rather than the Executive Order itself, when implementing that directive cannot change the plain terms of the documents at issue.

The Executive Order states, in particular, that "[a]ll agencies shall immediately pause the disbursement of funds appropriated through" the IRA and the IIJA. Exec. Order No. 14,154, § 7(a), 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025). Plaintiffs urge that the Memorandum expanded the Executive Order by providing that "*all* IRA and IIJA-appropriated funds were to be frozen unless or until OMB approved their disbursement—not merely those funds that contravene section 2" of the Executive

10

Order.  Br. 44.  That is the exact opposite of what the Memorandum says.  The Memorandum's first paragraph states that the pause is limited to funds "implicated by the policy established in Section 2 of the order."  A101.  The second paragraph provides that even funds implicated by the Executive Order—whose scope is narrowed by the interpretation in the first paragraph—may be disbursed after consultation with OMB.  Plaintiffs' contrary construction is entirely implausible.  And there is no merit to plaintiffs' footnote suggesting (at 47 n.5) that by not repeating the Executive Order's express proviso that it should be implemented only to the extent consistent with law, *see* Exec. Order No. 14,154, § 10(b), 90 Fed. Reg. at 8359, the Memorandum somehow overrides that directive and orders agencies to take illegal actions.

Plaintiffs further contort the relevant documents by saying that the Memorandum has effects beyond the Executive Order itself because it implements the Executive Order's directive that the OMB and the Director of the National Economic Council ensure that disbursements be "consistent with any review recommendations they have chosen to adopt."  Br. 43 (quoting Exec. Order No. 14,154, § 7(a), 90 Fed. Reg. at 8357).  The immediately preceding sentence of the Executive Order provides that "[w]ithin 90 days of the date of this order, all agency heads shall submit a report to the Director of the NEC and Director of OMB that details the findings of [their] review [of their own processes, policies, and programs], including recommendations to enhance their alignment with the policy set forth in

11

section 2." Exec. Order No. 14,154, § 7(a), 90 Fed. Reg. at 8357. Those are obviously the "review recommendations" referenced in the next sentence, and plaintiffs are wrong to suggest that the OMB Memorandum—which, as plaintiffs point out, was issued the day after the Executive Order, not 90 days later after input from agency heads—is "best understood as the 'review recommendations they have chosen to adopt.'" Br. 43.

In contending that they have properly pleaded a claim that OMB has improperly withheld necessary approvals to the disbursement of funds, plaintiffs accuse the government of a "rush to elide [the OMB Memorandum]." Br. 45. The entire text of the Memorandum is reproduced above; it says nothing whatsoever about any intention to withhold approvals. It is not the government that is eliding the Memorandum.

To sum up, the OMB Memorandum informs agencies about the Executive Order, clarifies that its scope is limited to funds implicated by the policy announced in section 2 of the Executive Order, and informs agencies that even funds implicated by the Executive Order can be disbursed after consultation. There is nothing arbitrary, capricious, or contrary to law about any of that, and plaintiffs' various arguments to the contrary attribute to the Memorandum actions that were taken by the unchallenged Executive Order or were never taken at all.

OMB did not need to consider reliance interests, for example, before explaining and narrowing the Executive Order. Nor did OMB require special

statutory authority to issue this modest memorandum. Regardless, the memorandum falls well within OMB's broad statutory authority to establish policies for, and promote consistency and efficiency in, the Executive Branch's financial management, as well as OMB's long-held responsibility for supervising the President's budgetary resources and advising agencies on various matters. *See* 31 U.S.C. §§ 503, 6307.

### C. Plaintiffs' Claims Independently Fail Because They Reflect Improper Claim Splitting

Plaintiffs do not dispute that the National Council of Nonprofits brought a lawsuit in the District of Columbia before the Council and several of its members brought the lawsuit at issue here. Nor can they reasonably dispute that in each case, plaintiffs allege that OMB unlawfully took action at the beginning of this Administration to indiscriminately freeze funding across a wide range of programs. They assert, around the edges, that this case involves several additional agencies, that there are some differences in the universe of funds involved, and that they identified a different OMB Memorandum in the other case. But especially given plaintiffs' cavalier approach to exactly which agency actions they are challenging here and which actions have the legal effect of freezing funding, they are in no position to deny that the two cases involve the same "series of related transactions" that "form a convenient trial unit," *Massachusetts Sch. of L. at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26, 38 (1st Cir. 1998) (quotation omitted)—indeed, they do not even recite that standard. Nor do they or could they deny that the Memorandum at issue in the D.C.

case invoked the Executive Order at issue here or that it applied to the funds at issue here. *See* Opening Br. 31.

Given all these similarities, plaintiffs were required to bring all of their related claims at one time, rather than filing one lawsuit, waiting to see whether a different district judge issued a broader ruling in a related case, and then bringing a second suit to obtain broader relief. Requiring plaintiffs to limit themselves to one bite at the apple is a matter of basic fairness and judicial economy, not a "distraction," Br. 35.

## II. Even if Plaintiffs Were Correct on the Merits of Their Claims, The District Court's Broad Relief Was Improper

The district court thus had no basis for entering relief at all. To make matters worse, the district court's injunction provides universal relief and extends to a wide swath of agency decisions without performing any analysis of applicable statutes, regulations, or contractual terms that govern the litany of grant programs and funding agreements encompassed by the injunction.

### A. The Injunction Impermissibly Extends Beyond Enjoining the Unlawful Agency Action Plaintiffs Purport to Have Identified

As discussed above, the core premise of plaintiffs' argument is that they challenge a universal funding freeze that directs agencies to pause funding without regard to any other considerations. A proper injunction against such an agency action, if it existed, would merely prohibit agencies from implementing that specific funding freeze. It would not provide a basis to enjoin any new or different pause in

14

funding that might occur without individualized consideration sufficient to satisfy the district court, nor would it provide a basis to direct the government to restore funding to grants that were previously paused.

Nor are plaintiffs correct to frame the question as one regarding whether the agencies have some independent power to implement a "unitary freeze."  Br. 27. Plaintiffs do not dispute that the President or agency heads may direct subordinate agency officials regarding how to exercise their discretion.  *See* Opening Br. 18-19. Thus, if an agency has discretion to pause specific grant agreements, the President (or an official acting on his behalf) has inherent constitutional authority to direct grant officers and other subordinate officials to exercise that discretion to pause all of the agreements were legally permissible.  No additional statutory authority is required.

Finally, plaintiffs are mistaken in contending that the injunction does not implicate the Tucker Act because plaintiffs "do not bring contract claims" and do not challenge the agencies' "actions on a particular award."  Br. 41.  Plaintiffs' description of their claims is impossible to square with the district court's injunction, which requires agencies to resume "disburs[ing]" grant funds and "to release awarded funds" to grant recipients.  A61.  That portion of the injunction is, at bottom, an order requiring the agencies to continue performing on grant agreements, even though the APA "does not extend to [such] orders to enforce a contractual obligation to pay money."  *Department of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam) (quotation omitted).

15

Plaintiffs' suggestion (at 41-42) that many of them cannot bring contract claims because they are not themselves direct grant recipients only underscores the incompatibility of the relief they received with Congress's design. The Tucker Act reflects Congress's judgment that suits founded on a contract should be heard in the Court of Federal Claims. It would make no sense to allow parties with no legal right in the grant agreements to bring APA claims while simultaneously forbidding the parties with actual rights under the agreements to bring those claims. *Cf. FDA v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 239 n.8 (2025) (explaining that when Congress creates a "cause of action enabling [some parties] (and not [others]) to seek judicial review," it would "frustrate[] that scheme" to allow those other parties "to sue under the APA").

Plaintiffs highlight their error by comparing (at 42) this case to *National Institutes of Health v. American Public Health Ass'n*, 145 S. Ct. 2658 (2025). There, the Supreme Court made clear that a plaintiff may not leverage even a successful APA challenge to a reviewable agency policy—for which a plaintiff may receive prospective relief against future implementation of the policy—into retrospective relief requiring an agency to take particular actions "pursuant to" specific grants. *Id.* at 2660. But that is exactly what the district court's injunction does: Rather than simply forbidding the agencies from implementing the asserted "blanket freezes" in the future, the injunction requires the agencies to reverse pauses already implemented and to resume disbursing grant funds. That relief was impermissible.

### B.    The District Court's Injunction Improperly Extended to Nonparties

In addition to extending beyond the agency actions that plaintiffs purport to have identified, the district court's injunction provided relief that extends beyond the plaintiffs to this case.  Plaintiffs' primary defense of the district court's universal relief is to contend (at 58-62) that the district court entered a stay under 5 U.S.C. § 705—rather than an injunction—and that such stays may permissibly operate universally. That argument draws into sharper focus that the district court did not merely delay the effectiveness of identified agency action but reached out to enjoin conduct that was not properly before the court and as to which no determination of illegality had been or plausibly could be made.  And, in any event, § 705 stays may not properly extend beyond remedying the plaintiffs' own harm.

As to the first point, the district court's relief operates in no way like a permissible § 705 stay.  That provision provides that a reviewing court may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  As plaintiffs do not dispute, the defining feature of appropriate § 705 relief is that it does no more than postpone, or stay, the challenged action.  Thus, as the D.C. Circuit recently explained in an opinion cited in plaintiffs' citation of supplemental authorities, a § 705 stay "simply suspends the legal source of authority to act" rather than (as an injunction might) "direct[ing] individuals to act or not to

act." *Make the Road N.Y. v. Noem*, 2025 WL 3563313, at \*16 (D.C. Cir. Nov. 22, 2025) (per curiam) (alterations and quotation omitted); *cf.* Br. 61 (stating that a "section 705 stay operates directly on agency *action*, not on particular parties").

But the district court's relief here speaks not in terms of suspending any specific agency action but instead in terms of compelling defendants to act and not act in various ways. Thus, the order forbids defendants "from freezing, halting, or pausing on a non-individualized basis the processing and payment of" certain funding; it requires defendants to "take immediate steps to resume the processing, disbursement, and payment of" certain funds; it requires defendants "to release awarded funds previously withheld or rendered inaccessible"; it requires defendants to provide certain written notice—of, as it happens, "the Court's preliminary injunction"—to various parties; and it forbids defendants from "implementing, giving effect to, or reinstating under a different name the directive in" the OMB Memorandum. A61-62. Thus, the preliminary injunction compels and restrains agency action throughout, and it must comport with the principles of equity as described in *CASA*. If plaintiffs were correct both that the defendant agencies had each issued an edict to freeze certain federal funds across the board without regard to individualized determinations and that the district court's order operated only to prevent agencies from carrying out that directive, there would be much less to this case.

18

Moreover, even if the district court had entered a § 705 stay, that stay would still properly be limited to redressing plaintiffs' irreparable harm. In contending otherwise, plaintiffs nowhere engage with the government's arguments regarding how best to interpret that provision, particularly in light of *CASA*'s explication of traditional equitable constraints. *See* Opening Br. 49-50. Instead, plaintiffs argue first that *CASA* "specifically did not address the scope of relief under the APA." Br. 60. But of course, the Supreme Court's decision not to address that question cannot provide affirmative support to plaintiffs' construction of that statute. And plaintiffs urge a "widespread judicial consensus" that a § 705 stay "is necessarily non-party-specific in its scope." Br. 61. But plaintiffs develop no statutory-construction arguments in favor of the remarkable proposition that the APA not only permits but "necessarily" compels such a stark break from traditional equitable principles. And plaintiffs identify no opinion binding on this Court that supports their position.

Nor are plaintiffs correct (at 62, 65) that this Court should decline to vacate the overbroad injunction in favor of remanding to the district court. Although plaintiffs note that the Supreme Court in *CASA* followed a similar path, that case involved "more complicated" arguments regarding the scope of relief required to redress State plaintiffs' injuries—and, indeed, one of the district courts in that case had concluded "that a universal injunction was necessary to provide the States *themselves* with complete relief." *Trump v. CASA, Inc.*, 606 U.S. 831, 853 (2025). Here, by contrast, plaintiffs have nowhere explained how an injunction running only to financial awards

in which plaintiffs have an interest would not provide plaintiffs with complete relief, and this Court should vacate the injunction to the extent it applies beyond such streams.

Nor are plaintiffs correct that the relevant scope of relief should encompass all of the associational plaintiff's members, rather than only those who have identified themselves in court and agreed to be bound. That necessary limitation on the proper relief comes from both Article III and equitable principles.

At the outset, plaintiffs' argument that they have standing to seek relief on behalf of all of their members (at 63-64) rather than only those who have been identified and demonstrated standing themselves rests almost entirely on an overreading of *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023). That case was brought by a plaintiff association that alleged that it had 47 members and was proceeding, in one of the consolidated cases, on behalf of "four members in particular" who "filed declarations" stating their support for the lawsuit. *Id.* at 201. As the Court explained, where "an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates." *Id.*

That statement in no way permits an organization to proceed on behalf of tens of thousands of unnamed members. Here, the government does not dispute that the plaintiff organization has standing to litigate on behalf of, and seek relief that runs to, identified members. The plaintiff organization, however, is purporting to litigate on

behalf of approximately 30,000 more unidentified "members" who do not control the organization or this litigation and many of whom may not even know about the litigation or that they will be bound by an adverse judgment. Nothing in the Supreme Court's decision in *Students for Fair Admission* undermines the commonsense rule that an organizational plaintiff may not assert claims held by unidentified members, without additional evidence establishing that those members in fact direct or control the organization. That limitation is particularly important here, where plaintiffs themselves seem to admit that only some unknown fraction of their members would have standing to litigate the claims at issue in this suit. *See* A118 (contending that "unknown hundreds" or "thousands" of 30,000 members "are recipients of funding through the IRA and IIJA").

And plaintiffs' audacious argument (at 62-63) that the district court should properly enter a universal injunction as a matter of equity so that plaintiffs can receive the benefits of relief without identifying their members is no more persuasive. For one, plaintiffs' argument on this score only highlights the ways in which they are attempting to leverage organizational status into an end-run around the fundamental equitable principles discussed in *CASA* as well as Rule 23. Nor do plaintiffs' vague allusions to "constitutional problems regarding the freedom of association and privacy," Br. 62 (quotation omitted), justify that attempted end-run. The government is not seeking to compel the plaintiff organization to do anything; it is the plaintiff organization that filed suit and sought to obtain relief for its members. And, of

course, parties seeking relief in court usually must identify themselves; courts do "not usually allow parties to proceed anonymously based on generalized concerns." *June Med. Servs., LLC v. Phillips*, 22 F.4th 512, 520 n.5 (5th Cir. 2022). In abiding by any judgment, the government must know to whom relief runs.

## III.    The Equitable Factors Also Counsel Against a Preliminary Injunction

The district court's injunction prohibiting the defendants from implementing any "freez[e]" or "paus[e]" of awarded IRA and IIJA funding "on a non-individualized basis" and affirmatively requiring the government to "resume the processing, disbursement, and payment of" such funding, A61, inflicts a direct harm on the government and the public. Plaintiffs do not seriously contend that every implementation of the President's Executive Order directing such temporary pauses where permissible would be unlawful, nor have plaintiffs established any statutory or regulatory entitlement to have decisions on such pauses made on an "individualized"—rather than, for example, at the program, subagency, or agency level—basis. Enjoining agencies from carrying out the President's lawful directives to pause and reassess funding is contrary to the public interest. And that harm is only compounded by the likely irreversible nature of the distribution of grant funds.

Plaintiffs barely dispute those practical realities. They do not, for example, seriously contest that the injunction intrudes on the agencies' ability to implement the President's policy priorities as reflected in the American Energy Executive Order.

22

Nor do they suggest that the government is likely to recover any funds that it disburses as a result of the injunction if the courts later determine that plaintiffs are not entitled to relief.

Instead, plaintiffs' primary response on these points is an attempt (at 54-57) to cast aside the government's and the public's interests by claiming that the public and the government have "no interest in the perpetuation of unlawful agency action." Br. 56-57 (quotation omitted). That attempt is unavailing, both given the particular circumstances of this case and given the preliminary injunction framework. With respect to this case, as explained, it is indisputable that the relevant agencies may properly pause at least some funding streams—including on a less-than-individualized basis—where permitted by the relevant statutes, regulations, and grant agreements. By nevertheless enjoining the government from exercising this authority, the district court has done more than prohibit the unlawful agency action in which plaintiffs claim there is no public or legitimate government interest.

More generally, plaintiffs' approach to the equitable preliminary injunction factors is inconsistent with Supreme Court precedent, which requires that plaintiffs demonstrate not only that they are "likely to succeed on the merits" but also that "the balance of equities tips in [their] favor" and "that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). If plaintiffs' reasoning were correct, the consideration of equitable factors would collapse into one inquiry: any plaintiff who could establish a likelihood of success on the merits and

23

irreparable harm would also establish that the balance of equities and the public interest tipped in his favor. That is not the law. *See id.* at 31-32 (declining to "address the underlying merits" but holding the plaintiffs had failed to meet the equitable factors). For example, in the copyright context, the Supreme Court "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination" that a defendant acted illegally. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006). And that is true even at final judgment, when a court's conclusion regarding a defendant's illegal action is final rather than—as at the preliminary relief stage—only tentative.

In improperly urging this Court to discount the government's and the public's equitable interests based on its assessment of the merits, plaintiffs cite four recent opinions of this Court, all of which were rendered in the stay posture. *See* Br. 55, 57 (citing *Agatha v. Trump*, 151 F.4th 9 (1st Cir. 2025); *American Pub. Health Ass'n v. National Insts. of Health*, 145 F.4th 39 (1st Cir. 2025); *California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025); *New Jersey v. Trump*, 131 F.4th 27 (1st Cir. 2025)). But in each of those cases, the Supreme Court ultimately concluded that the government would be irreparably harmed by the challenged injunction and granted at least partial relief—without suggesting that its conclusion on irreparable harm turned on its assessment of the merits rather than on its independent assessment of the equities. *See Trump v. Orr*, 2025 WL 3097824, at *1 (U.S. Nov. 6, 2025); *American Pub. Health Ass'n*, 145 S. Ct. at 2660; *CASA*, 606 U.S. at 860-61; *California*, 604 U.S. at 652.

24

Turning to their own harm, plaintiffs do not dispute as a factual matter that their asserted harms ultimately stem from their inability to access funds nor do they dispute that monetary damages would be available in a proper suit in the proper venue if the government breached any obligation requiring it to disburse particular funds on particular timelines.  Instead, plaintiffs first contend that the government forfeited any such argument by failing to raise it in district court.  But the government indeed argued in district court that plaintiffs could not demonstrate irreparable harm warranting an injunction in this suit because they may properly challenge "particular funding denials" through "individualized, specific lawsuits" regarding specific funds. Dkt. No. 31, at 54.

Beyond that, plaintiffs' primary argument (at 52-53) is that the injuries they will suffer from loss of funding in the meantime could not be fully remediated by damages after the fact.  But any entitlement to specific funds on specific timelines necessary to alleviate those harms would necessarily be based on some (as yet unidentified) contractual right to payment.  And as the Supreme Court has made clear in a related context, the "standard practice in breach-of-contract suits is to award damages, if appropriate, only at the conclusion of the case," notwithstanding any complaint that such a remedy "is inadequate" to alleviate present harms.  *Lujan v. G&G Fire Sprinklers, Inc.*, 532 U.S. 189, 197 (2001).

Moreover, plaintiffs' reliance on older, out-of-circuit precedent to contend that they will also suffer an irreparable injury if the lack of government funding "make[s] it

more difficult for Plaintiffs to accomplish their primary missions" also fails.  Br. 53 (alteration and quotation omitted).  The Supreme Court has more recently made clear that such abstract mission-based injuries are insufficient even to confer Article III standing, much less to serve as the basis for irreparable harm.  *See FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 393-95 (2024).

## CONCLUSION

For the foregoing reasons and those in the government's opening brief, the district court's preliminary injunction should be reversed or vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

SARA MIRON BLOOM
  *First Assistant United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY

 *s/ Sean R. Janda*
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

December 2025

26

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6473 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Sean R. Janda*

Sean R. Janda